RECEIVED
11/20/2026
KELLY L. STEPHENS, Clerk

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| OHIO BROADBAND & TECHNOLOGY ASSOCIATION,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,<br><br>Respondents. | Case No. 26-_______ |

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, 5 U.S.C. § 706, and Federal Rule of Appellate Procedure 15(a), Petitioner Ohio Broadband & Technology Association ("OBTA") hereby petitions the Court for review of the attached final order of the Federal Communications Commission ("FCC" or "Commission"), captioned *Modernizing the Commission's National Environmental Policy Act Rules*, Report and Order, WT Docket No. 25-217, FCC 26-64 (rel. Oct 1, 2026) (the "Order"). The Order was published in the Federal Register on November 17, 2026. *See* 91 Fed. Reg. 74,024. A copy of the Order is attached as Exhibit A.

OBTA is a statewide communications trade association that advocates to advance Ohio's connected future by promoting the infrastructure, innovation, investment, technology, and policies that strengthen communities, drive economic

growth, and position Ohio for what's next. OBTA represents over 40 telecommunications providers, 3 wireless providers, and more than 100 associate member companies that supply goods and services to the telecommunications industry. These members include communications carriers who are directly regulated by the Order. OBTA participated in the proceedings before the FCC on behalf of its members through a submission proposing reforms to the Commission's process for deciding what types of industry actions are subject to burdensome, time-consuming, and costly environmental review under federal law. *See* Letter, WT Docket No. 25-217 (filed Sep. 23, 2026), https://tinyurl.com/mw75u56y (the "Letter").

This Court has jurisdiction because OBTA participated in proceedings before the FCC on behalf of its members aggrieved by the Order. 28 U.S.C. § 2344. Venue is appropriate in this Court because OBTA resides and has its principal office in Columbus, Ohio. *Id.* § 2343. OBTA has associational standing to bring this suit because its members would have standing to sue in their own right; the interests OBTA seeks to protect are germane to its purpose; and neither the claims asserted nor the relief requested requires the participation of OBTA's individual members. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

The Order laudably "takes action to cut through outdated and unnecessary

burdens that have slowed deployment of critical communications networks" by streamlining the Commission's environmental-review requirements under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* Order ¶¶ 1, 4. Among other things, in the Order the Commission codifies NEPA's statutory definition of "major Federal action" ("MFA") and clarifies that many actions to facilitate and improve wireless communications, such as spectrum authorizations and geographic licenses issued by the FCC as well as many forms of wireless-infrastructure deployment, do not qualify under this definition to trigger NEPA review. *See* Order ¶¶ 18–80. In doing so, the Order makes great progress toward reducing unnecessary "NEPA-related costs and delays" that are imposed on OBTA's members and that "deter needed infrastructure deployment." *See id.* ¶ 3.

In several respects, however, the Order wrongly fails to go further to reduce these burdens, contrary to the law and the record. For example, because NEPA violations are often privately actionable and a veritable cottage industry of "project opponents" stands ready to sue, too often agency officials have made "litigation-averse" decisions to deem projects MFAs unnecessarily and thus subject them to burdensome NEPA review. *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 183 (2025). Although the Order takes important steps to curtail such decisionmaking, *see, e.g.*, Order ¶¶ 1–4, OBTA and others urged the FCC to provide an additional safeguard against its recurrence by asking the FCC to "amend its

delegated authority rules to make clear that only the Commission"—not agency staff acting pursuant to those rules—"may decide that any additional new wireless deployments or class of deployments constitute MFAs," Letter at 2; *see also* Order ¶ 50 n.136. But the Commission refused to do so. *See* Order ¶ 50 n.136.

Similarly, the Commission declined to adopt several other reforms proposed by commenters, leaving OBTA's members subject unnecessarily to costly regulatory burdens. *See, e.g.*, Order ¶¶ 143–44 (refusing to eliminate additional rounds of public notice when certain infrastructure projects trigger environmental review); *id.* ¶ 161 (declining to streamline the required contents of environmental assessments); *id.* ¶ 180 & n.552 (rejecting a proposal to exclude from environmental review certain emergency-response projects); *id.* ¶ 184 (refusing to adopt emergency procedures permitting, without further environmental review, the replacement of damaged facilities that previously underwent NEPA review).

For these and other reasons, certain aspects of the Order are contrary to law, arbitrary, capricious, an abuse of discretion, and otherwise violate the Administrative Procedure Act. *See* 5 U.S.C. § 706. OBTA therefore asks that the Court hold the Order unlawful in part, remand without vacatur to the Commission for further proceedings, and grant any other necessary and proper relief.

Respectfully submitted,

/s/ *Thomas M. Johnson, Jr.*

Thomas M. Johnson, Jr.
Joel S. Nolette
Brandon Beck
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
TMJohnson@wiley.law

*Counsel for Petitioner Ohio Broadband & Technology Association*

Dated: November 20, 2026

## CERTIFICATE OF SERVICE

I, Thomas M. Johnson, Jr., certify that on this 20th day of November, 2026, I caused this Petition to be served on the Circuit Clerk of this Court through the CM/ECF system. I further certify that I will serve a date-stamped copy of the Petition on the following counsel by the manner indicated:

*By Electronic Mail and Certified Mail*
Adam Candeub
General Counsel
Federal Communications Commission
45 L Street NE
Washington, DC 20554
LitigationNotice@fcc.gov

*By Certified Mail*
Todd Blanche, Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

/s/ *Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.

*Counsel for Petitioner Ohio Broadband & Technology Association*

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Modernizing the Commission's National Environmental Policy Act Rules | ) | WT Docket No. 25-217 |
| | ) | |

# REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING

**Adopted: September 30, 2026** **Released: October 1, 2026**

**Comment Date: 30 days after date of publication in the Federal Register**
**Reply Comment Date: 45 days after date of publication in the Federal Register**

By the Commission: Chairman Carr and Commissioner Trusty issuing separate statements; Commissioner Gomez dissenting in part and issuing a statement.

## TABLE OF CONTENTS


Heading Paragraph #

I. INTRODUCTION .......... 1
II. BACKGROUND .......... 5
  A. NEPA and Related CEQ Regulations .......... 5
  B. The Commission's Current Environmental Rules .......... 8
III. DISCUSSION .......... 18
  A. Commission Actions Subject to Environmental Review .......... 18
    1. Defining Commission MFAs .......... 21
    2. Privately Funded Deployments .......... 30
    3. Wireless Deployments .......... 33
    4. Satellite and Space Deployments .......... 59
    5. Antenna Structure Registration .......... 70
    6. Conclusion .......... 76
  B. Streamlining the Commission's Review Procedures .......... 81
    1. Commission's Categorical Exclusion and Extraordinary Circumstances Rules .......... 81
    2. Part 17 Environmental Notification and Other Processes for ASR Applications .......... 134
    3. Procedures for Determining Lead and Cooperating Agency .......... 147
    4. Federal Agency Exception .......... 150
    5. Other Changes to NEPA Procedures .......... 155
  C. Modernizing the Commission's EA and EIS Requirements .......... 158
    1. Updated EA Requirements .......... 158
    2. Updated EIS Requirements .......... 168
  D. Commission's Emergency Procedures for Environmental Review .......... 175
IV. FURTHER NOTICE OF PROPOSED RULEMAKING .......... 185
  A. Definition of "Undertaking" under the National Historic Preservation Act .......... 186
    1. Licensing of Spectrum and "Undertaking" .......... 187
    2. Section 106 Efficiencies .......... 190
  B. Definition of "Agency Action" under the Endangered Species Act .......... 202

V. PROCEDURAL MATTERS .......... 206
VI. ORDERING CLAUSES .......... 220
Appendix A: FINAL RULES
Appendix B: FINAL REGULATORY FLEXIBILITY ANALYSIS
Appendix C: INITIAL REGULATORY FLEXIBILITY ANALYSIS
Appendix D: LIST OF COMMENTERS
Appendix E: REGULATORY IMPACT ANALYSIS

## I. INTRODUCTION

1. In this Report and Order (*Order*) and Further Notice of Proposed Rulemaking (*Further Notice*), the Commission takes action to cut through outdated and unnecessary burdens that have slowed deployment of critical communications networks. These reforms restore balance to the Commission's National Environmental Policy Act (NEPA) implementation by providing clear and predictable rules to ensure NEPA serves as a tool for informed decision-making rather than a barrier to investment, innovation, and connectivity.

2. These updates to our NEPA rules answer the call from all three branches of government. Congress recognized the need for reform by amending the NEPA statute to codify core definitions, exempt certain actions from review, and expedite agency action.[1] In implementing these changes to the amended NEPA statute, President Trump directed agencies to streamline their procedures for environmental review and to "prioritize efficiency and certainty."[2] And the Supreme Court in *Seven County Infrastructure Coalition* provided what it described as a "course correction" to lower courts, affirming the amended NEPA's status as a "purely procedural statute."[3]

3. The burdens associated with the NEPA regulatory regime have long been one of the biggest obstacles to new infrastructure builds, and the record in this proceeding confirms that NEPA-related costs and delays associated with NEPA compliance continue to deter needed infrastructure deployment, even as projects pose no or minimal risk of environmental harm.[4] One study, for example, indicates that compliance adds "an estimated five-month delay in deploying new technologies and service upgrades," that under the Commission's legacy environmental rules, "mobile wireless providers would

[1] *See* 42 U.S.C. § 4321 *et seq*.; Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023) (FRA).

[2] *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353, 8355 (Jan. 29, 2025) (E.O. 14154). We also note that, in addition, on April 15, 2025, President Trump issued a Presidential Memorandum entitled "Updating Permitting Technology for the 21st Century," which directs agencies to "properly leverage technology to effectively and efficiently evaluate environmental permits." *Updating Permitting Technology for the 21st Century*, Presidential Memorandum (Apr. 15, 2025).

[3] *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S.168,184, (2025) (*Seven County Infrastructure Coalition*) (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)) (internal quotation marks omitted).

[4] *See, e.g.*, AT&T Reply at 4–6 (noting that AT&T's "annual NEPA and NHPA compliance costs vary based on build plan but have recently totaled as much as $6.5 million); CCA Comments at 7 (stating that "[i]n addition to significant monetary costs, the delays involved in the environmental review process are sometimes so lengthy that carriers have entirely abandoned sites—or refrained from even attempting to build a project . . ." and that some members have reported "delays measured in years, rather than weeks or months, eating up critical resources in areas [] that remain unserved or underserved."); T-Mobile Comments at 4 (stating that "T-Mobile has spent millions of dollars on NEPA compliance fees and other expenses" and that these costs "divert capital resources away from other needed deployments and network enhancements when they do not deter deployment altogether. For example, in order to complete all NEPA, NHPA, and other state and federal environmental reviews, costs can range from $2,000 up to $50,000 each, taking an average of three to six months to prepare."); NATE Comments at 1 ("The current process imposes substantial costs and operational uncertainty, even in the many cases where projects pose minimal or no environmental risk.").

spend in excess of $2.2 billion on regulatory compliance over the next decade alone," and that the "overall economic harm from the current policies amounts to at least $7.5 billion in welfare and economic activity loss over the next ten years."[5] Conversely, the record demonstrates that reducing the excessive costs and delays associated with burdensome NEPA reviews would yield substantial consumer and public benefits, accelerating the roll-out of new technologies and expanding access to more communities faster.[6] We anticipate that reducing regulatory barriers that delay the deployment of wireless facilities, combined with efforts by Congress, the FCC, and the broader Administration to establish a pipeline of dedicated spectrum will facilitate the continued deployment of 5G, and will help advance U.S. leadership in 6G.

4. Today, the Commission does its part to streamline its environmental review process, promote efficiency, and encourage deployment of infrastructure that results in more competition and technological innovation. We adopt our proposal to codify the statutory definition of major Federal action (MFA), the prerequisite to trigger federal agencies' NEPA obligations, in the Commission's rules, and we clarify which Commission actions are MFAs.[7] We adopt reforms to streamline other aspects of our NEPA rules, including the Commission's requirements for categorical exclusions (CEs), environmental assessments (EAs), environmental impact statements (EISs), joint agency actions, and emergency situations. We also make changes to our rules to separate NEPA requirements from our National Historic Preservation Act (NHPA) rules to account for the revisions to environmental review rules in this *Order*. Throughout, we clarify the Commission's role with respect to other statutory responsibilities, as these may have intersected with its NEPA work in the past. We issue a *Further Notice* seeking additional comment on our NHPA and Endangered Species Act (ESA) frameworks. Taking these actions to expedite, simplify, and reduce the costs of environmental review will help clear the way for faster and more infrastructure builds across the country and deliver significant benefits to the American public.

## II. BACKGROUND

### A. NEPA and Related CEQ Regulations

5. NEPA was signed into law on January 1, 1970, and requires federal agencies to determine whether any proposed MFAs will significantly affect the quality of the human environment and, if so, to assess those environmental impacts.[8] The statute created the Council on Environmental Quality (CEQ),

[5] Letter from Amy E. Bender, Vice Pres. Reg. Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217 (filed Jan. 22, 2026) Attach. NERA "Quantifying the Opportunity of Reforming the Federal Communications Commission's National Environmental Policy Act and National Historical Preservation Act Rules" at 2, 14 (CTIA Jan. 22, 2026 *Ex Parte*) (describing impact of "legacy regulatory NEPA and NHPA frameworks"); *see also* Letter from Amy Bender, Vice Pres. Reg. Affairs, CTIA to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217 (filed Sept. 21, 2026) (highlighting costs for NEPA compliance and need to streamline reviews) (Sept. 21, 2026) (Sept. 21, 2026 CTIA *Ex Parte*).

[6] CTIA Jan. 22, 2026 *Ex Parte,* Attach. at 11, 14; Letter from Stephen Keegan, Senior Counsel, Government & Legal Affairs, WIA—the Wireless Infrastructure Association, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217 (filed Jan. 23, 2026) (noting the Commission's efforts to update its rules for environmental rules "come[s] at a crucial time given the recent proliferation of Artificial Intelligence ('AI') in many Americans lives and the ongoing efforts to close the digital divide"); WIA Reply at 7 (noting that the proposed rule changes "will further spur key wireless network deployments, including densification, that will help deliver 5G—and soon 6G—services to all Americans.").

[7] *Modernizing the Commission's National Environmental Policy Act Rules CTIA Petition for Rulemaking on the Commission's National Environmental Policy Act Rules*, WT Docket No. 25-217, Notice of Proposed Rulemaking, 40 FCC Rcd 6377 (2025) (*NEPA NPRM*).

[8] 42 U.S.C. § 4321 *et seq*.

which assists with NEPA implementation across the federal government.[9] Federal agencies issue their own NEPA implementing procedures in consultation with CEQ.[10]

6. Recent developments have significantly altered NEPA's framework. First, Congress amended NEPA in June 2023[11] to promulgate a statutory definition of MFA, specify relevant exclusions to that definition, and codify various aspects of the environmental review process, including CEs, EAs, and EISs.[12] Then, in an interim final rule issued in February 2025, CEQ rescinded its longstanding interagency NEPA regulations, and affirmed the recission in a final rule in January 2026.[13] CEQ later issued guidance and a template to assist federal agencies in structuring agency-specific NEPA rules and procedures.[14] In April of 2026, CEQ issued guidance to assist federal agencies in establishing, revising, adopting, and applying categorical exclusions in accordance with the NEPA, replacing initial guidance on the same subject issued in 2010.[15]

7. Finally, the Supreme Court confirmed that that an agency implementing NEPA makes "fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry" within "a broad zone of reasonableness" and need not consider the environmental effects of a "project separate from the one under NEPA review by virtue of temporal or geographic distance."[16]

## B. The Commission's Current Environmental Rules

8. The structure and history of the Commission's current environmental rules, as set forth in greater detail in the *NEPA NPRM*, establish procedures to comply with statutory obligations that pertain to environmental and historic resources.[17] These rules were designed to support the Commission's compliance with NEPA, among other statutory obligations.

9. The Commission meets its NEPA obligations through its regulations, which impose enforceable duties on its licensees, applicants, and registrants, such as commercial licensees, utilities, public safety entities, and others, and relies upon those entities to make the initial evaluation of potential environmental effects.[18] Tower owners that are neither licensees nor applicants must also follow these rules if they intend their towers to host antennas supporting Commission-licensed services.[19]

[9] 42 U.S.C. §§ 4321, 4332(2)(B), 4342, 4344.

[10] *Id.* § 4332(2)(B).

[11] 42 U.S.C. § 4321 *et seq*.; FRA.

[12] *See, e.g.*, *id.* §§ 4332(C)(i)–(iii), 4336(a)(2), (b)(2), 4336a(e), (g)(1)–(2), 4336(c). Congress subsequently amended NEPA in 2025, to provide a process for project sponsors to pay opt-in fees for expedited environmental reviews, which will be addressed at a later time. *See* 42 U.S.C. § 4336f, *enacted by* One Big Beautiful Bill Act, Pub. L. No. 119-21, § 60026, 139 Stat. 1 (2025).

[13] Removal of National Environmental Policy Act Implementing Regulations, 90 FR 10610-01 (Feb. 25, 2025); Removal of National Environmental Policy Act Implementing Regulations, 91 FR 618-01 (Jan. 8, 2026).

[14] Implementation of the National Environmental Policy Act, Memorandum from Katherine R. Scarlett, Chairman, CEQ, to Heads of Federal Departments and Agencies, (Sept. 29, 2025) (CEQ Sept. 2025 Guidance Memo), available at https://nepa.gov/sites/default/files/documents/Agency-NEPA-Implementation-Guidance.pdf.

[15] Implementation of the National Environmental Policy Act Guidance, 91 Fed. Reg.18836 (Apr, 13, 2026).

[16] *Seven County Infrastructure Coalition*, 605 U.S. at 182–83, 187.

[17] *See* 47 CFR §§ 1.1301–1.1320; *NEPA NPRM*, 40 FCC Rcd 6377 (2025).

[18] 47 CFR § 1.1307(a); *see, e.g.*, FCC, *Tower and Antenna Siting* (June 29, 2022), https://www.fcc.gov/wireless/bureau-divisions/competition-infrastructure-policy-division/tower-and-antenna-siting.

[19] 47 CFR § 17.4(a).

10. The Commission's NEPA rules currently contain an overarching CE framework by which Commission actions generally "are deemed individually and cumulatively to have no significant effect on the quality of the human environment and are categorically excluded from environmental processing."[20] The regulation describes the limited instances, commonly referred to as extraordinary circumstances,[21] under which additional environmental processing is required.[22] This broad CE applies to both new actions as well as modifications to existing or authorized facilities and equipment.[23] If one of the enumerated extraordinary circumstances is present,[24] then applicants are generally required to prepare an EA.[25] The Commission's rules also require the preparation of an EA if an interested person files a written petition alleging that a particular action, otherwise categorically excluded, will have a significant environmental effect and the Commission, through the responsible Bureau, determines that the action may have a significant environmental impact.[26] In addition, the Commission's rules require the preparation of an EA if the responsible Bureau determines on its own motion that a particular action, otherwise categorically excluded, may have a significant environmental impact.[27]

11. When an applicant submits an EA, the Commission reviews the EA and makes an independent finding as to whether the proposed action will or will not have a significant environmental

[20] *Id.* §§ 1.1306(a), 1.1307. A categorical exclusion is a category of actions that a federal agency has determined normally does not significantly affect the quality of the human environmental within the meaning of 42 U.S.C. § 4332(2)(C). 42 U.S.C. § 4336e(1).

[21] While section 1.1307 does not use the term "extraordinary circumstances," the Commission has commonly referred to this list of enumerated circumstances as extraordinary circumstance and will continue to do so herein when referring both to the former and newly adopted rules. *See* 47 CFR § 1.1307; 47 CFR § 1.1306(b); *see also, e.g.*, *NEPA NPRM* at 40 FCC Rcd at 6381, 6383, 6393–6399, paras.12, 19, 51–69.

[22] These extraordinary circumstances currently include facilities that: (i) are to be located in an officially designated wilderness area or in an officially designated wildlife preserve; (ii) may affect listed threatened or endangered species or designated critical habitats, are likely to jeopardize the continued existence of any proposed endangered or threatened species, or are likely to result in the destruction or adverse modification of proposed critical habitats, as determined by the Secretary of the Interior pursuant to the Endangered Species Act of 1973 (ESA); (iii) may affect districts, sites, buildings, structures or objects, significant in American history, architecture, archeology, engineering or culture, that are listed, or are eligible for listing, in the National Register of Historic Places and are subject to review pursuant to section 1.1320 and have been determined through that review process to have adverse effects on identified historic properties; (iv) construction of will involve significant change in surface features (e.g., wetland fill, deforestation or water diversion); (v) are equipped with high intensity white lights which are to be located in residential neighborhoods, as defined by applicable zoning law; or (vi) cause human exposure to radiofrequency (RF) emissions that exceed the limits in the Commission's rules. *See* 47 CFR § 1.1307(a)(1)–(8) and (b). The Commission provides further guidance on applying these extraordinary circumstances in its NEPA Checklist. The Commission's NEPA Checklist can be found via the link to "NEPA Checklist with EA Checklist (Last Updated June 2022)" on its Tower and Antenna Siting web page at https://www.fcc.gov/wireless/bureau-divisions/competition-infrastructure-policy-division/tower-and-antenna-siting. In addition, sections 1.1307(c) and (d) provide a process for considering extraordinary circumstances not identified by the applicant or otherwise enumerated that require preparation of an EA, if the Bureau reviewing a proposed action determines that the action may have a significant environmental impact. *Id.* §1.1307(c)–(d).

[23] 47 CFR § 1.1306(b). In addition to the overarching CE in section 1.1306(b) of the rules, there are additional targeted exclusions in our rules dealing with specific scenarios. *See, e.g.*, *id.* § 1.1306(c), Note 1 (specifically addressing particular scenarios regarding the mounting of antennas and related equipment and the deployment of wire or cable); Note 3 (defining an antenna farm as "an area in which similar antenna towers are clustered, whether or not such area has been officially designated as an antenna farm").

[24] *Id.* § 1.1307(a).

[25] *Id.* § 1.1308(c).

[26] *Id.* § 1.1307(c).

[27] *Id.* § 1.1307(d).

effect requiring additional environmental processing in the form of an EIS.[28] If the responsible Bureau or the Commission determines that the proposal will not have a significant impact, it will make a finding of no significant impact (FONSI).[29] After the issuance of a FONSI, the application will be processed.[30] The Commission must issue a FONSI before a proposed action for which an EA has been submitted may be implemented.[31] The Commission's rules require the applicant to provide local public notice of the FONSI "[p]ursuant to CEQ regulations" after it is issued.[32] If the responsible Bureau or the Commission determines that the proposal will have a significant environmental impact upon the quality of the human environment, it will so inform the applicant, and the applicant will have an opportunity to amend its application so as to reduce, minimize, or eliminate environmental problems.[33] If the matter is not resolved by an application amendment, the rules provide that the Bureau will prepare a draft EIS and a Final EIS.[34]

12. The Commission's rules related to historic preservation are located in sections 1.1307(a)(4) and 1.1320 of the Commission's current environmental rules.[35] Commission undertakings are addressed through the Commission's historic preservation review procedures, which includes application of the Nationwide Programmatic Agreement for the Collocation of Wireless Antennas and the Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process (collectively the NPAs).[36] These provisions and NPAs implement section 106 of the NHPA, which requires federal agencies to consider the effects of federal undertakings on historic properties.[37]

13. Finally, the Commission's Antenna Structure Registration (ASR) rules can be found in part 17 of the Commission's regulations.[38] These rules contain environmental notification provisions, which must be completed by all ASR applicants unless an exception applies or a waiver is granted.[39] The environmental notification process applies to new tower registrations and to certain modifications of registered towers that may have a significant environmental effect.[40] Under the ASR rules, interested persons may submit a request for further environmental review within 30 days of the national notice date

---

[28] *Id.* § 1.1308.

[29] *Id.* § 1.1308(d).

[30] *Id.*

[31] The FONSI incorporates any conditions necessary to the finding of no significant impact; generally, these conditions are imposed from outside the Commission and are voluntarily agreed to by the applicants to avoid or mitigate potential significant effects.

[32] 47 CFR § 1.1308(d).

[33] *Id.* §§ 1.1308(c), 1.1309.

[34] *Id.* § 1.1314(a).

[35] *Id.* §§ 1.1307(a)(4), 1.1320.

[36] Nationwide Programmatic Agreement for the Collocation of Wireless Antennas, 47 CFR pt. 1, app. B (Collocation NPA); Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process, 47 CFR pt. 1, app. C (Wireless NPA) (collectively, NPAs).

[37] *Id.* § 1.1320(a).

[38] 47 CFR pt. 17.

[39] *Id.* § 17.4(c). The owner of any proposed or existing antenna structure that requires notice of proposed construction to the FAA due to physical obstruction must register the structure with the Commission. *Id.* § 17.4(a). Generally, and absent an exception, towers more than 200 feet above ground level or located near an airport require notice to the FAA and ASR system registration with the FCC. *See id.* § 17.7(a)–(e).

[40] *Id.* § 17.4(c).

alleging that the proposed facility or modification may have a significant environmental effect.[41] The responsible Bureau will issue a decision as to whether further environmental processing in the form of an EA, submitted by the applicant, is required.[42] If an EA is required, the responsible Bureau will review the EA and, if the responsible Bureau determines there will be a significant environmental effect, give the applicant an opportunity to amend its application so as to reduce, minimize, or eliminate environmental problems[43] and then determine whether to issue a FONSI or advise the applicant that an EIS is required.[44]

14. On March 27, 2025, CTIA—The Wireless Association (CTIA) filed a Petition for Rulemaking for the Commission to revise its rules to provide that wireless facility deployments pursuant to a geographic area license that do not require antenna structure registration are not MFAs under NEPA.[45] CTIA also asked the Commission to amend its NEPA rules to provide more definitive timelines and concrete standards of review.

15. In August 2025, the Commission adopted a Notice of Proposed Rulemaking (*NEPA NPRM*) seeking comment on the CTIA petition, along with a broad array of proposals discussed in greater detail below, to update our environmental review rules and procedures to ensure they comport with NEPA's amendments and accelerate infrastructure deployment.[46] Given their historic interplay within the Commission's rules, we asked for comment on the NHPA framework and what rule changes, if any, might be appropriate.[47]

16. The Commission held a series of opportunities for federally-recognized Tribal Nations and Native Hawaiian Organizations (NHOs) to consult with the Commission regarding the Commission's review of its NEPA rules. On July 15, 2025, the Commission held a nation-wide virtual Tribal consultation and listening session on the CTIA Petition.[48] In total, there were 109 attendees representing 57 Tribal Nations[49] and 11 Tribal entities.[50] On July 28, 2025, Tribal consultation was conducted with the

---

[41] *Id.* § 17.4(c)(5).

[42] *Id.* § 17.4(c)(8).

[43] *Id.* § 1.1308(c).

[44] *Id.* § 17.4(c)(8).

[45] Petition of CTIA for Rulemaking to Update Part 1, Subpart I of the Commission's Rules Implementing the National Environmental Policy Act, RM 12003 (filed Mar. 27, 2025), https://www.fcc.gov/ecfs/document/10327619008336/1 (CTIA Petition).

[46] *NEPA NPRM*, 40 FCC Rcd at 6384–85, paras. 18–19. The Commission incorporated the record for rulemaking proceeding RM-12003 into the *NEPA NPRM* and terminated RM-12003. *Id.* at 6419, para. 116.

[47] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 36. Today we issue a Further Notice seeking additional comment on whether changes are needed to the Commission's NHPA framework.

[48] As noted above, the Commission incorporated the record for CTIA Petition RM-12003 into the *NEPA NPRM* and terminated RM-12003.

[49] Absentee Shawnee of Indians of Oklahoma, Ak-Chin Indian Community, Bad River Band of Lake Superior Chippewa Indians, Bear River Band of the Rohnerville Rancheria, Blackfeet Nation, Catawba Nation, Central Council of the Tlingit & Haida Indians Tribes of Alaska, Cherokee Nation, Chickaloon Village Traditional Council, Cocopah Indian Tribe, Confederated Tribes of Grand Ronde, Confederated Tribes of the Chehalis Reservation, Confederated Tribes of the Colville Reservation, Delaware Nation, Forest County Potawatomi Community. Gila River Indian Community, Gun Lake Tribe, Habematolel Pomo of Upper Lake, Jamestown S'Klallam Tribe, Karuk Tribe, Knik Tribe, Lytton Rancheria, Mescalero Apache Tribe, Muscogee (Creek) Nation, Native Village of Dot Lake, Navajo Nation, Navajo Nation Telecommunications Regulatory Commission (NNTRC), Nez Perce Tribe, Northern Arapaho, Northern Cheyenne Tribe, Oneida Nation (Wisconsin), Organized Village of Kasaan, Osage Nation, Pascua Yaqui, Ponca Tribe of Oklahoma, Prairie Band Potawatomi Nation, Pueblo de San Ildefonso, Pueblo of Acoma, Quapaw Nation, Rappahannock Tribe of Virginia, Rincon Band of Luiseno Indians, Sac & Fox Tribe of the Mississippi in Iowa, Salt River Pima Maricopa Indian Community, San Juan Southern Paiute Tribe, Santa Ynez Band of Chumash Indians, Seminole Tribe of Florida, Shawnee Tribe, Shoshone Bannock Tribes of Idaho,

(continued….)

Osage Nation on the CTIA Petition. On September 8–9, 2025, the Commission conducted Tribal consultation on the *NEPA NPRM* and CTIA Petition in Reno, NV, which included separate, in-person consultation meetings with the Pit River Tribe and the Habematolel Pomo of Upper Lake. On September 11, 2025, the Commission held an FCC Tribal Workshop at the Coalition of Large Tribes Quarterly Meeting in Prior Lake, MN. The workshop addressed a variety of Commission initiatives that support the deployment of communications infrastructure and services nationwide, including on Tribal lands, and included an overview of proposed changes to the Commission's NEPA rules. Following the presentation, Commission staff provided an opportunity for COLT and other Tribes to consult and heard from the Blackfeet Nation, the Oglala Sioux Tribe, the Standing Rock Sioux Tribe, Leech Lake Band of Ojibwe, and Sisseton Wahpeton Oyate. The Commission also held virtual tribal consultations to discuss proposed changes to the NEPA rules on December 11, 2025, and January 14, 2026.[51] During these consultations Tribes expressed concerns about maintaining their ability to review wireless facility deployments. We have considered these concerns in making the determinations in this *Order* as described more fully herein.

17. In response to the *NEPA NPRM*, service providers, including AT&T, T-Mobile, and Verizon, utilities, space operators, tower builders, and related trade associations support streamlining the Commission's environmental review rules, which, in their view, impose significant costs and delays on their efforts to deploy infrastructure facilities.[52] Advocacy organizations, like bird conservation organizations and astronomical organizations, along with Tribal governments, historic preservation offices, and attorneys general from several states, oppose changes that, in their view, would reduce federal oversight of infrastructure deployments and their adverse effects.[53]

(Continued from previous page)
Sokaogon Chippewa Community, Stockbridge-Munsee Community, Suquamish Indian Tribe, Santa Ynez Band of Chumash Indians (SYBCI), Taos Pueblo, The Chickasaw Nation, The Kickapoo Tribe of Oklahoma, Wampanoag Tribe of Gay Head (Aquinnah), Yakutat Tlingit Tribe.

[50] Ahtna Intertribal Resource Commission, American Indian Policy Institute, Arizona State University, Association on American Indian Affairs (AAIA), Coalition of Large Tribes (COLT), NANA Regional Corporation, Inc., National Association of Tribal Historic Preservation Officers (NATHPO), National Congress of American Indians, United South & Eastern Tribes Sovereignty Protection Fund, Gila River Telecommunications, Inc., Mescalero Apache Telecommunications, Inc./National Tribal Telecommunications Association, San Carlos Apache Telecommunications Utilities, Inc.

[51] *See* Letter from Bambi Kraus, Chief, Office of Native Affairs and Policy, FCC, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217, (filed Feb. 25, 2026) (submitting list of attendees and transcript of December 11, 2025, consultation and listening session); Letter from Bambi Kraus, Chief, Office of Native Affairs and Policy, FCC, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217 (filed Mar. 4, 2026) (submitting list of attendees and transcript of January 14, 2026 consultation and listening session).

[52] *See, e.g.*, AT&T Reply at 4; Commercial Space Federation Comments at 4; Crown Castle Reply at 2–5; CTIA Comments at 12–13; NATE Comments at 2–3; T-Mobile Comments at 4; Utilities Technology Council (UTC) Comments at 4; Verizon Reply at 1–2; WIA Reply at 1; WISPA Comments at 1–2; WISPA Reply at 7.

[53] *See, e.g.*, American Bird Conservancy and Maryland Ornithological Society Comments at 4; Attorneys General of New York, California, Washington, Massachusetts, Arizona, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, Oregon, Rhode Island, Vermont, and District of Columbia; and the Harris County, Texas Attorney (States Attorneys General) Comments at 8–11; Dark Sky International Comments at 1–5; Dynamic Environmental Comments at 7–8; Flandreau Santee Sioux Tribe Comments at 5; Mille Lacs Band of Ojibwe Comments at 2; Public Employees for Environmental Responsibility (PEER) Comments at 2; Wired Broadband Inc., et al. (Wired Broadband) Comments at 5–7; National Association of Tribal Historic Preservation Officers (NATHPO)/National Congress of American Indians (NCAI) Reply at 4.

## III. DISCUSSION

### A. Commission Actions Subject to Environmental Review

18. We restructure our NEPA rules as proposed to align with recent statutory and judicial precedent. Historically, the Commission presumed, without any analysis, that certain activities constituted MFAs and then categorically excluded them unless an enumerated circumstance (as defined in our rules) required an EA.[54] Commenters contend that NEPA requires agencies to make a threshold determination about whether an action qualifies as an MFA before being subject to environmental processing.[55] We agree. We therefore revise our rules to first consider whether a proposed action constitutes an MFA. To that end, we codify the statutory definition of MFA and its exclusions. If the proposed action is an MFA, only then will our revised rules determine whether it is categorically excluded. We retain our existing CE to the extent a proposed action constitutes an MFA.[56]

19. We also establish bright-line rules that independently operate from each other and clarify when certain actions fall outside NEPA applicability altogether.[57] First, we find that the issuance of a spectrum license does not in itself create "substantial federal control and responsibility" over facilities deployed in connection with that license.[58] Next, we conclude that private infrastructure builds are not MFAs to the extent Commission funding is not directed towards them.[59] We also find that our spectrum-licensing functions for earth stations and space stations do not constitute MFAs or give rise to MFAs. We independently confirm, for the reasons detailed below, that deployments in connection with geographic area spectrum licenses are not MFAs, to the extent they do not require antenna structure registration.[60]

20. We do not alter the substance of the Commission's existing radiofrequency (RF) human-safety requirements for equipment and operations deployed in connection with spectrum licenses.[61] We also maintain the Commission's registration and compliance rules for antenna structures that require antenna structure registration. We find that these rules remain independently authorized under the Communications Act.

---

[54] *NEPA NPRM,* 40 FCC Rcd at 6385–86, para. 21. As we noted in the *NEPA NPRM*, the Commission has never taken the position that every form of license or authorization demonstrates a sufficient federal nexus to qualify as a federal undertaking or MFA. *Id.*; *see, e.g.*, *Wireless Broadband Deployment Second R&O*, 33 FCC Rcd 3102, 3135, para. 84 (*Wireless Broadband Deployment Second R&O*); *see also id*., 33 FCC Rcd at 3135, para. 84 n.170 (noting that "for instance, the FCC has never treated the authorized use of signal boosters or wi-fi deployments as enough to transform the deployment of those facilities into federal undertakings or major federal actions" despite their use of FCC-authorized spectrum).

[55] *See, e.g.*, WISPA Comments at 1–2.

[56] *See infra* Section III.B.1.

[57] For the reasons described herein, the rules adopted in this Report and Order support the Commission's goal of streamlining its environmental review process, promoting efficiency, and encouraging deployment of infrastructure that results in more competition and technological innovation. Though complementary, each of the separate rules serves its own distinct and specific purpose to promote that goal. It is our intent that each of these rules adopted in this Report and Order shall be severable. If any of the rules are declared invalid or unenforceable for any reason, we find that the remaining portions of the regulatory framework continue to fulfill our goal of streamlining environmental review, promoting efficiency, and encouraging deployment of infrastructure that results in more competition and technological innovation, and that any remaining rules not deemed invalid or unenforceable shall remain in effect and be enforced to the fullest extent permitted by law.

[58] 42 U.S.C. § 4336e(10)(A).

[59] 42 U.S.C. § 4336e(10)(B).

[60] *See infra* Section III.A.3. Under the Commission's rules, only towers that require notification to the FAA due to physical obstruction, as set forth in section 17.7, must be registered with the Commission. 47 CFR §§ 17.4, 17.7.

[61] *See infra* Section III.B.1.

### 1. Defining Commission MFAs

21. We codify in the Commission's rules the statutory definition and exceptions for MFAs set forth in NEPA, as initially proposed.[62] A number of commenters supported our proposal.[63] As we previously noted, the Commission has traditionally borrowed from relevant definitions in CEQ's regulations implementing NEPA.[64] Given CEQ's recission of those regulations, we find that codifying the contours of NEPA's definition into our rules will provide necessary clarity. We adopt these provisions nearly wholesale, with slight modifications, to make clear that they pertain to the *Commission's actions*.

22. We also supplement our MFA definition with bright-line rules that provide upfront clarity regarding the most common deployment scenarios that the Commission and regulated entities have encountered over the years. These rules are discussed in the sections that follow. Important principles of statutory and constitutional law guide our consideration of these scenarios, and we find them necessary to recount here.

23. *First*, NEPA does not enlarge an agency's powers or enable an agency to take decisions that are otherwise unauthorized or unlawful. NEPA only applies to actions or outcomes over which federal agencies have preexisting statutory authority. By its express terms, NEPA's "policies and goals" are "supplementary to those set forth in existing authorizations of Federal agencies."[65] Agencies like the Commission, in turn, "have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line."[66] Agencies must interpret statutes through the lens of separation of powers and "a practical understanding of legislative intent," for "Congress intends to make major policy decisions itself, not leave those decisions to agencies."[67] Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions."[68] NEPA contains no grant of regulatory authority.[69] Nor does NEPA operate to countermand, or impliedly repeal, requirements in an agency's primary statute.[70] Rather, as the Supreme Court recently reaffirmed, NEPA is a "purely procedural" requirement that does not affect the operation of or authority granted by the agency's "governing statute and any relevant substantive environmental laws."[71] NEPA is a "procedural cross-check, not a substantive

---

[62] *NEPA NPRM*, 40 FCC Rcd at 6385, para. 21. 42 U.S.C. § 4336e(10)(A), (B). The new definition limits MFAs to those actions that "the agency carrying out such action determines is subject to substantial federal control and responsibility." 42 U.S.C. § 4336e(10)(A); *see also* Appendix A, § 1.1302. Because our focus is on the scope of Commission MFAs, we find it unnecessary to incorporate the text of 42 U.S.C. § 4336e(10)(B)(iv), pertaining to business loan guarantees provided by the Small Business Administration.

[63] *See, e.g.*, Competitive Carriers Association (CCA) Comments at 2; UTC Comments at 4, *but see* Center for Regulatory Freedom Comments at 3–4 (urging the Commission to "[d]efine what is not a major Federal action"). In the discussion below, we address application of the amended NEPA's definition in the context of the Commission's rules.

[64] *NEPA NPRM*, 40 FCC Rcd at 6385, para. 21.

[65] 42 U.S.C. § 4335.

[66] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (*West Virginia*) (internal citations and quotation marks omitted).

[67] *Id.* (quoting *U.S. Telecom II*, 855 F.3d at 419 (Kavanaugh, J., dissenting from denial of rehearing en banc)).

[68] *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001).

[69] Removal of National Environmental Policy Act Implementing Regulations, 90 FR 10610–01 (Feb. 25, 2025); *see generally* 42 U.S.C. § 4321 *et seq.*

[70] *Flint Ridge Development Co. v. Scenic Rivers Assn. of Okla.*, 426 U.S. 776, 778 (1976) (finding that NEPA "must give way" when it comes into "a clear and unavoidable conflict" with an agency's governing statute).

[71] *Seven County Infrastructure Coalition*, 605 U.S. at 173.

roadblock."[72] In practical terms, NEPA does not mandate that an agency achieve particular environmental results, satisfy defined compliance benchmarks, or take specific mitigation activities. NEPA's processes are merely intended to constrain "uninformed—rather than unwise—agency action."[73] So long as those processes are followed, the statute is agnostic as to outcomes. And in following those processes, agencies "are not required to analyze the effects of projects over which they do not exercise regulatory authority."[74] That regulatory authority, in turn, is evaluated by virtue of an agency's primary *statutory* powers.[75]

24. Nothing in the Communications Act or any other statute gives the Commission plenary authority over the construction of infrastructure deployed by its licensees.[76] Time and again, the courts have recognized that the Communications Act does not explicitly "grant the Commission jurisdiction over the real estate industry, an area that is normally outside the Commission's scope of authority."[77] After all, it would be quite odd if the Commission had authority to regulate the particulars of the Sears Tower's construction.[78] So too with the terrestrial impacts from space launches, a responsibility expressly assigned to another agency but not the Commission.[79] Nor do we have express authority to address environmental issues relating to thermal, optical, and other emissions that use electromagnetic spectrum outside frequencies suitable, from a technical standpoint, for radiocommunications that the Commission otherwise regulates, for example, to prevent harmful interference. Rather, the Commission's relevant authorities requiring consideration of environmental effects principally extend to spectrum-based

---

[72] *Seven County Infrastructure Coalition*, 605 U.S. at 173.

[73] *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 351 (1989).

[74] *Seven County Infrastructure Coalition*, 605 U.S. at 188.

[75] *See* 42 U.S.C. § 4335.

[76] We note the Commission has the authority to act under the public-interest and ancillary-authority provisions of the Communications Act but such authorities are bound by the Commission's primary statutory authorities. *See, e.g.*, *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) (finding that the Commission's rules which are not "reasonably ancillary to the effective performance of the Commission's various responsibilities [because they] are not within the FCC's statutory authority") (quoting *United States v. Southwestern Cable Co.*, 392 U.S. 157, 178 (1968), internal citations omitted); *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002) ("The FCC cannot act in the 'public interest' if the agency does not otherwise have the authority to promulgate the regulations at issue. An action in the public interest is not necessarily [ ] authorized by the Act. The FCC must act pursuant to *delegated authority* before any 'public interest' inquiry is made."); *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 692–93 (D.C. Cir. 2005) (noting that, to properly invoke ancillary authority, "the subject of the regulation must be covered by the Commission's general grant of jurisdiction under [the Act]" and must be reasonably ancillary to Commission's duties); *Comcast Corp. v. FCC*, 600 F.3d 642, 658 (D.C. Cir. 2010) (affirming that the Commission's ancillary authority must be linked to a statutory grant of regulatory authority, not broad policy statements); *Nat'l Religious Broadcasters v. FCC*, 138 F.4th, 282, 293 ("[T]he FCC's authority to act in the 'public interest' does not extend outside of the statutorily prescribed tasks that Congress has instructed the FCC to carry out."). As discussed below, section 303(q) of the Act addresses Commission authority to prevent obstructions to airspace by prescribing lighting and marking, and section 319(d) relieves the FCC of the requirement to issue construction permits for common carriers, private microwave, and where waived in the public interest. 47 U.S.C. §§ 303(q), 319(d).

[77] *Building Owners and Managers Ass'n Int. v. FCC*, 254 F.3d 89, 94 (D.C. Cir. 2001) (citing *Illinois Citizens Committee for Broadcasting v. FCC*, 467 F.2d 1397, 1400 (7th Cir. 1972)).

[78] *Illinois Citizens Committee for Broadcasting v. FCC*, 467 F.2d 1397 (7th Cir. 1972) (no ancillary authority for the FCC to block the Sears Tower's construction on the grounds that it would affect broadcast reception).

[79] *See* 51 U.S.C. § 50905(B)(2)(b) (giving such authority to the FAA); *see also Illinois Citizens Committee*, 467 F.2d at 1401 (holding that the Commission's authority to regulate to prohibit signal interference is limited to signal transmission facilities and the Commission has no explicit or implied authority to regulate building construction to prohibit signal interference, in contrast to "the Federal Aviation Agency, [which] does have some responsibility in this area, particularly when building heights threaten to obstruct air navigation routes, these duties have been authorized by Statute".).

radiation that may pose a hazard to human health,[80] along with a limited category of antenna structures deemed a "menace to air navigation."[81]

25. *Second*, NEPA's "purely procedural" requirements attach to actions undertaken *by the federal government*. Indeed, Congress intended NEPA as a "responsibility of the Federal Government."[82] And by its express terms, NEPA governs "Federal" action. Each "agency carrying out such action" is individually responsible for its own NEPA compliance and must "determine" if that action constitutes an MFA.[83] In this regard, the relevant question before us is whether *Commission action* constitutes an MFA, as relevant to discharge the *Commission's* procedural obligations under NEPA. On the other hand, "non-Federal action" generally falls outside an agency's NEPA procedural responsibilities.[84]

26. The Commission lacks express authority to construct and operate communications infrastructure facilities like towers and earth stations and does not direct where such infrastructure should be placed by others. It generally does not direct funding towards the construction of specific infrastructure facilities but instead directs it toward the provision of service and rules respecting the service offered. Consequently, these facilities tend to be purely privately built, entirely with non-Commission funding, and we regulate their radiofrequency emissions directly or indirectly by virtue of our authority to issue spectrum licenses.

27. *Third*, agency action is subject to NEPA only if the agency finds that it has "*substantial* Federal control and responsibility."[85] This new substantiality requirement heightens the MFA standard. Before the FRA's passage, NEPA did not define MFA and the definition of MFA in CEQ's now-rescinded regulations did not contain a substantiality requirement.[86]

---

[80] 47 U.S.C. §§ 301 ("It is the purpose of this chapter . . . to maintain control of the United States over all the channels of radio transmission. . . . No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio . . . except under and in accordance with this chapter[.]"), 302a (authorizing the Commission to, "consistent with the public interest, convenience, and necessity, make reasonable regulations" governing devices "capable of emitting radio frequency energy by radiation, conduction, or other means[,]" and prohibiting the "manufacture, import, sell, offer for sale, or ship devices or home electronic equipment and systems, or use devices, which fail to comply with regulations promulgated pursuant to this section."), 303 (granting the Commission authority to, among other things, "assign frequencies", "determine the power which each station shall use", "regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions", require retention of records of "transmission of energy", and to make rules, regulations, restrictions, and conditions "as may be necessary to carry out the provisions of this chapter"), 307 (authorizing the Commission to grant a station license "if public convenience, interest, or necessity will be served thereby"), 332 (providing that state and local governments may not regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of RF emissions to the extent that such facilities comply with the Commission's RF rules); Telecommunications Act of 1996, Pub. L. No. 104-104, Title VII, § 704(b), 110 Stat. 56, 152 (directing the Commission to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions").

[81] 47 U.S.C. § 303(q).

[82] 42 U.S.C. § 4336e(10)(A).

[83] 42 U.S.C. § 4336e(10)(A) (cleaned up).

[84] 42 U.S.C. § 4336e(10)(B)(i) (excluding from the definition of MFA a non-Federal action "with no or minimal Federal funding" or "with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project.").

[85] 42 U.S.C. § 4336e(10)(A).

[86] Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Final Rule, 85 Fed. Reg. 43304, at 43375, 40 CFR § 1508.1(q) (July 16, 2020) (defining MFA as "an activity or decision subject to Federal control and responsibility . . . "), *abrogated by* Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618-01 (Jan. 8, 2026).

28. Here, our analysis will "presume that Congress is knowledgeable about existing law pertinent to interpreting the legislation it enacts"[87] and "when Congress enacts statutes, it is aware of relevant judicial precedent."[88] With the substantiality qualifier now added to NEPA, we infer congressional intent to limit NEPA's applicability to Federal actions. Our review of our NEPA rules will therefore give the inclusion of "substantial" due weight.

29. *Finally*, NEPA vests in the agency considerable discretion to find that an action is *not* an MFA. NEPA "does not mandate particular results, but simply prescribes the necessary process."[89] If the Commission reasonably "determines," as a factual matter, that its level of control and responsibility is not "substantial," then that is the end of the matter. But this discretion does not flow equally in both directions. As noted above, the Commission may not treat its actions as MFAs if doing so would exceed the agency's statutory authorities.

### 2. Privately Funded Deployments

30. Because nearly all towers and communications infrastructure are privately built without targeted Commission funding, we proposed to clarify the contours of the MFA exclusion for "non-Federal actions" with "no or minimal Federal funding" and incorporate them into our rules.

31. We confirm, as proposed, that there is "no or minimal Federal funding"[90] for deployments for our purposes unless Commission funding is expressly directed towards and conditioned on the construction of the particular communications facility in question.[91] Commenters such as CTIA, UTC, and WISPA support this interpretation.[92] We likewise confirm, as proposed, that Commission funding for unspecified private deployments or operator expenses is insufficient to give rise to an MFA.[93] We reject the contrary position, which implies that Commission funding for overall operator expenses would transform an inchoate set of infrastructure projects into Commission MFAs.[94]

32. We expect our findings as to private deployments to be outcome determinative for many infrastructure projects at issue.[95] As the Court of Appeals for the Eleventh Circuit recently held, under NEPA's "plain text, either the absence of federal funding *or* the absence of federal control is sufficient to

[87] *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988).

[88] *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010)

[89] *Robertson v. Methow Valley Citizens Council*, 490 U. S. 332, 350 (1989)); *see also Seven County Infrastructure Coalition*, 605 U.S. 168, 177–78 (citing additional authorities).

[90] 42 U.S.C. § 4336e(10)(B)(i)(I).

[91] *NEPA NPRM*, 40 FCC Rcd at 6386, para. 22.

[92] *See, e.g.*, CTIA Comments at 13; UTC Comments at 5; WISPA Comments at 2–4.

[93] *NEPA NPRM*, 40 FCC Rcd at 6386, para. 22.

[94] *See, e.g.*, ENTELEC Comments at 4–5; Wired Broadband Comments at 3; Wired Broadband Reply at 8–9; PEER Comments at 8–9.

[95] We also decline, as proposed, to specify at this time what level of funding is "minimal." With little experience and few relevant examples before us, we find this issue unnecessary to resolve now and best handled on a case-by-case basis when it arises. In calling for a safe harbor based on "a dollar amount or percentage of project cost provided by federal funding," CCA claims that our proposed approach would "neither simplify nor expedite permitting." CCA Comments at 4–5. We disagree. We provide clarity for a significant number of private deployments without targeted Commission funding. To the extent that providers may receive federal funding under existing programs related to deploying service in underserved areas across the country, that funding is not tied directly to specifically placing facilities and therefore the deployment of those facilities is excluded from the MFA definition based on the plain language of the statute.

take a project outside the definition of 'major federal action.'"[96] Our conclusion applies with equal force to the wireless, satellite, and space deployments discussed below.

### 3. Wireless Deployments

33. We sought extensive comment on whether wireless infrastructure deployments in connection with Commission-issued spectrum licenses give rise to an MFA.[97] We also asked commenters to address Commission rules subjecting certain licensees to minimum buildout and coverage requirements, including whether such rules, and the Commission's ability to enforce them, give the Commission substantial control and responsibility over the deployment of the facilities needed.[98] Many parties have argued that common private infrastructure deployments are not MFAs because they lack the requisite Federal nexus.[99]

34. We first consider the Commission's general spectrum licensing activities. We then examine considerations specific to geographic and site-based licenses. In addressing these issues, we note some ambiguity in how our analysis should proceed. On one hand, the relevant "action" might be characterized as "Federal" in view of the Commission's spectrum licensing functions. Under this framing, the relevant question is whether the Commission exercises "substantial Federal control and responsibility." On the other, the relevant "action" might be characterized as "non-Federal" given the primary role of private companies in building their wireless facilities. Here, the relevant question is whether there is "no or minimal [Commission] involvement where [the Commission] cannot control the outcome of the project."[100] No matter how posed, the existence of "control" spans both framings and we examine that common issue below.[101]

35. *Spectrum Licensing Generally.* We find that spectrum authorizations issued by the Commission do not constitute MFAs or give rise to MFAs. They do not condition Commission authorization on subsequent non-Federal infrastructure deployments so as to require the Commission to

---

[96] *Friends of the Everglades, Inc. v. Sec'y of United States Dep't of Homeland Sec.*, 2025 WL 2598567, at *6 (11th Cir. Sept. 4, 2025) (emphasis in original) (citing 42 U.S.C. § 4336e(10)(B)(i)); *accord Friends of the Everglades, Inc. v. Sec'y of United States Dep't of Homeland Sec.*, 174 F.4th 822, 834 (11th Cir. 2026) ("The environmentalists and Tribe must prove both that the facility was federally funded and that it was subject to federal control. But they failed to do so because the facility is not federally controlled. As a result, we need not address whether it was federally funded.").

[97] *NEPA NPRM*, 40 FCC Rcd at 6386–89, paras. 23–29.

[98] *NEPA NPRM*, 40 FCC Rcd at 6387, para. 25.

[99] *See, e.g.*, AT&T Reply at 10; CCA Comments at 3; Crown Castle Reply at 2; NATE Comments at 3–4; UTC Comments at 7–9.

[100] The issue of "no or minimal Federal funding" is discussed *supra*.

[101] We note that the Eleventh Circuit recently considered this very issue—namely, how to characterize the non-Federal construction of a non-Federal building for MFA purposes, when a Federal agency would control or direct some of the building's operations after construction. Looking to substance rather than form, the court characterized the action as "non-Federal" because, for practical purposes, the action being challenged on environmental grounds was the "*construction* of the facility" not the "federal supervision of and support for immigration enforcement at the facility." *Friends of the Everglades, Inc.*, 174 F.4th at 832–33. In the end, the court found that this "non-Federal action" was not an MFA because the challengers failed to demonstrate *both* federal funding *and* federal control *with respect to that construction*. *Id.* Many commenters agree that the proper object of the MFA analysis for present purposes is the construction of private communications infrastructure, not the Commission's spectrum licensing activities. *See, e.g.*, Sept. 21, 2026 CTIA *Ex Parte* at 5 (suggesting that the Commission clarify statements surrounding construction and licensing to confirm that facilities deployment in connection with spectrum licensing does not give rise to MFAs). While we find *Friends of the Everglades* persuasive and compelling given its reasoning and materially similar fact pattern, our MFA analysis in the instant decision considers both "federal" and "non-federal" scenarios.

consider the environmental effects of such deployments (if any) in a NEPA review before issuing a spectrum authorization.[102] We determine that our spectrum-licensing activities are too legally, factually, and causally attenuated from wireless deployments or their effects to create the requisite level of "control" for an MFA.[103]

36. First, as commenters correctly observe, a Commission spectrum license is legally unrelated to subsequent infrastructure deployment.[104] As defined by statute, a "license" allows for "the use or operation of apparatus for transmission of energy, or communications, or signals by radio."[105] A spectrum license authorizes the use of frequencies and enables the provision of associated wireless services. The Commission issues spectrum licenses to prevent harmful interference among different users[106] and to ensure the efficient use of scarce frequencies.[107] A license does not constitute Commission approval to build wireless infrastructure. And the Communications Act does not require consideration of environmental factors in determining whether to issue a spectrum license.

37. The Commission's rules do not legally require licensees to build new communications infrastructure upon receiving a spectrum authorization.[108] Under the Communications Act, licensees retain broad discretion regarding when and where to obtain a license, what infrastructure facilities they need to deploy service using their license, and where to locate those facilities. Buildout requirements, discussed below, do not affirmatively require the deployment of infrastructure. Indeed, they can be satisfied through preexisting towers, collocation, or deployment over other types of existing structures.

38. Nor does the Communications Act require other Commission authorizations to deploy wireless infrastructure. It specifically relieves the Commission from the requirement to issue a "permit for construction" for "mobile stations" or "privately owned fixed microwave stations."[109] Moreover, the Communications Act expressly confirms that "[s]tate or local government[s] or instrumentalit[ies] thereof," not the Commission, retain "authority" over the "placement, construction, and modification" of wireless infrastructure.[110] State and local governments are traditionally responsible for zoning and permitting decisions, which reveal a greater indicia of control than those taken by the Commission.

---

[102] We note that our determination applies regardless of whether the deployment is analyzed under the definition of MFA in subsection 42 U.S.C. § 4336e(10)(A) or under the exclusions to the MFA definition under subsection 42 U.S.C. § 4336e(10)(B).

[103] *See*, *e.g.*, *Seven County Infrastructure Coalition*, 605 U.S. 168, 187–88 (citing authorities).

[104] *See, e.g.*, AT&T Reply at 10–11; WISPA Reply at 3.

[105] 47 U.S.C § 153(49).

[106] 47 U.S.C. §§ 301, 303.

[107] 47 U.S.C. §§ 301, 303.

[108] *NEPA NPRM*, 40 FCC Rcd at 6387 para. 25.

[109] 47 U.S.C. § 319(d).

[110] *See* 47 U.S.C. § 332(c)(7)(A) (providing that "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities"). We note that state and local control is subject to important limitations that are not relevant to this item. *See id.* §§ 253 (providing limitations, such as that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service" albeit subject to the state's ability to "impose," subject to other limitations, "requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers," "manage the public rights-of-way" or "require fair and reasonable compensation from telecommunications providers,"), 332(c)(7)(B) (providing limitations explaining: (i) regulations that unreasonably discriminate among providers of functionally equivalent services or prohibit or have the effect of prohibiting the provision of personal wireless services are impermissible; (ii) request must be acted upon within a reasonable period

(continued….)

39. Likewise, the Commission's authority to revoke or modify licenses is too logically attenuated from infrastructure deployments to create the requisite level of control for an MFA, as some have claimed.[111] Here too, license revocation or modification affects the ability to transmit signals over spectrum and the service being offered. It does not affect the licensee's control of infrastructure facilities. Indeed, revocation or suspension of a license does not require dismantlement of a tower.[112] In any event, the Commission does not have unfettered discretion to revoke or modify licenses. Sections 312 and 316 of the Communications Act of 1934, as amended (the Act), provide that the Commission may take such actions only in certain circumstances and only after completing required procedural steps.[113]

40. Because licensees retain discretion over how and where they deploy the facilities they need to provide service, the Commission does not maintain control over the outcome of such infrastructure projects and does not need to consider the effects of non-Federal infrastructure deployment before issuing a spectrum license.

41. Second, the issuance of spectrum licenses bears no necessary factual connection with subsequent infrastructure deployments. As an initial matter, the holders of spectrum licenses need not deploy their own infrastructure. And they often do not. With the growth of neutral-host tower operators, spectrum licensees typically opt against building their own facilities. Industry data, for example, shows that the majority of towers are owned or operated by independent tower companies rather than Commission licensees.[114] According to one estimate, the three top tower companies own 100,000 of the estimated 185,000 cell towers in the country."[115] Based on information from the FCC's ASR database, which reflects a subset of towers, as of June 16, 2026, we estimate that approximately 80,816 antenna structures registered in ASR are owned by infrastructure companies that own 100 or more antenna

(Continued from previous page)
of time; (iii) denials must be in writing and supported with substantial evidence; and (iv) states or local governments may not regulate on the basis of radio frequency emissions to the extent the facility complies with the Commission's regulations), 1455(a) ("Notwithstanding section 704 of the Telecommunications Act of 1996 (Public Law 104-104) or any other provision of law, a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station."); *see also, e.g.*, CTIA Reply at 6 (stating that "licensing and oversight of spectrum use are distinct from the construction of facilities"). Similarly, we note that the Commission's "construction prior to grant of application" rules do not dictate how facilities must be built or where they must be built. *See, e.g.*, 47 CFR §§ 1.2113, 90.169. Instead, these rules are related to licensing and ensure that applicants who have not yet been granted a license comply with the Commission's rules, including, for example, RF and lighting and marking requirements.

[111] Attorneys General Comments at 10 (quoting 42 U.S.C. § 4336e(10)(B)(i)(II) which excludes from the definition of MFA non-Federal actions "with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project.").

[112] *Cf.* 47 U.S.C. §303(q) (providing that "the Commission may require the owner to dismantle and remove the tower when the Administrator of the Federal Aviation [Administration] determines that there is a reasonable possibility that it may constitute a menace to air navigation."). We discuss this authority, which pertains to ASR, further below.

[113] 47 U.S.C. §§ 312 (setting forth circumstances where a station license or construction permit may be revoked and describing procedural requirements that apply in such circumstances), 316 (setting forth circumstances where a station license or construction permit may be modified and describing procedural requirements that apply in such circumstances).

[114] Wireless Estimator, *Top 100 Tower Companies in the U.S.*, https://wirelessestimator.com/top-100-us-tower-companies-list/ (last visited Sept. 3, 2026) (towers do not include small cells and DAS); Steel in the Air, *Cell Tower Companies in 2026*, https://www.steelintheair.com/cell-tower-companies/ (last visited Sept. 3, 2026).

[115] Steel in the Air, *Cell Tower Companies in 2026*, https://www.steelintheair.com/cell-tower-companies/ (last visited Sept. 3, 2026).

structures.[116] In contrast, we estimate that about 21,857 antenna structures are owned by service providers (including smaller wireless service providers) that own 100 or more antenna structures.

42. In most cases, tower owners and operators lease space on their towers to multiple wireless service providers.[117] Neutral-host infrastructure operators do not necessarily build their facilities in response to the issuance of a spectrum license.[118] In fact, infrastructure operators may build facilities without having secured any tenants.[119]

43. Communications infrastructure often serves multiple purposes beyond spectrum-based services. For example, communications infrastructure facilities support a range of services including edge computing, AI and IoT applications.[120] In fact, the underlying structure may have been built for purposes other than for hosting Commission-licensed services. Antennas and network equipment are often located on pre-existing building rooftops, water towers, or utility poles. These pre-existing structures were built primarily for other purposes but are used to support communications infrastructure equipment.

44. Finally, the Commission's licensing activity bears an insufficient causal connection with subsequent infrastructure deployments. We reject the argument that spectrum licensing turns non-Federal infrastructure deployment into MFAs—either because deployment is foreseeable or because it would not have occurred "but for" the Commission's issuance of a license.[121]

45. Even if this argument were true—which it is not, for reasons explained immediately above—it would lack any meaningful limiting principle. Courts have recognized that "federal control and responsibility mean something more than the power to grant or withhold a permit, otherwise every project subject to federal permitting would be a major federal action"[122] and that "the reach of the major federal

[116] This total represents a little over half of the antenna structures contained in the ASR database and also includes antenna structures owned by subsidiary and holding companies associated with these companies. Other entities (such as electric utilities, state and local governments, and transportation companies, for example) also own antenna structures. The data represents antenna structures requiring ASR registration and those voluntarily registered but would not include all antenna structures owned by these companies.

[117] *See* Crown Castle 2025 SEC Form 10-K at 7 (stating that, as of December 31, 2025, the average number of tenants per tower was approximately 2.4) (Crown Castle 2025 Annual Report); SBA, SEC Form 10-K, 2025 at 3 (stating that as of December 31, 2025, the average number of tenants per site was 1.8).

[118] *See, e.g.*, WIA Reply at 4–5 (stating that its members support the "Commission's tentative conclusion that deployments pursuant to geographic area licenses, along with mixed licenses on neutral host infrastructure, are not MFAs which trigger NEPA where the facility does not require registration in the ASR system" and noting that "[t]he neutral-host model has been a boon for communities and industry alike because it consolidates needed communications infrastructure into a single site that is less environmentally and visually impactful while freeing up capital for service providers to invest in their networks."); Crown Castle 2025 Annual Report at 5 (stating that "[i]n addition to adding tenants to existing towers, we seek to invest our available capital, including the net cash generated by our operating activities and external financing sources, in a manner that will increase long-term stockholder value on a risk-adjusted basis. These investments include constructing and acquiring new towers that we expect will generate future cash flow growth and attractive long-term returns by adding tenants to those assets over time.").

[119] *Cf.* Letter from Stephen Keegan, Sr. Counsel, Government & Legal Affairs, WIA to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217, at 2 (filed Sept. 24, 2026) (Sept. 24, 2026 WIA *Ex Parte*) (noting the general industry practice to only deploy new structures with at least one prospective tenant).

[120] *See, e.g.*, Crown Castle, *Building the foundation for a connected internet of things*, https://www.crowncastle.com/industries/internet-of-things (last visited Sept. 3, 2026).

[121] *See, e.g.*, Connecticut SHPO Comments at 1–2; Dynamic Environmental Comments at 4; NATHPO Comments at 8–9; Wired Broadband Comments at 3.

[122] *Sierra Club v. United States Army Corps of Engineers*, 2025 WL 961432 (D. Maine 2025).

action stops where the federal control stops and does not extend to those actions' second and third order effects."[123] Likewise, "[a] property owner who builds an office building must comply with the Americans with Disabilities Act, but his compliance with federal law does not make it a federal building" that is subject to NEPA.[124] Indeed, the Commission exercises far less Federal control over facilities through spectrum licensing than other agencies whose actions were found by the courts to bear a closer relationship to the environmental effects but still fell outside NEPA.[125] Some of these judicial decisions are especially persuasive because they predate the 2023 amendments to limit NEPA's scope, during an era when courts were much more likely to find the existence of an MFA.[126]

46. In addition to proving overbroad, an MFA analysis centered on but-for causation would also gloss over the intervening decisions by private companies to site their infrastructure. In reality, once spectrum authorizations are issued by the Commission, licensees retain control and responsibility over their facility deployments as they would with any other business decision. The existence of Commission-mandated buildout requirements does not change this conclusion. Buildout requirements require licensees to offer spectrum-based services to the public. They are intended to ensure that licensed spectrum is used robustly. But they are not a monolithic category of requirements. They vary by radio service, including establishing a single link operating on the licensed spectrum, or serving a percentage of the population in the license area, or serving a portion of the geography of the license area, within specified timeframes typically ranging from 1 year to 10 years depending on the license type.[127]

47. Buildout requirements are performance-based standards.[128] They specify the desired outcome through service-related metrics, but not the method of compliance or "the construction of particular facilities in any specific place."[129] Licensees may elect to deploy antennas on new facilities or

[123] *Hoffman v. United States Department of Treasury*, 2025 WL 1809994 (D. Kan. 2025) (further explaining that "[t]he exclusionary language of the statute makes clear that it is the action of the federal agency that determines qualification. Independent acts by third parties may be an effect of a federal action. But they do not represent ongoing substantial control and responsibility.") (emphasis in original).

[124] *Friends of the Everglades*, 174 F.4th at 834.

[125] *See, e.g.*, *Friends of the Everglades*, 174 F. 4th at 834 (finding no federal control or involvement over a state-constructed detention facility when state "officials retained final authority over every decision regarding the project," including "the size of the detention facility," "how many beds it has," "who will build it," and "what materials will be used," and given the fact that "federal officials could not overrule" the state's hypothetical decision to stop or repurpose the construction); *Big Bend Conservation Alliance, v. FERC*, 896 F.3d 418, 423–25 (D.C. Cir. 2018) (holding that FERC's approval of a crude-oil pipeline project did not constitute "major federal action" because the privately built and operated pipeline proceeded largely independent of federal control, finding a disconnect between limited federal involvement and private construction); *Sierra Club v. U.S. Army Corps. of Engineers*, 803 F.3d 31, 49–52 (D.C. Cir. 2015) (rejecting request to consider construction of a nearly 600-mile pipeline project by private parties to fall within NEPA's scope given that federal authorizations were required to complete construction); *Sylvester v. U.S. Army Corp of Engineers*, 882 F.2d 407, 409–410 (9th Cir. 1989) (finding that where a federal agency has authority over only a narrow component of a private golf course, the federal action remains legally segregated from the private construction, limiting the scope of environmental review).

[126] *See, e.g.*, 40 CFR § 1508.18 (2018 Ed.) ("*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."), *abrogated by* Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618-01 (Jan. 8, 2026).

[127] *See, e.g.*, 47 CFR § 27.14 (prescribing buildout requirements for a variety of wireless communications services).

[128] *See, e.g.*, 47 U.S.C. § 309 (in connection with systems of competitive bidding making available spectrum at auction, providing that "the Commission shall . . . include performance requirements, such as appropriate deadlines and penalties for performance failures, to ensure prompt delivery of service to rural areas, to prevent stockpiling or warehousing of spectrum by licensees or permittees, and to promote investment in and rapid deployment of new technologies and services").

[129] CTIA Comments at 14; CTIA Reply at 8; WISPA Comments at 8, UTC Comments at 6.

to collocate on existing towers or other infrastructure such as utility poles. They may elect to deploy on guyed towers, monopoles, small cells, or other novel structures. Indeed, meeting a buildout requirement may not require construction at all, in the case where improved technology allows a licensee to cover a greater population by, for example, changing an antenna.[130]

48. The Commission's buildout requirements, notably, do *not* restrict the extent of wireless deployments on environmental grounds or otherwise. Indeed, geographic area licensees can and typically do continue to deploy facilities beyond those needed to satisfy the buildout requirements associated with a license, including to densify their network operations, to modify or add sites to improve coverage, and to maximize their use of licensed spectrum.[131] That buildout requirements serve laudable objectives does not imply substantial Federal control and responsibility, as some have argued.[132] Nor is it dispositive that buildout requirements may "have a substantial impact on licensees' construction plans."[133] Again, these arguments would sweep too broadly by disregarding the intervening break in causation—namely, spectrum licensees' independent decisions to build infrastructure in the time, place, and manner of their choosing.

49. We note that the Supreme Court has strongly disfavored the kind of causally attenuated NEPA analysis that would tie Federal action to hypothetical downstream effects. The Court recently noted that "a mere 'but for' causal relationship is insufficient to make an agency responsible for a particular effect."[134] The Court indicated that "[s]imply stated, a court may not invoke but-for causation or mere foreseeability to order agency analysis of the effects of every project that might somehow or someday follow from the current project" and that "NEPA calls for the agency to focus on the environmental effects of the project itself, not on the potential environmental effects of future or geographically separate projects."[135] Although the Court's decision involved a different procedural posture, we find the recency and clarity of its guidance on NEPA causality persuasive here. The fact that non-Federal facilities might foreseeably be built following the issuance of the spectrum licenses does not mean that the Commission has substantial control and responsibility over the separate placement, number, and construction of those facilities. Based on our experience with both licensing activities and environmental review, we believe that the connection is too attenuated to trigger NEPA's requirements.

50. For the foregoing reasons, we find that the issuance of a spectrum license does not give rise to an MFA.[136] In addition to, and independently of, this overarching conclusion, we also confirm that

---

[130] *WTB & OET Seek Comment on Samsung Waiver of Sections 96.41 and 2.947; Ericsson Petition for Waiver of Sections 96.41 and 2.947*, WT Docket Nos. 23-93 and 25-159, Order, DA 25-387 (rel. May 2, 2025).

[131] *See* WISPA Comments at 9 (noting that after satisfying buildout obligations, a licensee may "subsequently decide to deploy additional wireless facilities to enhance its coverage or serve a particular customer"); *cf.*, *e.g.*, *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd 9088, 9089, para. 3 (2018) ("We clarify that an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service. This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities.") (internal citations omitted).

[132] Paul D'Ari Comments at 3–4; National Trust for Historic Preservation Reply at 1; Miami Tribe of Oklahoma Comments on the CTIA Petition at 5.

[133] Paul D'Ari Comments at 3–4; Miami Tribe of Oklahoma Comments on the CTIA Petition at 5; Osage Nation Comments on the CTIA Petition at 1; NCAI and NATHPO Reply to Comments on the CTIA Petition at 9.

[134] *Seven County Infrastructure Coalition*, 605 U.S. at 189 (citing *Department of Transp. v. Public Citizen*, 541 U.S. 752, at n.767 (2004) (internal quotation omitted).

[135] *Seven County Infrastructure Coalition*, 605 U.S. at 189.

[136] 42 U.S.C. § 4336e(10)(A) ("The term 'major Federal action' means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility."). CTIA requests that the Commission "modify its delegated authority rules to make clear that any new determination that a specific deployment or class of

(continued….)

the issuance of several specific categories of Commission licenses on which the Commission sought comment in the *NEPA NPRM*, including geographic area, site-based, and earth station licenses, does not constitute an MFA.[137]

51. *Geographic area licensing*. Geographic area licensing allows deployment anywhere in the authorized area. In the *Wireless Broadband Deployment Second R&O*, the Commission determined that a geographic license "only authorizes transmissions" and bears "an insufficient connection to in itself cause the construction [of facilities] to constitute . . . major Federal action under NEPA."[138] Consistent with that previous determination, we affirm that the Commission's issuance of a geographic area license does not create substantial Federal control and responsibility over facilities deployed in connection with that license and therefore is not an MFA.

52. Many commenters support our proposed treatment of geographic area licenses. CTIA, for instance, contends that the issuance of geographic area licenses is "remote in time and regulatory reach from deployment of individual wireless facilities."[139] T-Mobile agrees that there is an insufficient nexus, explaining that "[l]icensees may build anywhere within the geographic area the license covers; the Commission does not specify locations where [licensees] can or must build."[140] Other commenters disagree.[141] Dynamic Environmental, for example, argues that "[t]he granting of a geographic area license not only inevitably results in the construction or modification of countless facilities, it is a required component of that license."[142] Wired Broadband argues that "it is reasonably foreseeable that licensees will build out facilities upon acquiring their spectrum licenses."[143]

53. Independent from our general conclusions regarding spectrum licensing and other categories of licenses as discussed below, we specifically find that geographic area licensing does not

(Continued from previous page)
deployments constitutes 'major Federal action' should be made at the Commission level . . . ." Sept. 21, 2026 CTIA *Ex Parte* at 8; Letter from Trint Hatt, Exec. Dir., Ohio Broadband & Technology Ass'n, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 25-217 (filed Sept. 23, 2026) at 2 (similarly requesting the Commission amend its delegated authority rules). We find that taking such action is unnecessary as the Commission's delegated authority rules already provide that Bureaus do not have delegated authority to decide new or novel questions of law or policy, *see, e.g.*, 47 CFR § 0.331.

137 *NEPA NPRM*, 40 FCC Rcd at 6386–89 paras. 23–29.

138 *NEPA NPRM*, 40 FCC Rcd at 6386, para. 23; *Wireless Broadband Deployment Second R&O*, 33 FCC Rcd at 3135–41, paras. 84–91. On appeal, the D.C. Circuit did not reach the merits of that conclusion and the Commission has not revisited those determinations since. *United Keetoowah Band of Cherokee Indians v FCC*, 933 F.3d 728, 745 (D.C. Cir. 2019) (*United Keetoowah*) ("We . . . decide neither the alternative grounds for holding that the *Order* is arbitrary and capricious or otherwise violated the Administrative Procedures Act, nor the claim that small cell construction is a federal undertaking and a major federal action requiring NHPA and NEPA review."). Consequently, we sought comment in the *NEPA NPRM* on that prior analysis as it relates to our consideration of these issues. *NEPA NPRM*, 40 FCC Rcd at 6386, para. 23.

139 CTIA Comments at 12.

140 T-Mobile Comments at 7. WISPA similarly argues that deployments pursuant to geographic area licenses are not MFAs because the Commission "cannot reasonably foresee how an individual licensee will make decisions regarding the specific location and timing of the deployment of the physical infrastructure, and the Commission does not control the outcome of the tower construction project." WISPA Comments at i.

141 *See, e.g.*, Dynamic Environmental Comments at 8; Knik Tribe Comments at 6–8; PEER Comments at 2; Osage Nation Comments on the CTIA Petition at 1; Confederated Tribes of the Umatilla Indian Reservation Comments on the CTIA Petition at 2–5.

142 Dynamic Environmental Comments at 4; *see also* Wired Broadband Comments at 3 (contending that the Commission exercises substantial federal control because it mandates minimum buildout and coverage requirements and regulates RF emissions.).

143 Wired Broadband Comments at 3. Wired Broadband Reply at 6–8.

provide for Commission involvement in facilities deployment decisions.[144] Rather, geographic area licensees make their own determinations about what facilities to deploy, when to deploy them, and where to locate facilities to serve their broad licensed service area. For example, the Commission does not require a licensee to deploy on an existing structure, a building, or new towers; what facility to use is the licensee's decision. As commenters note, these licensees provide no information to the Commission about planned facility deployments such as information about project timelines, facility locations, facility designs, or local approvals.[145] They also do not routinely provide the Commission with this information after facilities are deployed. As discussed above, geographic area licensees also often deploy facilities well beyond those needed to satisfy the buildout requirements associated with their licenses to densify their networks and improve their coverage. As these factors demonstrate, geographic area licensee choices about individual deployments are informed by business objectives and operate outside the Commission's regulatory reach.[146]

54. *Site-based licensing.* With site-based licenses, the Commission has more information about the location of facilities,[147] but still does not control or even influence licensees' facility deployment decisions. A site-based license is a permit for operating specific radio systems, such as land mobile, point-to-point, or point-to-multipoint systems, that are fixed to a particular physical location chosen by the licensee.[148] Whereas geographic area licenses typically confer exclusive spectrum rights, site-specific licenses tend to authorize shared rights to use spectrum within a defined area. Accordingly, for site-specific deployments, the FCC requires an individualized permit for the primary purpose of deconflicting the potential of harmful interference between different licensees.[149]

55. In the *NEPA NPRM*, we sought comment on whether this type of licensing creates substantial Federal control and responsibility over the associated facilities deployment because the

---

[144] *Wireless Broadband Deployment Second R&O*, 33 FCC Rcd at 3135–41, paras. 84–91.

[145] *See, e.g.*, T-Mobile Comments at 7; CTIA Reply at 7–8; WISPA Reply at 2. Indeed, it would not be operationally or legally practicable for the Commission to consider any effects of particular geographic-area deployments at the time of licensing. To attempt otherwise would require the Commission to speculate about the number and impact of hypothetical, future deployments before a multi-year license term has even begun. Decisions based on that speculative analysis would likely constrain providers' deployment plans in a way that would undermine the flexibility geographic-area licenses were intended to offer. Because individual, private deployment decisions cannot be *foreseen* with any degree of precision, their second- and third-order effects cannot be *reasonably foreseeable*. CTIA Reply at 7–8. As discussed herein, the Supreme Court recently confirmed that NEPA does not require agencies to consider such hypothetical downstream effects. *See supra* para. 49.

[146] *See, e.g.*, WISPA Comments at 7 (noting that geographic area licensees consider numerous factors in determining where to deploy, including costs, negotiating lease agreements for land or collocations, local permits, and "various other business decisions that are outside the Commission's control.")

[147] *See, e.g.*, 47 CFR §§ 90.129, 101.21.

[148] *See, e.g.*, 47 CFR Parts 90, 101.

[149] *See Amendment of Parts 1, 22, 24, 27, 74, 80, 90, 95, and 101 To Establish Uniform License Renewal, Discontinuance of Operation, and Geographic Partitioning and Spectrum Disaggregation Rules and Policies for Certain Wireless Radio Services*, Second Report and Order and Further Notice of Proposed Rulemaking, WT Docket No. 10-112, para. 18 (2017) (requiring that for site-based operations, initial applications for authorization must provide technical parameters of planned operations (such as transmitter location, particular frequency, and power levels)); *Amendment of the Schedule of Application Fees Set Forth in Sections 1.1102 through 1.1109 of the Commission's Rules*, Report and Order, MD Docket No. 20-270, para. 17 (2020) (requiring applicants to provide data of location, antenna, frequency, and path). We note that the Commission also reviews individualized applications for certain eligibility purposes such as qualifications to hold a license. For example, in the Public Safety Pool, only certain authorities are eligible to operate in the service and for certain activities (*see* 47 CFR § 90.20(a)); in the Industrial/Business Pool, only persons primarily engaged in certain commercial activities are eligible to operate in the service (*see* 47 CFR § 90.35(a)).

Commission has discretion to authorize the construction of specific facilities at a specific location, or whether additional indicia of Federal control and responsibility were necessary to determine that site-based licensing is an MFA.[150] Some commenters argue that the requisite Federal nexus does not exist because, similar to geographic area licensing, with site-based licenses, the Commission "authorizes the use of spectrum, but the licensee is ultimately responsible for the actual construction at the site in compliance with the parameters of its permit without exceeding the authorized power or antenna height limits specified in the license."[151] Others argue that issuance of site-based licenses should be viewed as an MFA because issuing an authorization for a specific site gives the Commission substantial control and responsibility for the project and its environmental effects.[152] Dynamic Environmental also argues that deployment of facilities in connection with site-based licenses is an MFA because site-based licenses give the Commission discretion "to authorize construction of specific facilities at a specific location."[153]

56. We find that the issuance of a site-based license does not create substantial Federal control and responsibility over the deployment of facilities in connection with that license and therefore is not an MFA.[154] Site-based licenses are different from geographic area licenses in that they authorize the provision of service from a transmitting facility in a specific location. As with geographic area licensing, however, it is the provider, and not the Commission, that chooses to apply for a site-based license to provide service and chooses the location of its facilities, the equipment used, and the manner in which service is provided.[155] And as with geographic area licensing, the provider may elect to deploy antennas on new facilities or to collocate on existing towers or other infrastructure such as utility poles. Accordingly, the Commission, in issuing a site-based license, does not exercise regulatory authority over the underlying infrastructure used to host licensed services, but rather over the use of spectrum by site-based licensees. As the Supreme Court has held, "agencies are not required to analyze the effects of projects over which they do not exercise regulatory authority."[156] While service rules that apply to site-based licenses serve primarily to prevent harmful interference and may require an applicant to give the Commission information about planned deployments, such as the geographic coordinates, height, and transmitter angles of planned facilities, the applicant retains control over the deployment of any facilities needed to operate under the license and is responsible for complying with Commission-specified spectrum coordination procedures to ensure its proposed operations will not impermissibly interfere with another licensee's operations.[157] If the applicant cannot successfully coordinate its proposed operations, it may choose to place its facilities in a different location, adopt alternative technical parameters to address

---

[150] *NEPA NPRM*, 40 FCC Rcd at 6388 para. 28.

[151] UTC Comments at 7–9; *see also* Electric Utilities Coalition Comments at 6–7 (arguing that the Commission should not retain NEPA requirements for site-based licenses if it removes them for geographic area licenses because doing so would result in "disparate regulatory requirements for activities that have identical effects on the environment.").

[152] *See, e.g.*, Dynamic Environmental Comments at 7; PEER Comments at 9.

[153] Dynamic Environmental Comments at 7.

[154] We consider broadcast towers built pursuant to a Commission construction permit to constitute "site-based licensing" as used herein. We note that several parties asked the Commission to address "mixed-use" facilities or facilities that may be used by both geographic area and site-based licensees at the same time. *See, e.g.*, CTIA Comments at 29; UTC Comments at 7–9; WISPA Comments at i. We clarify that our finding that facilities deployment in connection with spectrum licensing is not an MFA under the amended NEPA applies also with respect to "mixed-use" facilities.

[155] *See, e.g.*, 47 CFR § 90.129 ("Supplemental information to be routinely submitted with applications") (describing information that must accompany applications including information about frequency bands proposed for use, and descriptions of equipment proposed to be used).

[156] *Seven County Infrastructure Coalition*, 605 U.S. at 188.

[157] *See, e.g.*, 47 CFR §§ 90.175, 101.103.

the potential interference, or deploy service using another spectrum band. Also, to the extent that the Commission requires site-based licensees to meet certain performance benchmarks, to increase the efficient and intensive use of spectrum, the licensee retains control over how to meet those performance benchmarks.[158]

57. *Unlicensed and License-by-Rule Operations.* In the *NEPA NPRM*, we asked about other actions we should consider as we update our rules to account for the new definition of MFA.[159] In particular, we asked commenters to discuss whether it would be beneficial for the Commission to clarify that certain actions do not satisfy the definition of MFA or that they meet any of its enumerated exclusions, particularly those relating to non-Federal actions.[160] For example, we noted that the Commission has always considered NEPA as inapplicable to deployment of unlicensed wireless facilities, and we proposed to codify that practice into our rules.[161]

58. In responding comments, CTIA and WISPA agreed that the Commission should clarify that NEPA does not apply to unlicensed wireless facilities while Wired Broadband argues that authorizing spectrum for unlicensed use should be viewed as an MFA.[162] WISPA further requested that the Commission clarify that deployment of facilities authorized-by-rule pursuant to section 307(e) of the Communications Act are not MFAs.[163] We agree that the deployment of facilities to provide unlicensed or licensed-by-rule wireless services is not an MFA under the amended NEPA.[164] Consistent with our determinations above, we find that no MFA exists because the Commission's involvement with respect to the deployment of such facilities is too limited because the Commission lacks control over unlicensed and license-by-rule providers' facility deployment decisions and instead focuses on technical rules with respect to their use of the spectrum.[165] We amend section 1.1302 of the rules to codify this determination.[166]

---

[158] Rules relating to site-based licenses may require that the licensee notify the Commission when it has completed construction. *See, e.g.*, 47 CFR § 101.63 (period of construction and certification of completion of construction).

[159] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 34.

[160] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 34.

[161] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 34.

[162] *See, e.g.*, CTIA Comments at 12; WISPA Comments at 13; WISPA Reply at 6–7; *But see* Wired Broadband Comments at 3.

[163] WISPA Reply at 6–7.

[164] As described further below, RF-emitting equipment will continue to receive review to ensure compliance with the Commission's existing RF requirements even when associated with a facilities deployment that does not otherwise qualify as an MFA. *See infra* section III.B.1.

[165] *See, e.g.*, 47 U.S.C. §§ 302a ("The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy."), 307(e)(1) ("Notwithstanding any license requirement established in this chapter, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services: (A) the citizens band radio service; (B) the radio control service; (C) the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and (D) the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.").

[166] *See* the discussion *infra* Section III.B.1, regarding clarifications that the Commission is also adopting as part of this rule revision.

### 4. Satellite and Space Deployments

59. *Satellite earth stations*. We also conclude, for the same reasons, that infrastructure deployments associated with earth station licenses are not subject to Commission control and responsibility. With respect to earth stations, the *NEPA NPRM* sought comment on the same basic questions concerning the definition of MFA as for other types of spectrum licensing.[167]

60. Several commenters support our proposed finding as to earth stations.[168] Satellite Operators states, for example, that the Commission's involvement with respect to the earth station facilities deployment is limited because the Commission is involved only with "authorizing use of the relevant spectrum frequencies, prevention of harmful interference among various spectrum users, certification of the relevant radiofrequency equipment, and ensuring emissions are within radiation hazard limits."[169] Other commenters disagree, arguing that any ground-based facilities deployed in connection with earth station licenses should be viewed as MFAs.[170]

61. For the same reasons we describe above with respect to terrestrial geographic area and site-based licenses, we find that the construction of earth stations is not an MFA. First, the Commission's rules do not legally obligate private satellite service providers to build communications infrastructure facilities.[171] We agree with comments that, in issuing earth station licenses, the Commission does not exercise substantial control and responsibility over the deployment of earth station facilities. Like geographic area and site-based licensees, earth station licensees retain broad discretion over their facilities deployment decisions. The earth station licensing rules serve the primary purpose of managing spectrum use and preventing harmful interference.[172] They do not give the Commission control and responsibility over the facilities satellite providers choose to deploy and where they deploy them. While Commission rules that apply to earth station licenses may require an applicant to give the Commission information about planned deployments, such as the geographic coordinates, height, and transmitter angles of planned facilities, the applicant retains control over the subsequent deployment of facilities and is responsible for complying with Commission-specified coordination procedures to ensure its proposed operations will not impermissibly interfere with another licensee's operations.[173] If the applicant cannot successfully coordinate its proposed operations, it may choose to place its facilities in a different location, adopt alternative technical parameters to address the potential interference, or deploy service using another spectrum band. Also, to the extent that the Commission requires earth station licensees to meet certain performance benchmarks, to increase the efficient and intensive use of spectrum, the licensee retains control over how to meet those performance benchmarks.[174] Finally, because the non-Federal deployment of earth station facilities receives no Commission funding and, as outlined above, is not subject to Federal control and responsibility, it is independently disqualified as an MFA on that basis.[175]

62. *Space-based Operations*. As proposed, we find that Commission licensed space-based operations do not constitute MFAs. As an initial matter, they are considered "extraterritorial activities"

[167] *NEPA NPRM*, 40 FCC Rcd at 6389, para. 29.

[168] *See, e.g.*, Commercial Space Federation Comments at 4; Satellite Operators Comments at 3; Space Explorations Holdings, LLC Comments at 3–4.

[169] Satellite Operators Comments at 7–8; Reply at 5.

[170] *See, e.g.*, Dynamic Environmental Comments at 7; PEER Comments at 9–10.

[171] *See, e.g.*, 47 CFR § 25.133.

[172] We note that the Commission grants blanket earth station licenses when the possibility of interference is remote. *See, e.g.*, 47 CFR § 25.115(c).

[173] *See, e.g.*, 47 CFR § 25.115.

[174] *See, e.g.*, 47 CFR § 25.202 *et seq*.

[175] 42 U.S.C. § 4336e(10)(A), (B)(i).

which are listed as excluded from NEPA's definition of MFA.[176] We also find that spectrum authorizations for space-based operations do not create "Federal control and responsibility" over subsequent non-Federal space-based deployments so as to constitute MFAs or give rise to MFAs. Further, we observe that certain space-based operations or activities (such as manufacturing of pharmaceutical products) will be excluded from the MFA definition to the extent they fall under NEPA's exclusion for non-Federal actions "with no or minimal Federal funding."[177]

63. The Commission issues licenses under parts 5, 25, and 97 for satellite and space-based communications, and in the future the Commission will issue licenses under a new part 100. In the *NEPA NPRM*, we sought comment on whether such licensing activities qualify as MFAs and noted that parties have alleged in certain cases that satellites in orbit can create impacts on the atmosphere from launches and reentries, impacts from satellites reflecting sunlight, and orbital debris caused by increased collisions in space."[178] Commenters offered differing views. Some, like the Commercial Space Federation, argue that satellite and orbital operations are inherently extraterrestrial and therefore fall outside the scope of NEPA, which applies only to MFAs with impacts within the United States.[179] Commenters also note that international law establishes that outer space is beyond the borders of any sovereign state, and thus actions occurring there cannot be said to occur within U.S. jurisdiction.[180] Other commenters, such as Dark Sky International, contend that the NEPA exclusion for extraterritorial activities should not apply because certain space-related activities, such as rocket launches and satellite de-orbiting, result in environmental effects within the United States, including atmospheric impacts and light pollution.[181]

64. We find that Commission licensed space-based operations and activities are excluded from the definition of MFA.[182] Excluded from that definition are "extraterritorial" activities, defined as activities with effects located "entirely outside the jurisdiction of the United States."[183] We agree with commenters that the potential effects of Commission licensed space-based operations do not take place within U.S. territory but instead occur in outer space.[184] The jurisdiction of the United States extends only to territories where the United States is sovereign and the United States is not legally sovereign over outer space, as other nations are free to enter and operate there, including operations the United States disapproves of.

---

[176] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 33; 42 U.S.C. § 4336e(10)(B)(vi).

[177] 42 U.S.C. § 4336e(10)(B)(i). Activities and operations are broad terms meant to capture a wide range of space-based undertakings ranging from debris removal to on-orbit satellite repair to activities still to be imagined. As the current space age continues new business cases in space proliferate and are not necessarily confined to more traditional undertakings. The Commission speaks broadly of space undertakings with "activities" and "operations" here and, indeed, attempts to take into account new proliferations and innovations in policy considerations. *See, e.g.*, *Spectrum Abundance for Weird Space Stuff*, SB Docket No. 26-54, Notice of Proposed Rulemaking, https://www.fcc.gov/document/spectrum-abundance-weird-space-stuff.

[178] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 33.

[179] Commercial Space Federation Comments at 1–2. The Commercial Space Federation also observes that space "does not constitute the 'human environment'." *Id.* at 2.

[180] *See, e.g.*, SpaceX Comments at 2.

[181] *See, e.g.*, DarkSky International Comments at 1–5.

[182] *See* 42 U.S.C. § 4336e(10)(B)(vi).

[183] 42 U.S.C. § 4336e(10)(B)(vi) (excluding "extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States" from the MFA definition).

[184] *See, e.g.*, Commercial Space Federation Comments at 2 (noting that "[p]urely extraterrestrial activities such as satellite licensing, on-orbit operations, and deep-space communications fall entirely outside that scope because any potential impacts occur in space"); TechFreedom Comments at 10 (arguing that NEPA does not apply to outer space as space "is not part of the biosphere—i.e., the places on Earth that can sustain life.").

65. Our conclusion also flows from the Outer Space Treaty, which confirms that outer space is not U.S. territory: "Outer space . . . is not subject to national appropriation by claim of sovereignty, by means of use or occupation, or by any other means."[185] While Outer Space Treaty signatory nations "retain jurisdiction and control" over objects and persons they send into space, this does not transform space into U.S. territory and is not dispositive of whether the effects of licensing space-based transmissions occur within the territorial jurisdiction of the United States.[186] Specifically, we decline to conclude, as some commenters urge,[187] that because the United States writ large has certain treaty rights and obligations to exercise extraterritorial jurisdiction over outer space activities,[188] such activities can be considered as within Commission jurisdiction for purposes of NEPA.[189]

66. Certain commenters argue that NEPA regulations should apply to Commission-licensed space-based operations due to the potential for light pollution over U.S. territory.[190] However, we agree with other commenters that "[w]hen the Commission authorizes a space station to utilize certain radio frequency spectrum from orbit, the immediate effect of the agency's decision is on the operation of satellites in space, outside the territorial jurisdiction of the United States."[191] As we discussed in the context of other licensing activities, courts have found that the scope of MFAs "stops where the federal control stops and does not extend to those actions' second and third order effects."[192]

[185] Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies, Jan. 27, 1967, 18 U.S.T. 2410, 610 U.N.T.S. 205 (Outer Space Treaty). We note that the United States and 117 other nations have joined the Treaty. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (articulating the presumption against application of U.S. law beyond territorial U.S. jurisdiction.).

[186] *See* Outer Space Treaty at art. VIII. We confirm that our conclusions as to the scope of NEPA in outer space do not disturb the requirements for FCC-authorized satellite operators to comply with domestic and international regulatory requirements, including the Commission's rules and certifications relating to orbital debris mitigation, end-of-life disposal, human casualty risk, and other provisions to protect communications facilities in space from collision risk. See, e.g., 47 CFR §§ 25.114(d)(14), 25.283; Space Modernization for the 21st Century, SB Docket No. 25-306, Report and Order and Further Notice of Proposed Rulemaking, FCC 26-47 (2026), Appx. A at §§ 100.111, 100.200, 100.260, and 100.261 (Space Modernization Report and Order); Outer Space Treaty at art. IX; Space Modernization Report and Order, at paras. 115, 116–18, 288, 290–94. As we recently observed, "the Commission has found that it may adopt orbital debris rules, if ancillary to our spectrum-management authorities, by protecting communications facilities in space." Space Modernization Report and Order at para. 148. As this *Order* makes clear, while an MFA cannot exist without a proper exercise of statutory authority, it does not follow that every proper exercise of statutory authority constitutes or gives rise to an MFA.

[187] *See, e.g.*, Secure World Foundation Comments at 3–4.

[188] *See, e.g.*, Alliance to Reduce Light Pollution Comments at 1. Other commenters state that NEPA was never intended to apply to international activities or to implement the Outer Space Treaty, and the provisions of the Outer Space Treaty do not create substantial responsibility in the context of the MFA definition. *See, e.g.,* Tech Freedom Comments at 6–10.

[189] The rule implementing this decision tracks the NEPA statute and excludes from the definition of MFA extraterritorial activities or decisions, which means Commission activities or decisions with effects located entirely outside of the jurisdiction of the United States. In this context, we understand that the term jurisdiction is limited to territorial jurisdiction.

[190] *See, e.g.*, DarkSky International Comments at 1–5.

[191] *See, e.g.*, SpaceX Reply Comments at 3 (also arguing that "[s]uch authorizations are not only extraterritorial, but they also do not significantly affect the quality of the human environment—a threshold level of affect [sic] needed to trigger NEPA" (citing 42 U.S.C. § 4332(C))).

[192] *Hoffman v. United States Department of Treasury*, 2025 WL 1809994 (D. Kan. 2025) (further explaining that "[i]ndependent acts by third parties may be an effect of a federal action. But they do not represent ongoing substantial control and responsibility.").

67. A few commenters such as Dark Sky International contend that certain aspects of space operations, including orbital debris mitigation, result in environmental effects within the United States. These comments do not allege an actual effect within U.S. jurisdiction, but instead refer to a vague and attenuated specter of undefined, ambiguous potential effects to the atmosphere.[193] As the D.C. Circuit recently held, a contention that a project may give rise to "indirect domestic effects," in that case, through increased carbon emissions, "does not suffice to bring the Project within NEPA's ambit."[194] The Commission's orbital debris rules are primarily focused on mitigating the effects of orbital debris in space. For example, Commission rules require GSO satellites be relocated at end of mission to an orbital altitude so as practically to never re-enter the Earth's atmosphere.[195] For NGSO space stations ending their mission in or passing through the low-Earth orbit region below 2000 km altitude, applicants must include a statement disclosing whether any portion of the spacecraft is reasonably anticipated to survive atmospheric re-entry in an uncontrolled manner.[196] Accordingly, we agree with other commenters that there is a lack of causal connection between the Commission's orbital debris rules and activity in the jurisdiction of the United States.

68. In any event, the Commission's debris mitigation rules are based on a specific determination that orbital debris could affect the cost, reliability, continuity, and safety of satellite operations and therefore has bearing on Congress's mandate that the Commission encourage "the larger and more effective use of radio in the public interest."[197] NEPA analysis has never been required for the promulgation of the Commission's debris mitigation rules and, as with radio transmissions from space, we find no basis for requiring NEPA analysis of this exercise of the Commission's licensing function.

69. Additionally, as an independent and alternative basis for our decisions, we find that spectrum authorizations for space-based operations do not create "Federal control and responsibility" over subsequent non-Federal space-based deployments so as to convert them into MFAs.[198] While the Commission, through its satellite licensing rules, assigns spectrum used in connection with space-based operations and as part of those assignments specifies some technical parameters, operational characteristics, and orbital location of the spacecraft, licensees retain broad discretion and control over other aspects related to the deployment and operations of their space systems, subject to other agencies'

[193] *See, e.g.*, Viasat Comments at 3, International Astronomical Union Comments at 1; *cf* American Astronomical Society Comments at 2 (alleging, without further support, that effects could manifest "in U.S. airspace . . . [or] on U.S. soil").

[194] *Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*, No. 25-5387, 2026 WL 2409602, at *11 (D.C. Cir. Aug. 18, 2026) (holding that a petitioners opposing a natural gas project located entirely overseas in Mozambique were not likely to succeed on the merits on a NEPA claim because NEPA excludes extraterritorial activities or decisions with effects located entirely outside of the jurisdiction of the United States, and citing the *Seven County Infrastructure Coalition* case for the proposition that "NEPA applies only where there exists a reasonably close causal relationship between the challenged action and the alleged effects within the United States.") (internal quotation marks omitted).

[195] 47 CFR § 25.283(a).

[196] 47 CFR § 25.114(d)(14)(viii)(D)(2)(ii). Further, if an applicant is unable to certify their NGSO spacecraft will completely demise in the atmosphere, Commission rules require the applicant to certify that the calculated casualty risk for an individual spacecraft using the NASA Debris Assessment Software or a higher fidelity assessment tool is less than 0.0001 for the total earth's surface (of which the United States comprises 1.867%).

[197] Mitigation of Orbital Debris, Second Report and Order, 19 FCC Rcd 11567, at 11575, para. 14 (2004) (citing 47 U.S.C. § 303(g).

[198] Where appropriate, as part of its licensing responsibilities under the Communications Act of 1934, as amended, or as a result of obligations under international treaties, the Commission has evaluated potential effects from proposed satellite operations on a case-by-case basis and required applicants to address any such effects in a manner that is consistent with the public interest. *See generally Mitigation of Orbital Debris in the New Space Age*, IB Docket No. 18-313, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 8764 (2024).

regulatory requirements.[199] Many of the concerns commenters pose regarding the potential effects of space-based operations relate to the technical specifications and physical configuration of the satellite outside the control of the Commission.[200] The private satellite operator, not the Commission, designs, controls, and executes its own plan for post mission disposal. For these reasons, similar to the Commission's geographic, site-based, and earth station licensing activities, we find that non-Federal space-based deployments and operations[201] are not Commission MFAs.

### 5. Antenna Structure Registration

70. We find that regardless of whether Antenna Structure Registration (ASR) qualifies as an MFA, the Commission retains statutory authority to require review for the limited category of antenna structures that require notice of proposed construction to the Federal Aviation Administration (FAA) due to physical obstruction. Generally, and absent an exception, towers more than 200 feet above ground level or located near an airport require notice to the FAA and ASR registration with the FCC under FAA and FCC rules.[202] Antenna structures that do not meet these requirements are not covered by the ASR rules and do not require registration.[203]

71. In the *NEPA NPRM*, we asked whether the ASR requirements give the Commission "substantial Federal control and responsibility" over antenna structure facilities.[204] Alternatively, we sought comment on whether ASR falls into the exclusion for non-Federal actions "with no or minimal Federal involvement" under which the Commission "cannot control the outcome of the project."[205] We asked whether the Commission's reliance on the FAA determination of no hazard should affect a determination of whether the Commission has sufficient control over tower facilities that are registered through the ASR system.[206] We also sought comment on whether ASR may fall into the exclusion for "activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority."[207]

72. A number of commenters urge the Commission to continue to treat ASR as an MFA. AT&T, for example, states that "ASR filings require authorizations in which the FCC has significant

[199] The FAA is charged by statute with licensing of launches and controlled, non-destructive re-entries. *See* 51 U.S.C. § 50903.

[200] International Astronomical Union at 1 (expressing concerns regarding the potential effect of orbital light and radio spectrum on international astronomical observations). *See also* ViaSat Comments at 3 (highlighting the potential for light pollution as a result of artificial "skyglow").

[201] Some commenters also raise concerns about aspects of space operations, such as radio-frequency interference to radioastronomy and orbital debris mitigation, that have never been treated within the NEPA regulatory framework. *See, e.g.*, International Astronomical Union Comment at 1; Royal Astronomical Society Comment at 2; *Mitigation of Orbital Debris*, 2d R&O, FCC 04-130 (2004) (discussing statutory authority over orbital debris). These commenters offer no credible support for considering these matters as within the scope of NEPA and we decline to do so. Some commenters also argue that effects from launch and re-entries should be considered in the FCC NEPA process. *See, e.g.*, Alliance to Reduce Light Pollution Comments at 1. The FAA is charged by statute with licensing of launches and controlled, non-destructive re-entries, and we do not view NEPA as providing the FCC with authority superseding the FAA's. *See* 51 U.S.C. § 50903.

[202] 47 CFR §§ 17.4, 17.7; 14 CFR § 77.9.

[203] As discussed in more detail in para. 146, *infra*, voluntary registration of facilities in the ASR system will continue to be allowed, and the *Order* clarifies that such voluntary registrations are not subject to the Commission's environmental notice and review provisions. *See* Sept. 24, 2026 WIA *Ex Parte* at 2.

[204] *NEPA NPRM*, 40 FCC Rcd at 6390 para. 31.

[205] *NEPA NPRM*, 40 FCC Rcd at 6390 para. 31.

[206] *NEPA NPRM*, 40 FCC Rcd at 6390 para. 31.

[207] *NEPA NPRM*, 40 FCC Rcd at 6390 para. 32.

control and responsibility."[208] PEER argues, similarly, that "[b]ecause construction may not proceed without ASR registration, the FCC exercises sufficient control over tower construction to trigger NEPA."[209] Other commenters argue that the Commission's involvement in tower registration is too limited.[210] The Electric Utilities Coalition, for example, argues that ASR should not be considered an MFA because ASR is "a mere registration," and the "FCC relies on the FAA to determine whether construction of a tower poses a hazard to air navigation."[211] It also contends that ASR should fall within the exclusion for non-Federal actions "with no or minimal Federal involvement" under which the Commission "cannot control the outcome of the project," because "ASR only provides FAA clearance that the tower does not present a hazard to air navigation and does not involve any Commission funding for the construction of the tower or any other control over the construction of the tower."[212]

73. We first find that the Commission has statutory authority to require ASR and related compliance obligations for antenna structures that are deemed a menace to air navigation. Section 303(q) of the Communications Act gives the Commission the authority "to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation."[213] As part of a broader suite of aviation safety rules across different statutes, section 303(q) incorporates the judgment of the FAA Administrator and provides the Commission with discretion to exercise its judgment in determining whether the structure poses a threat to safety. The Commission has determined that registration and review of planned facility construction is necessary in order for it to fulfill its statutory responsibility to require not only painting and illumination but also to "require the owner to dismantle and remove the tower when the Administrator of the [FAA] determines that there is a reasonable possibility that it may constitute a menace to air navigation."[214] Section 303(r) of the Act provides that the Commission shall "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter."[215]

74. Based on this authority, the Commission's ASR rules require the registration of antenna structures that require notice of proposed construction to the FAA due to physical obstruction.[216] Following FAA criteria, the rules provide that generally, and absent an exception, towers more than 200 feet above ground level or located near an airport require notice to the FAA and ASR registration with the

[208] AT&T Reply at 2, 12.

[209] PEER Comments at 10.

[210] *See, e.g.*, Electric Utilities Coalition Comments at 7–8; Energy Telecommunications and Electrical Association Comments at 7.

[211] Electric Utilities Coalition Comments at 7–8; *see also* ENTELEC Comments at 7 (similarly arguing that the "issuance of an ASR is a registration as opposed to an authorization" and that the "Commission's reliance of the FAA determination of no hazard means that the Commission's role in tower construction is minimal.").

[212] Electric Utilities Coalition Comments at 8–9.

[213] 47 U.S.C. §303(q) (emphasis added). Section 303(q) further provides that: "The permittee or licensee, and the tower owner in any case in which the owner is not the permittee or licensee, shall maintain the painting and/or illumination of the tower as prescribed by the Commission pursuant to this section. In the event that the tower ceases to be licensed by the Commission for the transmission of radio energy, the owner of the tower shall maintain the prescribed painting and/or illumination of such tower until it is dismantled, and the Commission may require the owner to dismantle and remove the tower when the Administrator of the [FAA] determines that there is a reasonable possibility that it may constitute a menace to air navigation."

[214] *Id.* at § 303(q).

[215] *Id.* at § 303(r).

[216] 47 CFR § 17.4(a). The ASR rules apply to any owner of a "proposed or existing antenna structure" including tower owners who are not FCC licensees. *Id.*

FCC to ensure that they do not present a hazard to air navigation and incorporate FAA requirements for agency notification.[217] The ASR rules do not apply to antenna structures that do not meet these criteria. Antenna structure owners must submit FCC Form 854 and a valid FAA determination of "no hazard" before the Commission will issue the antenna registration.[218] To serve the public interest and ensure that members of the public have the opportunity to raise concerns about potential tower registrations, the rules include an environmental review component, requiring tower owners to conduct environmental review using the Commission's NEPA procedures.[219] Under this requirement, applicants must complete a notice process and determine whether an EA, as specified under the agency's NEPA rules, is necessary for the proposed tower.[220] Interested persons may also submit a request for environmental processing of the proposed antenna structure registration.[221]

75. In addition to its statutory authority to require ASR and associated compliance measures, the Commission also exercises more control over towers that must be registered in ASR due to physical obstruction. The Commission's ASR program is a direct implementation of exclusive federal sovereignty over airspace in the United States.[222] The Commission's statutory mandate to require proper lighting and marking of communications towers furthers the nationwide regulatory framework for maintaining the safety of United States airspace.[223]

#### 6. Conclusion

76. We amend section 1.1302 to codify in the Commission's rules the statutory definition and exceptions for MFA set forth in NEPA. We also amend section 1.1302 of the rules to codify our independent determinations that deployments of facilities in connection with geographic area spectrum licenses, site-based spectrum licenses, unlicensed or licensed-by-rule wireless services, and satellite earth stations do not qualify as an MFAs to the extent the deployments do not require antenna structure registration and that actions associated with space-based operations, including the launch, deployment, and operation of space stations are not MFAs.[224] We adopt our proposal to rescind section 1.1312 from the rules to remove environmental review requirements for facilities deployed in connection with facilities for which no preconstruction authorization is required.[225] We find that section 1.1312 is no

---

[217] 47 CFR §§ 17.4, 17.7(a)–(e); 14 CFR § 77.9(a)–(e). The Commission also considers the effect of communications towers on migratory birds in accordance with the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703.

[218] *Id.* § 17.4(b).

[219] 47 CFR §17.4(c).

[220] 47 CFR § 17.4(c).

[221] 47 CFR § 17.4(c).

[222] 49 U.S.C. § 40103(a), (b) (providing that "[t]he United States Government has exclusive sovereignty of airspace of the United States" and affording the FAA Administrator authority to regulate the safe and efficient use of the navigable airspace).

[223] *See* 47 U.S.C. § 303(q); 49 U.S.C. § 44718(a), (c) (authorizing the Secretary of Transportation to require notice of proposed construction and alteration of a structure when the notice will promote safety in air commerce or the efficient use and preservation of the navigable airspace, among other purposes, and directing the FAA and FCC to coordinate in receiving, considering, and acting on applications and conducting aeronautical studies related to "broadcast towers.").

[224] In view of our amendments to section 1.1302, we remove section 1.1303 from our rules because we find that it is no longer necessary.

[225] 47 CFR § 1.1312. We note that we also make conforming amendments in parts 1, 2, 5, 17, 22, 27, 30, 63, 73, 74, 78, 80, 90, 97, and 101 of the Commission rules to reflect this determination and other changes to the NEPA rules, as described further herein, *see* Appendix A. Additionally, we make conforming amendments to the recently adopted part 100 rules that replace part 25 rules. *Space Modernization for the 21st Century*, SB Docket No. 25-306,

(continued….)

longer necessary for compliance with NEPA requirements based on our determination that deployment of facilities in connection with geographic area licensing does not qualify as an MFA.[226] We note, however, as described further below, that equipment and operations deployed in connection with spectrum licenses remain subject to the Commission's existing RF requirements.[227] We maintain the Commission's registration and compliance rules for antenna structures that require antenna structure registration. We find that these environmental rules remain authorized under the Communications Act.

77. We find that these updates reflect the "best reading"[228] of the amended NEPA statute, the Commission's exercise of environmental responsibilities under the Communications Act and administrative law, and the Supreme Court's "course correction" to NEPA in *Seven County Infrastructure Coalition*. Together, these developments outline a set of principles, discussed extensively at the beginning of this section, that provide the legal basis for the actions we take in this *Order*.[229] We agree with comments that revising our NEPA rules to bring them into compliance with the current statutory and legal framework serves the public interest, consistent with section 319(d) of the Communications Act.[230] To the extent that section 319(d) gives the Commission policy discretion to act in the public interest, that discretion does not enable the Commission to act *ultra vires*.[231]

78. We disagree with comments suggesting that our findings would be inconsistent with the Court's decision in *United Keetoowah*.[232] In *United Keetoowah,* the Court adopted a narrow holding that focused on the Commission's application of the public interest standard under section 319(d) in the context of its decision in the *Wireless Broadband Deployment Second R&O* to remove its limited approval authority to require environmental review of small cells under section 1.1312.[233] The Court found that the Commission failed to justify its public interest determination and remanded back to the Commission to

(Continued from previous page)
Report and Order and Further Notice of Proposed Rulemaking, FCC 26-47 (rel. Jul. 23, 2026). Although the part 100 rules are not yet effective, we adopt changes to our rules governing space communications by amending part 100 rule sections, rather than amending part 25 rules that will be removed once part 100 is effective. We direct relevant Bureaus to make necessary modifications to relevant Commission forms, consistent with the changes to the Commission's environmental rules described in this *Order.*

226 Several commenters support removal of section 1.1312. *See, e.g.,* CTIA Comments at 21; Utilities Technology Council Comments at 7. *But see* Organized Village of Kassan Comments at 2 (arguing that the Commission should retain section 1.1312 and that geographic licenses "must not be exempted from NEPA or NHPA review"). In the accompanying Further Notice, we seek comment on the impact of our rescission of section 1.1312 of the rules on whether spectrum licensing is an undertaking under the NHPA. *See infra* Section IV.A.1.

227 *See infra* Section III.B.1.

228 *See supra* Section III.A.1; *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (holding that only the "best reading" of a statute is permissible and overruling the *Chevron* doctrine, which required courts to defer to an agency's reasonable interpretation of an ambiguous statute). The Court also noted that deference to an agency's interpretation of a statute is "perhaps least appropriate" when there is an ambiguity "about the scope of an agency's own power." *Id* at 401.

229 The Commission's updates also follow from CEQ's recission of its regulations.

230 47 U.S.C. § 319(d). Section 319(d) states, in relevant part, that "[a] permit for construction shall not be required for . . . stations licensed to common carriers, unless the Commission determines that the public interest, convenience and necessity would be served by requiring such permits for any such stations." *Id*. In adopting this provision, Congress acted to address its concern that the approval process that existed at the time for the deployment of wireless network facilities "may delay market entry and place an unnecessary administrative and financial burden on both the potential licensee and the Commission." H.R, Conf. Rep. No. 97-765, 51–52 (Aug. 19, 1982); *see also, e.g.*, CTIA Comments at 22–23.

231 *See supra* note 76 (collecting court decisions on the Commission's public-interest authority).

232 *See, e.g.*, States Attorneys General Comments at 9; NCAI Comments at 4.

233 *United Keetoowah*, 933 F.3d at 739–40.

conduct further fact finding to justify its decision. The Court did not address the Commission's separate determination that a geographic license "only authorizes transmissions" and bears "an insufficient connection to in itself cause the construction [of facilities] to constitute . . . major Federal action under NEPA"[234] nor did it find that the costs of greater flexibility outweighed its benefits.[235] Here, the basis for the *Order*'s findings was not addressed in *United Keetoowah*. Our *Order* responds to legislative, judicial, and executive branch developments that transpired after *United Keetoowah*. Moreover, whereas the court's decision considered NEPA and NHPA issues in a conjoined setting, our *Order* addresses NEPA only. Simply put, the questions before the court in *United Keewotah* arose from a different set of substantive rules and a unique procedural posture. Recent developments to narrow the scope of actions subject to NEPA review provide an independent, extrinsic legal basis for our rule changes and supersede any discretionary policy-based considerations to the contrary under a public interest analysis.

79. Additionally, the *United Keetoowah* decision focused on the Commission's limited approval authority in section 1.1312.[236] At the time section 1.1312 was adopted, all Commission actions were assumed to be MFAs and the Commission retained limited approval authority to ensure that it could fully comply with Federal environmental laws.[237] In this *Order*, we update our NEPA framework to first consider whether a particular action meets the definition of an MFA under the amended NEPA's requirements. As a result of our determination that spectrum authorizations issued by the Commission, including geographic-area licenses, do not constitute MFAs or give rise to MFAs, the rationale for section 1.1312 no longer exists. In rescinding 1.1312, we now determine that the public interest cannot be served by categorically requiring preconstruction review over deployments that are not MFAs as a matter of law.

80. Even so, we find that our revised NEPA framework will serve the public interest by bringing consumer and public benefits. Congress amended NEPA in significant ways based on its public-interest determination that NEPA had generated outsized permitting burdens relative to its procedural benefits.[238] We find that updating our NEPA rules will further the public-interest benefits that Congress intended when it adopted the FRA. Information in the record shows that NEPA compliance adds an estimated five months of delay to the deployment of new technologies and service upgrades and that, without permitting reforms, the Commission's legacy environmental rules would result in over $2.2 billion in direct regulatory compliance costs between 2025-2035, and a total of at least $7.5 billion in

---

[234] *Wireless Broadband Deployment Second R&O*, 33 FCC Rcd at 3138, para. 87.

[235] *United Keetoowah*, 933 F. 3d at 745 ("We . . . decide neither the alternative grounds for holding that the *Order* is arbitrary and capricious or otherwise violated the Administrative Procedures Act, nor the claim that small cell construction is a federal undertaking and a major federal action requiring NHPA and NEPA review.").

[236] *United Keetoowah*, 933 F. 3d at 739–40.

[237] *Amendment of Environmental Rules*, First Report and Order, 5 FCC Rcd 2942, 2944, para. 18 (1990).

[238] Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023); Hearing Memorandum from Subcomms. on Water, Wildlife and Fisheries and Federal Lands to House Comm. on Natural Resources Republican Members at 3, 14 (Feb. 28, 2023), https://naturalresources.house.gov/uploadedfiles/hearing_memo_--_fc_leg_hrg_on_builder_02.28.23_final.pdf (noting that "ambiguity in the statute allowed NEPA to evolve into an extremely cumbersome and lengthy process for federal agencies that has delayed and increased costs for numerous projects ranging from transportation and infrastructure to forestry and energy development[,]" and reasoning that the BUILDER Act "would lower costs by providing direction to agencies to reduce delays associated with the environmental review process, imposing practical and predictable project review timelines, and clarifying the necessary scope of review"). The revisions to the statute reflect this Congressional intent to cabin the scope, timelines, and burdens of NEPA reviews. *See, e.g.,* 42 U.S.C. § 4332(C) (requiring consideration of "reasonably foreseeable" environmental effects of a proposed action and "a reasonable range" of alternatives to the proposed action that are "technically and economically feasible, and meet the purpose and need of the proposal"); 42 U.S.C. § 4336a(e)(2) (imposing limit on length of EAs); 42 U.S.C. § 4336a(g)(1)(B) (imposing one-year EA completion deadline).

welfare and economic activity loss over that same period.[239] Additionally, as described further in Appendix D, our regulatory impact analysis for this proceeding shows that the changes we adopt will increase economic welfare by reducing costs for wireless licensees. We estimate the present value of the increased economic welfare created by the streamlining of the NEPA review procedures for 2026–2030 is $169.5 million at a 3% discount rate or $157.4 million at a 7% discount rate.[240] By contrast, the potential harms raised by some commenters are less significant and unsupported.[241] We find that the benefits of reducing the costs and delays associated with environmental review outweigh the potential harms and we expect the rule changes we adopt will encourage the deployment of infrastructure that will result in greater competition and innovation.[242]

## B. Streamlining the Commission's Review Procedures

### 1. Commission's Categorical Exclusion and Extraordinary Circumstances Rules

81. NEPA requires an agency to prepare an environmental document—either an EA or an EIS—for a proposed agency action unless the action is subject to a CE, is nondiscretionary, or when otherwise excluded by law.[243] For over 40 years, the Commission has determined and repeatedly reaffirmed that telecommunications infrastructure deployment presents limited environmental impact.[244] Accordingly, the Commission applies an overarching, broad CE rather than multiple CEs tailored to various agency actions. Under this broad CE, Commission MFAs are categorically excluded from further environmental processing unless one or more of the extraordinary circumstances listed in section 1.1307 are implicated.[245] In the existing rules, sections 1.1307(a), (b)(1)(i)(C), and the Note to (d) provide enumerated factors, which the Commission commonly refers to as extraordinary circumstances, that the Commission has determined, when present, may have a significant environmental effect and thus require

[239] CTIA Jan. 22, 2026 *Ex Parte* Attach at 2, 14.

[240] *See infra* Appendix D.

[241] *See, e.g.*, PEER Comments at 7 (stating that eliminating NEPA reviews for wireless facilities would "result in problems not being identified up front and project improvement and mitigation opportunities foreclosed"). As we discuss *infra*, for over 40 years, the Commission has repeatedly affirmed that telecommunications infrastructure deployment presents limited environmental impact, and that limited impact is supported by Commission data.

[242] We also find that *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006), does not preclude the actions we take in this *Order*. That decision was issued well prior to the amendments to NEPA in 2023 and the Supreme Court's *Seven County Infrastructure Coalition* decision in 2025. As a consequence, the CTIA case has no bearing on the post-2023 meaning of an MFA and the legal framework applicable to NEPA to which today's actions respond.

[243] 42 U.S.C. § 4336(a)(1)–(4).

[244] *See generally Amend. of Env't Rules in Response to New Reguls. Issued by the Council on Env't Quality*, 60 Rad. Reg. 2d (P & F), para. 13 (FCC Mar. 26, 1986) (*1986 Environmental Rules R&O*) ("Under our existing rules, numerous applicants have been required to submit environmental information for review by Commission staff. However, instances in which an Environmental Impact Statement has proved necessary, or where the facts have shown a significant impact on the environment, have been rare. [ ] [W]e would agree that communications licensing has not usually given rise to environmental concerns[.]"). This limited impact is borne out by the data. For example, from July 28, 2024, through January 28, 2025, a 6-month period, 6,452 ASR applications were filed but only 51 (0.79%) required an EA. Furthermore, no Commission action has required an EIS.

[245] 47 CFR § 1.1306(a)(1). The Commission also categorically excludes certain actions that involve alterations to existing facilities, such as collocations of equipment on existing antenna structures, pole replacements, or towers constructed in an established "antenna farm." 47 CFR § 1.1306, Note 1, Note 3.

preparation of an EA.[246] Sections 1.1307(c) and (d) provide processes for identifying extraordinary circumstances not identified by applicants or otherwise enumerated in the rules which, if present, may have a significant environmental impact and thus require preparation of an EA.[247] We sought comment on whether changes to the Commission's rules governing when an EA is required are necessary, including whether we should keep our single broad CE or adopt a set of individual CEs, whether we should delete or revise the list of extraordinary circumstances in section 1.1307(a) and the note to 1.1307(d), and whether we should delete or revise sections 1.1307(c) and 1.1307(d).[248]

82. *Retention of the Commission's Broad Categorical Exclusion.* Under NEPA, an EA is required when a proposed MFA "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," unless the agency finds that the action is categorically excluded or excluded by another provision of law.[249] For Commission actions, applicants initially determine whether an enumerated factor—or extraordinary circumstance—requiring the preparation of an EA is present. The Commission has long found that, generally, Commission actions that do not involve the factors enumerated in the Commission's rules have no significant effect on the quality of the human environment and are thus categorically excluded.[250]

83. Consistent with our historical finding that communications infrastructure has limited environmental effects, we will continue our existing approach of applying a broad CE with enumerated extraordinary circumstances which, if present, require the preparation of an EA. Industry stakeholders support this approach and praise it for providing efficiency and regulatory certainty while ensuring communications infrastructure is deployed in a responsible and sustainable manner.[251] While some

[246] 47 CFR § 1.1307(a), (b)(1)(i)(C), and (d), Note. Commission MFAs that "may" have a reasonably foreseeable significant environmental effect are actions that may or may not have such an effect, and thus their effects are unknown and require the preparation of an EA, consistent with the NEPA statute. *See* 42 U.S.C. § 4336(b)(2).

[247] 47 CFR § 1.1307(c) and (d).

[248] *NEPA NPRM*, 40 FCC Rcd at 6401, para. 60 and at 6399, para. 55; *see also* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 14 (Dec. 11, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/10226086707465 (a question concerning what sort of updates or changes the Commission could make regarding categorical exclusions and extraordinary circumstances).

[249] 42 U.S.C. § 4336(b)(2).

[250] 47 CFR § 1.1306(a); *see, e.g.*, *Environmental Rules in Response to New Regulations Issued by the Council on Environmental Quality*, 51 FR 14999-01, 14999 (1986) ("Based on the Commission's experience, we have determined that the telecommunications industry does not generally raise environmental concerns.").

[251] *See, e.g.*, Kuiper Systems, LLC (Kuiper) Comments at 4 (contending that the Commission's broad CE "maximizes efficiency and ensures regulatory certainty in applicants' deployment planning consistent with the letter and intent of statutory reform and executive directives."); WIA at 3 (stating that the Commission's broad CE has created "a permitting regime that respects and supports the responsible and sustainable deployment of communications infrastructure without creating unnecessary barriers."). NASCA argues that we should retain the existing CE as it pertains to submarine cables and that we should eliminate the routine condition specified in section 1.70007(i), which it argues is "both unnecessary and inconsistent with the categorical exclusion." *See* North American Submarine Cable Association (NASCA) Comments at 4, 6. While this item does not address whether, and if so, under what circumstances, facilities constructed pursuant to cable landing licenses are or are not MFAs under the Commission's rules, we find that retention of this routine condition is appropriate to ensure that the Commission meets its NEPA obligations, in the event the Commission determines, after review of a petition from an interested person, that an action is an MFA that may significantly affect the environment. Contrary to NASCA's claims, the routine condition is consistent with section 1.1307(c) which ensures the Commission meets its environmental obligations under NEPA. *See id.* at 6; 47 CFR § 1.70007(i) (formerly codified in 47 CFR § 1.767(g)(9)); *1986 Environmental Rules R&O*, 60 Rad. Reg. 2d (P & F), 1, at para. 6 (explaining that, "to assure performance of our responsibilities under NEPA," section 1.1307(c) "permits environmental processing of actions

(continued….)

commenters suggested changes to our approach, such as adopting new, action-specific CEs or expanding the scope of the existing CE, we decline to adopt these proposals because they are unnecessary and unsupported by the record.[252] Commenters arguing for the expansion of the CE provide examples of scenarios already addressed by our existing rules.[253] Accordingly, the record does not contain sufficient, detailed, or technical evidence supporting our changing course after 40 years to require a more particularized approach with greater compliance burdens.[254] Further, such a change is not required by the amended statute, relevant case law, or Commission policy objectives.

(Continued from previous page)
categorically excluded upon the motion of any interested person . . . ."). However, consistent with our decision to remove 47 CFR § 1.1307(d), we strike from 47 CFR § 1.70007(i) the reference to section 1.1307(d).

[252] *See, e.g.*, Valley Rancheria Comments at 2 (contending that the Commission should adopt action-specific CEs); UTC Comments at 5 ("the Commission should adjust its CE framework to list specific MFAs that would be categorically excluded[.]"). The Power & Communications Contractors Association (PCCA) urges us to adopt a policy of foregoing NEPA review if a project has already undergone state or local environmental review. PCCA comments at 5. NEPA is a federal statute which imposes affirmative duties on the Commission. We are unable to waive review, even where such review may seem duplicative of a state or local authority's environmental review. Commenter Dinah Bear argues the broad CE does not tell FCC staff, other agency staff, or the public what actions the FCC has determined are unlikely to have significant effects, and "seriously risks the agency overlooking effects that it has not ever considered and that should be the subject of, at minimum, an [EA]." Dinah Bear comments at 1. We disagree. As we address above, decades of experience support the conclusion that Commission actions have limited environmental impact. *See supra* para. 81, note 244.

[253] *See, e.g.*, International Center for Law and Economics (ICLE) Comments on CTIA Petition at 2, quoting ICLE Comments on *In re: Delete, Delete, Delete*, GN Docket No. 25-133, Public Notice, 40 FCC Rcd 1601 (2025) (*Delete, Delete, Delete*) at 18 (favoring expansion of section 1.1306 of the Commission's rules to include low-impact projects, such as collocation on existing structures); RWA Comments on CTIA Petition at 7–8 (arguing in favor of the Commission exempting all small wireless facilities from NEPA); Foundation for American Innovation Comments on CTIA Petition at 3–5 (contending that the Commission should expand CEs for wireless deployments as well as other infrastructure under the Commission's jurisdiction); *see also, e.g.*, Competitive Carriers Association (CCA) Comments at 5–6 (arguing that the CE "should explicitly exclude projects constructed in rights of way, to the mounting of antennas on existing structures, and to smaller facilities such as small wireless facilities and distributed antenna system facilities.") (Internal quotation marks omitted); UTC Comments at 5, 12–13 (arguing the Commission should adopt CEs for specific MFAs in order to find that "towers on electric substation sites and other existing utility structures" should be categorially excluded); PCCA Comments at 5 (contending that the Commission should add to its existing CE the CEs of the National Telecommunications and Information Administration (NTIA), including "collocations and site upgrades with minimal ground disturbance[,]" "[s]mall cell deployments in public rights-of-way[,]" and "[f]iber plowing, boring, and microtrenching in existing roadways or utility corridors."); CPAC Foundation for Regulatory Freedom Comments at 4 (arguing the Commission should "[e]xpand technology-neutral [CEs] for proven low-risk activities."); NATE Comments at 3 (arguing the Commission should expand its "list of categorical exclusions" to include collocations, small cell deployments, and fiber trenching, and asserting the Commission "must harmonize its approach" with NTIA's); and Crown Castle Reply at 3 (arguing that the Commission should "strik[e] everything after the word 'government'" in section 1.1306(c)(1)(i)). These proposals are generally covered by the existing notes to § 1.1306 or by the broad CE itself. Verizon suggests we adopt a new CE for collocations on structures that were exempt from NEPA review prior to the collocation, and provides the example of a 199-foot tall tower that only requires ASR when a collocation results in the tower standing over 200 feet tall. Verizon comments at 5. We decline to adopt this proposal. All towers standing over 200 feet above ground level require notice to the FAA due to physical obstruction. In this *Order*, we find it appropriate to continue to apply the Commission's ASR national environmental notice and review procedures to towers above that threshold, and decline to adopt a new CE that would undermine that approach.

[254] *See* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 8 (Jan. 14, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/103041866728827 (noting that the Tlingit & Haida Tribes support the use of broad CEs for wireless facility deployments provided they include clear extraordinary circumstances triggers and that these triggers ensure that any project impacting Tribal lands or historic properties is elevated for more rigorous review).

84. *Adoption of Another Agency's Categorical Exclusion.* To accelerate permitting, the amended NEPA statute prescribes the process by which one agency may adopt another's CE, where appropriate.[255] Under the statute, an agency must follow four steps when adopting another agency's CE: (i) identify the CE listed in another agency's NEPA procedures that covers a category of proposed actions or related actions; (ii) consult with the agency that established the CE to ensure that the proposed adoption of the CE to a category of actions is appropriate; (iii) identify to the public the CE that the agency plans to use for its proposed actions; and (iv) document adoption of the CE.[256] We now adopt a rule implementing this process.

85. In the *NEPA NPRM*, we noted the potential for the Commission to adopt CEs from other agencies that have analyzed the potential environmental effects of communications facilities under NEPA, such as the NTIA or the Rural Utilities Service, and sought comment on whether the Commission, when applying an adopted CE, should consider the extraordinary circumstances of the agency originating an adopted CE, our own extraordinary circumstances, or both.[257] We also sought comment on whether and how to address third party petitions when applying a CE adopted from another agency.[258]

86. While no commenters argue against our adoption of a rule allowing for the adoption of another agency's CE, some argue against the necessity or value of Commission's application of an adopted CE to a Commission MFA in some circumstances.[259] We agree with comments that adopting another agency's CE may not make sense in many instances, for example, because of the broad nature of our own CE or because another agency's CE incorporates a requirement to determine whether an EA is required under the Commission's rules anyway. However, we reject the premise that there could never be circumstances under which it would be beneficial and appropriate for the Commission to adopt a CE from another agency. For example, it may be appropriate and beneficial to Commission licensees for the Commission to adopt another agency's CE applicable to new authorities or actions with which the Commission does not have adequate experience to make the determination required by 42 U.S.C. § 4336e(1) and that are not otherwise categorically excluded under the Commission's rules.[260] CEs across the federal government vary greatly and are subject to changes and additions over time. Accordingly, we adopt this rule to account for circumstances in which it may be appropriate for the Commission, and beneficial to Commission applicants, for the Commission to adopt another agency's CE, whether now or in the future.[261]

---

[255] 42 U.S.C. § 4336c.

[256] 42 U.S.C. § 4336c(1)–(4).

[257] *NEPA NPRM*, 40 FCC Rcd at 6405, para. 71.

[258] *NEPA NPRM*, 40 FCC Rcd at 6405, para. 72.

[259] WIA Comments at 4–5 (arguing that, due to the Commission's broad CE, the Commission should not generally need to adopt another agency's CE because, it argues, all Commission MFAs are already presumed to be categorically excluded); *see also* Wired Broadband Comments at 9 (arguing that that the Commission should not adopt any other federal agency's CE with respect to RF because other agencies such as NTIA defer to the Commission on this topic and the Commission cannot abdicate its responsibility for RF emissions). Dynamic Environmental argues that a specific NTIA CE, referred to by NTIA "C-7" could, if adopted by the Commission, only be applied after the application of the Commission's own CE, and would therefore provide no benefit to Commission applicants. Dynamic Environmental Comments at 21.

[260] 42 U.S.C. § 4336e(1)

[261] Some commenters urge the Commission to adopt specific agency CEs. *See, e.g.*, Verizon Reply at 4–5, Tlingit & Haida Tribes Comments at 4. If the Commission were to adopt another agency's CE, it would be required to do so through the process set forth in the NEPA statute and adopted herein. 42 U.S.C. § 4336c. At this time and outside of that process, we decline to speak to the potential adoption of any particular CE from another federal agency or such a CE's potential application to a Commission MFA.

87. Consistent with 42 U.S.C. § 4336c, the Commission will consult with the agency that established the CE the Commission wishes to adopt to ensure that the adoption is appropriate.[262] We anticipate that such a consultation would include discussion of appropriate considerations related to adoption of the CE, for example, whether the other agency's procedures include consideration of specific extraordinary circumstances that are relevant to that agency's application of its CE. The Commission and the agency should discuss whether to apply any of the Commission's own extraordinary circumstances or those of the originating agency to the adopted CE.[263] Accordingly, when the Commission documents the adoption of a CE by publishing it on our website, we will specify any extraordinary circumstances that applicants must evaluate when applying the adopted CE.[264] We find that this approach is consistent with the NEPA statute's requirement that the agencies consult on whether adoption of the CE is appropriate and promotes a NEPA review process for Commission applicants that is clear and appropriately tailored to a specific CE. Once adopted, the originating agency's CE becomes a Commission CE going forward.[265]

88. *Reorganizing Sections 1.1306–1.1308, 1.1311.* In order to enhance the clarity of our regulations, as well as to condense and remove unnecessary language consistent with the *Delete, Delete, Delete* initiative,[266] we revise and reorganize sections 1.1306–1.1308 and 1.1311. We revise section 1.1306 to consolidate in a single location our rules indicating when an MFA may significantly affect the human environment. We revise section 1.1307 to reflect when an EA is required as well as the information that is required in an EA. We accomplish these revisions by first moving the list of enumerated extraordinary circumstances from section 1.1307(a) to section 1.1306(b). While we make clear in section 1.1306(b)(8) that human exposure to RF emissions in excess of the limits in the rules continues to constitute an extraordinary circumstance for Commission MFAs, we do not relocate section 1.1307(b) because, as discussed further herein, the Commission's RF rules apply to actions that are not otherwise Commission MFAs. We also delete sections 1.1308 and 1.1311 and consolidate the substance of those sections into section 1.1307.

89. We also make changes to the text of former section 1.1307(a)(3), now section 1.1306(b)(3). We make non-substantive changes to correct citations to the Code of Federal Regulations that are no longer accurate. We relocate the language from the former 1.1307(a)(3) Note regarding consultation with the Fish and Wildlife Service (FWS) under the Endangered Species Act to the new section 1.1306(b)(3) Note 1. We update the resources applicants should review to ascertain the status of proposed species and habitats. We also add language to this Note to make clear our interpretation and explanation as to how this rule operates. Specifically, we explain that consultation with the FWS or

[262] 42 U.S.C. § 4336c.

[263] We decline to specifically follow the suggestion by Verizon and T-Mobile that the Commission follow only the extraordinary circumstances found in the original agency's rules. *See* Verizon Reply at 4; T-Mobile Comments at 16–17. Instead, we anticipate that the Commission and the originating agency will consult on which extraordinary circumstances should apply to the adopted CE. We find that the deference afforded to that expert agency is most appropriately given during that time and that this approach will promote a NEPA review process for Commission applicants that is tailored to a specific CE.

[264] We clarify that the Commission's RF rules at section 1.1307(b) will continue to apply to all Commission actions, regardless of whether we have adopted another agency's CE. *See* Wired Broadband Comments at 9 (arguing that the FCC should not adopt any other agency's CE with respect to RF emissions). We direct the reviewing Bureau, through notice and comment, to document adoption of another agency's CE as the Commission's CE and to specify any exceptions or additions to the extraordinary circumstances under section 1.1306(b) (Appendix A, (revised) 47 CFR § 1.1306(b)).

[265] Accordingly, the Commission, and not the agency that established the CE, would adjudicate petitions from the public under section 1.1307(c). We find that it is unlikely the agency originating the CE would be familiar with the Commission's process for resolving petitions submitted pursuant to section 1.1307(c) of its rules, and that a decision otherwise would cause unnecessary burdens and delays.

[266] *Delete, Delete, Delete*, 40 FCC Rcd 1601.

National Marine Fisheries Service (NMFS), as appropriate, is required for all actions, as defined by 50 CFR § 402.02, and not just MFAs.[267] We discuss applicants' continued obligations under the ESA below.[268]

90. *Further Revisions to Section 1.1306.* We sought comment on whether, in the event we chose to retain a broad CE, as we are doing today, we should revise what is now section 1.1306(a) to more closely track NEPA's definition of "categorical exclusion" as "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment."[269] Accordingly, we modify section 1.1306(a) to read: "Except as provided in § 1.1307(c) of this chapter, the Commission has determined that a Commission major Federal action not covered by paragraphs (b) and (c) of this section normally does not significantly affect the quality of the human environment and is categorically excluded from further environmental processing." Among other changes to more closely adhere to the statutory definition, we strike the word "cumulatively" from the rules.[270] These changes are supported by CTIA and WISPA.[271]

91. We reject the contrary position of some commenters, including a coalition of state attorneys general, which argue that the Commission should evaluate cumulative effects because cumulative effects "occur as a result of the agency's decision" and are reasonably foreseeable, and because NEPA does not permit the wholesale discounting of a particular type of reasonably foreseeable effects just because they are cumulative.[272] As an initial matter, this argument appears to presuppose a

---

[267] *See* 16 U.S.C. § 1536(a)(2) (requiring that agencies, in consultation with the Secretary of the Interior or the Secretary of Commerce, shall "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction of adverse modification of [critical habitat] . . ."). We adopt this text as part of our efforts to streamline how applicants should determine if the Commission will consider their proposed facilities to constitute an MFA and find that prior notice-and-comment is not required under the Administrative Procedure Act because it is an interpretive rule being issued by the Commission to advise the public of our construction of our rules, rather than creating new legal duties. *See* 5 U.S.C. § 553(b)(A) (excepting interpretive and procedural rules from the notice requirement for proposed rulemakings). We note that we seek comment in the *Further Notice* below regarding whether, in light of the Commission's finding in the *Order* that spectrum licensing is not an MFA, construction of communications facilities using Commission-licensed spectrum are "agency actions" subject to the ESA. *See infra Further Notice* at Section IV.B.

[268] *See infra* paras. 130–31.

[269] *See* 42 U.S.C. § 4336e(1).

[270] In addition to the substantive changes discussed in this section, we make the following non-substantive revisions to section 1.1306 to harmonize it with other changes in this *Order* and to improve readability. We remove references to section 1.1307(a)(4), renumbering 1.1306(c)(1)(i)–(iii) as 1.1306(c)(1)–(3). Section 1.1306(c)(1)(iii)(A)–(D) are now 1.1306(c)(3)(i)–(iv). What is now section 1.1306(c)(3)(iv) remains substantively unchanged, but we revise the text for brevity and readability. Appendix A, (revised) 47 CFR § 1.1306(c). The former Notes to section 1.1306 are now 1.1306(d). Appendix A, (revised) 47 CFR § 1.1306(d). We make these changes because the numbering convention in former section 1.1306(c) was not consistent with the numbering convention throughout the remainder of our rules, and the Notes were regulatory in nature. The changes we make here harmonize the new section 1.1306 with the remainder of our rules, including our efforts to decouple NEPA from NHPA, and will improve readability.

[271] CTIA Comments at 25 (noting that "consistent with the FRA, as reinforced by CEQ's Guidance Memorandum, the Commission should make clear that any environmental effects analysis requires an analysis only of 'reasonably foreseeable' effects on the environment as opposed to 'cumulative' effects. Relatedly, the FCC should revise Section 1.1306 as proposed to remove the 'cumulative' reference and mirror the statutory categorical exclusion ('CE') definition"). WISPA Comments at 13–14.

[272] States Attorneys General Reply at 2; *see also* Wired Broadband Reply at 5 (referencing concerns associated with cumulative impacts of RF radiation). The Commission's RF rules are outside the scope of this proceeding. *See also, e.g.*, National Trust for Historic Preservation Comments at 3 (arguing that although the Supreme Court's

(continued….)

broad and now-outdated definition of MFA that would encompass private activities that are not directly funded or controlled by the Commission. In any event, the argument is premised on CEQ guidance from 1997 that significantly predates the 2023 amendments to NEPA.[273] Since the 2023 amendments, the Supreme Court clarified that NEPA requires consideration of the "project at hand," not the "environmental effects of [a] separate project" that "breaks the chain of proximate causation between the project at hand and the environmental effects of the separate project."[274] Even if the separate project is "factually foreseeable," the Court explained, an agency is not reasonably held responsible for those effects.[275] Therefore, NEPA only requires the Commission to evaluate the impact of individual projects, not the cumulative effects of multiple projects lacking a proximate cause to the individual project, even if those effects may be foreseeable. In evaluating the impact of an individual project, applicants, and the FCC, will take into account the existing condition of the environment.

92. Former Note 1 to section 1.1306 exempts certain deployments from the extraordinary circumstances of section 1.1306(b). We revise to clarify this point and move the text of the Note to a new section 1.1306(d) because the language of the Note is regulatory and not explanatory in nature, and therefore is more appropriately treated as rule text.

93. Under former Note 3 to section 1.1306, towers constructed in areas where similar antenna towers are clustered, called antenna farms, are categorically excluded unless the addition of a tower would cause human exposure to RF emissions in excess of the Commission's health and safety guidelines cited in section 1.1307(b). As with former Note 1, we revise and move the text of former Note 3 to new section 1.1306(e). We also clarify in new section 1.1306(e) that towers over 450 feet tall continue to require the preparation of an EA, even if they are located in an antenna farm because of the potential for such a tower to affect protected migratory or other bird species.[276]

94. WIA commented that the reference to locations where "similar antenna towers are clustered" is ambiguous and requested that we instead exempt deployments "when there are two or more antenna towers or supporting structures in close proximity to each other."[277] Verizon requests that we expand the antenna farm exception to categorically exclude projects in a "technology served landscape," which Verizon defines as "an area where the environment is already characterized by extensive infrastructure, including areas such as existing utility corridors, transportation right-of-way ('ROW'), or a cluster of two or more existing communications towers, where the marginal impact of adding new equipment is negligible."[278] Verizon states this approach would mirror the approach of other federal agencies, including the United States Department of Agriculture and NTIA, that exclude burial of new

(Continued from previous page)
decision in *Seven County Infrastructure Coalition* limits consideration of reasonably foreseeable impacts under NEPA, section 106 requires them); Sisseton Wahpeton Oyate Comments at 2–3 (encouraging the Commission to retain cumulative effects analysis on "cultural landscapes, view sheds, and spiritual landscapes."). The Commission's section 106 procedures are not being changed in this *Order* other than to decouple them from NEPA review. Cumulative effects analysis for section 106 purposes is unaffected by our proposal.

273 States Attorneys General Reply at 2 and n.6.

274 *Seven County Infrastructure Coalition*, 605 U.S. at 186–87.

275 *Seven County Infrastructure Coalition*, 605 U.S. at 186–87.

276 *See National Environmental Policy Act Compliance for Proposed Tower Registrations, Effects of Communications Towers on Migratory Birds*, WT Docket No. 08-61, Order on Remand, 26 FCC Rcd 16700, 16731, para. 333 (2011) (*Migratory Bird Remand Order*); Memorandum of Understanding Between the Infrastructure Coalition and the Conservation Groups Concerning Interim Antenna Structure Registration Standards (Apr. 23, 2010).

277 WIA Comments at 5–6 (also suggesting that the Commission define "proximity" to "look for similar structures within a .5-mile radius of the proposed deployment).

278 Verizon Reply at 2–3.

telecommunications cables in previously disturbed ground.[279] NATE suggests we "adopt a programmatic or batch review model for repetitive deployments, such as: Multiple small cells in an urban grid [or] Fiber trunk lines along an interstate corridor."[280] We decline to adopt these proposals at this time, based on the current state of the record. We also decline to adopt NATE's proposal that we adopt programmatic or batch processing at this time. In all cases, we find it unnecessary to address these requests at this juncture, given the limited pool of Commission MFAs that will be subject to NEPA review going forward.

95. *Documenting the Evaluation of the Applicability of the Categorical Exclusion*. Commission applicants make an initial determination of whether a proposed MFA is categorically excluded under the Commission's rules by completing the Commission's NEPA Checklist. The NEPA Checklist is used to determine whether any of the extraordinary circumstances are present.[281] Historically, we have informed applicants that documentation supporting their evaluation of the NEPA Checklist may be requested by the Commission, for example, in instances where requests for further environmental processing are received, but there is no standing requirement that applicants submit documentation to support application of a CE. PEER, in response to our proposal to revise for clarity the text of section 1.1307(a)(6)—facilities to be located in floodplains—suggests that we require applicants to submit proof of their compliance with NEPA rules.[282] CEQ's NEPA Procedures Template, intended "to provide clarity and technical assistance" to agencies in developing their procedures, includes recommended provisions for agencies to document the application of CEs in appropriate circumstances determined by the agency and suggests that agencies identify the form they will use, such as a checklist, to do so.[283] We therefore modify our rules by adding section 1.1306(g) requiring applicants for ASR required by section 17.4(a) to indicate and certify that none of the Commission's list of extraordinary circumstances requiring an EA are present.[284] We find this requirement appropriate to ensure proper consideration of whether further environmental processing is needed. We will not require this certification for voluntarily-filed ASR applications. The responsible Bureau will determine the method and format of this certification.

96. In the *NEPA NPRM*, we broadly sought comment on whether changes to our EA and categorical exclusion processes and our list of extraordinary circumstances are necessary to meet our obligations under the amended NEPA statute.[285] Under our existing processes, applicants make the initial determination of whether one or more of the enumerated extraordinary circumstances requiring an EA applies to a proposed MFA. Therefore, we find it appropriate to adopt a requirement that ASR applicants retain their NEPA checklists and supporting documentation for a period of six years from the date of grant of an ASR registration application, except that documentation showing compliance with the Commission's radiofrequency safety standards must be retained throughout the duration of operation.[286]

---

[279] Verizon Reply at 3.

[280] NATE Comments at 4.

[281] 47 CFR § 1.1307.

[282] PEER Comments at 18.

[283] CEQ Sept. 2025 Guidance Memo, Appendix 1 – Agency NEPA Procedures Template at 1, 6.

[284] NATHPO comments that the NEPA checklist in which applicants attest that the ASR facility will not affect Indian religious sites without notification to the public and the tribes, is insufficient. NATHPO Reply at 23. As we describe further herein we are decoupling NEPA and NPHA review. The section 106 NPA public notification and tribal consultation requirements remain unchanged.

[285] *See generally NEPA NPRM*, 40 FCC Rcd at 6397–6400, para. 51, 53–55.

[286] We find it appropriate to require applicants to maintain RF compliance-related records throughout the duration of operations because applicants are required to maintain ongoing compliance with our radiofrequency exposure limitations and radiofrequency emitting equipment will continue to produce emissions for as long as it is in use. *See generally* 47 CFR §§ 1.1307(b), 1.1310; *see also Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields; Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies,* ET Docket No. 19-226, Resolution of Notice of Inquiry, Second

(continued….)

ASR applicants must provide this documentation to Commission staff within five business days of any request. For MFAs, the Commission meets its obligations under the ESA through the NEPA process.[287] Although the ESA prescribes no statute of limitations, most courts hold that "the general six-year statute of limitations for civil actions for suits against the United States applies."[288] Accordingly, we find it appropriate to require applicants to retain their records for a period of six years, to ensure the Commission can access records demonstrating its compliance, through its applicants, with the ESA.

97. *Limits on Exposure to Radiofrequency Emissions*. In the *NEPA NPRM*, we proposed not to make substantive changes to our radiofrequency (RF) emissions rules in this proceeding.[289] We sought comment, however, on whether, in the event certain licensing matters no longer require NEPA review, we should modify any of the Commission's other rules to make clear that the RF emission limits continue to apply to licensees and regulated devices, and if so, how we should do so.[290] Given the change in scope of actions subject to NEPA, we find it appropriate to affirm the continued applicability of the Commission's RF emission limits to MFAs and non-MFAs alike and to underscore the Commission's continued authority to impose such limits. Irrespective of NEPA, the Commission has broad authority over spectrum management, including a central role in regulation of the environmental effects of RF emissions.[291] The Commission's statutory objective, to "promot[e] safety of life and property through the

(Continued from previous page)
Report and Order, Notice of Proposed Rulemaking, and Memorandum Opinion and Order, 34 FCC Rcd 11687 at 11739, para. 113 (2019) (describing the obligation to maintain ongoing compliance and noting that all occupants of a site share responsibility to ensure that compliance at a site is maintained); 47 CFR § 1.1307(b)(1)(ii) (requiring submission of technical information showing the basis for compliance with the RF exposure rules in certain circumstances, upon request by the Commission).

[287] We note that ESA procedural and substantive obligations must be met for all Commission actions meeting the ESA's definition, regardless of whether those actions are also the Commission's MFAs. *See infra* paras. 130–31; 16 U.S.C. § 1536(a)(2), 50 CFR § 402.02 (definition of action).

[288] *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006); *see also Conservation Force v. Salazar*, 811 F. Supp. 2d 18, 27 (D.D.C. 2011), vacated and remanded sub nom. on different grounds, *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200 (D.C. Cir. 2013); *Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d 1075, 1087 (9th Cir. 2017); and *Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 759 (8th Cir. 2009); *see infra.* paras. 130–31 (applicability of ESA to actions that are not MFAs).

[289] *NEPA NPRM* at 6398, para. 51, n.153.

[290] *NEPA NPRM* at 6398, para. 51, n.153.

[291] 47 U.S.C. §§ 301 ("It is the purpose of this chapter . . . to maintain control of the United States over all the channels of radio transmission. . . . No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio . . . except under and in accordance with this chapter[.]"), 302a (authorizing the Commission to, "consistent with the public interest, convenience, and necessity, make reasonable regulations" governing devices "capable of emitting radio frequency energy by radiation, conduction, or other means[,]" and prohibiting the "manufacture, import, sell, offer for sale, or ship devices or home electronic equipment and systems, or use devices, which fail to comply with regulations promulgated pursuant to this section."), 303 (granting the Commission authority to, among other things, "assign frequencies", "determine the power which each station shall use", "regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions", require retention of records of "transmission of energy", and to make rules, regulations, restrictions, and conditions "as may be necessary to carry out the provisions of this chapter"), 307 (authorizing the Commission to grant a station license "if public convenience, interest, or necessity will be served thereby"), 332 (providing that state and local governments may not regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of RF emissions to the extent that such facilities comply with the Commission's RF rules); Telecommunications Act of 1996, Pub. L. No. 104-104, Title VII, § 704(b), 110 Stat. 56, 152 (directing the Commission to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions").

use of wire and radio communications," animates its exercise of its other statutory responsibilities.[292] We thus find ample statutory authority for the rules limiting human exposure to RF from facilities operating on Commission-regulated radio spectrum and authorized equipment.[293] We received numerous comments related to this topic, most of which argued that the Commission should strengthen or broaden its RF emissions standards.[294] Consistent with our proposal in the *NEPA NPRM*, considering substantive changes to the Commission's rules limiting human exposure to RF emissions is outside the scope of this proceeding.

98. We take our duty to protect the public from any potential harm from RF exposure seriously, and Commission-regulated equipment and operations will continue to receive necessary review to ensure compliance with our rules limiting human exposure to RF emissions. To ensure that RF-emitting equipment continues to receive review, even when associated with a deployment that does not otherwise qualify as an MFA, we add section 1.1302(d) to the rules. This section provides that "the Commission maintains responsibility for the certification of equipment and for operations on facilities pursuant to § 1.1307(b) and § 1.1310 and administers the Commission's radiofrequency radiation exposure limits through Subpart I—Procedures Implementing the National Environmental Policy Act of 1969." Accordingly, facilities operating on Commission-regulated radio spectrum will continue to require preparation of an EA if their operations will result in human exposure in excess of the applicable guidelines cited in section 1.1307(b), even if they do not otherwise qualify as MFAs. This amendment to section 1.1302 responds to comments from industry asking the Commission to affirm its exclusive jurisdiction over radiofrequency emissions of wireless facilities not otherwise subject to environmental review.[295] In addition, we find it appropriate to add a cross-reference before the current text of section

[292] 47 U.S.C. § 151 (creating the FCC "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service, . . . for the purpose of [*inter alia*] promoting safety of life and property through the use of wire and radio communications"); *see also Farina v. Nokia, Inc*., 625 F.3d 97, 125 (3d Cir. 2010) (*Farina*) (reasoning that the Commission has a dual mandate "to regulate the safety concerns of RF emissions and to ensure the creation of an efficient and uniform nationwide network.").

[293] *See Farina*, 625 F.3d at 130 (stating that "[p]rotecting public safety [with RF emissions regulation] is clearly within the mandate of the FCC," and observing that "although the FCC's RF regulations were triggered by the Commission's NEPA obligations, health and safety considerations were already within the FCC's mandates, 47 U.S.C. § 151, 332(a), and all RF regulations were promulgated under the rulemaking authority granted by the [Communications Act of 1934, as amended]"); *see also* H.R. Rep. No. 204(I), 104th Cong., 1st Sess. 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61 (1996) (in legislative history of section 704 of 1996 Telecommunications Act, identifying "adequate safeguards of the public health and safety" as part of a framework of uniform, nationwide RF regulations).

[294] *See, e.g.*, Wired Broadband Comments at 2, 8–9 (arguing that RF rules should apply to plants, animals, and microbes and that our maximum exposure limit does not account for the cumulative long-term effects of satellite related RF exposure); Wired Broadband Reply at 4–5; Theodora Scarato, Environmental Health Sciences, Sept. 17, 2025 Comments at 2 (raising numerous arguments including, but not limited to, the Commission should provide a reasoned explanation addressing evidence in the record for its 2019 decision to retain its 1996 RF exposure limits, the Commission should evaluate long-term cumulative exposure, and the Commission should update compliance testing protocols); *see also, e.g.*, Theodora Scarato *ex parte* filings dated Dec. 22, 2025–Dec. 31, 2025. We also received several emails with identical text that were directed at the Commission's "current rulemaking on wireless infrastructure and electromagnetic radiation" which encouraged the Commission to adopt stronger "EMF safety protections." Email Comments from Lyle Russel, Shelly Keating, Alice McGreevey, and Sarah Foley.

[295] WIA Comments at 3, 6.

1.1307(b), which remains unchanged, to make clear that Commission applicants must continue to follow the procedures of section 1.1307(b) for both Commission MFAs and non-MFAs.[296]

99. *Information or Evidence Considered in Reviewing MFAs.* We sought comment on whether any changes are needed to the Commission's rules, particularly section 1.1307, to conform to the NEPA provision stating that in preparing an EA or EIS an agency "may make use of any reliable data source," but is not required to undertake new scientific or technical research unless the new scientific or technical research is essential to a reasoned choice among alternatives, and the overall costs and time frame of obtaining it are not unreasonable.[297] No comments were received in response. We include new language that tracks the language of the statute in sections 1.1307 and 1.1312, which govern the production and writing of EAs and EISs.

100. *Decoupling NEPA and the NHPA*. Historically, the Commission's rules implementing section 106 of the NHPA have been incorporated in its NEPA rules and processes for purposes of efficiency and streamlining. Given the recent changes to the amended NEPA statute that require us to amend our NEPA rules and processes, the Commission sought comment on whether to decouple NEPA and NHPA review in its rules and, if so, whether to do so by deleting section 1.1307(a)(4), and whether there are any enumerated extraordinary circumstances which, if present, require the preparation of an EA, that should be omitted.[298] For the reasons explained below, we find that that decoupling is appropriate and some streamlining of the categories of the Commission's extraordinary circumstances is warranted.

101. We received numerous comments about this issue. Some comments do not address the issue directly, but express concern that attempts to streamline NEPA review may result in weakened NHPA review.[299] The Village of Kasaan opposes decoupling on the basis that decoupling NEPA review from NHPA review "would have the practical effect of eliminating early Tribal notice and consultation."[300] Several commenters argue that NEPA and NHPA have different requirements and should be considered separately.[301]

102. We disagree that decoupling NEPA review and NHPA review will in any way weaken NHPA review or otherwise deprive Tribal Nations or Native Hawaiian Organization (NHOs) of notice and meaningful consultation. Our decision today makes no material change to our longstanding rules implementing section 106 of the NHPA or our existing NPAs.[302]

---

[296] The additional language does not change the substance of the Commission's RF rules or the actions to which they apply.

[297] *NEPA NPRM*, 40 FCC Rcd at 6400, para. 56; 42 U.S.C. § 4336(b)(3).

[298] *NEPA NPRM*, 40 FCC Rcd at 6401–02, para. 60.

[299] Standing Rock Sioux Tribe Comments at 7–8; Flandreau Santee Sioux Tribe Comments at 4–5; Choctaw Nation Comments on the CTIA Petition at 1, Yuhaaviatam of San Manuel Nation Comments on the CTIA Petition at 1, Mandan, Hidatsa and Arikara Nation Comments on the CTIA Petition at 1.

[300] The Organized Village of Kasaan Comments at 2 (Village of Kasaan).

[301] *See, e.g.*, Advisory Council on Historic Preservation (ACHP) Comments at 1 (noting NEPA and NHPA are different statutes and urging the Commission to consider both separately); Iowa State Historic Preservation Office Comments at 1 (arguing that NEPA and NHPA are separate acts and while the procedures and priorities might overlap one doesn't always trigger the other)); NCSHPO Comments at 2 (urging the Commission to consider each statute separately); Navajo Nation Telecommunications Regulatory Commission Comments at 8 (arguing that Congress intended NEPA and NHPA to be separate); Maryland SHPO Comments at 1–2 (arguing that NEPA and NHPA are separate laws that are not interchangeable and that categorical exclusions associated with NEPA do not necessarily exempt the action from section 106 compliance); Wired Broadband Comments at 40 (arguing that reviews under NEPA and NHPA are very different).

[302] *See* Appendix A, Final Rules, Chapter I, Subchapter A, Part 1, Subpart GG – Procedures Implementing the National Historic Preservation Act of 1966; *supra* para. 12.

103. In 2020, the Commission clarified that a determination made as part of the Commission's section 106 review process, that a project will have an adverse effect on one or more historic properties does not, by itself, require an EA when the adverse effect(s) are mitigated by the execution of a memorandum of agreement consistent with the requirements of the Wireless NPA by the FCC and applicants.[303] Consistent with that clarification, today's decoupling of NEPA and NHPA in the Commission's rules preserves the Commission's section 106 review processes while we make changes to align the Commission's NEPA rules and processes with the amended NEPA statute. We therefore find it unnecessary to retain an extraordinary circumstance that would trigger the need to produce an EA solely for impacts to historic properties.[304] We emphasize that we decouple NHPA from our NEPA procedures for prudential reasons to preserve the status quo while we consider next steps on NHPA.

104. In addition to removing section 1.1307(a)(4), we also remove section 1.1307(a)(5)—facilities that may affect Indian religious sites—as an extraordinary circumstance. The Commission's process of identifying sites of religious importance to Indian Tribes has historically been coordinated through the Commission's consultation process under section 106 of NHPA. We see no reason to change this process. In decoupling NEPA from NHPA and removing this language from our NEPA regulations, we anticipate the Commission and Commission applicants will continue to identify Indian religious sites through the section 106 process. NATHPO opposes removing section 1.1307(a)(5) and warns that removal would undermine the Commission's commitment to recognizing Tribal sovereignty.[305] The Commission takes seriously its legal obligations and trust responsibility with Tribal nations and our commitment to engage in government-to-government consultation with them. As we have explained here, we will still satisfy our obligations through the existing section 106 process. We further emphasize that the removal of section 1.1307(a)(5) from our NEPA rules does not alter our current approach to how overlapping obligations are considered in the context of evaluation of historic preservation impacts.

105. To further implement these changes, we also revise section 1.1306 by striking the words "unless § 1.1307(a)(4) is applicable" from section 1.1306(c)(1). The Commission added that language to section 1.1306 in 2014 to account for the potential impact of distributed antenna system (DAS) and small-cell deployments on historic properties.[306] Prior to this change, collocations and replacement poles were categorically excluded unless the action would have an adverse effect on a historic property under former section 1.1307(a)(4). The change in the definition of MFA means that small-cell deployments are unlikely to qualify as MFAs under NEPA,[307] and so the special exception based on impacts from small-cell deployments to historic and cultural properties in former section 1.1306(c)(1) is no longer necessary. With respect to the NHPA, Commission undertakings are addressed through the Commission's historic preservation review procedures, which includes application of the NPAs. This change to section 1.1306 will not change section 106 review of DAS and small-cell deployments under the NPAs.

---

[303] Implementation of State and Local Governments' Obligation to Approve Certain Wireless Facility Modification Requests Under Section 6409(a) of the Spectrum Act of 2012, *Declaratory Ruling and Notice of Proposed Rulemaking*, 35 FCC Rcd 5977, 6000–03, paras. 45–50 (2020) (reasoning that any effects to historic properties remaining after execution of the memorandum of agreement would not be significant, citing 47 CFR § 1.1307(a)); Wireless NPA § VII.D.

[304] Implementation of State and Local Governments' Obligation to Approve Certain Wireless Facility Modification Requests Under Section 6409(a) of the Spectrum Act of 2012, *Declaratory Ruling and Notice of Proposed Rulemaking*, 33 FCC Rcd 5977, 6000–03, paras. 45–50 (2020); *see generally* 36 CFR Part 800.

[305] NATHPO/NCIA Reply Comments at 23–24.

[306] *Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, WT Docket No. 13-238, Report and Order, 29 FCC Rcd 12865, 12868, para. 3. (2014) (*2014 Infrastructure Order*).

[307] As an example, small cell deployments that require registration in ASR qualify as MFAs and are subject to the Commission's NEPA rules.

106. As discussed previously in this section, we are deleting section 1.1308 and folding its substance into section 1.1307. In doing so we delete the portion of the Note to section 1.1308(b) pertaining to section 1.1307(4)–(5). The Note specifies that with respect to actions specified under sections 1.1307(a)(4)–(5)—actions potentially impacting or affecting historically significant districts, sites, buildings, structures or objects, or impacting Indian religious sites—applicants will consult with the Department of Interior, the State Historic Preservation Officer and the Advisory Council on Historic Preservation, or solicit the views of the Tribal Nation or NHO whose religious site(s) may be affected, whichever is applicable. In order to accomplish the decoupling of NEPA and NHPA review, we strike from the Note the requirement to consult with the State Historic Preservation Officer and the Advisory Council on Historic Preservation. As with the changes to section 1.1306, the recodified NHPA rules we adopt today do not alter the scope of section 106 review. Consultation with State Historic Preservation Officers and the Advisory Council on Historic Preservation remain a requirement of the NHPA and the NPAs. We are also deleting the portion of the Note to section 1.1308(b) requiring applicants to consult with the affected Tribal Nation or NHO whose religious sites(s) may be affected for the same reasons we are deleting 1.1307(a)(5). Similar to our deletion of section 1.1305(a)(4), we find this consultation will be addressed through the Commission's section 106 process, and will not be required to be addressed within an EA.[308]

107. We also find it appropriate to remove section 1.1320 from Subpart I—Procedures Implementing the National Environmental Policy Act of 1969—and to move it to the newly created Subpart HH—Procedures for Implementing the National Historic Preservation Act of 1966. In doing so, we divide the original section 1.1320 into three sections—now sections 1.90000–1.90002—to enhance the clarity and readability of the rules. Under the new section 1.90002(b), we include the installation of aerial wire or cable over existing aerial corridors and existing underground corridors as well as construction of new submarine cable systems as categories of undertakings that are excluded from NHPA review consistent with the existing exclusions described in section 1.1306 Note 1.[309] We also strike section 1.1320(b)(4)(v), which excludes from NHPA review collocations on buildings that would otherwise require an EA under section 1.1307(a)(4) due solely to the age of the building.[310] We find that this provision is no longer necessary as it is covered by the Collocation NPA.[311] Moreover, removal of this provision furthers our goal of helping to decouple our NHPA rules from NEPA.

108. In response to our proposal to cut section 1.1307(a)(4), some commenters requested that the Commission revise the terms of the NPAs, which govern the Commission's NHPA section 106 review.[312] We decline to do so today and note that such changes would require amending the agreements with the National Conference of State Historic Preservation Officers and Advisory Council on Historic Preservation (ACHP).[313]

109. *Updated List of Enumerated Extraordinary Circumstances.* The *NEPA NPRM* sought comment on whether to update the list of extraordinary circumstances in our rules and whether certain

---

[308] *See generally* NPAs.

[309] *See* Sept. 21, 2026 CTIA *Ex Parte* at 4 (requesting that the Commission keep the "corridor exclusion" for NHPA review which is currently described in existing section 1.1306 Note 1).

[310] The text of section 1.1320(b)(4)(v) cross-references 1.1304(a)(4), but this is a typographical error in the regulation. There is no 1.1304(a)(4). The intended cross-reference is 1.1307(a)(4).

[311] *See* Collocation NPA at section VIII.A.3 (setting forth exclusions for buildings over 45 years old).

[312] *See* Michigan State Historic Preservation Office Comments at 1; The Regulatory and Technology Committee of the Energy Telecommunications and Electrical Association (ENTELEC) Comments at 1–2; Electric Utilities Coalition Comments at 8–9.

[313] In the event ACHP revises its rules, we delegate to the Wireless Telecommunications Bureau authority to seek comment, as necessary, on updating the Commission's historic preservation rules to reflect ACHP's revisions.

circumstances should be omitted. We received numerous comments on this issue and make certain updates to account for the amended NEPA statute and to provide further clarifications.[314] First, we add the term "extraordinary circumstances" to the rules and clarify that an extraordinary circumstance requires preparation of an EA for an otherwise categorically excluded action where an MFA "may have a reasonably foreseeable significant environmental effect." We find that this amendment to the rules clarifies the longstanding function of the enumerated factors in section 1.1307 as extraordinary circumstances and comports with the NEPA statute and CEQ guidance.[315]

110. Section 1.1307(a)(3) of the Commission's existing rules provides, in part, that an EA is required for facilities that "[m]ay affect listed threatened or endangered species or designated critical habitats."[316] The Commission designates its applicants as non-federal representatives responsible for conducting informal consultation with the FWS or NMFS, as appropriate, under section 7 of the ESA.[317] In practice, the section 7 informal consultation process can result in one of three determinations: (i) no effect; (ii) may affect, not likely to adversely affect; or (iii) may affect, likely to adversely affect.[318] Consistent with NEPA, we clarify in this *Order* that an extraordinary circumstance requires preparation of an EA for an otherwise categorically excluded action where, in light of the extraordinary circumstance, an MFA "may have a reasonably foreseeable significant environmental effect." Accordingly, we find that where informal consultation results in a "no effect" or a "may affect, not likely to adversely affect" determination for an MFA, that action does not rise to the level of an extraordinary circumstance requiring preparation of an EA. We therefore modify what was formerly section 1.1307(a)(3), now section 1.1306(b)(3), to specify that an EA is required where facilities "may affect and are likely to adversely affect listed threatened or endangered species or designated critical habitats."[319] Implementation of recommended conservation measures, such as avoidance times, could allow the determination of effects for an applicant's action to change from "may affect, likely to adversely affect" to

---

[314] *See, e.g.*, Verizon Reply Comments at 1–2; DarkSky International Comments at 6–8 (arguing the Commission should add reflective satellites to its list of enumerated extraordinary circumstances. We decline to do because satellite deployments are not MFAs); Elk Valley Rancheria Comments at 2 (advocating that the Commission should update the list of extraordinary circumstances to include potential effects to Tribal cultural resources, sacred sites, and traditional cultural properties). As we explain in our section on decoupling NEPA and the NHPA, these matters are better addressed through the section 106 process than the NEPA process.); PEER Comments at 19 (stating that "[t]he high-intensity white lights rule could also be clarified[,]" but without providing further explanation. Due to the lack of explanation, no changes were made based on this comment.); and NATE Comments at 3 ("The FCC's list of categorical exclusions has not been significantly updated in over two decades. We recommend the following additions: Collocations and site upgrades with minimal ground disturbance[,] Small cell deployments in public rights-of-way[,] Fiber trenching or micro trenching in existing roadways or utility corridors."). We address these comments below.

[315] *See* 42 U.S.C. § 4336(b)(2); CEQ Sept. 2025 Guidance Memo, Appendix 1 – Agency NEPA Procedures Template at 6 (advising agencies to evaluate for extraordinary circumstances that indicate a normally excluded action is likely to have a reasonably foreseeable significant adverse effect.).

[316] 47 CFR § 1.1307(a)(3).

[317] 16 U.S.C. § 1536(a)(2); 50 CFR § 402.08; Letter from Susan H. Steiman, Associate General Counsel, FCC to Steve Williams, Director, U.S. Fish and Wildlife Service, U.S. Department of the Interior (July 9, 2003). We discuss ESA obligations in greater detail, *infra* paras. 130–31.

[318] *See* 50 CFR §§ 402.13, 402.14; U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act at 3-12-13 (1998), available at https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

[319] Appendix A, (revised) 47 CFR § 1.1306(b)(3). This amendment to our rules is consistent with past Commission determinations. *See, e.g.*, *Michigan Public Safety Communications System Public Safety Towers,* Memorandum Opinion and Order, 30 FCC Rcd 1719, 1722, para. 12 (2016) (concurring with a division finding that there was no obligation to prepare an EA where towers were "not likely to adversely affect" a listed species).

"may affect, not likely to adversely affect."[320] Applicants determining that no EA is required under this amended rule must comply with such measures, retain documentation of their compliance with them, and make such documentation available to the Commission upon request, in accordance with section 1.1306(g)(2)–(3) of the amended rules.

111. We sought comment on whether to modify section 1.1307(a)(6) of the Commission's rules, regarding facilities to be located in floodplains, to clarify that in order to be categorically excluded, the facilities that must be elevated include antennas and associated equipment, including electrical equipment, but not the antenna structures.[321] The comments demonstrate broad support for this proposal.[322] No comments oppose this change. Accordingly, we modify what was formerly section 1.1307(a)(6), now section 1.1306(b)(4), as proposed.

112. While PEER supports the proposed clarifying language on facilities that must be elevated, it also suggests that we require "an alternatives analysis to avoid building in floodplains as required under EO 11988 and submission of a local permit if required."[323] The Commission already requires an alternative sites analysis in all EAs.[324] Moreover, building in a floodplain results in additional federal, state, and local compliance burdens on tower builders such that builders are unlikely to undertake a project if an alternative site is reasonably available.[325] We find that our implementation of EO 11988 by requiring elevation of facilities—specifically, of antennas and associated equipment, including electrical equipment—constructed in floodplains has proven to strike an appropriate and reasonable balance between consideration of the impacts of construction in floodplains and the need for infrastructure deployment.

113. Former section 1.1307(a)(7), now section 1.1306(b)(5), of the Commission's rules requires an EA for those MFAs which "involve significant change in surface features."[326] This section provides examples of significant changes to surface features, including the use of "wetland fill, deforestation, or water diversion,"[327] but does not define "significant." The Commission sought comment on whether it should consider any changes to this extraordinary circumstance to provide greater clarity and some comments support the Commission taking action to do so.[328] PEER suggests replacing the term "deforestation" in the list of examples with "ground disturbance and tree, vegetation, and desert crust

[320] *See* 50 CFR § 402.13(b).

[321] *NEPA NPRM*, 40 FCC Rcd at 6401, para. 58; 47 CFR § 1.1307(a)(6).

[322] AT&T Comments at 5, 16 (contending that the proposed clarification "would remove ambiguity in the rules. It is also consistent with our real-word experience that flood damage poses a substantially greater risk to communications services due to water exposure to sensitive electrical equipment, not to typically reinforced structures."); CTIA Comments at 32 (agreeing with the Commission that the rule should be modified to clarify that "the facilities that must be elevated include antennas and associated equipment, including electrical equipment, but not antenna towers."); WIA Comments at 9 ("clarifying that the facilities that must be elevated for deployments within flood plains are the associated equipment at the facility, including electrical equipment, but not antenna tower itself will prevent needless, or cost-prohibitive, mitigation efforts on structures designed to engineering and industry standards that contemplate resiliency."); PEER Comments at 19 (supporting the Commission's proposed language but proposes requiring submission of evidence of compliance).

[323] PEER Comments at 19.

[324] 47 CFR § 1.1311(a)(4).

[325] For example, construction in a wetland requires builders to undergo a complex permitting process with the U.S. Army Corps of Engineers. *See* 33 CFR §§ 320–330.

[326] *See* Appendix A, (revised) 47 CFR § 1.1306(b)(5), formerly § 1.1307(a)(7).

[327] *Id.*

[328] *NEPA NPRM*, 40 FCC Rcd at 6401, para. 58; *see, e.g.*, Dynamic Environmental Comments at 18.; PEER Comments at 19.

removal."[329] Dynamic Environmental agrees the term lacks clarity, and suggests the Commission institute a working group to determine what actions qualify as significant.[330] The Commission finds that PEER's suggested replacement language would create ambiguity and burden, causing removal of even a single tree to require preparation of an EA. Dynamic Environmental asks a number of illustrative questions that highlight the complexity of the issue, and we find that the record before us is insufficient to support specific changes to this provision in the rules at this time.[331] The Commission may revisit this issue in a future proceeding with the benefit of more record evidence.

114. PEER comments that the Commission should remove "wildlife preserve" from the list of extraordinary circumstances and replace it with "protected or preserved habitat or park land and sensitive ecosystems, whether terrestrial or marine, designated under federal, local, state, or tribal law or regulations including, for example, Wilderness and Wilderness Study Areas, marine sanctuaries, Byways, and Wild and Scenic rivers."[332] We decline to do so. PEER offers no rationale for its proposed change. We note that our longstanding rules, which we keep intact, include extraordinary circumstances addressing deployments in officially designated wilderness areas, wildlife preserves, wetlands, waterbodies, and facilities that may affect federally threatened or endangered species or designated critical habitats, and facilities.[333]

115. PEER argues that "impacts to scenic sites, and recreational lands and landscapes should also be added" to the list of extraordinary circumstances on the basis that "[a]esthetic impacts are one of the most common and significant environmental effects associated with infrastructure."[334] Dynamic Environmental similarly recommends that because visual effects are "very often used at the local level as a primary means of judging the potential impacts from a proposed facility, the Commission may benefit the industry by adding specific visual effects language [to the list of extraordinary circumstances] that could be used as a tool to objectify the review of potential visual effects [on non-historic resources] as opposed to relying on varied levels of subjective local review."[335] We decline to implement this modification. No party has supplied administrable criteria for the Commission to determine *ex ante* when visual effects constitute extraordinary circumstances, and in the absence of record evidence, we decline to adopt such aesthetic criteria given the inherent subjectivity and inscrutability of the exercise.

116. Except for our decoupling of NHPA review from NEPA review, by which extraordinary circumstances currently in sections 1.1307(a)(4) and (a)(5) are removed from our NEPA rules,[336] the record does not support removing any additional enumerated extraordinary circumstances. The remaining enumerated extraordinary circumstances are necessary to meet our obligations under NEPA, the ESA, and E.O. 11990,[337] and no commenters support removing any of the other enumerated extraordinary

[329] PEER Comments at 19.

[330] Dynamic Environmental Comments at 18.

[331] Dynamic Environmental Comments at 18.

[332] PEER Comments at 19.

[333] *See* Appendix A, (revised) 47 CFR § 1.1306(b)(1)–(3), formerly § 1.1307(a)(1)–(3).

[334] PEER Comments at 14, 18, n.14, n.19 (arguing that without an aesthetic determination on the NEPA checklist, a tower can be deemed categorically excluded and then constructed "before the public sees the impact to its viewshed."). PEER raises these comments in combination with its recommendation that we expand sections 1.1307a) (4) and (5) "to include NHPA triggers." PEER Comments at 19. As discussed above at para. 97 we are decoupling NEPA and NHPA review and therefore we decline this proposal.

[335] Dynamic Environmental Comments at 12–13. Dynamic Environmental also suggests that the Commission take "this opportunity to codify when a visual impact of a tower may be considered an extraordinary circumstance and when it cannot be." *Id*. at 20.

[336] *See supra* paras. 103–04.

[337] *Protection of Wetlands*, Exec. Order No. 11990, 42 Fed. Reg. 26961 (May 24, 1977).

circumstances formerly in section 1.1307(a), now in section 1.1306(b), but for the already discussed suggestions to clarify or expand them.[338]

117. *Sections 1.1307(c) and (d).* Due to the broad nature of its CE, the Commission has historically included the provisions of sections 1.1307(c) and (d) to capture the consideration of extraordinary circumstances not identified by applicants that are beyond the otherwise enumerated extraordinary circumstances in the Commission's rules.[339] Section 1.1307(c) allows members of the public to raise NEPA complaints against Commission MFAs, while 1.1307(d) allows Commission staff to initiate reviews on behalf of the Commission. We now modify section 1.1307(c) to address concerns raised by commenters and eliminate section 1.1307(d).

118. We sought comment on whether, in light of the revisions in the amended NEPA statute, the Commission should retain these provisions.[340] We received numerous comments on this issue, the majority of which supported retaining them in some form.[341] PEER objects to deleting these provisions and instead recommends the Commission shift the burden from the public onto applicants by "convert[ing]" these provisions to an extraordinary circumstance, requiring "applicants, licensees, and registrants" to prepare an EA if "any other potentially significant environmental effect [is] identified during the initial environmental review," including, but not limited to, impacts to "designated scenic, pristine, or historic areas [and] recreational trails or sites."[342] WIA submitted comments suggesting that we delete section 1.1307(c), claiming it is abused to derail otherwise necessary projects, and that we should retain section 1.1307(d), which WIA believes is adequate to satisfy the Commission's NEPA obligations.[343]

119. PEER's suggestion would undermine the intended purpose of these provisions to capture circumstances in which a proposed action may have a significant environmental effect not identified by applicants or enumerated in the rules. A broad extraordinary circumstance reaching "any other potentially significant environmental effect" is ambiguous, inconsistent with the Commission's broad CE, and could provide an opportunity for abuse.[344] Instead, we continue to apply the clear standards enumerated in our list of extraordinary circumstances, coupled with section 1.1307(c), under which the Commission can independently evaluate the merit to a claim that a proposed MFA will have a significant environmental effect. If our continued experience with application of the NEPA rules supports adjustment to this approach, including through the addition of other extraordinary circumstances, we will consider such issues in a future rulemaking.

120. While we agree with WIA's comments that section 1.1307(c) petitions may, on occasion, be used abusively, we disagree that we should do away with section 1.1307(c) altogether. The agency retains an independent obligation to ensure all of its MFAs comply with the NEPA statute, and the public plays an important and helpful role in identifying MFAs that fail to comply with our rules and applicable federal laws. Other commenters have requested that we modify our rules to incorporate a heightened

[338] *See, e.g.*, Dynamic Environmental Comments at 20 ("None of the Commission's enumerated extraordinary circumstances should be deleted[.]"); PEER Comments at 19 (recommending the Commission replace wildlife preserve with an expanded extraordinary circumstance protecting a broader range of wildlife habitats).

[339] *1986 Environmental Rules R&O*, 60 Rad. Reg. 2d (P & F), 1, para. 6.

[340] *NEPA NPRM*, 40 FCC Rcd at 6403–04, paras. 66–68.

[341] *See, e.g.*, ViaSat Comments at 5–6; PEER Comments at 17–18; Wired Broadband Comments at 6; Dynamic Environmental Comments at 13.

[342] PEER Comments at 14, 17–18.

[343] WIA Comments at 9.

[344] PEER Comments at 18.

threshold for third party petitions.[345] We agree the correct course of action is not to strike section 1.1307(c) but to revise it.

121. We revise our rules to require that all petitions submitted pursuant to 1.1307(c) in response to an MFA must provide specific detailed evidence demonstrating that the proposed MFA is likely to have a reasonably foreseeable significant environmental effect.[346] We find this approach consistent with the standard articulated in the NEPA statute,[347] and with guidance provided by CEQ in its April 9, 2026, guidance on Establishing, Revising, Adopting, and Applying Categorical Exclusions Under the National Environmental Policy Act, which states that agencies should evaluate whether there are extraordinary circumstances that indicate a normally excluded action "is likely to have a reasonably foreseeable significant adverse effect."[348] We also find this approach is supported by the requirement in 1.1306(g) under the Commission's revised NEPA rules that applicants must certify that they have analyzed the extraordinary circumstances in section 1.1306(b) and that none are present.[349] Because applicants must certify their application of those criteria, we find it appropriate to require petitioners to present specific evidence refuting the applicability of those criteria or otherwise identifying specific, reasonably foreseeable significant environmental effects not considered by the applicant. We further amend section 1.1307(c) to clarify that, if the Bureau determines that an action is likely to have a reasonably foreseeable significant effect, the applicant may prepare an EA or otherwise modify the proposal to avoid such effects and avoid the need to prepare an EA. This is consistent with longstanding Commission practice.

122. In our experience, petitions under section 1.1307(c) sometimes include large volumes of information that distract from the Commission's consideration of such petitions and create unnecessary delays. Because of this, we revise section 1.1307(c) to limit petitions to 5 pages with up to 15 pages of supplemental documents that provide evidentiary support. We find this limit appropriate and consistent with the spirit of the amended NEPA, which imposes new page limits on EAs and EISs.[350] However, the reviewing Bureau may, in its discretion, and upon a showing of good cause in complex cases, permit a supplement to the petition and set page limits for any supplemental submissions. In our experience, most petitions do not exceed 2 pages or involve more than 5 pages of supplemental materials, so we find these new page limits reasonable, while providing a mechanism for the responsible Bureau to consider longer documents in more complex cases, where appropriate.

123. While WIA highlights the fact that Bureau staff are well equipped to determine when a proposed MFA requires additional environmental review,[351] section 1.1307(d) of our rules has rarely been

[345] AT&T Reply at 15–16; WISPA Comments at 16–17.

[346] Allegations arising under section 1.1307(b) must provide evidence that members of the public will likely be exposed to RF emissions in excess of Commission limits.

[347] 42 U.S.C. §§ 4332(C), 4336(b)(2) (requiring consideration of reasonably foreseeable environmental effects of a proposed agency action).

[348] CEQ, Establishing, Revising, Adopting, and Applying Categorical Exclusions Under the National Environmental Policy Act, at 8 (Apr. 9, 2026), https://www.energy.gov/sites/default/files/2026-04/2026-04-ceq-guidance-categorical-exclusions.pdf.

[349] This requirement currently applies only to proposed towers requiring registration in the Commission's ASR system. If the Commission determines that other actions constitute MFAs in the future, we may amend the rule to require such certifications for other MFAs, if appropriate. *See* PEER Comments at 12 (arguing that the Commission provides insufficient access to information and environmental documents, including applicants' NEPA checklists and supporting documentation).

[350] 42 U.S.C. § 4336a(e).

[351] WIA Comments at 9. Dynamic Environmental also opposes revising section 1.1307(d), but they note "[t]he important aspect of [sections 1.1307(c) and (d)] is that the applicable FCC Bureau has the final decision on whether an EA is required." Dynamic Environmental Comments at 13. Accordingly we do not interpret their comment as

(continued….)

used to require preparation of EAs, and typically only in the context of the requirement in the Note to section 1.1307(d) for applicants to prepare EAs for proposed towers over 450 feet tall because they may have a significant effect on protected avian species.[352] Given that we are moving the extraordinary circumstance described in the Note to section 1.1307(d) to section 1.1306(b)(7), section 1.1307(d) would not play a meaningful role in ensuring the Commission meets its NEPA obligations going forward. Accordingly, we eliminate it from the rules. We note that the Commission, which is ultimately responsible for its NEPA compliance, retains the authority to work with or direct applicants to ensure the Commission can meet its statutory obligations.

124. *Note to Section 1.1307(d)*. In the *NEPA NPRM*, the Commission sought comment on whether it should revise 1.1307(a) to incorporate the instructions contained in the Note into section 1.1307(d).[353] The Note codifies the main provision of a 2010 Memorandum of Understanding between industry and conservation groups in which the parties agreed that an EA should be required for all towers over 450 tall AGL to evaluate potential significant effects to migratory birds.[354] All comments received on this topic are supportive of this change, although both PEER and the ABC & MOS suggest additional changes.[355]

125. PEER states "the cut off of 450 feet may be outdated and should be reconsidered based on current science,"[356] but offers no evidence to suggest why 450 feet is outdated. Therefore, we find no evidence in the record to warrant reevaluating the height threshold. Nor do we see a gap in regulation that would justify a further change to our rules. In addition to expressing support for continued application of the EA requirement for towers over 450 feet, ABC & MOS recommend expanding our list of extraordinary circumstances to include additional factors potentially impacting migratory birds but did not provide support beyond suggesting that "[f]ederal land management agencies restrict the construction of tall structures within 4 miles of a Greater Sage-Grouse leks" because the towers can serve as perches for predators.[357] We note that the Commission's existing extraordinary circumstances include consideration of endangered and threatened species, critical habitats, and wetlands, and satisfy the Commission's obligations under the ESA.[358] We find that the Commission's current considerations satisfy ABC &

(Continued from previous page)
opposing the elimination of section 1.1307(d), but as opposing a change that would eliminate the Bureau's role in application of either provision, to ensure that the Commission can continue to address quickly any unsupported requests. *See* Dynamic Environmental Comments at 20.

[352] The Note to 47 CFR § 1.1307(d) was adopted in response to the D.C. Circuit Court of Appeals 2008 decision in *American Bird Conservancy v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008). This case involved litigation related to ASR registered towers, the MBTA (16 U.S.C. §§ 703–712), and the ESA (16 U.S.C. §§ 1531–1544). *Migratory Bird Remand Order*, 26 FCC Rcd at 16733, para. 84.

[353] *NEPA NPRM*, 40 FCC Rcd at 6402, para. 62; *see* 42 U.S.C. § 4336(b).

[354] *Id.*; *Migratory Bird Remand Order*, 26 FCC Rcd at 16713, para. 33; Memorandum of Understanding Between the Infrastructure Coalition and The Conservation Groups Concerning Interim Antenna Structure Registration Standards (Apr. 23, 2010), at 3–4, https://www.nab.org/xert/Marcomm/Newsletters/Pulse/2010/051010/FINALExecutedMOUAllSignatures042310.pdf; *see also* 16 U.S.C. §§ 703–12 (setting forth the requirements under the MBTA). In section 1.1306(b)(7)(ii) we correct the reference to Appendix B to part 1 of Chapter I of our rules.

[355] Dynamic Environmental Comments at 19; American Bird Conservancy and Maryland Ornithological Society (ABC & MOS) Comments at 6–8; PEER Comments at 19.

[356] PEER Comments at 19.

[357] ABC & MOS Comments at 3–6. Specifically, they request we expand our list to include: "(1) areas along major migratory bird pathways and near stopover sites; (2) endangered species habitats; (3) Greater Sage-Grouse priority habitat; (4) wetlands and grasslands; and (5) interior forests where avoiding or minimizing fragmentation is important for conservation of birds such as Wood Thrush, Cerulean Warbler, Worm-eating Warbler, Kentucky Warbler, Bachman's Sparrow, and Red-headed Woodpecker." ABC & MOS Comments at 3–4.

[358] 47 CFR § 1.1307(a)(3), (7).

MOS's concerns and there is insufficient support for adding to the Commission's list of extraordinary circumstances.

126. The Commission also sought comment on whether to amend the lighting changes on towers over 450 feet in height that require an EA. Currently, Note to section 1.1307(d) requires an EA for the addition of lighting or adoption of a less-preferred lighting style, as defined by section 17.4(c)(1)(iii),[359] on towers over 450 feet tall. Since 2015, the FAA's Advisory Circulars no longer recommend steady-burning red lights, which are the lights of primary concern for potential, significant environmental effects on birds, except for a small subset of towers 150 feet or less in height AGL.[360] We therefore find it unnecessary going forward to require an EA for a change in lighting on a tower over 450 feet in height, except in the unlikely event that such a lighting change includes the addition of steady red lighting.

127. For these reasons and in light of supportive comments,[361] we remove Note 3 from existing section 1.1307(d) and incorporate its remaining provisions into section 1.1306(b)(7), and amend the lighting provision to require an EA for lighting changes to existing towers over 450 feet in height AGL only when they involve the addition of steady red lighting.[362] We find this modification will provide more clarity regarding the extraordinary circumstances that require an EA by moving it to section 1.1306(b). We also remove unnecessary and ambiguous language in the rule by deleting reference to "less-preferred" lighting styles.[363]

128. Related to lighting styles, ABC & MOS encourages the Commission to create a pre-filled version of FCC Form 854 (Application for Antenna Structure Registration) to streamline and simplify the process for tower operators who wish to "switch from steady to flashing lights, or to turn off existing steady burning lights on pre-2016 towers over 350ft."[364] ABC & MOS contend that bird mortality is greatest for towers over 350 feet, and that changing away from steady burning lights can save tower operators "as much as 70%" in energy and tower maintenance costs.[365] We support the goal of simplifying and streamlining the process for tower operators to seek approval to change their lighting to a more preferred lighting style. However, we find it unnecessary to make changes to implement this suggestion because we note that the ASR system already pre-fills tower information in applications to

[359] 47 CFR § 17.4(c)(1)(iii).

[360] The FAA Advisory Circular provides that tower structures "are typically marked with flashing red lights. Buildings and small obstructions located near airports should be marked with steady-burning red lights." Federal Aviation Administration, *Obstruction Marking and Lighting*, 70/7460-1M, CHG 1 at 20 (Oct. 29, 2024). While unlikely to occur, our rules cover the possibility that the FAA could deviate from its published obstruction lighting parameters in a unique case and recommend steady burning red lights where it typically would not in order to provide a no hazard determination.

[361] ABC & MOS Comments at 6 ("We believe that moving the Note from subsection d to subsection a is acceptable, particularly as 'incorporate[ing] permanent measures for the protection of migratory birds.'"); PEER Comments at 19 (noting that PEER supports incorporating the Note to section 1.1307(d) to protect migratory birds). Additionally, in the *NEPA NPRM* we sought comment on closing WT Dockets Nos. 03-187 and 08-61, regarding the effects of communications towers on migratory birds and the *American Bird Conservancy v. FCC* court decision. We decline to do so at this time.

[362] *See* Appendix A, (revised) 47 CFR § 1.1306(b)(7).

[363] *See* Dynamic Environmental Comments at 19 (supporting this change).

[364] ABC & MOS Comments at 5.

[365] *Id.* at 1–2.

modify ASR registrations. We are unable to waive the requirement to obtain FAA approval for a lighting change and an updated no-hazard determination, as required by our rules.[366]

129. *Other Legal Obligations*. In the *NEPA NPRM*, we sought comment on the Commission's legal responsibilities under other environmental protection statutes for its actions that are not MFAs under NEPA.[367] We also asked commenters to identify other legal requirements that may be affected by our decisions here and whether we should address any collateral issues in a separate proceeding.[368] While few commenters addressed this section, statutes such as the ESA, the Clean Water Act, the Outer Space Treaty, and the NHPA were mentioned.[369] We note that we address the NHPA separately and request additional comments related to NHPA in the *Further Notice*, and address space-based operations and the Outer Space Treaty elsewhere in the *Order*.

130. While recent amendments to NEPA have narrowed the pool of Commission actions that qualify as MFAs for which NEPA review is required, the range of actions subject to other federal environmental statutes has not narrowed. Applicants should be aware that compliance with other federal statutes, including the ESA, the MBTA,[370] the Bald and Golden Eagle Protection Act,[371] and the Clean Water Act,[372] is a separate question from whether NEPA applies to a particular action.

131. Section 7(a)(2) of the ESA requires each federal agency, in consultation with the Secretary of the Interior or the Secretary of Commerce, as appropriate, to ensure that any action it authorizes, funds, or carries out, in whole or in part, is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat.[373] The Commission's responsibilities under the ESA apply to actions that it "authorizes, funds, or carries out, in whole or in part," including, among other things, the granting of licenses, contracts, leases, easements, rights-of-way, and permits.[374] The Commission designates its licensees, applicants, tower companies and their representatives, as non-federal representatives responsible for conducting informal consultation or preparing a biological assessment under the Commission's supervision and independent review.[375] Under the ESA, the Commission retains responsibility for conducting formal consultation,

---

[366] *See* 47 CFR §§ 17.4(b), 17.4(k) ("[a]ny change in the marking and lighting that varies from the specifications described on any antenna structure registration requires prior approval from the FAA and the Commission.").

[367] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 35.

[368] *Id.*

[369] *See* PEER Comments at 10–11, Secure World Foundation Comments at 3–4.

[370] 16 U.S.C. § 703–712.

[371] 16 U.S.C. § 668–668d.

[372] 33 U.S.C. § 1251 *et seq.*

[373] 16 U.S.C. § 1536(a)(2), 50 CFR § 402.02 (definition of action).

[374] 50 CFR § 402.02 ("Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.").

[375] 50 CFR § 402.08. This includes, for example, applicants requesting concurrence that a project is not likely to adversely affect listed species or critical habitat. 50 CFR § 402.08 (explaining how a federal agency may designate a non-federal representative to conduct informal consultation). Letter from Susan H. Steiman, Associate General Counsel, FCC to Steve Williams, Director, U.S. Fish and Wildlife Service, U.S. Department of the Interior (July 9, 2003).

when required.[376] We seek comment in the *Further Notice* on the scope of actions to which ESA applies. Pending consideration of the issues in the *Further Notice*, we find it appropriate to amend Note 1 to section 1.1306(b)(3), as moved from section 1.1307(a)(3), of the rules to add language clarifying that "[t]he Endangered Species Act of 1973, as amended, 16 U.S.C. § 1531 *et seq*., requires consultation with the U.S. Fish and Wildlife Service, Department of the Interior, or with the National Marine Fisheries Service, Department of Commerce, as appropriate for actions that meet the definition of 'action' in 50 CFR § 402.02, regardless of whether they meet the definition of major Federal action in 47 CFR § 1.1302."[377] We also clarify that collocations of antennas and associated equipment on existing buildings, antenna towers, or other man-made structures, do not trigger ESA review requirements, consistent with existing Note 1 to section 1.1306.[378] We delegate to the relevant Bureau to provide further guidance to Commission applicants, regarding compliance with the ESA in light of the decisions we adopt today.

132. The MBTA prohibits a list of described actions, and federal courts have held that the MBTA applies to federal agencies.[379] Specifically, the MBTA prohibits the "hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof" identified in one of four international conservation treaties described in the MBTA.[380] Unlike the ESA, the MBTA does not require prior consultation with the FWS, but federal agencies retain an obligation to ensure their actions do not result in violations of the MBTA.[381] Similarly, the Bald and Golden Eagle Protection Act[382] prohibits anyone, without a permit issued by the Secretary of the Interior, from "taking" any bald or golden eagle, dead or alive, in whole or in part.[383] We note that these broadly applicable statutes protecting migratory birds and bald and golden eagles continue to apply to actions beyond the pool of Commission MFAs, and, as a result, entities building infrastructure to support the use of services authorized by the Commission should continue to ensure their projects do not violate these statutes.

133. While recent legal decisions have narrowed the scope of the Clean Water Act[384] by redefining what are considered to be the waters of the United States,[385] the Commission retains

---

[376] This consultation is usually accomplished by coordinating with the FWS and must be conducted unless there is a "no effect" determination.

[377] While this scenario may be unlikely for Commission applicants, we remind applicants that potential effects to marine mammals should be considered and the procedural and substantive obligations of the Marine Mammal Protection Act, 16 U.S.C. §§ 1361–1423h, and the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq*., should be fulfilled for any actions that may affect marine areas.

[378] *See* Sept. 21, 2026 CTIA *Ex Parte* at 6 (requesting that the Commission find that wireless deployments that do not require ASR are not agency "actions" under the ESA or "at minimum" that the Commission maintain the status quo by making clear that collocations are not actions subject to ESA review). We seek comment on CTIA's broader request to determine the scope of Commission "actions" under the ESA in the *Further Notice*.

[379] *See Humane Society of the United States v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000). *But see Sierra Club v. Martin*, 110 F.3d 1551 (11th Cir. 1997), *Newton County Wildlife Association v. USFS,* 113 F.3d 110 (8th Cir. 1997).

[380] 16 U.S.C. § 703(a).

[381] 16 U.S.C. § 703.

[382] 16 U.S.C. §§ 668–668d.

[383] 16 U.S.C. § 703 (defining a "take").

[384] 33 U.S.C §§ 1251–1387.

responsibilities under the Clean Water Act, including ensuring that certifications and permits are obtained for its MFAs, when required.[386] The Clean Water Act may still apply to actions that are not MFAs, and applicants or project proponents will need to evaluate whether and what permits and/or certifications they will need to obtain.[387]

### 2. Part 17 Environmental Notification and Other Processes for ASR Applications

134. In the *NEPA NPRM*, the Commission sought comment on whether to make changes to the environmental notification process for ASR in light of its review of the environmental rules.[388] Accordingly, to conform with changes to our part 1 NEPA rules and in response to comments, we retain and revise our environmental notification and public participation processes for ASR applications found at part 17 of the Commission's rules. We retain the national public notice period and 30-day period for interested persons to request further environmental review of ASR applications, delete the local public notice requirement, require third party petitions to conform to the updated criteria of section 1.1307(c) of our rules, and maintain national public notice of EAs while reducing the period for the submission of requests for further review of ASR applications with complete EAs to 20 days.[389]

135. In 2012, in response to the D.C. Circuit's 2008 decision in *American Bird Conservancy v. FCC*,[390] the Commission adopted its environmental notification process to provide public notice of pending ASR applications and to allow the public a meaningful opportunity to request further environmental review of pending ASR applications, as provided for by section 1.1307(c) of the Commission's rules.[391] The Commission's existing part 17 environmental notification process requires both local and national public notice of pending ASR applications, provides a 30-day period for the public to submit requests for further environmental review beginning with the publication of national notice, and incorporates a pleading cycle for requests for further environmental review that mirrors the procedures in section 1.45 of our rules.[392] ASR applications meeting the criteria of one or more exceptions listed in section 17.4(c)(1) of our rules, are not required to be placed on environmental public notice.[393] The exceptions listed in section 17.4(c)(1) have been deemed by the Commission to be unlikely to have

(Continued from previous page)

[385] *Sackett v. EPA*, 598 U.S. 651 (2023).

[386] 33 U.S.C. § 1341; 40 CFR parts 121, 122, 124.

[387] For example, section 401 of the Clean Water Act requires a certification that a proposed action with potential discharges into waters of the United States meet state or tribal water quality standards, and section 404 of the Clean Water Act, administered by the U.S. Army Corps of Engineers, regulates the discharge of dredged or fill material into waters of the United States. 33 U.S.C. §§ 1341, 1344; *see also* 40 CFR Parts 121, 232; 33 CFR Part 323; U.S. Army Corps of Engineers, *Nationwide Permit Program*, https://www.mvn.usace.army.mil/Missions/Regulatory/Permits/Nationwide-Permits-Program/ (last visited Sept. 3, 2026).

[388] *NEPA NPRM*, 40 FCC Rcd at 6397, paras. 49–50.

[389] We also delete language in existing section 17.4(d) noting that failure to include a final FAA "no hazard" determination with an FCC Form 854 can delay or result in disapproval of an ASR application, because it is unnecessary and duplicative of other provisions in the rules that make clear a valid "no hazard" determination must be filed before an ASR application is granted. *See* 47 CFR § 17.4(b).

[390] *Am. Bird Conservancy, Inc. v. F.C.C.*, 516 F.3d 1027 (D.C. Cir. 2008). This case involved litigation related to ASR registered towers, the MBTA (16 U.S.C. §§ 703–712), and the ESA (16 U.S.C. §§ 1531–1544).

[391] 47 CFR §§ 1.1307(c), 17.4(c).

[392] 47 CFR § 1.45.

[393] 47 CFR §17.4(c)(1).

significant environmental effects.[394] Separately, ASR applicants may also seek waivers of the notice process requirement, for example, due to emergency circumstances.[395]

136. In the *NEPA NPRM*, we asked whether we are legally required to retain the environmental notification process and, even if we are not, whether we should retain it.[396] We also asked about a scenario in which the Commission chooses to delete section 1.1307(c),[397] which the Commission has not opted to do,[398] and whether and how the Commission could evaluate the potential, significant effects of towers requiring registration in the Commission's ASR system on migratory birds in other ways.[399] Finally, we sought comment on whether and what changes the Commission should make to the environmental notification process, if it is retained, such as changes to the list of exceptions and whether the process should only be required for ASR applications that require EAs.[400]

137. Overall, commenters support retaining some manner of environmental public notice for ASR applications and an opportunity for the public to comment on potential environmental effects of Commission MFAs.[401] Many comments support amendments to the environmental notification process, but indicate an assumption that the Commission will retain the environmental notification process in some form.[402] Some commenters argue that the environmental notification process is still legally required to comply with the 2008 D.C. Circuit decision and/or to fulfill NEPA's public participation goals[403] and that any provision allowing for public comment would be meaningless without public notice.[404] Some commenters argue that the Commission should strengthen its public notice provisions.[405] Others note the importance of public participation in agency NEPA decision-making generally and particularly in the context of the Commission's NEPA process, which relies upon applicants to determine in the first instance whether their proposed projects are categorically excluded.[406]

---

[394] *See Migratory Bird Remand Order*, 26 FCC Rcd at 16719, para. 50 (requiring that the environmental notification process be completed for "new towers and modifications that could have a significant environmental impact, but not for administrative changes and modifications that are unlikely to have a significant environmental impact") and at 16719–23 (describing the exceptions to the environmental notification requirement codified at 47 CFR § 17.4(c)(1)).

[395] 47 CFR §§ 1.3, 1.925.

[396] *NEPA NPRM*, 40 FCC Rcd at 6397, para. 49.

[397] 47 CFR § 1.1307(c),

[398] *See supra* Section III.B.1.

[399] *NEPA NPRM*, 40 FCC Rcd at 6397, para. 49.

[400] *NEPA NPRM*, 40 FCC Rcd at 6397, para. 50.

[401] *See, e.g.*, PEER Comments at 13 (arguing that the environmental notification process should be maintained and strengthened); Dynamic Environmental Comments at 13; Dinah Bear Comments at 3–4; Wired Broadband Comments at 6, 10.

[402] *See, e.g.*, CTIA Petition at 25–26; Verizon Reply at 7; T-Mobile Comments at 14; WISPA Comments at 15–17; AT&T Reply at 3, 14–17.

[403] *See, e.g.*, ABC & MOS Comments at 5, 8; Dynamic Environmental Comments at 20; *see also* 42 U.S.C. §§ 4331 (Congressional declaration of national environmental policy of the federal government to act "in cooperation with . . . other concerned public and private organizations"), 43336(b)(2) (describing an environmental assessment as a "public document"), 4336a(c) (requiring request for public comment on EISs), 4336d (requiring CEQ to report to Congress on the potential for digital technologies to improve public accessibility and transparency under NEPA).

[404] *See, e.g.*, NATHPO/NCAI Reply at 23.

[405] Dinah Bear Comments at 3; PEER Comments at 12–14.

[406] Dark Sky International Comments at 8–9; Dinah Bear Comments at 3–4; PEER Comments at 12.

138. We retain but revise the Commission's environmental notification process so that it provides certainty to applicants and promotes public participation in a manner that minimizes compliance burdens. The environmental notification process establishes a defined timeframe and structure for third party petitions, after which such requests may be dismissed as untimely.[407] This process provides clarity to the industry on when it is permissible to proceed with deployment. Without a process specific to ASR, interested persons would rely instead on the Commission's part 1 rules to file informal or formal complaints,[408] which would mean that complaints could be submitted at any time during the construction of projects. By retaining and revising the environmental notification process, we preserve a meaningful opportunity for interested persons to request further review of proposed Commission MFAs while also providing applicants some protection from the potential for uncertainty or delay.[409]

139. While there is general support for retaining some type of public notice and period for submitting requests for further review of ASR applications, many commenters support the elimination of the local public notice requirement,[410] by which applicants are required to provide public notice of their pending ASR applications in a newspaper local to the tower site or via the local zoning process.[411] These commenters argue that the D.C. Circuit did not require the Commission to provide local public notice, and instead noted the petitioners' support for web-based notice.[412] These commenters also argued that local public notice has outlived its usefulness, citing in part the decline in the number and availability of local newspapers in which local public notices can be published.[413] WIA, the only commenter to recommend that the Commission eliminate both local and national public notice requirements for ASR applications, argues in part that community feedback is already received as part of the local zoning and planning process.[414] In contrast, PEER opposes the elimination of local notice, arguing that its absence would undermine meaningful opportunity for the public to learn about and comment on a deployment.[415] WISPA supports the retention of national notice but argues that the national notice period should be reduced from 30 days to 15 to 20 days in order to streamline timely deployment of services while still allowing for meaningful public participation.[416]

140. We disagree with WIA that the Commission should eliminate national public notice because community feedback is already received as part of the local zoning and planning process.[417] In addition to the reasons set forth above, we note that local review processes vary greatly: not all local review processes consider environmental effects, and of those that do, not all fully consider the Commission's list of extraordinary circumstances, the presence or absence of which determines in the

[407] We note that the pleadings timeline in 47 CFR § 17.4(c)(5)(i) mirrors that of 47 CFR § 1.45.

[408] 47 CFR §§ 1.41 (informal requests for Commission action), 1.720–1.740 (formal complaints).

[409] *See* T-Mobile Comments at 14–15.

[410] *See, e.g.*, WIA Comments at 10 (recognizing "the importance of considering the input of the community where a facility will be located," but urging the Commission to eliminate the public notice requirement because the process can be abused and is unnecessary because it is achieved through state and local processes); CTIA Comments at 31; Crown Castle Fiber LLC (Crown Castle) Reply at 4; WISPA Comments at 2, 15–16; WISPA Reply at 8; T-Mobile Comments at 14.

[411] 47 CFR § 17.4(c)(3).

[412] *See, e.g.*, CTIA Comments at 31.

[413] AT&T Reply Comments at 14–15; CTIA Comments at 31; Verizon Reply at 7; and WISPA Comments at 2, 15–16.

[414] WIA Comments at 10.

[415] PEER Comments at 11.

[416] WISPA Comments at 16.

[417] WIA Comments at 10.

first instance whether a proposed MFA is categorically excluded from further NEPA review. As such, we cannot rely on local zoning and planning processes to detect the presence of extraordinary circumstances in the Commission's rules. Therefore, we will continue to require ASR applications not subject to the exceptions in section 17.4(c)(1) to be placed on national notice for 30 days.

141. We also agree with commenters who argue that local notice has become difficult, in part due to the decreased number of local newspapers generally and the fact that some localities have no local print newspaper at all, and that its usefulness has decreased over time as more of the public obtain their news from online sources.[418] We therefore delete the text of section 17.4(c)(3) of our rules referring to local public notice and other references to local public notice requirements in section 17.4(c),[419] which sets forth the environmental notification process. Going forward, as indicated in revised section 17.4(c)(3), environmental public notice required by the Commission will consist only of national public notice posted on the Commission's website.[420] With regard to the requirement for new notice for certain amendments to pending ASR applications, we also reduce the burden on applicants by limiting the types of lighting changes made, whether to a pending ASR application or by an application to modify an existing ASR system registration, that require additional notice and a new period for filing requests to the addition of red steady-burning lights.[421]

142. We received a number of comments regarding the content of requests for further environmental review, now referred to as third party petitions, under section 17.4(c)(5)(ii) of the Commission's rules. While PEER takes issue with the Commission's requirement that the public is required to establish that a proposed action may have a significant environmental effect, rather than being able merely to raise a potential effect,[422] AT&T supports a modification of section 17.4(c)(5)(ii) regarding the content of requests for further environmental processing of our rules to allow Commission staff to dismiss any request that staff determines to be speculative, general, and unsupported or otherwise fail to meet standards in the Commission's rules.[423] We note that requests for environmental review under section 17.4(c)(5)(ii) in the environmental notification process rules, are, by definition, petitions under section 1.1307(c) and will be subject to the same requirements.[424]

143. CTIA argues against requiring additional public notice when an EA is added to a pending application that has already been placed on public notice, whether through the ASR system or ULS, because the public has already been provided with notice of the application.[425] In contrast, Dinah Bear argues that EAs should continue to be placed on public notice for 30 days, given that EAs are the principal vehicle for Commission decision-making and public involvement regarding environmental

[418] *See, e.g.*, AT&T Reply at 14–15; T-Mobile Comments at 14; *see also, e.g.,* Brian Stelter, CNN, *There's a 'severe shortage' of local news across the US, new report reveals* (July 10, 2025), https://www.cnn.com/2025/07/10/media/severe-shortage-local-news-muck-rack-journalism-index.

[419] *See* 47 CFR §17.4(c)(3), (c)(4), (c)(6), (c)(7). We also delete from the Commission's rules cross-references to the local public notice portion of the environmental notification requirement.

[420] *See* Appendix A, (revised) 47 CFR §17.4(c)(3); Federal Communications Commission, *Applications on Environmental Notice*, https://wireless2.fcc.gov/ASRManager/service/nationalNoticeReport.faces (last visited Sept. 3, 2026).

[421] *See infra* para. 144–45.

[422] PEER Comments at 13–14. We note that aspects of section 17.4(c)(5)(ii) overlap with section 1.1307(c) of the Commission's rules. Section 17.4(c)(5)(ii) filings are usually brought pursuant to section 1.1307(c).

[423] AT&T Reply at 15–16.

[424] 47 CFR §§ 1.1307(c), 17.4(c)(5). As discussed in the previous section, under our revised rules petitions submitted pursuant to section 1.1307(c) will be required to show, with evidentiary support, that the proposed action is likely to have a reasonably foreseeable significant environmental effect and will be subject to page limits.

[425] CTIA Comments at 26.

impacts.[426] ABC & MOS emphasize the importance of retaining both notice and comment requirements for EAs given the strong public interest in migratory bird conservation.[427] Crown Castle Fiber LLC (Crown Castle) agrees that EAs should be put on public notice, but argues that only those ASR applications with EAs attached should be put on public notice.[428]

144. We disagree with CTIA that there should be no additional national public notice when an EA is attached to an already pending ASR application, i.e., for which the national notice period has already begun.[429] As noted above, an EA is a vehicle for the agency's decision-making,[430] and, indeed, NEPA describes an EA as a public document.[431] The Commission's ASR system will be the primary receptacle for Commission EAs, and the listing of the ASR application on the Commission's Applications on Environmental Notice webpage[432] will be the means by which the public can learn about and access these public environmental documents.[433] Our concerns about the absence of a defined public notice period for ASR applications, as described above, are heightened for ASR applications with EAs.[434] If the notice period did not restart when an EA was uploaded, an applicant could wait until the end of the notice period, or even after its expiration, to submit its EA, which would create uncertainty about when the public's opportunity to request further review began and, importantly, ended. We find that providing temporal certainty for this process is beneficial for all parties involved. However, as discussed above, we are abbreviating the notice period during which requests for further environmental review may be filed on complete EAs to 20 days,[435] with requests related to EAs due 20 days after the EA is published on the Commission's website. This means that ASR applications initially submitted with EAs attached will have two overlapping notice periods—the 30-day national notice period and the 20-day EA request period. We disagree with Crown Castle's assertion that only ASR applications with EAs attached should require environmental notice.[436] The purpose of the environmental notification process is different from the purpose of the public notice period for EAs, although the timeframes may overlap if an EA is filed when the ASR application is submitted.

145. While commenters generally did not address whether any changes should be made to the list of exceptions to the public notice requirement in section 17.4(c)(1), we note that we have updated the exceptions in line with our decisions here. First, notice will only be required for a lighting change that involves the addition of steady red lights which, we expect, will be exceedingly rare.[437] Second, we delete

---

[426] Dinah Bear Comments at 3–4 (arguing that EAs should continue to be put on public notice for 30 days).

[427] MOS and ABC Comments at 7.

[428] Crown Castle Reply at 4.

[429] CTIA Comments at 26.

[430] Dinah Bear Comments at 3–4.

[431] 42 U.S.C. § 4336(b)(2).

[432] *See* Federal Communications Commission, *Applications on Environmental Notice*, https://wireless2.fcc.gov/ASRManager/service/nationalNoticeReport.faces (last visited Sept. 3, 2026).

[433] We note that we will require EAs for towers requiring ASR to be submitted in ASR, even if they are also submitted in the Universal Licensing System (ULS).

[434] For example, the amended NEPA statute requires EAs to be completed within one year and any missed deadlines to be reported annually to Congress. 42 U.S.C. § 4336a(g)(1)(B), (h).

[435] *See supra* para. 134. We note that the national notice date for ASR applications with EAs may need to be reset when a previously incomplete EA is complete.

[436] Crown Castle Comments at 4.

[437] *See supra* Section III.B.1. Appendix A, (revised) 47 CFR §§ 17.4(c)(1)(iii)–(iv).

the federal agency exception to notice and replace it with the similar lead agency exception, as discussed below.[438]

146. CTIA contends it would be appropriate to clarify in our rules that voluntary registration in the Commission's ASR system is permitted and that voluntarily registered towers do not require marking or lighting and do not require a Determination of No Hazard from the FAA.[439] We agree and amend our rules to clarify that we continue to allow the submission of ASR applications for towers and modifications that do not require ASR system registration under our rules, i.e., towers with a height not over 200 feet AGL or within the glide slope of an airport,[440] and to clarify the obligations of owners of voluntarily registered ASR structures. First, we amend our rules and direct the Wireless Telecommunications Bureau to make changes to the ASR system and FCC Form 854 so that voluntary applications for ASR system registration do not require a No Hazard Determination to be submitted and granted.[441] Second, we relieve applicants for voluntary ASR system registration from the responsibilities in our part 17 rules related to lighting and marking of towers, given that lighting will not be required for these towers.[442] However, while notice will not be required for modifications to voluntarily registered towers (unless those modifications result in the requirement of ASR system registration), we will continue to require tower owners to ensure that information in the ASR system is accurate and current, including any lighting the owner of a voluntarily registered tower decides to add and all changes in height.[443] This will help maintain the accuracy of information in the ASR system. Third, applicants submitting voluntary ASR system registration applications will not be required to complete the environmental notification process, given that the Commission's decision to maintain that process only for towers requiring ASR system registration.[444]

### 3. Procedures for Determining Lead and Cooperating Agency

147. *Determining Lead and Cooperating Agencies.* With respect to a proposed action, the lead agency is ultimately responsible for completing the NEPA process. NEPA defines the lead agency as the agency that proposed the action or, if there are two or more federal agencies involved in the action, the agency designated as lead agency.[445] When more than one federal agency is involved in the

---

[438] *See infra* Section III.B.4; Appendix A, (revised) 47 CFR § 17.4(c)(1)(vi).

[439] CTIA Comments at 32; *see In the Matter of 2004 & 2006 Biennial Regul. Revs. F Streamlining & Other Revisions of Parts 1 & 17 of the Commission's Rules Governing Constr., Marking & Lighting of Antenna Structures*, 29 F.C.C. Rcd. 9787, 9796, para. 21 (2014) ("We will continue to allow owners to voluntarily register antenna structures[.]").

[440] *See* 47 CFR §§ 17.2(a) (defining an antenna structure for purposes of the Commission's part 17 rules), 17.4(a) (setting forth when registration of an antenna structure is required).

[441] *See* Appendix A, (revised) 47 CFR § 17.4(b).

[442] Appendix A, (revised) 47 CFR § 17.4(l) (excepting voluntarily ASR applications from the requirements to obtain a no hazard determination from the FAA, complete the environmental notification process, submit the NEPA checklist, display the ASR number, and mark and light according to specifications (and perform inspections thereof)).

[443] *Id.*

[444] *See* Appendix A, (revised) 47 CFR § 17.4(l). To provide clarity on the transition of these new ASR rules and procedures, applicants with pending ASR applications that are in the process of completing the environmental notification process when the amendments to section 17.4(c) take effect will have the choice to either complete their applications under the prior rules or to withdraw and refile their applications under the new rules. In the case of voluntary ASR applications, for example, withdrawing and refiling the application will allow the applicant to proceed without a determination of no hazard from the FAA and to skip the environmental notification process.

[445] 42 U.S.C. § 4336e(9). The lead agency performs a list of functions, including: (i) supervising the preparation of an environmental document when more than one agency is participating in the action; (ii) requesting the participation of cooperating agencies at the earliest practicable time; preparing an environmental document and

(continued….)

environmental review or authorization of an action,[446] the revised NEPA statute provides for the designation of a single lead federal agency upon consideration of the following five listed factors: (i) the magnitude of agency involvement; (ii) project approval or disapproval authority; (iii) expertise concerning the action's environmental effects; (iv) duration of agency involvement; and (vi) the sequence of agency involvement.[447] The designation of a lead federal agency must be memorialized in a letter or memorandum.[448] Additionally, participating federal agencies may appoint as joint lead agencies such state, Tribal, or local agencies as they determine appropriate,[449] and the lead agency can designate as a cooperating agency any federal, state, Tribal, or local agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal.[450]

148. In the *NEPA NPRM*, we sought comment on whether and how the Commission should adopt rules implementing NEPA's lead and cooperating agency provisions and what would be sufficient as a letter or memorandum of such designation, as required by the statute.[451] Commenters that addressed this issue are in favor of the adoption of lead agency provisions to clarify the NEPA process when multiple federal agencies are participating in the same action, but were not specific about how we should do so.[452]

149. Consistent with the NEPA statute, we adopt modifications to section 1.1302, which as revised set forth the procedures for the Commission, in conjunction with the other federal agency or agencies involved in a particular action subject to NEPA, to designate a lead federal agency or joint lead agencies.[453] We agree with commenters that a rule that encompasses the procedures set forth in NEPA for designating lead and cooperating agencies provides clarity and efficiency to the NEPA process and, accordingly, incorporate consideration of the five factors required by NEPA into our rules.[454] To ensure compliance with the NEPA statute, we require a letter or memorandum of lead agency designation within or attached to an email on which all participating agencies, and, if applicable, the project sponsor or

(Continued from previous page)
giving consideration to any analysis or proposal created by a cooperating agency; (iii) developing and maintaining schedules in coordination with each cooperating agency, the applicant, and other entities for completion of any environmental review, permit, or authorization required to carry out the proposed action; and (iv) meeting with a cooperating agency upon request. 42 U.S.C. §§ 4336a(a)(2).

[446] 42 U.S.C. § 4336e(8) (definition of participating agency).

[447] 42 U.S.C. § 4336a(a)(1)(A).

[448] *Id.*

[449] 42 U.S.C. § 4336a(a)(1)(B).

[450] 42 U.S.C. § 4336a(a)(3). NEPA further allows any federal, state, Tribal, or local agency or person that is substantially affected by the lack of a designation of a lead agency with respect to a proposed agency action to submit a written request for the designation of a lead agency to a participating federal agency, which request must then be transmitted to each participating federal agency and CEQ. 42 U.S.C. § 4336a(a)(4). If the participating agencies are unable to agree on a lead agency within 45 days of such a request, then the substantially affected federal, state, Tribal, or local agency or person may request that CEQ appoint a lead agency. 42 U.S.C. § 4336a(a)(5).

[451] *NEPA NPRM*, 40 FCC Rcd at 6406, para. 73.

[452] *See, e.g.*, U.S. Small Business Administration Office of Advocacy Comments at 3–4; WIA Comments at 5 (noting that the FRA added provisions to NEPA allowing for the designation of a lead agency); *see also* NATE Comments at 4 (in favor of avoiding duplication of environmental review by other agencies).

[453] 42 U.S.C. § 4336a(a)(1)(A), (1)(B); *see* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 12 (Dec. 11, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/10226086707465 (noting that the Tlingit Haida Tribes of Alaska ask what the protocol is for determining a lead agency).

[454] 42 U.S.C. § 4336a(a)(1)(A).

applicant, are copied.[455] Also consistent with the NEPA statute, the modifications in section 1.1302, describe the role of the Commission when designated as the lead agency or as a joint lead agency.[456] Finally, the rule requires the Commission, when it is a participating agency in a proposed action, to submit to CEQ and all other participating agencies any written request for the designation of a lead agency that it receives from any federal, state, Tribal, or local agency or person that is substantially affected by the lack of designation.[457] We note that the lead and cooperating agency designations should be made early in the NEPA process and not after any participating agency has completed its review. We believe this change will improve clarity and efficiency in addressing actions in which the Commission is among multiple agencies involved.[458] These modifications are adopted in section 1.1302(e).

#### 4. Federal Agency Exception

150. To reduce or eliminate duplication of effort among federal agencies in NEPA reviews,[459] sections 1.1311(e) and 17.4(c)(1)(vi) of the Commission's rules included what is known as the federal agency exception.[460] Section 1.1311(e) provided that an EA need not be submitted to the Commission if another federal agency has assumed responsibility for determining whether the facilities in question will have a significant effect on the quality of the human environment and, if it will, for invoking the EIS process.[461] In turn, section 17.4(c)(1)(vi) provided that the environmental notification process need not be completed for an ASR application for the construction, modification, or replacement of an antenna structure sited on federal land where another federal agency assumes responsibility for determining whether the facilities in question will have a significant effect on the quality of the human environment, and if so, for invoking the EIS process.[462] Section 17.4(c)(1)(vi) also included a rarely used provision allowing for it to be applied to any ASR structure pursuant to a written agreement between the Commission and the federal agency that assumed responsibility for environmental review.[463] In practice,

---

[455] *Id.*

[456] 42 U.S.C. § 4336a(a)(2).

[457] 42 U.S.C. § 4336a(a)(4), (5).

[458] *See* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 9 (Dec. 11, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/10226086707465 (noting that the Tlingit & Haida Tribes of Alaska recommend that NTIA and the Commission coordinate in order to avoid duplicative environmental review); Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 9 (Jan. 14, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/103041866728827 (noting that the Tlingit & Haida Tribes support eliminating redundant environmental review documentation).

[459] *Amendment of Environmental Rules*, First Report and Order, 5 FCC Rcd 2942, 2943 at para. 10 (1990), *citing* 47 CFR § 1.1311(e); *see Migratory Bird Remand Order*, 26 FCC Rcd at 16722–23, para. 56 (2011), *citing* 47 CFR § 1.1311(e). We note that the *Migratory Bird Remand Order* references CEQ rules implementing NEPA's lead and cooperating agency provisions, and that CEQ regulations were removed effective April 11, 2025. CEQ Interim Final Rule, 90 Fed. Reg. 10610. However, the concept of the designation of lead agencies dates back at least to CEQ's 1973 guidance and the Commission's 1974 NEPA rules. *See* Council on Environmental Quality, Preparation of Environmental Impact Statement Guidelines, 38 Fed. Reg. 20550, 20553 (Aug. 1, 1973) (recommending the designation of a lead agency to assume supervisory responsibility when more than one agency is involved in an action); Federal Communications Commission, Implementation of the National Environmental Policy Act of 1969, *Termination of Proceeding*, 39 Fed. Reg. 43834, 43841, 43845 (Dec. 19, 1974) (adoption of the federal agency exception as 47 CFR § 1.1311(d)).

[460] 47 CFR §§ 1.1311(e), 17.4(c)(1)(vi).

[461] 47 CFR §§ 1.1311(e), 17.4(c)(1)(vi).

[462] 47 CFR § 17.4(c)(1)(vi).

[463] 47 CFR § 17.4(c)(1)(vi).

Commission staff have typically reviewed the completed NEPA documentation from another federal agency submitted by an applicant or licensee seeking to apply the federal agency exception at sections 1.1311(e) or 17.4(c)(1)(vi) and determined whether the exception to the EA requirement or the environmental notification requirement, as applicable, applied. In the *NEPA NPRM*, we sought comment on whether we should retain the federal agency exception in part 1 and/or part 17 of the Commission's rules, whether and how they should be amended, and whether these rules, as applied in practice, comply with the NEPA statute.

151. CTIA and WIA are both in favor of the Commission retaining its federal agency exception.[464] In its comments, CTIA said that the federal agency exception is helpful and should be retained, but opined that the exception in both the part 1 and part 17 rules should be clarified to read that "environmental processing under the Commission's rules is not required" if another [f]ederal agency has assumed responsibility for determining if the facility will have a significant environmental effect."[465] Regarding acceptable documentation, CTIA said that applicants should retain the other agency's environmental review documentation, such as a FONSI, Record of Decision (RoD), or CE determination in their files.[466] No other commenters argued for or against retaining the federal agency exception.

152. Given that the federal agency exception was designed to be consistent with the concept of a lead agency and the Commission is now adopting a rule requiring the designation of a lead agency consistent with the NEPA statute, we find that the best course of action is to replace the federal agency exception, as it has been applied by the Commission in the past, with a lead agency exception. Specifically, we amend the Commission's federal agency exception, which was previously codified in section 1.1311(e), and now appears as the lead agency exception in section 1.1307(a)(4), to provide that an EA need not be submitted to the Commission if another federal agency has been designated as the lead agency. We also amend the rule at section 17.4(c)(1)(vi) to include an exception from the environmental notice requirement in the ASR system "[f]or construction, modification, or replacement of an antenna structure for which a Federal agency other than the Commission has been designated as the lead agency and for which environmental review has concluded."[467] This amended ASR provision omits the requirement that the facility be sited on federal land, since that is just one of multiple factors that may be considered in determining whether the FCC or another agency is the lead agency for a proposal.[468] We agree with CTIA that simplifying the text of the federal agency exception, now the lead agency exception, and applying the same standard consistently in both parts 1 and 17 of our rules makes sense and will be beneficial to our applicants. However, to help ensure the Commission meets its NEPA obligations, the lead agency exception in our part 17 rules requires that the lead agency's environmental review be complete prior to excepting the proposed construction or modification of a tower requiring ASR from the environmental notice requirement.[469] We also find these changes, and continued application of appropriate exceptions when another agency is the lead, to be consistent with NEPA's goals of promoting timely and unified federal reviews and the "one document" requirement.[470]

---

[464] CTIA Comments at 33; WIA Comments at 5.

[465] CTIA Comments at 33.

[466] CTIA Comments at 33.

[467] Appendix A, (revised) 47 CFR § 17.4(c)(1)(vi).

[468] 42 U.S.C. § 4336a(a)(1)(A) (outlining criteria agencies must consider when determining which agency will be the lead).

[469] Appendix A, (revised) 47 CFR § 17.4(c)(vi).

[470] 42 U.S.C. § 4336a(b) (providing that, "to the extent practicable," if a proposal "will require action by more than one Federal agency and the lead agency has determined that it requires preparation of an environmental document, the lead and cooperating agencies shall evaluate the proposal in a single environmental document.").

153. In practice, because towers requiring registration in the Commission's ASR system remain subject to NEPA, and based on the Commission's long history and expertise with respect to communications facilities and their environmental impacts, we anticipate that the Commission is likely to serve as either the lead or a cooperating agency for actions involving the construction or modification of communications facilities that require ASR system registration.[471] As a cooperating agency, the Commission will have the opportunity to submit comments, and may, for example, recommend that the lead agency consider the Commission's list of extraordinary circumstances, to the extent not already considered under the lead agency's own NEPA procedures, or recommend measures to mitigate adverse environmental effects when appropriate.[472] In instances where another federal agency is the lead, that agency will be responsible for determining, consistent with the NEPA statute, whether a CE applies to the action or whether preparation of an environmental document is required.[473] We, therefore, find it appropriate for the lead agency exceptions in our rules to apply both when the lead agency determines that an environmental document is required and in instances where a lead agency applies a CE to the action.[474]

154. The ASR application will include a question about whether a federal agency other than the Commission has been designated as the lead agency for the antenna structure that is the subject of the ASR application.[475] Given that towers requiring registration in the Commission's ASR system are the Commission's MFAs, it is important for the Commission to ensure that these towers comply with NEPA before granting ASR applications. Therefore, applicants who answer yes will be prompted to upload documentation showing that the lead agency has completed its NEPA process for the tower. Upon confirmation, ASR applicants will be prompted to complete any further sections of the ASR application as applicable, including a certification that the facility will not result in human exposure in excess of the applicable guidelines cited in section 1.1307(b).[476] For these applications, environmental notice will not be required.

### 5. Other Changes to NEPA Procedures

155. *Clarifying Definition of Antenna Structure Property.* In the *NEPA NPRM*, the Commission sought comment on whether to provide a universal definition of the term "antenna structure property" so as to remove any ambiguities within our rules that may cause confusion or delay.[477] By way of example, we explained that the Collocation NPA defines an antenna structure property as "the current boundaries of the leased or owned property surrounding the tower and any access or utility easements currently related to the site," but section 1.1306 defines antenna site as "the area that is within the boundaries of the leased or owned property surrounding the deployment or that is in proximity to the structure and within the boundaries of the utility easement on which the facility is to be deployed,

---

[471] 42 U.S.C. § 4336a(a).

[472] 42 U.S.C. § 4336a(a)(3).

[473] 42 U.S.C. §§ 4336, 4336a(a)(2), (b). Where a project sponsor prepares an EA or EIS, the lead agency must independently evaluate it and take responsibility for the contents. 42 U.S.C. § 4336a(f).

[474] As discussed above, in all instances, and consistent with the Commission's exclusive jurisdiction under the Telecommunications Act of 1996 over the regulation of RF emissions, facilities will continue to be subject to section 1.1307(b) and require EAs if their construction would result in human exposure to RF emissions in excess of the applicable guidelines cited in section 1.1307(b). 47 U.S.C. § 332(c)(7)(B)(iv), Telecommunications Act of 1996, Pub. L. No. 104-104, Title VII, § 704(b), 110 Stat. 56. Accordingly, even if an ASR applicant indicates that the lead agency exception applies, the applicant must still certify its evaluation of 47 CFR § 1.1307(b).

[475] We direct the Wireless Telecommunications Bureau to make appropriate changes to the ASR system and FCC Form 854 to implement the changes described in this section.

[476] *See supra* paras. 95–96.

[477] *NEPA NPRM*, 40 FCC Rcd at 6409, para. 82.

*whichever is more restrictive*."[478] Because no comments were received in response to this proposal, we do not find any basis, at this juncture, to modify our rules.

156. *Removing References to Rescinded Regulations.* The Commission sought comment on removing references to rescinded CEQ regulations from our rules consistent with guidance from CEQ and the D.C. Circuit's decision in *Marin Audubon Society* that CEQ rules are not binding on other agencies and that CEQ serves as an advisory agency.[479] No comments in opposition were received. WIA expressed that the removal of these references was necessary, and although they did not comment directly on this proposal, the U.S. Small Business Administration Office of Advocacy noted that the removal of CEQ's implementing regulations would permit the Commission to develop its "own procedures for meeting NEPA's requirements while focusing on [its] own statutory mandates[,]" but cautions that it is "important when developing NEPA implementation regulations, the FCC maintains a degree of consistency with other agencies to avoid unnecessary project expenses and delays."[480] Accordingly, we modify our rules to delete any reference to CEQ's regulations.

157. *Correcting Cross-References*. In this *Order*, we reorganize, amend, and delete a number of Commission rules, many of which are referenced in other provisions of the rules. Accordingly, we revise a number of cross-references to the Commission's NEPA and NHPA rules to reflect the new codifications of relevant provisions and delete cross-references to deleted rules.[481]

## C. Modernizing the Commission's EA and EIS Requirements

### 1. Updated EA Requirements

158. The Commission sought comment on whether, consistent with the requirements of NEPA, we should make any changes to our rules requiring a project sponsor (i.e., the applicant) to prepare an EA where one is required by the Commission's rules to help expedite processing and reduce costs and burdens for project sponsors, including small entities.[482] Below we address amendments to the Commission's rules governing the preparation of EAs.

159. *Reasonable Range of Alternatives.* In its petition, CTIA states that, under the revised NEPA, "agencies need only consider a reasonable range of alternatives when making environmental determinations"[483] and argues that the Commission should amend its rules to clarify that the Commission need only consider a "reasonable range of alternatives [ ] that are technically and economically feasible, and meet the purpose and need of the proposal."[484] Dynamic Environmental indicates that it does not oppose a reasonableness standard, provided that the standard "is not construed to suggest that mitigation of environmental impacts is not needed and would be cost-prohibitive."[485] Based on these comments, we find it appropriate to amend our rules governing EAs to require in section 1.1307(a)(1)(vi) that an EA

---

[478] *NEPA NPRM*, 40 FCC Rcd at 6409, para. 82, note 226, citing to Collocation NPA at Section I.E.4 and 47 CFR 1.1306(c)(1)(iii)(D) (emphasis added).

[479] *See NEPA NPRM*, 40 FCC Rcd at 6409, para. 83; CEQ Interim Final Rule, 90 Fed. Reg. at 10610; and *Marin Audubon Society*, 121 F. 4th at 912.

[480] WIA Comments at 4; U.S. Small Business Administration Office of Advocacy (SBA) Comments at 3–4.

[481] *See* Appendix A.

[482] *NEPA NPRM*, 40 FCC Rcd at 6410, para. 84.

[483] CTIA Petition at 24, citing to 42 U.S.C. § 4332(2)(C)(iii) (internal quotation marks omitted). We note that CTIA recommends amendments to sections 1.1308 and 1.1311 of our rules, and we have deleted these sections and incorporated their substance into revised section 1.1307 (Appendix A, (revised) 47 CFR § 1.1307).

[484] CTIA Petition at 24–25 (citing 42 U.S.C. § 4332(2)(C)(i)–(ii) (internal quotation marks omitted)); *see also* CTIA Comments at 25–26 & n.122.

[485] Dynamic Environmental Comments to CTIA Petition at 6.

include "[a] description of technically and economically feasible alternative sites or facilities considered."[486] We find that further modification, regarding the inclusion of alternatives in EAs, to section 1.1307, where we have consolidated the substance of our rules regarding EAs, is unnecessary, as nothing therein is inconsistent with the application of a reasonableness standard as described in the NEPA statute.[487]

160. *EA Document Requirements.* As proposed in the *NEPA NPRM*, we modify our rules to require EAs to include "a statement of purpose and need that briefly summarizes the underlying purpose and need for the proposed agency action" and a 75-page limit on EAs, excluding citations and appendices.[488] This proposal is supported by CTIA, Verizon, and Dynamic Environmental.[489] The Standing Rock Sioux Tribe and Flandreau Santee Sioux Tribe claim that a 75-page limit is insufficient, but assume that the EA will be used to address section 106 issues, which will be addressed outside of the NEPA context, consistent with decoupling the NHPA process from NEPA.[490] The page limit is a statutory requirement.[491]

161. CTIA argues that EAs required by the Commission's rules should only have to address the potential, significant environmental effects that triggered the EA requirement.[492] PEER objects to this proposal, arguing in part that merely relying on the NEPA checklist with no documentation showing that full review was completed is insufficient.[493] We decline to adopt CTIA's proposal. Applicants must already evaluate the Commission's list of extraordinary circumstances and retain documentation thereof, and we think it is neither unreasonable nor burdensome for applicants to include in their EAs information and analysis already in their possession.

162. *Public Requests for Further Review of EAs*. The Commission sought comment on whether to continue requiring EAs to be placed on public notice for 30-days during which requests for further review may be submitted prior to the issuance of a FONSI or a decision to require further environmental processing, as required for ASR applications with EAs by sections 17.4(c)(5) and (7).[494] The NEPA statute describes an EA as a "public document," but only requires a public comment period for a notice of intent for EISs.[495] We sought comment on the meaning of "public document" and did not receive any comments in response. Even though the amended NEPA statute does not require public notice, we find it is in the public interest to ensure a public participation process for EAs. To balance the goals of public participation and accelerating broadband deployment, we are modifying section 17.4(c)(6) to shorten the EA public notice period from 30 days to 20 days.

---

[486] Appendix A, (revised) 47 CFR § 1.1307(a)(1(vi). Section 1.1311(a)(4) previously stated, in discussing site selection, that an EA shall include a discussion of "any alternative sites or facilities which have been or might reasonably be considered."

[487] Appendix A, (revised) 47 CFR § 1.1307; 42 U.S.C. § 4332(2)(C)(ii) (requiring consideration of a reasonable range of alternatives); *see also* Miami Tribe of Oklahoma Comments on CTIA Petition at 6 (arguing that nothing in the Commission's rules is inconsistent with the reasonably foreseeable standard of NEPA).

[488] *NEPA NPRM*, 40 FCC Rcd at 6410, para. 85.

[489] CTIA Comments at 28–29; Verizon Reply at 8 (supporting the Commission's proposals to codify certain EA requirements (e.g., templates, page limits)); Dynamic Environmental Comments at 22.

[490] Standing Rock Sioux Tribe Comments at 7; Flandreau Santee Sioux Tribe Comments at 6.

[491] 42 U.S.C. § 4336a(e)(2).

[492] CTIA Comments at 28–29.

[493] PEER Comments at 11.

[494] *NEPA NPRM*, 40 FCC Rcd at 6411, para. 86.

[495] 42 U.S.C. § 4336a(c).

163. While we received no comments regarding the meaning of "public document" in the context of whether NEPA requires public notice of EAs, we did receive comments encouraging us to retain and expand the period for filing requests for further review. Several Tribal nations claim that the 30-day period is too short, would limit Tribal participation due to Tribes' limited resources, is impractical, and does not respect the government-to-government relationship between the United States and Tribal Nations.[496] They expressed that an increase in wireless infrastructure projects would risk overwhelming their THPO offices under a 30-day notice period.[497] We decline to adopt an extended period for filing requests for further review and note that the THPO is tasked, among other things, with reviewing the impact to sacred, historical, and cultural sites under section 106 of the NHPA, which we are decoupling from the NEPA review process, as described above. The NPA governs our section 106 review process, including its own comment period, and is outside the scope of this proceeding.[498] Changes to the period for filing requests for further review of EAs will not alter the timeframe afforded to THPOs to review and respond to applications under the section 106 process.

164. *One-Year EA Completion Deadline*. In the *NEPA NPRM*, we proposed to modify section 1.1308 of the Commission's rules to require that the EA process be concluded within a one-year period, as required by the amended NEPA statute.[499] We adopt the proposed one-year deadline as section 1.1307(a)(9). In the *NEPA NPRM*, we tentatively found that the scenarios discussed in the statute for determining when the EA submission process has begun are not applicable to the Commission's NEPA process, which relies on applicants to make an initial determination of whether an EA is required, and we sought comment on whether the one-year period should start on the date the Commission receives an applicant's completed EA.[500] The Commission's rules require applicants to determine whether the Commission's rules require an EA for a particular project, and the Commission generally considers whether an EA is required after it receives information about the project. Therefore, we believe that using the date the Commission receives information about a proposed infrastructure deployment, specifically, when an EA is received for review by the Commission (*see* new section 1.1307(a)(9)(i)), most closely aligns with section 4336a(g)(1)(B)(i) of the statute, which uses as a benchmark, "the date on which such agency determines that section 4336(b)(2) of this title requires the preparation of an environmental assessment with respect to such action."[501] We thus clarify in our rules that the one-year period starts on the date the Commission receives an applicant's EA and ends when the Commission issues a FONSI or determines that a FONSI is not appropriate, subject to a provision that the Commission, in consultation with the applicant, may establish a new deadline that provides only as much additional time as needed for the applicant to amend its EA to submit any additional information. The industry supports this proposal.[502] Elk Valley Rancheria also supports adoption of the one-year deadline, but argues that the Commission must "explicitly recogniz[e] that time reasonably necessary for government-to-government consultation is integral to the schedule," and that "[t]he rules should provide transparent pause/extension

---

[496] Standing Rock Sioux Tribe Comments at 7; Flandreau Santee Sioux Tribe Comments at 6; United South and Eastern Tribes Sovereignty Protection Fund Comments at 4.

[497] *Id.*

[498] *See Wireless NPA* at Section VII.B–C

[499] 42 U.S.C. § 4336a(g)(1)(B).

[500] *NEPA NPRM*, 40 FCC Rcd at 6412, para. 90.

[501] 42 U.S.C. § 4336(g)(1)(B)(i).

[502] CTIA Comments at 27–28; T-Mobile Comments at 15–16; and SBA Comments at 4; *see also* Verizon Reply at 8 ("[T]he Commission's proposed provisions on modernizing the Commission's Environmental Assessment and Environmental Impact Statement requirements, and other common-sense reforms, such as standardized templates, page limits, and online submission requirements should be adopted. All of these proposals serve to streamline the infrastructure permitting process."); *see also* SBA Comments at 1, 3–5, 7; Sept. 24, 2026 WIA *Ex Parte* at 2.

mechanics to ensure consultation quality rather than speed alone."[503] We agree and note that the statute provides a mechanism to establish a new deadline as necessary.[504] Consistent with NEPA, we add a provision to our rules allowing the Commission or responsible Bureau, in consultation with the applicant, to extend the EA completion deadline by as much time as needed to complete the EA.

165. *Timeframes for Commission Actions on EAs and Third Party Petitions.* The Commission sought comment on what, if any, changes we could make to our rules consistent with NEPA to "help expedite environmental processing time and reduce costs and burdens for project sponsors, including those that are small entities."[505] The Commission also sought comment on whether to codify the timeframes described in the *Wireless Broadband Deployment Second R&O* in its environmental processing rules. In the *Wireless Broadband Deployment Second R&O*, the Commission directed staff to review an EA for completeness and sufficiency within 20 days of its submission, notify the applicant of any deficiencies within 30 days of submission (within 10 days after completing review), and issue a FONSI within 60 days of an EA being deemed complete when the EA supports such a finding[506] The Commission asked whether doing so would create any issues with the amended NEPA's one-year deadline and whether the timeframes adequately balance the Commission's need to fulfill its NEPA obligations with the need to facilitate broadband deployment. Several commenters recommended that the Commission adopt a timeline for Commission staff to review and resolve third party petitions.[507] After careful consideration, we have decided to proceed with codifying the timelines provided in the *Wireless Broadband Deployment Second R&O*, with the exception of the requirement for staff to review the EA within 20 days of receipt, but to notify the applicant of deficiencies within 30 days. The requirement that staff complete review within 20 days is an internal business process, which confers no cognizable rights on the applicants, and thus we find no basis to codify it. Instead, we require staff to complete review *and* provide notice of deficiencies to the applicant within 30 days of receipt of the EA. As noted above, we also codify the one-year statutory deadline, which imposes certain reporting requirements on the Commission.[508] The *Wireless Broadband Deployment Second R&O* timelines we codify here provide applicants with a measure of predictability and help facilitate the rapid deployment of infrastructure.

166. While Dynamic Environmental encourages the Commission to adopt "[w]ritten policy schedules of when staff must review submitted EAs, when an EA is deemed complete or, deemed incomplete and requests s for further review submitted to the sponsor, and when a FONSI must be issued

---

[503] Elk Valley Rancheria Comments at 2. PEER also supports a mechanism for extending the one-year deadline, noting that "[m]ost submissions are already reviewed within a short, mandated timeframe. The majority of processing delays are due to missing information on the applicant's part and deadlines should be tolled to reflect the applicant's failure to provide information." PEER Comments at 20.

[504] 42 U.S.C. § 4336a(g)(2).

[505] *NEPA NPRM*, 40 FCC Rcd at 6410, para. 84.

[506] *NEPA NPRM*, 40 FCC Rcd at 6412, para. 91; *Wireless Broadband Deployment Second R&O*, 33 FCC Rcd at 3165–66, paras. 149–151. The *NEPA NPRM* incorrectly stated that the timeframe for notifying the applicant of deficiencies was 20 days after receipt of the EA. (*NEPA NPRM*, 40 FCC Rcd at 6412, note 247). The *Wireless Broadband Deployment Second R&O,* however, explained that staff would have an additional 10 days beyond the 20-day review period to notify the applicant. We are adopting the timeframes described in the *Wireless Broadband Deployment Second R&O.*

[507] T-Mobile Comments at 15; AT&T Reply at 15. NATE recommends that the Commission modify our rules to require "a 30-day completeness review with one consolidated deficiency letter; a presumptive 90-day EA decision from completeness (extendable to 120 days with written, project-specific findings and transparent stop-the-clock criteria)[.]" NATE Comments at 5. NATE does not provide an argument for why these deadlines are superior to those we propose. Because our deadlines are less generous and, as we explain in para. 163, sufficient to effectuate EA review, we decline to adopt NATE's proposed deadlines.

[508] *See* 42 U.S.C. § 4336a(h)(1)(A).

following the comment period,"[509] it argues that codifying the *Wireless Broadband Deployment Second R&O* timelines "may not be necessary" and questions whether the Commission has sufficient staff to achieve these objectives.[510] It further argues that granting applicants a right to seek judicial review if the proscribed timeframes are exceeded "is contrary to the goal of speeding broadband deployment as this would certainly add unwelcome delays to a project."[511] As we noted in the *Wireless Broadband Deployment Second R&O*, 75% of EAs are processed within 60 days and, with a handful of exceptions, those that take longer are due to missing or otherwise deficient information from the applicant.[512] From July 28, 2024 to January 28, 2025, we issued 27 FONSIs, which took an average of 12 days following submission of a completed EA. For these reasons, we do not anticipate that codifying this existing practice in our rules will significantly tax Commission resources. We note, however, that as outlined in the relevant rule section, these timeframes assume that the relevant Bureau has received an EA that is complete, adequate, and does not have a third party petition or petition to deny filed against it. Contrary to Dynamic Environmental's comment, codifying these timeframes does not create an automatic right of judicial review. EAs are reviewed by the Bureaus on delegated authority, and our rules establish that it is a condition precedent for seeking judicial review that any party aggrieved by an action, or in this case inaction, taken by a Bureau on delegated authority must first file an application requesting review by the Commission.[513]

167. We further amend our rules, as some commenters recommend,[514] to adopt a timeline for Commission staff to review and resolve third party petitions.[515] CTIA and T-Mobile propose that the Commission adopt a rule requiring Commission staff to resolve third party petitions within 90 days of the close of the pleading cycle set forth in section 17.4(c)(5)(i).[516] In the context of third party petitions addressing ASR applications with EAs, we note that timelines for completing EAs already apply, including NEPA's one-year deadline and the deadlines the Commission imposed upon itself in the *Wireless Broadband Deployment Second R&O*.[517] Given that most third party petitions are resolved by staff promptly,[518] we believe the proposed time period of 90 days from the close of the pleading cycle is reasonable and amend our rules to incorporate it.[519] In cases where there is a third party petition with no pleading cycle established, staff will complete review within 90 days of receipt of the third party petition. However, we agree with PEER that, occasionally, applicants have taken extended time periods to provide complete information staff need to make a determination.[520] This could be for any number of reasons, including an applicant's business priorities. Applicants have, and should have, the discretion to prioritize

---

[509] Dynamic Environmental Comments at 21–22 (arguing that such an approach would be "in keeping with environmental reviews by other state and federal agencies as well as the timelines the FCC requires of state historic preservation offices and tribal entities.").

[510] Dynamic Environmental Comments at 23–24.

[511] *Id.* at 24.

[512] *Wireless Broadband Deployment Second R&O*, 31 FCC Rcd at 3165, para. 149 and fn. 352; *see also* PEER Comments at 11.

[513] 47 CFR § 1.115(k).

[514] T-Mobile Comments at 15; AT&T Reply at 15.

[515] T-Mobile Comments at 15; AT&T Reply at 15.

[516] 47 CFR § 17.4(c)(5)(i); CTIA Petition at 27; T-Mobile Comments at 15.

[517] 42 U.S.C. § 4336a(g)(1)(B).

[518] *See, e.g.*, Dynamic Environmental Comments at 20 (contending that frivolous or unsupported claims are already dealt with quickly by staff).

[519] These changes are incorporated into our rules at 47 CFR §§ 1.1307(c) and 17.4(c)(7).

[520] *See, e.g.*, 47 CFR §§ 1.17, 1.1204(a)(1); PEER Comments at 11.

projects and staff or contractor work as they see fit, but we believe that the applicant's decisions in this regard should not impact the ability of Commission staff to meet a codified deadline. Therefore, we also incorporate in the amended rule a provision that tolls the 90-day clock from the time Commission staff request information or clarification from an applicant to the time the applicant provides it to the requesting Commission staff.

### 2. Updated EIS Requirements

168. In the *NEPA NPRM*, we sought comment on whether we should revise our EIS rules to align them with the changes in the amended NEPA statute, and, if the Commission decided to require applicants to prepare an EIS when one is required, which we do herein, what other changes to our EIS procedures may be needed.[521] These revisions to the statute include: (1) a requirement that agencies prescribe procedures to allow a project sponsor to prepare an EIS under the supervision of the agency; (2) public notice of intent to prepare an EIS and request for comments on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action; (3) a 150-page limit except for complex issues, which are limited to 300 pages; and (4) a two-year deadline for completion, with the ability to extend the deadline only so long as necessary to complete the EIS, and a requirement that missed deadlines be reported to Congress.[522] We received general statements of support from the industry.[523] The Standing Rock Sioux Tribe and Flandreau Santee Sioux Tribe object to the 150-page limit on EISs.[524] However, the page limit is a statutory requirement. Additionally, we have combined our EIS requirements in revised section 1.1312 and aligned that section with the requirements of the revised NEPA statute in the manner described below. Consistent with the Commission's *Delete, Delete, Delete* initiative, we also remove sections 1.1305 and 1.1314 through 1.1319 and consolidate the relevant language in section 1.1312, as well as removing extraneous text to streamline and clarify section 1.1312.[525]

169. *Project Sponsor Preparation of an EIS.* We modify our rules to require the project sponsor (i.e., applicant) to prepare the EIS, as permitted by the amended NEPA.[526] No comments opposing this proposal were received.

170. *Content of an EIS.* Revised section 1.1312(c) reflects the statutory requirements and limits for EIS documents, including incorporating the statutory page limit of 150 pages, or 300 pages for a proposed action of extraordinary complexity.[527]

171. *Public Notice and Related Requirements.* As proposed, revised section 1.1312(b)(1) incorporates the statutory requirement that "[e]ach notice of intent to prepare an environmental impact statement . . . shall include a request for public comment on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action."[528] No commenter opposed this proposal.

172. *Supplements to Statements*. Revised section 1.1312 eliminates from the Commission's EIS procedures the need to prepare draft and final EISs, as draft and final versions of an EIS are not

---

[521] *NEPA NPRM*, 40 FCC Rcd at 6413, paras. 93–94.

[522] 42 U.S.C. § 4336a(c), (e)(1), (f), (g)(1)–(2), (h)(1).

[523] WIA Comments at 9; WISPA Reply at 7–8.

[524] Standing Rock Sioux Tribe Comments at 7; Flandreau Santee Sioux Tribe Comments at 6.

[525] *See Delete, Delete, Delete,* 40 FCC Rcd 1601; Appendix A, (revised) 47 CFR § 1.1312.

[526] 42 U.S.C. § 4336a(f).

[527] Appendix A, (revised) 47 CFR § 1.1312(c); *NEPA NPRM*, 40 FCC Rcd at 6413–14, paras. 94, 96; 42 U.S.C. § 4336a(e)(1). These page limits do not include citations or appendices.

[528] *NEPA NPRM*, 40 FCC Rcd at 6413–14, para. 95; 42 U.S.C. § 4336a(c).

required by the NEPA statute.[529] However, revised section 1.1312(e) permits the Bureau responsible for processing an application to coordinate with the applicant to prepare supplements to EISs where substantial changes to the proposal or new circumstances or information arise that would result in significant environmental impacts not already evaluated in the EIS.[530]

173. *Completion*. As proposed and consistent with the amended NEPA statute, revised section 1.1312(g), establishes that the two-year completion period for an EIS starts on the date the Commission determines that an EIS is required or the date Commission publishes a Notice of intent to prepare an EIS.[531] While the statute provides a third trigger—notification to an applicant that an application to establish a right-of-way is complete—this third trigger is not applicable to our actions and processes. We also note that our process involves extensive communication with applicants to try to eliminate or mitigate adverse environmental impacts, so we expect that the date that we determine an EIS is necessary and the date we publish notice of intent to prepare an EIS are likely to be concurrent.

174. Elk Valley Rancheria, California supports the two-year deadline but requests that the Commission "explicitly recogniz[e] that time reasonably necessary for government-to-government consultation is integral to the schedule."[532] We concur that Tribal consultation as well as the possibility of unanticipated events warrant incorporating a degree of flexibility into the two-year deadline. Consistent with section 4336a(g)(2) of the revised NEPA statute, we include a provision in our rules at section 1.1312(g) to allow the responsible Bureau, in consultation with the applicant, to extend the completion deadline by only as much time as needed to complete the EIS, and delegate to the responsible Bureau the authority to extend the EIS deadline in accordance with section 1.1312(g).[533]

### D. Commission's Emergency Procedures for Environmental Review

175. Consistent with CEQ's NEPA implementation guidance and recommendations,[534] we adopt new emergency NEPA procedures to provide greater clarity and predictability for applicants and licensees, while simultaneously prioritizing efficiency and certainty.[535]

176. Currently, the Commission's NEPA rules do not contain emergency procedures. Instead, the Commission has provided *ad hoc* assistance to licensees and applicants, generally by extending filing and regulatory deadlines, expediting review of Special Temporary Authority (STA) requests, prioritizing review of waiver requests, and reminding applicants and licensees of existing rule provisions that may be of assistance in emergency circumstances.[536] When emergency circumstances do not allow sufficient time

---

[529] Appendix A, (revised) 47 CFR § 1.1312.

[530] Appendix A, (revised) 47 CFR § 1.1312(e). Because this is a matter of Commission procedure and practice, we find that prior notice-and-comment is not required under the Administrative Procedure Act. *See* 5 U.S.C. § 553(b)(A).

[531] Appendix A, (revised) 47 CFR § 1.1312(g).

[532] Elk River Rancheria, California Comments at 2.

[533] 42 U.S.C. § 4336a(g)(2); Appendix A, (revised) 47 CFR § 1.1312(h).

[534] *See* Guidance on Emergencies and the National Environmental Policy Act, Memorandum from Katherine R. Scarlett, Chairman, CEQ, to Heads of Federal Departments and Agencies, at 2 (Jan. 21, 2026) (CEQ 2026 Emergencies Guidance), available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Emergencies-and-NEPA-Guidance-2026.pdf.

[535] *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353, 8355 (Jan. 29, 2025) (E.O. 14154).

[536] *See, e.g.*, *WTB and PSHSB Extend Filing and Regulatory Deadlines in Areas Affected by Hurricanes Helene and Milton*, Public Notice, 39 FCC Rcd 11364, 11364–66 (WTB/PSHSB Oct. 11, 2024); *WTB and PSHSB Extend Filing and Regulatory Deadlines in Areas Affected by Hawaii Wildfires*, Public Notice, DA 23-701 (WTB/PSHSB Aug. 15, 2023); ASR Application No. A1164049 (filed Apr. 21, 2020), *ASR Temp Waiver* (utilizing the temporary tower exception to deploy a cell-on-wheels for an emergency Covid-19 site to provide service to a U.S. National Guard Quarantine Facility).

for applicants to complete the environmental notification process (when required), the responsible Bureau may waive or postpone the requirement at the applicant's request and upon an appropriate showing.[537]

177. CEQ recommends that an agency's NEPA procedures include processes for emergency situations when there is insufficient time to follow its standard NEPA procedures and emphasizes that agencies should not delay taking action when an emergency poses an imminent threat to life, property, or important natural, cultural, or historic resources.[538] In those situations, CEQ recommends agencies "take into account the probable environmental consequences of the emergency action and consider taking steps to mitigate reasonably foreseeable adverse environmental effects to the extent possible and consistent with agency authority."[539]

178. CEQ advises agencies first to determine whether NEPA applies and then to determine the appropriate level of NEPA review for the emergency action.[540] Once the appropriate level of review is determined, CEQ advises that agencies "must consider whether there is sufficient time to follow the requirements for environmental review established by the agency's NEPA procedures, or whether the situation warrants alternative arrangements for NEPA compliance."[541] Agencies may pursue alternative arrangements to the EA process without first consulting with CEQ, but, if the agency determines the emergency MFA will have a reasonably foreseeable significant effect, CEQ advises agencies to consult with CEQ about alternative arrangements and provides template language agencies may include in their procedures regarding the consultation process for alternative arrangements.[542] Finally, CEQ emphasizes that alternative arrangements do not waive the requirement to comply with NEPA, but instead establish an alternative means for NEPA compliance.[543]

179. In the *NEPA NPRM*, we sought comment on whether we should adopt NEPA procedures applicable in emergency situations and, if so, what the procedures should be.[544] We sought comment on whether it would be sufficient to adopt a rule requiring consultation with CEQ about alternative arrangements for compliance with section 4332(2)(C) of NEPA when emergency circumstances make it necessary to take action with reasonably foreseeable significant environmental effects and whether we should adopt rules for additional procedures for applicants to follow in emergency situations.[545] We also sought comment on whether we should delegate the authority to issue emergency guidance to the responsible Bureau on an *ad hoc* basis, whether we should adopt criteria defining when emergency circumstances apply, whether we should adopt unique criteria for EAs completed in emergency circumstances, and whether we should delegate to the responsible Bureau the authority to consult with CEQ when emergency circumstances apply.[546] Finally, we sought comment on whether we could reduce the time it takes applicants to complete the NEPA checklist under emergency circumstances or whether it

---

[537] *Migratory Bird Order on Remand*, 26 FCC Rcd at 16717 & n.117 (2011). In most circumstances, the responsible Bureau does not waive the notice requirement, but instead requires notice post-construction. *See id.*

[538] CEQ 2026 Emergencies Guidance (rescinding and replacing CEQ's previously-published guidance on NEPA implementation for emergencies, but notes that agencies may still look to the prior 2024 guidance when developing requirements for EAs). *Id*. at 1 n.2.

[539] *Id.* at 2.

[540] *Id.* at 2–4.

[541] *Id.* at 2.

[542] *Id*. at 2–4.

[543] *Id.* at 2.

[544] *NEPA NPRM*, 40 FCC Rcd at 6416, para. 101.

[545] *NEPA NPRM*, 40 FCC Rcd at 6416, para. 101.

[546] *NEPA NPRM*, 40 FCC Rcd at 6416–17, paras. 101–02.

would be appropriate and in the public interest to eliminate or shorten any period for the public to submit requests for further review in the context of emergency circumstances.[547]

180. Commenters generally support adoption of emergency NEPA procedures.[548] CCA urges the Commission to adopt emergency procedures that are broad enough to cover efforts to replace insecure equipment with secure alternatives, such as efforts to add secure equipment pursuant to the Secure and Trusted Communications Networks Reimbursement Program.[549] PEER supports adopting emergency procedures that include consultation with CEQ.[550] CTIA supports our adoption of emergency procedures and says that applicants would benefit from knowing what emergency procedures to follow in advance rather than our typical *ad hoc* approach, and further proposes that the Commission should adopt a rule allowing a facility owner to quickly rebuild or fortify an existing facility damaged by a disaster or emergency without undertaking a new NEPA review.[551] CTIA suggests excluding from NEPA reviews, whether by excluding from the MFA definition or adopting a new CE, projects located within an area for which the President, a governor, or Tribal leader has declared a major disaster or emergency that will be carried out within five years of the declaration and that will replace or improve a communications facility damaged by such disaster or emergency or that mitigates any future disaster or emergency.[552] Crown Castle requests that the Commission clarify that NEPA review is not necessary if a review was performed for the original structure or if the current regulatory scheme does not require such review.[553] CPAC Foundation Center advocates for explicit CEs "for rapid restoration to pre-event conditions" with a simple post-hoc report and for clarification that "footprint-neutral resiliency improvements" qualify for CE treatment.[554] Wired Broadband does not believe that emergency procedures are necessary, but in the event that such procedures are adopted, urges the Commission to ensure emergency authorizations are time-limited and expire promptly upon the cessation of the emergency to prevent abuse.[555]

---

[547] *NEPA NPRM*, 40 FCC Rcd at 6416, para. 101.

[548] *See* CTIA Comments at 35; PEER Comments at 21. *But see* Wired Broadband Comments at 10 (stating emergency procedures are not necessary).

[549] CCA Comments at 7–8; *see also* WISPA Reply at 9 (supporting CCA's recommendation). We decline to adopt CCA's suggestion to clarify that efforts taken pursuant to the Secure and Trusted Communications Networks Reimbursement Program (Rip-and-Replace Program) qualify as an emergency that would trigger the emergency procedures. Efforts to secure new equipment under the Rip-and-Replace Program lack the urgency and immediacy of the actions our emergency procedures are intended to address. Rather, equipment reimbursement under the Rip-and-Replace Program involves a process conducted over a longer period of time, and applicants are able to plan to implement the NEPA review process in advance, utilizing the streamlined process we adopt today.

[550] PEER Comments at 21.

[551] CTIA Comments at 34–35. CTIA's comments also address how NHPA reviews are conducted during emergency situations. We discuss that aspect of CTIA's comments in the *Further Notice* accompanying this *Order*.

[552] CTIA Comments at 35; *see also* WISPA Reply at 8 (supporting CTIA's proposed rule). We decline to adopt a new CE or MFA exclusion for projects located within an area for which the President, a governor, or Tribal leader has declared a major disaster or emergency that will be carried out within five years of the declaration and that will replace or improve a communications facility damaged by such disaster or emergency or that mitigates any future disaster or emergency. The emergency procedures we adopt today are intended to be temporarily available for projects that require urgent and immediate action, and we find that applicants may more appropriately address projects that could be carried out up to five years after the declaration of emergency by utilizing the standard NEPA review process streamlined by our revisions in this *Order*.

[553] Crown Castle Reply at 4.

[554] CPAC Foundation Center for Regulatory Freedom (CPAC Foundation Center) Comments at 4. CPAC Foundation Center offers projects such as backup power, cabinet hardening, and improved enclosures as examples of such footprint-neutral resiliency improvements. *Id.* at 4.

[555] Wired Broadband Comments at 10.

181. We agree with commenters that support our adoption of emergency NEPA procedures, which we find will provide more clarity and consistency for providers, maintain the flexibility to adapt to unique situations, and allow the Commission to meet its NEPA responsibilities. The procedures we now adopt are applicable in emergency situations where it is necessary to take immediate federal action to address imminent threats to life, property, or important natural, cultural, or historic resources. Applicants availing themselves of these procedures must include with any application a certification that the application is for an action necessitated by a specified emergency. At this time, we decline to enumerate specific scenarios which may or may not qualify as an emergency.[556]

182. While Wired Broadband argues that such procedures should only remain applicable for the duration of a declared emergency,[557] we note that emergency circumstances may exist in the absence of a formal declaration of emergency. Additionally, the duration of an emergency may be brief in comparison to required recovery time and may not provide adequate time for applicants to assess impacts and initiate the emergency procedures we adopt today. For example, a tower owner may not have access to a site damaged by a natural disaster until after the emergency has ended, whether due to safety concerns or other restrictions. For this reason, we find it appropriate not to tie emergency procedures to the duration of an emergency declaration, but instead require a showing by the applicant that the proposed action is necessitated by emergency circumstances.

183. Our emergency NEPA procedures follow CEQ's recommendations. Specifically, where emergency circumstances make it necessary to take a major Federal action with reasonably foreseeable significant environmental effects and for which there is no existing NEPA analysis to apply, the Commission or responsible Bureau will consult with CEQ about alternative arrangements for compliance with section 4332(2)(C) of the NEPA statute. In circumstances where the proposed emergency action is not likely to have significant environmental effects, or where the significance of the environmental effects is unknown, and to which no CE applies, we adopt a further streamlined process by which applicants may complete an EA for an action necessitated by emergency circumstances that includes only the purpose and need for the proposed action; the reasonably foreseeable effects of the proposed agency action; any mitigation measures that the applicant will implement; and the alternatives considered.[558] We find that these shortened EA requirements will streamline the emergency NEPA process in line with our direction to prioritize efficiency and, in the case of emergencies, expediency.[559]

184. Lastly, we decline to adopt emergency procedures specifically permitting the replacement of damaged facilities. Our part 17 rules exclude certain replacement towers from the environmental notification process,[560] and applicants should otherwise apply the new emergency procedures. Further, we maintain authority to issue further emergency guidance on an *ad hoc* basis and delegate to the responsible Bureau the authority to issue such guidance and adopt rules as necessary for a particular emergency situation.

---

[556] *See* CCA Comments at 7–8; CPAC Foundation Center Comments at 4.

[557] Wired Broadband Comments at 10.

[558] *See* Appendix A, (revised) 47 CFR § 1.1313(c).

[559] Though the *NEPA NPRM* sought comment on whether to eliminate or shorten any public comment period during emergency circumstances, we decline to do so in our rules given the shortened comment period for all circumstances adopted herein. *See supra* Section III.C.1 (adopting a 20-day comment period for EA publication). In the event of exigent circumstances, however, the Commission or appropriate Bureau will consider requests to shorten or waive the comment period for EAs on a case-by-case basis.

[560] *See* 47 CFR § 17.4(c)(1)(iv); *see also Registration of a Replacement Antenna Structure in the Antenna Structure Registration (ASR) System*, https://www.fcc.gov/wireless/support/antenna-structure-registration-asr-resources/registration-replacement-antenna (last visited Sept. 3, 2026).

## IV. FURTHER NOTICE OF PROPOSED RULEMAKING

185. Through this Further Notice of Proposed Rulemaking (*Further Notice*), we seek additional comment on our NHPA framework, including section 106 efficiencies. Additionally, we seek comment on whether communications infrastructure deployments are agency actions subject to the ESA.

### A. Definition of "Undertaking" under the National Historic Preservation Act

186. In light of the decisions in the *Report and Order (Order)*, we seek to refresh the record on the meaning of "undertaking" and the Commission's approach to implementing section 106 of the National Historic Preservation Act (NHPA) as set forth in the *NEPA NPRM*.[561] Additionally, and in light of the Commission's findings above related to the licensing of spectrum, we seek comment on whether activities that are part of the deployment and operation of communications infrastructure are within the scope of "undertaking." We also seek comment on actions and practices that the Commission could adopt to provide more efficiencies in the section 106 process and add greater predictability for all stakeholders.

#### 1. Licensing of Spectrum and "Undertaking"

187. Section 106 of the NHPA requires federal agencies to take into account the effect of an "undertaking on any historic property."[562] The NHPA further defines "undertaking" as "a project, activity, or program *funded in whole or in part* under the direct or indirect jurisdiction of a Federal agency."[563] This includes: "(1) those carried out by or on behalf of a Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license or approval; and (4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency."[564] ACHP's rules afford each individual federal agency the responsibility to "determine whether [a] proposed Federal act to be taken by it is an undertaking."[565] In its comments on the *NEPA NPRM*, ACHP stated that the "FCC could use the rulemaking process to define a list of activities that do not rise to the level of an 'undertaking' due to a lack of federal involvement under Section 106."[566]

---

[561] *See* 54 U.S.C. § 300101 *et seq*.; *see also NEPA NPRM*, 40 FCC Rcd at 6391–96, paras. 36–46. The Commission has built a record on the subject of whether "undertaking" and "major Federal action" are coterminous. Therefore, no further comment on this matter is being sought in this Further Notice.

[562] *NEPA NPRM*, 40 FCC Rcd at 6392, para. 37; 54 U.S.C. § 306108. This provision is commonly referred to as section 106 of the NHPA.

[563] 54 U.S.C. § 300320 (emphasis added).

[564] 54 U.S.C. § 300320; *see also* 36 CFR § 800.16(y); *Sheridan Kalorama Historical Ass'n,* 49 F.3d 750, 755–56 (D.C. Cir. 1995) (holding that section 106 review is only triggered if a federal agency has the authority to fund or license the project); *see also CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 112 (D.C. Cir. 2006) (citing *Sheridan Kalorama Historical Ass'n* for the principle that federal funding is not necessary for there to be an undertaking, as long as the action requires a "federal permit, license, or approval"); *Nat'l Mining Ass'n v. Fower*, 324 F.3d 752, 759–60 (D.C. Cir. 2003) (citing *Sheridan Kalorama Historical Ass'n* for "squarely hold[ing] . . . Section 106's requirement that [a] project be federally funded or licensed" for the project to be an undertaking); *Solenex, LLC v. Haaland*, 626 F.Supp.3d 110, 116 (D.D.C. 2022) (citing *Sheridan Kalorama Historical Ass'n* and *Nat'l Mining Ass'n v. Fower* for the principle that "[a]bsent an expenditure of federal funds or the grant of a federal license § 106 . . . does not, apply to a project.").

[565] 36 CFR § 800.3(a) (citing 36 CFR § 800.16(y)).

[566] ACHP Comment to *NEPA NPRM* at para. 36. A number of commenters that responded to the *NEPA NPRM* argued that only ACHP has the authority to promulgate rules implementing the application of "undertaking," as defined in the NHPA and ACHP's rules. *See, e.g.*, California State Historic Preservation Officer Comments at 1 ("Although . . . the FCC is considering changes to its obligation, the [ACHP] retains unique authority under the NHPA to promulgate regulation[s], including those for Section 106."); National Association of Tribal Historic Preservation Officers (NATHPO) Comments at 3 ("Congress delegated to the ACHP the authority to promulgate regulations as it considers necessary to implement Section 106 of the NHPA in its entirety.") (internal quotes omitted)); Oglala Sioux Tribe Reply at 3 ("Congress exclusively delegated the power to promulgate regulations

(continued….)

188. As discussed in the *Order*, the Commission licenses the use of spectrum, not facilities. Importantly, we note that: Commission rules do not legally require licensees to build communications infrastructure upon receiving a spectrum authorization; while the Commission's spectrum licensing rules manage spectrum to ensure that it is used efficiently and to prevent harmful interference, licensees retain control and responsibility over their facility deployment decisions; there is an insufficient causal connection between the Commission's licensing activity and subsequent infrastructure deployments; buildout requirements do not require the construction of particular facilities in any specific place and may be satisfied without new construction; and revocation or suspension of a spectrum license does not require dismantlement of a tower.[567] Because of this, we seek comment on whether the construction of communications facilities connected with the issuance of a Commission license for the use of spectrum should be regarded as an "undertaking," where the Commission does not issue a "permit, license or approval" for deployment of the facilities themselves, but rather for the use of spectrum. To the extent the Commission clarifies the extent to which its actions constitute undertakings, we seek comment on whether to apply that clarification prospectively or to existing facilities, including those built prior to 2005.

189. Finally, we seek comment on the impact of the Commission's determination in the *Order* that Commission spectrum licenses and facilities deployment in connection with spectrum licenses are not subject to NEPA review and our related rescission of section 1.1312 of the rules on whether spectrum licensing is an undertaking under the NHPA.[568] The Commission previously determined that the issuance of a geographic area license constituted an undertaking because of the Commission's "limited approval authority," in section 1.1312 of the NEPA rules, which required completion of the environmental review process prior to tower construction.[569] We seek comment on whether the actions in the *Order*, which remove that limited approval authority, merit reconsideration of the determination that Commission spectrum licensing activities are subject to NHPA review.

### 2. Section 106 Efficiencies

190. We seek comment on whether there are efficiencies to be gained through modifications to the Commission's NHPA procedures.[570] We invite comment on the measures discussed below and on any

(Continued from previous page)
necessary to implement Section 106 to the [ACHP] . . . ."). Indeed, ACHP's comment is consistent with its rule providing that each federal agency "determine[s] whether [a] proposed Federal action is an undertaking as defined by 36 CFR §800.16(y). . . ." 36 CFR § 800.3(a).

[567] *See supra* Section III.A.3. Further, the Commission's ability to revoke a license is subject to the requirements of section 316 of the Communications Act of 1934, 47 U.S.C. § 316.

[568] *See* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 10, 18 (Dec. 11, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/10226086707465 (noting that the Yavapai Prescott Indian Tribe and the Susanville Indian Rancheria asks if wireless facility deployments are not subject to NEPA review will such deployments be subject to NHPA review); Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 9–10 (Jan. 14, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/103041866728827 (noting that the Tlingit & Haida Tribes and the Flandreau Santee Sioux Tribe of South Dakota believe that even if a project is no longer subject to NEPA review it must remain subject to section 106 review).

[569] *See NEPA NPRM*, 40 FCC Rcd at 6393–94, paras. 39–42. The D.C. Circuit upheld that determination, finding that the Commission was "neither arbitrary nor capricious in determining that the FCC's approval authority under NEPA makes tower construction an undertaking." *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 115 (D.C. Cir. 2006).

[570] *See, e.g.*, CTIA Jan. 22, 2026 *Ex Parte* Letter, Attach. (highlighting, in part, industry costs for completing section 106 reviews).

additional measures that will enable the Commission to fulfill its section 106 commitments in a manner that minimizes delays to infrastructure deployment for communications services.[571]

191. *Batching*. To reduce repetitive submissions and paperwork for all parties, we seek comment on whether allowing multiple installation submissions into a single filing via the Commission's Tower Construction Notification System (TCNS) would create efficiencies.[572] What challenges would this pose? We invite commenters to provide data or examples illustrating how batching may affect administrative costs, review timelines, and overall project delivery. In particular, we are interested in whether batching reduces repetitive paperwork, streamlines coordination among stakeholders, or introduces new complexities.

192. Currently, batching is permitted in the context of the Positive Train Control (PTC) Program Comment.[573] This was a streamlined process for certain facilities associated with building out the PTC railroad safety system.[574] We seek comment on the experience of the PTC batching process. What has worked well? Has batching posed challenges?

193. If we permit batching, what guidelines should be established to realize efficiencies while minimizing drawbacks? In this regard, should there be a limit on the number of facilities to be batched? How should this be determined? Should geographic proximity be a factor? In this regard, would the use of common zip codes be a useful organizing principle for batching? Should the size of the facility be a factor? Should shared characteristics among the facilities be a factor (for example, the deployment of the same antenna structure or collocation antenna in similar terrain)? Should the extent of expected ground disturbance be a factor? Are there other factors relevant to batching eligibility? Should batching be accompanied by different time limits for processing? What changes to the current TCNS process might facilitate batching?[575] We seek comment on these and any other policy or operational matters regarding batching that commenters may be aware of through their experiences.

194. *Non-compliant Towers*. Non-compliant towers are structures that did not previously undergo section 106 review or lack documentation of such review, but which parties may have an interest in for collocation. Commenters to the *NEPA NPRM* advocated for bringing these towers into compliance.[576] We seek comment on whether there should be an initiative to facilitate collocation on such

---

[571] In the *Order*, we also delegate authority to the Wireless Telecommunications Bureau to seek comments, as necessary, on updating and streamlining the Commission's historic preservation rules including on any updates that may be necessary to reflect revised ACHP requirements. *See supra* para. 108, note 313.

[572] *See* Power & Communication Contractors Ass'n Comments at 5 (advocating batching for multiple small cells in urban areas and for fiber trunk lines along an interstate corridor). The Commission developed TCNS as a mechanism to automatically notify Tribal Nations and Native Hawaiian Organizations (NHOs) of proposed constructions within geographic areas that they have confidentially identified as potentially containing historic properties of religious and cultural significance to them.

[573] *See Accelerating Wireless Broadband Deployment NPRM* , 32 FCC Rcd at 3352, paras. 62–63.

[574] *See* Batching Guidance for TCNS and E106 Submissions Under the Positive Train Control Program Comment (rev. Dec. 19, 2014), http://wireless.fcc.gov/ptc/Batching_Guidance_121914.pdf.

[575] *See* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 23 (Dec. 11, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/10226086707465 (noting that the Yavapai-Prescott Indian Tribe asks whether there will be changes to the TCNS notification system).

[576] *See* WIA Comments at 11–12 (advocating that collocations on these towers "be deemed by the Commission to have a low likelihood of any historic impact," and that towers built before the effective date of the 2004 Wireless NPA be "exempt from any NHPA requirements"); Crown Castle Reply at 5 (advocates "reinstating the draft 2020 Program Comment addressing" non-complaint towers); Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 16 (Jan.

(continued….)

non-compliant towers. We note that the Collocation NPA, which established streamlined section 106 reviews for collocation infrastructure projects, includes review of collocations on non-compliant towers under certain circumstances.[577] Pursuant to the Collocation NPA, however, there would be additional streamlined processing opportunities if the towers came into section 106 compliance.[578] The Commission has recognized the benefits to industry and to historic properties from collocations on existing structures, and encourages collocation of antennas where technically and economically feasible, in order to reduce the need for new tower construction.[579] We seek comment on approaches to bringing non-compliant towers into compliance to enable future collocation. We also seek comment on potential efficiencies or challenges associated with such approaches.

195. *Geographic Areas of Interest.* In the context of tribal historic preservation review, Tribal Nations and NHOs identifying areas of cultural, historical, or religious interest for purposes of the section 106 process and TCNS, we seek comment on any trends that have developed in the indication of Geographic Areas of Interests since we considered this matter in 2017.[580] If the data support a conclusion that such areas are expanding significantly along with historic properties, we seek comment on what practices might assist in addressing an increased designation of Geographic Areas of Interest. Are there techniques for increasing efficiencies that could be adopted, whether it be features of TCNS, adjustments to Forms 620 and 621, or other techniques to evaluate wider geographic interests without materially compromising the section 106 process?

196. *Emergency and Disaster Situations.* In response to the *NEPA NPRM*, a number of commenters have argued for greater efficiencies in responding to damage to infrastructure due to weather-related incidents to more quickly restore communications for citizens in the impacted area.[581] Specifically, commenters seek the ability to rebuild or fortify structures damaged by a weather incident, natural disaster, or other incident without reprising the section 106 process. We seek comment on the merits of this proposal. We note that the Wireless NPA includes existing exclusions from section 106 review for construction of a replacement tower that does not substantially increase the size of the tower,

(Continued from previous page)
14, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/103041866728827 (noting that the Flandreau Santee Sioux Tribe has concerns with non-compliant and twilight towers).

[577] *See* Collocation NPA at Section IV: Collocation of Antennas on Towers Constructed on or After March 16, 2001.

[578] *See id.* at Section III: Collocation of Antennas on Towers Constructed on or Before March 16, 2001.

[579] *See, e.g.*, *2014 Infrastructure Order*, 29 FCC Rcd at 12867, para. 3 (adopting additional exclusions from section 106 review for certain collocations, with the Commission "encourag[ing] deployments on existing towers and structures—rather than entirely new towers—in recognition that collocations almost always result in less impact or no impact at all."). The Commission's actions to expand the scope of collocations excluded from section 106 review were informed by consideration of technological innovations that ushered in wireless communications infrastructure characterized by a relatively small physical scale. *See id.* at 12876, para. 24 (noting that prior to the section 106 exclusions added by the *2014 Infrastructure Order*, "the collocation exclusions . . . under Section 106 [did] not consider the scale of small wireless facility deployments."); Collocation NPA (establishing streamlined section 106 reviews for collocation scenarios addressed in the NPA); *see also Wireless Telecommunications Bureau Announces Execution of First Amendment to the Nationwide Programmatic Agreement for the Collocation of Wireless Antennas*, WT Docket No. 15-180, Public Notice, 31 FCC Rcd 8824 (WTB 2016); *Wireless Telecommunications Bureau Announces Execution of Second Amendment to the Nationwide Programmatic Agreement for the Collocation of Wireless Antennas*, WT Docket No. 15-180, Public Notice, 35 FCC Rcd 7150 (WTB 2020).

[580] *See Accelerating Wireless Broadband Deployment NPRM*, 32 FCC Rcd at 3350, para. 53.

[581] *See* CTIA Comments at 35 (suggesting a section 106 exemption for any facility that "(i) is located within an area for which the President, a governor, or Tribal leader has declared a major disaster or an emergency; (ii) will be carried out within five years of the declaration; and (iii) will replace or improve a communication facility damaged by such disaster or emergency or that mitigates any future disaster or emergency."); WISPA Reply at 8 (stating that in accord with CTIA).

and for construction of a temporary communications tower.[582] We also note that ACHP rules set forth alternative procedures for undertakings in response to declared disasters or emergencies or in response to other immediate threats to life or property.[583] We seek comment on the sufficiency of these existing exclusions and procedures and whether additional efficiencies are needed. Should any section 106 efficiency addressing emergency situations be conditioned on a certain level of damage? Should replacement or improved infrastructure constructed pursuant to such an efficiency be held to any historic preservation conditions resulting from the initial section 106 process? What other considerations are relevant to a section 106 exemption when damage to facilities rises to a level of a communications emergency? What are the criteria for a communications emergency? Would accessing the Commission's established waiver process on a case-by-case basis be a preferred approach in such emergency situations?[584] We seek comment on the trade-offs between applying general rules or a case-by-case approach to emergency situations, and we encourage commenters to provide data and statistics to support the cost and benefit estimates associated with each approach.

197. *Tribal Consultation and Monitoring.* In response to the *NEPA NPRM*, Verizon has expressed an interest in "more definite timelines" for section 106 review. Specifically, Verizon maintains that in its "experience, where Government-to-Government consultation is requested, the Tribe's response timeline stretches from 30–60 days to an average of 110 days."[585] For this reason Verizon advocates "narrowing the scope of the consultation process. . . ."[586] Tribes also commented on the challenges that they face with expedited timelines.[587] We seek comment on how often Tribal consultations extend Tribal response timelines beyond 60 days. What specific modifications are recommended that would resolve any timeliness issues without compromising the integrity of the consultation process?

198. *Timeline for Tribal Review Process.* In the *Wireless Broadband Deployment Second R&O,* the Commission adopted the current procedures for applicants to notify Tribal Nations and NHOs (Tribal Nations/NHOs) of proposed tower builds and collocations, and reciprocally, for Tribal Nations/NHOs to respond by indicating whether such proposals may affect historic properties to which they attach religious and/or cultural significance.[588] Specifically, the Commission adopted a 45-day

---

[582] *See* Wireless NPA at Section III.B–C; *see also* Crown Castle Reply at 4 ("Occasionally, emergency situations arise that by necessity involve the replacement of a support structure or placement of [a] temporary structure. . . . [B]oth of these scenarios are exempt from Section 106 review . . . .").

[583] *See* 36 CFR § 800.12.

[584] *See* 47 CFR § 1.925.

[585] Verizon Reply at 10.

[586] *Id.*

[587] *See, e.g.*, National Ass'n of Tribal Historic Preservation Officers and National Congress of American Indians Joint Reply at 19 ("To the extent that there is any credibility to the criticism raised by the FCC and some commentators that the Section 106 process hinders the deployment of wireless infrastructure, the solution is to engage in meaningful and good faith consultation with stakeholders, including Tribal Nations, to identify and address any concerns with the FCC's Section 106 process."); Pit River Tribe Comments at 2 ("Meaningful consultation . . . must allow sufficient time for Tribes to analyze projects, engage in dialogue with agencies, and collaborate on solutions that prevent or mitigate harm."); United South and Eastern Tribes, Inc. Reply at 4 ("[A]ny compressed . . . historical preservation review period outside the standard minimum 30–45 days limits Tribal consultation and our participation in these critical reviews. These limitations undermine federal trust and treaty obligations to Tribal Nations that ensure the protection of Tribal resources in perpetuity."); Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 15, 16–17 (Jan. 14, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/103041866728827 (noting that the Colville Tribes and COLT are concerned with changes that might impact Tribal consultation).

[588] *Wireless Broadband Deployment Second R&O,* 33 FCC Rcd at 3151, paras. 111–12. The legal predicate for having notification procedures is found in the NHPA statute and the ACHP rules. *See* 54 U.S.C. § 302706 ("[A]

(continued….)

process for the applicants and Tribal Nations/NHOs to engage after which tower construction or collocation installations could proceed.

199. As part of this 45-day review process, applicants are required to send submission packets to the Tribal Nations/NHO.[589] The Tribal Nations/NHOs have 30 calendar days to respond to the applicant's submission packet, which begins on the date that Tribal Nations/NHOs can be shown to have received or may reasonably be expected to have received the relevant submission packets.[590] If an applicant does not receive a response within 30 calendar days of the date that Tribal Nations/NHOs can be shown to have or may reasonably be expected to have received the submission packet, the applicant can refer the matter to the Commission for follow-up.[591]

200. Within five business days after receiving the applicant's referral, the Commission sends a letter and/or email to the Tribal Nation's or NHO's designated cultural resource representative with a reminder that the 30-day period for review of the submission packet has elapsed and requesting that, within 15 calendar days of the date of the letter and/or email, the Tribal Nation/NHO indicate its interest or lack thereof in participating in a section 106 review.[592] During the 15-day period, Commission staff place phone calls to the designated cultural resource representative.[593] If the Tribal Nation/NHO does not respond within 15 calendar days, the applicant's pre-construction obligations are discharged with respect to that Tribal Nation/NHO.[594] The Commission concluded that pursuant to ACHP rules,[595] these procedures "satisfy the Commission's obligation to make reasonable and good faith efforts to identify Tribal Nations and NHOs that may attach religious and cultural significance to historic properties that may be affected by an undertaking."[596]

201. We seek comment on whether the telephone call component of the 45-day procedure is necessary given that the Commission already sends a letter and/or email for the same purpose. Since the effective date of these procedures on July 2, 2018[597] through January 8, 2026, Commission staff has placed approximately 20,539 telephone calls during the 15-day period after the 30-day review period accorded Tribal Nations/NHOs to review submission packets.[598] These calls consume a considerable amount of Commission staff time. In 2025 alone, approximately 1,669 calls were placed.[599] These calls

(Continued from previous page)
Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to property"); 36 CFR § 800.3(f)(2) ("The agency official shall make a reasonable and good faith effort to identify any Indian tribes or Native Hawaiian organizations that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties.").

[589] The process commences with the applicant sending a submission packet to Tribal Nations/NHOs potentially affected by the proposed project. The packet explains the project (e.g., location, whether a tower build or collocation and other "baseline . . . information to enable Tribal Nations and NHOs to comment on these projects.") *See Wireless Broadband Deployment Second R&O,* 33 FCC Rcd at 3147, 3149, paras. 104, 108.

[590] *See id*. at 3151, para. 111.

[591] *See id*.

[592] *See id*.

[593] *See id*., para. 111, n.261.

[594] *See id*., para. 111.

[595] 36 CFR § 800.3(f)(2).

[596] *Wireless Broadband Deployment Second R&O,* 33 FCC Rcd at 3151, para. 112.

[597] *See Changes and Updates to Tower Construction Notification and E-106 Systems on July 2, 2018*, WT Docket No. 17-79, Public Notice, 33 FCC Rcd 6273 (WTB 2018).

[598] *See generally* TCNS.

[599] *Id.*

are in addition to letters and/or emails reminding the Tribal Nations/NHOs that the 30-day review period has elapsed and informing them of the additional 15 days to indicate interest or lack thereof in participating in the section 106 review before the applicant's pre-construction obligations are considered discharged. To the extent commenters argue that these calls are necessary, we request that commenters explain why letters or emails are insufficient. For those advocating in favor of retaining the phone call step, we seek comment on how this might be done more efficiently. For example, if feasible, would a recorded message be a suitable substitute for in-person contact?

### B. Definition of "Agency Action" under the Endangered Species Act

202. In light of the Commission's finding in the *Order* above that spectrum licensing is not an MFA, we seek comment on whether construction of communications facilities in connection with Commission spectrum authorizations are "agency actions" subject to the ESA.[600] As discussed in the *Order* and further outlined in this *Further Notice*,[601] the Commission licenses the use of spectrum, not facilities.

203. In the *NEPA NPRM* we sought comment "on the impact to the Commission's other legal responsibilities if certain actions were to fall outside NEPA for failure to qualify as MFAs."[602] Additionally, commenters were invited to identify other legal requirements that may be affected by any potential changes to our NEPA rules consistent with the amended statute.[603] In response, CTIA contends that "the Commission should make a finding that wireless deployments that do not require ASR are not agency 'actions' under the ESA for the same basic reasons they are not MFAs under NEPA."[604] Other commenters, however, encourage the Commission to maintain or expand its obligations under the ESA.[605]

204. Under the ESA, an agency action "means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[606] Cases interpreting the definition of an "agency action" under ESA compare the

---

[600] *See* 16 U.S.C. § 1536(a)(2); 50 CFR. § 404.02.

[601] *See supra* para. 188.

[602] *NEPA NPRM*, 40 FCC Rcd at 6391, para. 35 n.113.

[603] *Id.*

[604] Sept. 21, 2026 CTIA *Ex Parte* at 6; CTIA Comments at 18 n.87. *But see* PEER Comments at 10–11 ("Because NEPA is an umbrella statute, the FCC meets its obligations to comply with other environmental statutes through its NEPA procedures. For example, it must comply with the NHPA, the Clean Water Act, and the ESA, and entities to which it has delegated its NEPA compliance must therefore comply with those statutes and conduct some sort of environmental evaluation. The FCC cannot conclude that it has no control over these deployments and that any given non-ASR facility will not have potentially significant foreseeable environmental effects.").

[605] *See* PEER Comments at 10–11; American Bird Conservancy and Maryland Ornithological Society Comments at 3–4 (recommending maintaining or expanding the use of categorical exclusions when constructing new towers, including endangered species habitats).

[606] 50 CFR § 404.02 Definitions.

standard to the standard for "major federal action" under NEPA.[607] However, some courts also hold that the definition of "agency action" should be broadly construed.[608]

205. We seek comment on whether the construction of communications facilities connected with the issuance of a Commission license for the use of spectrum is an "agency action" where the Commission does not grant a license or permit for deployment of the infrastructure facilities themselves, but rather for the use of spectrum. Commenters should explain the basis for their views or any suggested alternatives, and comment on benefits and costs associated with adopting their position.

## V. PROCEDURAL MATTERS

206. *Transition of Rules*. For all ASR changes, the effective date is 30 days after Wireless Telecommunications Bureau notice that the ASR system changes have been implemented.

207. *Ex Parte Rules*. This proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[609] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with 47 CFR § 1.1206(b). In proceedings governed by 47 CFR § 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

208. In light of the Commission's trust relationship with Tribal Nations and our commitment to engage in government-to-government consultation with them, we find the public interest requires a limited modification of the *ex parte* rules in this proceeding. Tribal Nations, like other interested parties, should file comments, reply comments, and *ex parte* presentations in the record to put facts and arguments before the Commission in a manner such that they may be relied upon in the decision-making process consistent with the requirements of the Administrative Procedure Act. However, at the option of the Tribe, *ex parte* presentations made during consultations by elected and appointed leaders and duly appointed representatives of federally recognized Tribal Nations and Native Hawaiian Organizations to Commission decision makers shall be exempt from the rules requiring disclosure in permit-but-disclose proceedings and exempt from the prohibitions during the Sunshine Agenda period. To be clear, while the Commission recognizes consultation is critically important, we emphasize that the Commission will rely on its decision-making only on those presentations that are placed in the public record for this proceeding.

---

[607] *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996) (noting the standards are "much the same," but "major federal action" is the "more exclusive standard").

[608] *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (citing *W. Watersheds Project v. Matejko*, 468 F.3d 1118, 11125 (9th Cir. 2006); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir.2003); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir.1994)).

[609] 47 CFR § 1.1200 *et seq.*

209. We note that some of the issues discussed above might uniquely affect Tribes. We direct the Office of Native Affairs and Policy (ONAP), in coordination with the Wireless Telecommunications Bureau and other Commission Bureaus and Offices as appropriate, to conduct government-to-government consultation as appropriate with Tribal Nations. Tribal Nations may notify ONAP of their desire for consultation via email to Native@fcc.gov.

210. *Filing of Comments and Reply Comments*. Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on the Further Notice of Proposed Rulemaking on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).

- *Electronic Filers*: Comments may be filed electronically using the Internet by accessing the ECFS: https://www.fcc.gov/ecfs/.
- *Paper Filers*: Parties who choose to file by paper must file an original and one copy of each filing.
  - Filings can be sent by hand or messenger delivery, by commercial courier, or by the U.S. Postal Service. **All filings must be addressed to the Secretary, Federal Communications Commission.**
  - Hand-delivered or messenger-delivered paper filings for the Commission's Secretary are accepted between 8:00 a.m. and 4:00 p.m. by the FCC's mailing contractor at 9050 Junction Drive, Annapolis Junction, MD 20701. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes and boxes must be disposed of before entering the building.
  - Commercial courier deliveries (any deliveries not by the U.S. Postal Service) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.
  - Filings sent by U.S. Postal Service First-Class Mail, Priority Mail, and Priority Mail Express must be sent to 45 L Street NE, Washington, DC 20554.

211. *People with Disabilities.* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530.

212. *Regulatory Flexibility Act*. The Regulatory Flexibility Act of 1980, as amended (RFA),[610] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[611] Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this Report and Order on small entities. The FRFA is set forth in Appendix B.

213. The Commission has also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of rule and policy change proposals on small entities in the Further Notice of Proposed Rulemaking. The IRFA is set forth in Appendix C. The Commission invites the general public, in particular small businesses, to comment on the IRFA. Comments must be filed by the deadlines for comments on the Further Notice of Proposed Rulemaking indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

214. *Paperwork Reduction Act*. This Report and Order may contain new or substantively modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), 44 U.S.C.

---

[610] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[611] *Id.* § 605(b).

§§ 3501–3521. All such new or modified information collections will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collections contained in this proceeding. Additionally, this document may contain non-substantive modifications to approved information collections. Any such modifications will be submitted to OMB for review pursuant to OMB's non-substantive modification process. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, 44 U.S.C. § 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

215. The Further Notice of Proposed Rulemaking may contain proposed new or modified information collections. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on any information collections contained in this document, as required by the Paperwork Reduction Act of 1995, 44 U.S.C. §§ 3501–3521. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, 44 U.S.C. § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

216. *Providing Accountability Through Transparency Act.* Consistent with the Providing Accountability Through Transparency Act, Public Law 1189, a summary of the Further Notice of Proposed Rulemaking will be available on https://www.fcc.gov/proposed-rulemakings.

217. *OPEN Government Data Act*. The OPEN Government Data Act[612] requires agencies to make "public data assets" available under an open license and as "open Government data assets," i.e., in machine-readable, open format, unencumbered by use restrictions other than intellectual property rights, and based on an open standard that is maintained by a standards organization.[613] This requirement is to be implemented "in accordance with guidance by the Director" of the OMB.[614] The term "public data asset" means "a data asset, or part thereof, maintained by the Federal Government that has been, or may be, released to the public, including any data asset, or part thereof, subject to disclosure under [the Freedom of Information Act (FOIA)]."[615] A "data asset" is "a collection of data elements or data sets that may be grouped together,"[616] and "data" is "recorded information, regardless of form or the media on which the data is recorded."[617]

218. *Congressional Review Act.* The Office of Information and Regulatory Affairs, Office of Management and Budget has found, and the Commission concurs, that this rule is non-major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

219. *Further Information*. For further information, contact Robert Krinsky of the Wireless Telecommunications Bureau, Competition & Infrastructure Policy Division, at robert.krinsky@fcc.gov.

---

[612] Congress enacted the OPEN Government Data Act as Title II of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019), §§ 201–202.

[613] 44 U.S.C. §§ 3502(20), (22) (definitions of "open Government data asset" and "public data asset"), 3506(b)(6)(B) (public availability).

[614] *See* OMB Memorandum M-25-05, *Phase 2 Implementation of the Foundations for Evidence-Based Policymaking Act of 2018: Open Government Data Access and Management Guidance* (Jan. 15, 2025).

[615] 44 U.S.C. § 3502(22).

[616] 44 U.S.C. § 3502(17).

[617] 44 U.S.C. § 3502(16).

## VI. ORDERING CLAUSES

220. Accordingly, IT IS ORDERED that, pursuant to sections 1, 2, 4(i)–(j), 201, 214, 301, 302a, 303, 307, 309, 319, and 332 of the Communications Act of 1934, as amended 47 U.S.C. §§ 151, 152, 154(i)–(j), 201, 214, 301, 302a, 303, 307, 309, 319, and 332, section 704(b) of the Telecommunications Act of 1996, Pub. L. No. 104-104, section 102 of the National Environmental Policy Act of 1969, as amended, 42 U.S.C. § 4332, section 106 of the National Historic Preservation Act of 1966, as amended, 54 U.S.C. § 306108, and the Endangered Species Act of 1973, as amended, 16 U.S.C. § 1536, this Report and Order and Further Notice of Proposed Rulemaking IS ADOPTED.[618]

221. IT IS FURTHER ORDERED that the Report and Order SHALL BE EFFECTIVE 30 days after publication in the Federal Register, including revised rule sections 1.1301 and 1.1302 of the Commission's rules as set forth in Appendix A, 47 CFR §§ 1.1301 and 1.1302. All other revisions to the Commission's rules set forth in Appendix A shall become effective after the Office of Management and Budget (OMB) under the Paperwork Reduction Act approves of any new, modified, or non-substantive information collections that these rules may contain and the Wireless Telecommunications Bureau publishes a notice in the Federal Register announcing the completion of such review and relevant effective date.

222. IT IS FURTHER ORDERED that, pursuant to applicable procedures set forth in sections 1.415 and 1.419 of the Commission's Rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on the Further Notice of Proposed Rulemaking on or before 30 days after publication in the Federal Register, and reply comments on or before 45 days after publication in the Federal Register.

223. IT IS FURTHER ORDERED that the Commission's Office of the Secretary, SHALL SEND a copy of this Report and Order and Further Notice of Proposed Rulemaking, including the Final and Initial Regulatory Flexibility Analyses, to the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy.

224. IT IS FURTHER ORDERED that the Office of the Managing Director, Performance Program Management, SHALL SEND a copy of this Report & Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

[618] Pursuant to Executive Order 14215, 90 Fed. Reg. 10447 (Feb. 20, 2025), this regulatory action has been determined to be significant under Executive Order 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993).

## APPENDIX A

### Final Rules

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR parts 1, 2, 5, 17, 22, 27, 30, 63, 73, 74, 78, 80, 90, 97, 100, and 101 as follows:

**PART 1—PRACTICE AND PROCEDURE**

1. The authority citation for part 1 is revised to read as follows:

**Authority:** 47 U.S.C. chs. 1, 2, 3, 5, 9, 13; section 704(b) of the Telecommunications Act of 1996, Pub. L. No. 104-104; 28 U.S.C. 2461 note; 47 U.S.C. 1754, unless otherwise noted.

**Subpart A—General Rules of Practice and Procedure**

2. Delayed indefinitely, amend § 1.61 by:

a. Revising paragraph (a)(2); and

b. Revising the last sentence of paragraph (a)(4).

The revisions read as follows:

**§ 1.61 Procedures for handling applications requiring special aeronautical study.**

(a) * * *

(2) In accordance with § 1.1306(b) and § 17.4 of this chapter, the Bureau will address any environmental concerns prior to processing the registration.

* * * * *

(4) * * * The owner remains responsible for providing a copy of FCC Form 854R to all tenant licensees on the structure and for posting the registration number as required by § 17.4(g) and (h) of this chapter.

* * * * *

**Subpart F—Wireless Radio Services Applications and Proceedings**

3. Delayed indefinitely, amend § 1.923 by revising paragraphs (d)(2) and (e)(2) to read as follows:

**§ 1.923 Content of applications.**

* * * * *

(d) * * *

(2) The Commission has posted notification of the proposed construction on its Web site pursuant to § 17.4(c)(3) of this chapter; and

* * * * *

(e) * * *

(2) For applications that propose any facilities that are not subject to the process set forth in § 17.4(c) of this chapter, the applicant is required to indicate at the time its application is filed whether or not the application requires preparation of an Environmental Assessment under § 1.1307(b). If the applicant answers affirmatively, an Environmental Assessment must be filed with the application and environmental review by the Commission must be completed prior to construction.

* * * * *

4. Delayed indefinitely, amend § 1.929 by revising paragraph (a)(4) to read as follows:

**§ 1.929 Classification of filings as major or minor.**

* * * * *

(a) * * *

(4) Application or amendment requesting authorization for a facility that requires an Environmental Assessment as set forth in § 1.1307(b), unless the facility has been determined not to have a significant environmental effect through the process set forth in § 17.4(c) of this chapter.

* * * * *

**Subpart I—Procedures Implementing the National Environmental Policy Act of 1969**

5. Revise and republish §§ 1.1301 and 1.1302 to read as follows:

**§ 1.1301 Basis and purpose.**

The provisions of this subpart implement Subchapter I of the National Environmental Policy Act of 1969, as amended, 42 U.S.C. 4321–4336f and specifically describe the process by which the Commission determines what actions are subject to NEPA's procedural requirements and the applicable level of NEPA review. The provisions of this subpart also impose limits on human exposure to RF pursuant to the Commission's authority under the Communications Act and the Telecommunications Act of 1996.

**§ 1.1302 Scope.**

The provisions of this subpart shall apply to all Commission major Federal actions as defined by 42 U.S.C.§ 4336e(10) and this section. To the extent that other provisions of the Commission's rules and regulations are inconsistent with the subpart, the provisions of this subpart shall govern.

(a) *Commission major Federal action.* A Commission major Federal action is an action that the Commission determines is subject to substantial Commission control and responsibility.

(b) *Exclusions.* The following are not Commission major Federal actions:

(1) A non-Federal action with no or minimal Commission funding;

(2) A non-Federal action with no or minimal Commission involvement where the Commission cannot control the outcome of the project;

(3) Funding assistance solely in the form of general revenue sharing funds which do not provide Commission compliance or enforcement responsibility over the subsequent use of such funds;

(4) Loans, loan guarantees, or other forms of financial assistance where the Commission does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action;

(5) Bringing judicial or administration civil or criminal enforcement actions;

(6) Extraterritorial activities or decisions, which means Commission activities or decisions with effects located entirely outside of the jurisdiction of the United States; or

(7) Activities or decisions that are non-discretionary and made in accordance with the Commission's statutory authority.

(c) *Actions the Commission has determined do not constitute Commission major Federal actions.* The Commission has determined that the following non-exhaustive list of actions do not constitute major Federal actions by the Commission pursuant to paragraph (a) and paragraphs (b)(1) through (7) of this section:

(1) The deployment of non-Federal facilities in connection with geographic area spectrum licenses, to the extent the deployments do not require antenna structure registration;

(2) The deployment of non-Federal facilities in connection with site-based spectrum licenses, to the extent the deployments do not require antenna structure registration;

(3) The deployment of non-Federal facilities in connection with the provision of unlicensed or licensed-by-rule wireless services, to the extent the deployments do not require antenna structure registration;

(4) The deployment of non-Federal satellite earth stations to the extent the deployments do not require antenna structure registration; and

(5) Actions associated with space-based operations, including the launch, deployment, and operation of space stations.

(d) *Application of radiofrequency emissions exposure limits.* Notwithstanding paragraphs (a) through (c) of this section, the Commission maintains responsibility for the certification of equipment and for operations on facilities pursuant to § 1.1307(b) and § 1.1310 and administers the Commission's radiofrequency radiation exposure limits through Subpart I—Procedures Implementing the National Environmental Policy Act of 1969.

(e) *Designation of lead agency.*

(1) When the Commission is one of multiple Federal agencies participating in an environmental review or authorization of a major Federal action, a lead Federal agency shall be designated by the participating agencies upon consideration of the factors set forth at 42 U.S.C. § 4336a(a)(1)(A) and documented in a letter or memorandum, which may be attached to or contained within an email including representatives of each of the participating Federal agencies and, if applicable, the project sponsor or applicant.

(2) When the Commission is designated as a lead agency, it will, jointly with any State, Tribal, or local agency or agencies appointed as joint lead agencies by the participating Federal agencies, fulfill the role set forth in 42 U.S.C. § 4336a(a)(2).

**§ 1.1303 [Removed]**

6. Delayed indefinitely, remove § 1.1303.

7. Delayed indefinitely, revise and republish § 1.1304 to read as follows:

**§ 1.1304 Information, assistance, and waiver of electronic filing and service requirements.**

All submissions relating to this subpart shall be made electronically. An interested party may submit its filing on paper to the appropriate address for the Commission Secretary and serve the filing on the other parties by mail if it includes a request to waive the electronic filing requirement that explains that the requester is unable to file electronically or that filing electronically would be unduly burdensome. Either showing will be sufficient to obtain a waiver under this section.

**§ 1.1305 [Removed]**

8. Delayed indefinitely, remove § 1.1305.

9. Delayed indefinitely, revise and republish § 1.1306 to read as follows:

**§ 1.1306 Categorical exclusions and extraordinary circumstances.**

(a) *General categorical exclusion.* Except as provided in § 1.1307(c), the Commission has determined that a Commission major Federal action not covered by paragraphs (b) and (c) of this section normally does not significantly affect the quality of the human environment and is categorically excluded from further environmental processing.

(b) *Categorical exclusion and extraordinary circumstances.* Specifically, any Commission major Federal action with respect to any new application, or minor or major modifications of existing or authorized facilities or equipment, will be categorically excluded, except where one of the following extraordinary circumstances apply, indicating that a normally-excluded major Federal action may have a reasonably foreseeable significant environmental effect:

(1) Facilities that are to be located in an officially designated wilderness area.

(2) Facilities that are to be located in an officially designated wildlife preserve.

(3) Facilities that: (i) may affect and are likely to adversely affect listed threatened or endangered species or designated critical habitats; or (ii) are likely to jeopardize the continued existence of any proposed endangered or threatened species or likely to result in the destruction or adverse modification of proposed critical habitats, as determined by the Secretary of the Interior pursuant to the Endangered Species Act of 1973.

Note 1 to § 1.1306(b)(3):

The lists of endangered and threatened species are contained in 50 CFR §§ 17.11, 17.12, 223.102, 224.101. The lists of designated critical habitats are contained in 50 CFR §§ 17.95, 17.96, 17.99, and 226.201 through 232. To ascertain the status of proposed species and habitats, consult the U.S. Fish and Wildlife Service's Information for Planning and Consultation (IPaC) website for terrestrial and freshwater species, and the National Oceanic and Atmospheric Administration Fisheries Species and Habitat app and/or the National Endangered Species Act Critical Habitat Mapper for marine and anadromous species.

The Endangered Species Act of 1973, as amended, 16 U.S.C. § 1531 *et seq*., requires consultation with the U.S. Fish and Wildlife Service, Department of the Interior, or with the National Marine Fisheries Service, Department of Commerce, as appropriate for actions that meet the definition of "action" in 50 CFR § 402.02, regardless of whether they meet the definition of major Federal action in § 1.1302.

(4) Facilities to be located in floodplains, if the antennas and associated equipment, including any electrical equipment, will not be placed at least one foot above the base flood elevation of the floodplain.

(5) Facilities whose construction will involve significant change in surface features (e.g., wetland fill, deforestation, or water diversion). (In the case of wetlands on Federal property, *see* Executive Order 11990.).

(6) Antenna towers and/or supporting structures that are to be equipped with high intensity white lights which are to be located in residential neighborhoods, as defined by the applicable zoning law.

(7) Antenna structures that will be over 450 feet in height above ground level (AGL) and involve either:

(i) Construction of a new antenna structure;

(ii) Modification or replacement of an existing antenna structure involving a substantial increase in size as defined in paragraph I(E)(1)–(3) of Appendix B to part 1 of this chapter; or

(iii) The addition of red steady lighting.

(8) Facilities that would result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in § 1.1307(b) and § 1.1310.

(c) *Categorical exclusion for wireless facilities to be located in a right-of-way.* The construction of wireless facilities, including deployments on new or replacement poles, is categorically excluded if:

(1) The facilities will be located in a right-of-way that is designated by a Federal, State, local, or Tribal government for communications towers, above-ground utility transmission or distribution lines, or any associated structures and equipment;

(2) The right-of-way is in active use for such designated purposes; and

(3) The facilities would not:

(i) Increase the height of the tower or non-tower structure by more than 10% or 20 feet, whichever is greater, over existing support structures that are located in the right-of-way within the vicinity of the proposed construction;

(ii) Involve the installation of more than four new equipment cabinets or more than one new equipment shelter;

(iii) Add an appurtenance to the body of the structure that would protrude from the edge of the structure more than 20 feet, or more than the width of the structure at the level of the appurtenance, whichever is greater (except that the deployment may exceed this size limit if necessary to shelter the antenna from inclement weather or to connect the antenna to the tower via cable); or

(iv) Involve excavation outside the current site, defined as the area that is within the current boundaries of the leased or owned property surrounding the tower and any access or utility easements currently related to the site.

(4) Such wireless facilities are subject to paragraph (b)(8) of this section and require EAs if their construction would result in human exposure to radiofrequency radiation in excess of the applicable health and safety guidelines cited in § 1.1307(b). The extraordinary circumstances in paragraphs (b)(1) through (7) of this section do not apply.

(d) *Categorical exclusions pertaining to certain equipment.*

(1) The mounting of antenna(s) and associated equipment (such as wiring, cabling, cabinets, or backup-power), on or in an existing building, or on an antenna tower or other man-made structure is categorically excluded unless it would result in human exposure to radiofrequency radiation in excess of the applicable guidelines cited in § 1.1307(b). The extraordinary circumstances in paragraphs (b)(1) through (7) of this section do not apply.

(2) The installation of aerial wire or cable over existing aerial corridors of prior or permitted use or the underground installation of wire or cable along existing underground corridors of prior or permitted use, established by the applicant or others is categorically excluded and is not subject to the extraordinary circumstances in paragraphs (b)(1) through (8) of this section or to § 1.1307(b).

(3) The construction of new submarine cable systems is categorically excluded and is not subject to the extraordinary circumstances in paragraphs (b)(1) through (8) of this section or to § 1.1307(b).

(e) *Categorical exclusion for construction in an antenna farm.* The construction of an antenna tower or supporting structure in an established "antenna farm" (i.e., an area in which similar antenna towers are clustered, whether or not such area has been officially designated as an antenna farm) will be categorically excluded unless (1) the tower will be over 450 feet tall or (2) one or more of the antennas to be mounted on the tower or structure are subject to § 1.1307(b) and the additional radiofrequency radiation from the antenna(s) on the new tower or structure would cause human exposure in excess of the applicable health and safety guidelines cited in § 1.1307(b). The extraordinary circumstances in paragraphs (b)(1) through (6) of this section do not apply.

(f) *Adopting categorical exclusions from other Federal agencies*. Consistent with 42 U.S.C. § 4336c, the Commission may adopt a categorical exclusion listed in another agency's NEPA procedures. Any Commission major Federal action that meets the criteria of a categorical exclusion listed in another agency's NEPA procedures and adopted by the Commission shall be categorically excluded. When adopting a categorical exclusion from another agency, the Commission shall follow the procedures set forth in 42 U.S.C. § 4336c and publish the adopted categorical exclusion on its website. The Commission will continue to apply § 1.1307(b) and (c) when adopting another agency's categorical exclusion.

(g) *Documentation of categorical exclusion determinations*. The applicant will document the evaluation of the applicability of a categorical exclusion in a certification indicating that the major Federal action does not trigger any of the extraordinary circumstances in paragraphs (b)(1) through (8) of this section for any application of a categorical exclusion to any major Federal action requiring registration in the Antenna Structure Registration system under § 17.4 of this chapter.

(1) The responsible Bureau will determine the format and method for the applicant to submit this certification.

(2) The applicant must retain supporting documentation in its records showing that the major Federal action is categorically excluded pursuant to this section, for a period of 6 years from the date

the ASR registration application is granted, except that documentation showing compliance with the Commission's radiofrequency safety standards must be retained throughout the duration of operation.

(3) The applicant will provide the documentation to the Commission within five business days of receiving a request from the Commission for such documentation.

Note to § 1.1306:

Except where § 1.1306(b)(7) applies, the specific height of an antenna tower or supporting structure, as well as the specific diameter of a satellite earth station, in and of itself, will not be deemed sufficient to warrant environmental processing, *see* paragraphs (a) through (c) of this section.

10. Delayed indefinitely, amend § 1.1307 by:

a. Revising paragraph (a);

b. Revising the introductory text of paragraph (b);

c. Revising the first sentence of paragraph (b)(5)(i);

d. Revising paragraphs (c) and (d); and

e. Removing paragraph (e).

The revisions read as follows:

**§ 1.1307 Environmental assessments (EAs).**

(a) *Environmental processing and requirements for EAs.* Applicants shall prepare EAs for actions that may have a reasonably foreseeable significant environmental effect (*see* § 1.1306(b)) and when otherwise required by paragraph (b) of this section.

(1) *Elements of EAs.* The EA shall explain the environmental consequences of the proposal and set forth sufficient analysis for the Bureau or the Commission to reach a determination that the proposal will or will not have a significant environmental effect. To assist in making that determination, the Bureau or the Commission may request further information from the applicant, interested persons, and agencies and authorities which have jurisdiction by law or which have relevant expertise. Each EA shall contain the following information:

(i) A statement of purpose and need that briefly summarizes the underlying purpose and need for the proposed action.

(ii) A description of the facilities as well as supporting structures and appurtenances, and a description of the site as well as the surrounding area and uses. If high intensity white lighting is proposed or utilized within a residential area, the EA must also address the impact of this lighting upon the residents.

(iii) A statement as to the zoning classification of the site and communications with, or proceedings before and determinations (if any) made by, zoning, planning, environmental or other local, state or Federal authorities on matters relating to environmental effect. The EA shall also be accompanied with evidence of site approval, which has been obtained from local or Federal land use authorities.

(iv) A statement as to whether construction of the facilities has been a source of controversy on environmental grounds in the local community.

(v) A discussion of environmental and other considerations which led to the selection of the particular site and, if relevant, the particular facility and the nature and extent of any unavoidable adverse environmental effects.

(vi) A description of technically and economically feasible alternative sites or facilities considered.

(vii) Any other information that may be requested by the Bureau or Commission.

(viii) If endangered or threatened species or their critical habitats may be affected, the applicant's analysis must utilize the best scientific and commercial data available (*see* 50 CFR § 402.14(c)).

(2) *Scope of analysis.* In preparing the EA, the focus of the analysis shall be on whether the environmental effects of the action or project at hand are significant. The document must identify where and how reasonable and manageable lines are drawn relating to the consideration of any environmental effects from the action or project at hand that extend outside the geographical territory of the project or might materialize later in time. EAs shall:

(i) Contain information that is factual (not argumentative or conclusory) and concise with sufficient detail to explain the environmental consequences and to enable the Commission or Bureau, after an independent review of the EA, to reach a determination of whether the proposal will have a reasonably foreseeable significant environmental impact, if any;

(ii) Specifically address any feature of the site which has special environmental significance (e.g., wilderness areas, wildlife preserves, natural migration paths for birds and other wildlife);

(iii) Include details of any substantial change in the character of the land utilized (e.g., deforestation, water diversion, wetland fill, or other extensive change of surface features); and

(iv) Shall discuss the effect of any continuing pattern of human intrusion (e.g., necessitated by the operation and maintenance of the facilities) on wildlife areas, wildlife preserves, or other like areas, if present.

(3) *Non-duplication.* To the extent that such information is submitted in another part of the application, it need not be duplicated in the EA, but adequate cross-reference to such information shall be supplied.

(4) *Lead agency exception.* An EA need not be submitted to the Commission if another Federal agency has been designated as the lead agency for a major Federal action.

(5) *Data sources.* An EA may make use of any reliable data source; new scientific or technical research is not required unless it is essential to a reasoned choice among alternatives and the overall costs and timeframe of obtaining it are not unreasonable.

(6) *Page limit.* No EA shall exceed 75 pages, exclusive of citations and appendices.

(7) *Determination of significant environmental effect.* If the Bureau or the Commission determines, based on an independent review of the EA and any applicable mandatory consultation requirements imposed upon Federal agencies, that the proposal will have a reasonably foreseeable significant effect on the quality of the human environment, it will so inform the applicant. The applicant

will then have an opportunity to amend its application in accordance with § 1.1309. If the significant environmental effect is not eliminated, the Bureau will publish a Notice of Intent (*see* § 1.1312(c)) that an Environmental Impact Statement will be prepared (*see* § 1.1312).

(8) *Findings of no significant impact.* If the Bureau or Commission determines, based on an independent review of the EA, and any mandatory consultation requirements imposed upon Federal agencies, that the proposal would not have a significant impact, it will make a Finding of No Significant Impact. The Finding of No Significant Impact shall include a statement that the EA that was submitted represents the Commission's good faith effort to fulfill NEPA's requirements within the congressional timeline, and that such efforts are now complete; that, in the Commission's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the Commission's judgment, the analysis contained therein is adequate to inform and reasonably explain the Commission's final decision regarding the proposed action. Thereafter, the application will be processed without further documentation of environmental effect.

(9) *Deadlines.* Processing of EAs shall be completed within one year of the date the EA is received for review and shall be deemed completed when the Commission or Bureau issues either a Finding of No Significant Impact or informs the applicant that the proposed major Federal action will have a reasonably foreseeable significant effect on the quality of the human environment. The Commission or Bureau, in consultation with the applicant, may establish a new deadline that provides only as much additional time as needed for the applicant to amend its EA to submit any additional information.

(i) An EA shall be considered received for review by the Bureau after it has been both electronically submitted to the Bureau and placed on public notice (*see* § 17.4(d)(6) of this chapter). The EA will remain on public notice for 20 days.

(ii) Within 30 days of the EA being placed on public notice, the reviewing Bureau shall review the EA for completeness and adequacy. If the EA is found to be complete and adequate, and in the absence of a third party petition (*see* paragraph (c) of this section) or Petition to Deny, the reviewing Bureau shall issue a Finding of No Significant Impact or advise the applicant that the proposal will have a significant environmental effect, within 60 days from placement on public notice.

(iii) If, however, the EA is missing necessary information or the reviewing Bureau determines that it needs to consider additional information to make an informed determination, the reviewing Bureau will notify the applicant of the additional information needed within 30 days after the EA is placed on notice. Where the missing information is of a nature that is likely to affect the public's ability to request further review of environmental impacts, the application will again be placed on notice after receipt of this missing information. In such cases, and absent the reviewing Bureau determining additional information is required, the Bureau will complete the review and issue a Finding of No Significant Impact, or advise the applicant that the proposal will have a significant environmental effect, within 30 days after the missing information is provided or 60 days after the initial notice, whichever is later.

(iv) In the event the Commission receives a third party petition (*see* paragraph (c) of this section) or Petition to Deny in response to the public notice, the reviewing Bureau will resolve the third party petition or Petition to Deny within 90 days of the end of the pleading cycle on such petition. The 90-day period is paused when the reviewing Bureau requests additional information from the applicant, and the time period is resumed once the applicant provides the requested information to the Bureau. The Bureau will then complete its review and issue a Finding of No Significant Impact, or advise the applicant that the proposal will have a significant environmental effect, within 30 days after completing adjudication of the request or Petition.

(b) *Requirements Regarding Human Exposure to RF.* In addition to imposing limits on human exposure to RF for Commission major Federal actions (*see* § 1.1306(b)(8)), the Commission maintains independent legal authority to impose limits on human exposure to RF for actions that are not major Federal actions (*see* § 1.1302(d)). The procedures herein apply to both major Federal actions and actions that are not major Federal actions.

* * * * *

(5) * * *

(i) In general, when the exposure limits specified in § 1.1310 are exceeded in an accessible area due to the emissions from multiple fixed RF sources, actions necessary to bring the area into compliance or preparation of an EA as specified in paragraph (a) of this section are the shared responsibility of all licensees whose RF sources produce, at the area in question, levels that exceed 5% of the applicable exposure limit proportional to power. * * *

* * * * *

(c) *Third Party Petitions.* An interested person alleging that a particular major Federal action, otherwise categorically excluded, will have a significant environmental effect may petition the Bureau responsible for processing that action to require further environmental processing of the application. Except as provided for in § 1.1304, such petitions shall be submitted electronically and shall set forth in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process. The Bureau shall review the petition and supporting materials and consider the environmental concerns that have been raised. In cases in which a pleading cycle has been established, the Bureau shall resolve the petition within 90 days of the close of the pleading cycle on such petition. In cases without a pleading cycle, the petition shall be resolved within 90 days of receipt of the petition. The 90-day period is paused when the Bureau requests additional information from the applicant and is resumed once the applicant provides the requested information to the Bureau. If the Bureau determines that the action is likely to have a reasonably foreseeable significant environmental effect, the Bureau will require the applicant to either prepare an EA, which will serve as the basis for the determination to proceed with or terminate environmental processing, or otherwise modify the proposal to avoid these effects.

(1) All such petitions must provide specific, detailed evidence demonstrating that the proposed major Federal action is likely to have a reasonably foreseeable significant environmental effect.

(2) All such petitions shall be supported by a written submission which can include photographic evidence supporting the facts alleged in the petition. The petition shall be limited to five pages in length with 15 pages of supporting evidentiary documents. The Bureau may in its discretion permit a supplement to the petition and may set page limits on the supplemental submissions.

(d) *Preemption.* No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the regulations contained in this chapter concerning the environmental effects of such emissions. For purposes of this paragraph:

(1) The term *personal wireless service* means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(2) The term *personal wireless service facilities* means facilities for the provision of personal wireless services;

(3) The term *unlicensed wireless services* means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services; and

(4) The term *direct-to-home satellite services* means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

**§ 1.1308 [Removed]**

11. Delayed indefinitely, remove § 1.1308.

12. Delayed indefinitely, revise and republish § 1.1309 to read as follows:

**§ 1.1309 Application amendments.**

Applicants are permitted to amend their applications to reduce, minimize, or eliminate reasonably foreseeable significant environmental effects. Amendments shall be made electronically. As a routine matter, an applicant will be permitted to amend its application within 30 days after the Commission or the Bureau informs the applicant that the proposal will have a reasonably foreseeable significant effect on the quality of the human environment. The period of 30 days may be extended upon a showing of good cause.

13. Delayed indefinitely, revise and republish §§ 1.1311 through 1.1313 to read as follows:

**§ 1.1311 Objections.**

(a) In the case of an application to which section 309(b) of the Communications Act applies, objections based on environmental considerations shall be filed electronically as petitions to deny. If the interested person is unable to file electronically or if filing electronically would be unreasonably burdensome, such person may submit the petition by mail, with a request for waiver under § 1.1304.

(b) Informal objections which are based on environmental considerations must be filed electronically prior to grant of the application. If the interested person is unable to file electronically or if filing electronically would be unreasonably burdensome, such person may submit the objection by mail, with a request for waiver under § 1.1304.

**§ 1.1312 Environmental impact statements (EISs).**

(a) *Applicant preparation of EISs.* The applicant for any proposed Commission major Federal action requiring an environmental document that the Commission determines has a reasonably foreseeable significant effect on the quality of the human environment shall prepare an Environmental Impact Statement (EIS).

(b) *Notices of intent (NOI).* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an Environmental Impact Statement, the Bureau will publish a Notice of Intent to prepare an EIS.

(1) Contents. The NOI will identify the proposal, concisely describe the environmental issues and concerns presented by the subject application, and request public comment from affected or involved agencies, authorities and other interested persons on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed major Federal action.

(2) Comments and reply comments. Any person or agency may comment on the NOI and the environmental effect of the proposal described therein within 45 days of the publication of the NOI. A copy of those comments shall be filed electronically with the Commission, subject to the waiver provisions of § 1.1304. If a person submitting comments is especially qualified in any way to comment on the environmental impact of the facilities, a statement of his or her qualifications shall be set out in the comments. In addition, comments submitted by an agency shall identify the person(s) who prepared them. Reply comments may be filed within 15 days after the time for filing comments has expired.

(c) *Content of EISs.*

(1) An EIS for a proposed Commission major Federal action shall contain:

(i) A concise description of the proposed major Federal action and the nature of the area affected, its uses, and any specific feature that has special environmental significance;

(ii) A statement briefly summarizing the underlying purpose and need for the proposed action;

(iii) A detailed statement, with support, of each element listed at 42 U.S.C. § 4332(2)(C);

(iv) For any proposal that involves unresolved conflicts concerning alternative uses of available resources, include a description of the appropriate alternatives to the recommended major Federal action in the proposal;

(v) A summary of the comments, a response to the comments, and an analysis of the proposal in terms of its environmental consequences, and any reasonable alternatives, and recommendations, if any, and shall cite the Commission's internal appeal procedures (*see* §§ 1.101 through 1.117 of this chapter). Copies of the comments and reply comments, or summaries thereof where the record is voluminous, shall be attached to the EIS.

(2) An EIS shall not exceed 150 pages, exclusive of citations or appendices, except in the case of a major Federal action of extraordinary complexity, for which the Bureau, in consultation with the applicant, may permit or require an EIS not to exceed 300 pages, exclusive of citations or appendices.

(d) *Limitations on Challenges to the Application During EIS Initiation*. The publication of an NOI, including a request for comments, and the preparation of an EIS and the request for comments shall not open the application to attack on other grounds.

(e) *Supplementation of EISs.* Where substantial changes are made to the proposed action that are relevant to environmental concerns, or substantial new circumstances occur or information arises about the significance of the adverse effects that bear upon the proposed action or its effects, the Bureau responsible for processing the particular application shall coordinate with the applicant to draft supplements addressing the changes or new circumstances or information.

(f) *Consideration of environmental impact statements.*

(1) If the major Federal action is designated for hearing:

(i) In rendering an initial decision, the presiding officer (other than the Commission) shall use the EIS in considering the environmental issues.

(ii) When the Commission serves as the presiding officer or upon its review of an initial decision, the Commission will consider and assess all aspects of the EIS and will render its decision, giving due consideration to the environmental and nonenvironmental issues.

(2) In all non-hearing matters, the Commission, as part of its decision-making process, will review the EIS, along with other relevant issues, to ensure that the environmental effects are specifically assessed and given comprehensive consideration.

(g) *Completion.* EISs shall be completed within two years of the date on which the Commission or relevant Bureau determines that 42 U.S.C. § 4332(2)(C) requires the issuance of an environmental impact statement or the date on which the Commission issues a notice of intent to prepare the environmental impact statement, unless the Commission or Bureau, in consultation with the applicant, establishes a new deadline that provides only so much additional time as is necessary to complete the EIS. When the environmental impact statement is published, a responsible official will certify (and the certification will be incorporated into the environmental impact statement) that the resulting environmental impact statement represents the Commission's good-faith effort to fulfill NEPA's requirements within the congressional timeline; that such effort is substantially complete; that, in the Commission's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the Commission's judgment, the analysis contained therein is adequate to inform and reasonably explain the Commission's final decision regarding the proposed Federal action.

**§ 1.1313 Emergency procedures**

(a) These emergency procedures are applicable in emergency situations where it is necessary to take immediate Federal action to address imminent threats to life, property, or important natural, cultural, or historic resources, as determined by the Bureau responsible for processing the action. Applicants seeking to apply these procedures to a proposed major Federal action must include a description of the specific emergency circumstances and a certification that the action is necessitated by those emergency circumstances.

(b) Where emergency circumstances make it necessary to take a major Federal action with reasonably foreseeable significant environmental effects, the Commission or responsible Bureau will consult with the Council on Environmental Quality about alternative arrangements for compliance with 42 U.S.C. § 4332(2)(C).

(c) Where the Commission or responsible Bureau expects that the proposed emergency major Federal action is not likely to have significant environmental effects, or if the significance of the environmental effects is unknown, applicants may prepare a shortened Environmental Assessment, consisting of:

(1) The purpose and need for the proposed action;

(2) The reasonably foreseeable effects of the proposed agency action;

(3) Any mitigation measures that the applicant will implement; and

(4) The alternatives considered.

(d) The Commission or responsible Bureau may issue further guidance as necessary for emergency circumstances, including waiving rules for good cause pursuant to § 1.3 of this chapter or alleviating any additional burden in accordance with other sections of the Commission's rules.

**§§ 1.1314, 1.1315, 1.1317, 1.1319, and 1.1320 [Removed]**

14. Delayed indefinitely, remove §§ 1.1314, 1.1315, 1.1317, 1.1319, and 1.1320.

**Subpart M—Cable Operations and Licensing Systems (COALS)**

15. Delayed indefinitely, amend § 1.1706 by revising paragraph (d) as follows:

**§ 1.1706 Content of Filings.**

* * * * *

(d) *Environmental concerns.* Each applicant is required to indicate at the time its application is filed whether a Commission grant of the application requires preparation of an Environmental Assessment under § 1.1307(b) of this chapter. If yes, an Environmental Assessment, as required by § 1.1307 of this chapter, must be filed with the application and environmental review by the Commission must be completed prior to construction.

* * * * *

**Subpart Q—Competitive Bidding Proceedings**

16. Delayed indefinitely, amend § 1.2113 by revising paragraph (d)(3) to read as follows:

**§ 1.2113 Construction prior to grant of application.**

* * * * *

(d) * * *

(3) The applicant has indicated in the application that the proposed facility would not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter.

* * * * *

**Subpart U—State and Local Government Regulation of the Placement, Construction, and Modification of Personal Wireless Service Facilities**

17. Delayed indefinitely, amend § 1.6002 by:

a. Revising the first sentence of paragraph (b);

b. Revising paragraph (c);

c. Revising the introductory text of paragraph (g); and

d. Revising paragraphs (l)(1)(i), and (l)(2).

The revisions read as follows:

**§ 1.6002 Definitions.**

* * * * *

(b) *Antenna,* consistent with § 1.90000(a) of this chapter, means an apparatus designed for the purpose of emitting radiofrequency (RF) radiation, to be operated or operating from a fixed location pursuant to Commission authorization, for the provision of personal wireless service and any commingled information services. * * *

(c) *Antenna equipment,* consistent with § 1.90000(a) of this chapter, means equipment, switches, wiring, cabling, power sources, shelters or cabinets associated with an antenna, located at the same fixed location as the antenna, and, when collocated on a structure, is mounted or installed at the same time as such antenna.

* * * * *

(g) *Collocation,* consistent with § 1.90000(a) of this chapter and the Nationwide Programmatic Agreement (NPA) for the Collocation of Wireless Antennas, appendix B of this part, section I.B, means—

* * * * *

(l) * * *

(1) * * *

(i) Are mounted on structures fifty 50 feet or less in height including their antennas as defined in § 1.90000(a) of this chapter; or

* * * * *

(2) Each antenna associated with the deployment, excluding associated antenna equipment (as defined in the definition of antenna in § 1.90000(a) of this chapter), is no more than three cubic feet in volume;

* * * * *

**Subpart X—Spectrum Leasing**

18. Delayed indefinitely, amend § 1.9010 by revising the second sentence of paragraph (b)(1)(ii) to read as follows:

**§ 1.9010 *De facto* control standard for spectrum leasing arrangements.**

* * * * *

(b) * * *

(1) * * *

(ii) * * * These responsibilities include: Coordinating operations and modifications of the spectrum lessee's system to ensure compliance with Commission rules regarding non-interference with co-channel and adjacent channel licensees (and any authorized spectrum user); making all determinations as to whether an application is required for any individual spectrum lessee stations (e.g., those that require frequency coordination, those that require international or Interdepartment Radio Advisory Committee

(IRAC) coordination, those that affect radio frequency quiet zones described in § 1.924 of this chapter, or those that require notification to the Federal Aviation Administration under part 17 of this chapter); and, ensuring that the spectrum lessee complies with the Commission's safety guidelines relating to human exposure to radiofrequency (RF) radiation, including submission of an Environmental Assessment where required, pursuant to § 1.1307(b) and related rules of part 1, subpart I of this chapter. * * *

* * * * *

**Subpart FF—Cable Landing Licenses**

19. Delayed indefinitely, amend § 1.70007 by revising paragraph (i) to read as follows:

**§ 1.70007 Routine Conditions.**

* * * * *

(i) The Commission reserves the right to require the licensee to file an Environmental Assessment should it determine that the landing of the cable at the specific locations and construction of necessary cable landing stations are subject to environmental review under § 1.1302 of this chapter and may significantly affect the environment within the meaning of § 1.1306 of this chapter implementing the National Environmental Policy Act of 1969. The cable landing license is subject to modification by the Commission under its review of any Environmental Assessment or Environmental Impact Statement that it may require pursuant to its rules. *See also* § 1.1306(d) and § 1.1307(c) of this chapter.

* * * * *

**Subpart HH—Procedures Implementing the National Historic Preservation Act of 1966**

20. Delayed indefinitely, add subpart HH, consisting of §§ 1.90000 through 1.90002, to read as follows:

Sec.

1.90000 Definitions.

1.90001 Responsibilities of applicants.

1.90002 Review of Commission undertakings that may affect historic properties.

**§ 1.90000—Definitions.**

(a) *Antenna* means an apparatus designed for the purpose of emitting radiofrequency (RF) radiation, to be operated or operating from a fixed location pursuant to Commission authorization, for the transmission of writing, signs, signals, data, images, pictures, and sounds of all kinds, including the transmitting device and any on-site equipment, switches, wiring, cabling, power sources, shelters or cabinets associated with that antenna and added to a tower, structure, or building as part of the original installation of the antenna. For most services, an antenna will be mounted on or in, and is distinct from, a supporting structure such as a tower, structure or building. However, in the case of AM broadcast stations, the entire tower or group of towers constitutes the antenna for that station. For purposes of this section, the term antenna does not include unintentional radiators, mobile stations, or devices authorized under part 15 of this title.

(b) *Applicant* means a Commission licensee, permittee, or registration holder, or an applicant or prospective applicant for a wireless or broadcast license, authorization or antenna structure registration, and the duly authorized agents, employees, and contractors of any such person or entity.

(c) *Collocation* means the mounting or installation of an antenna on an existing tower, building or structure for the purpose of transmitting and/or receiving radio frequency signals for communications purposes, whether or not there is an existing antenna on the structure.

(d) *Tower* means any structure built for the sole or primary purpose of supporting Commission-licensed or authorized antennas, including the on-site fencing, equipment, switches, wiring, cabling, power sources, shelters, or cabinets associated with that tower but not installed as part of an antenna as defined herein.

(e) *Undertaking* means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of the Commission, including those requiring a Commission permit, license or approval. Maintenance and servicing of towers, antennas, and associated equipment are not deemed to be undertakings subject to review under this section.

**§ 1.90001—Responsibilities of applicants.**

Applicants seeking Commission authorization for construction or modification of towers, collocation of antennas, or other undertakings shall take the steps mandated by, and comply with the requirements set forth in Appendix C of this part, sections III through X, or any other applicable program alternative.

**§ 1.90002—Review of Commission undertakings that may affect historic properties.**

(a) *Review of Commission undertakings.* Any Commission undertaking that has the potential to cause effects on historic properties, unless excluded from review pursuant to paragraph (b) of this section, shall be subject to review under section 106 of the National Historic Preservation Act, as amended, 54 U.S.C. § 306108, by applying—

(1) The procedures set forth in regulations of the Advisory Council on Historic Preservation, 36 CFR §§ 800.3 through 800.13, or

(2) If applicable, a program alternative established pursuant to 36 CFR §§ 800.14, 800.16, including but not limited to the following:

(i) The Nationwide Programmatic Agreement for the Collocation of Wireless Antennas, as amended, Appendix B of this part.

(ii) The Nationwide Programmatic Agreement for Review of Effects on Historic Properties for Certain Undertakings Approved by the Federal Communications Commission, Appendix C of this part.

(iii) The Program Comment to Tailor the Federal Communications Commission's Section 106 Review for Undertakings Involving the Construction of Positive Train Control Wayside Poles and Infrastructure, 79 Fed. Reg. 30861 (May 29, 2014).

(b) *Exclusions.* The following categories of undertakings are excluded from review under this section:

(1) *Projects reviewed by other agencies.* Undertakings for which an agency other than the Commission is the lead Federal agency pursuant to 36 CFR § 800.2(a)(2).

(2) *Projects subject to program alternatives.* Undertakings excluded from review under a program alternative established pursuant to 36 CFR § 800.14, including those listed in paragraph (a)(2) of this section.

(3) *Replacement utility poles.* Construction of a replacement for an existing structure where all the following criteria are satisfied:

(i) The original structure—

(A) Is a pole that can hold utility, communications, or related transmission lines;

(B) Was not originally erected for the sole or primary purpose of supporting antennas that operate pursuant to the Commission's spectrum license or authorization; and

(C) Is not itself a historic property.

(ii) The replacement pole—

(A) Is located no more than 10 feet away from the original pole, based on the distance between the centerpoint of the replacement pole and the centerpoint of the original pole; *provided* that construction of the replacement pole in place of the original pole entails no new ground disturbance (either laterally or in depth) outside previously disturbed areas, including disturbance associated with temporary support of utility, communications, or related transmission lines. For purposes of this paragraph, "ground disturbance" means any activity that moves, compacts, alters, displaces, or penetrates the ground surface of previously undisturbed soils;

(B) Has a height that does not exceed the height of the original pole by more than five feet or 10 percent of the height of the original pole, whichever is greater; and

(C) Has an appearance consistent with the quality and appearance of the original pole.

(4) *Collocations on buildings and other non-tower structures.* The mounting of antennas (including associated equipment such as wiring, cabling, cabinets, or backup power) on buildings or other non-tower structures where the deployment meets the following conditions:

(i) There is an existing antenna on the building or structure;

(ii) One of the following criteria is met:

(A) *Non-Visible Antennas.* The new antenna is not visible from any adjacent streets or surrounding public spaces and is added in the same vicinity as a pre-existing antenna;

(B) *Visible Replacement Antennas.* The new antenna is visible from adjacent streets or surrounding public spaces, provided that:

(*1*) It is a replacement for a pre-existing antenna,

(*2*) The new antenna will be located in the same vicinity as the pre-existing antenna,

(*3*) The new antenna will be visible only from adjacent streets and surrounding public spaces that also afford views of the pre-existing antenna,

(*4*) The new antenna is not more than three feet larger in height or width (including all protuberances) than the pre-existing antenna, and

(*5*) No new equipment cabinets are visible from the adjacent streets or surrounding public spaces; or

(C) *Other Visible Antennas.* The new antenna is visible from adjacent streets or surrounding public spaces, provided that:

(*1*) It is located in the same vicinity as a pre-existing antenna;

(*2*) The new antenna will be visible only from adjacent streets and surrounding public spaces that also afford views of the pre-existing antenna;

(*3*) The pre-existing antenna was not deployed pursuant to the exclusion in this paragraph;

(*4*) The new antenna is not more than three feet larger in height or width (including all protuberances) than the pre-existing antenna; and

(*5*) No new equipment cabinets are visible from the adjacent streets or surrounding public spaces.

(iii) The new antenna complies with all zoning conditions and historic preservation conditions applicable to existing antennas in the same vicinity that directly mitigate or prevent effects, such as camouflage or concealment requirements; and

(iv) The deployment of the new antenna involves no new ground disturbance.

Note 1 to § 1.90002(b)(4):

A non-visible new antenna is in the "same vicinity" as a pre-existing antenna if it will be collocated on the same rooftop, façade or other surface. A visible new antenna is in the "same vicinity" as a pre-existing antenna if it is on the same rooftop, façade, or other surface and the centerpoint of the new antenna is within 10 feet of the centerpoint of the pre-existing antenna. A deployment causes no new ground disturbance when the depth and width of previous disturbance exceeds the proposed construction depth and width by at least two feet.

(5) *Aerial corridors and existing underground corridors.* The installation of aerial wire or cable over existing aerial corridors of prior or permitted use or the underground installation of wire or cable along existing underground corridors of prior or permitted use, established by the applicant or others.

(6) *Submarine Cable Systems.* The construction of new submarine cable systems.

(c) *Responsibilities of applicants.* Applicants seeking Commission authorization for construction or modification of towers, collocation of antennas, or other undertakings shall take the steps mandated by, and comply with the requirements set forth in, Appendix C of this part, sections III through X, or any other applicable program alternative.

**PART 2—FREQUENCY ALLOCATIONS AND RADIO TREATY MATTERS; GENERAL RULES AND REGULATIONS**

21. The authority citation for part 2 is revised to read as follows:

**Authority:** 47 U.S.C. 154, 302a, 303, 332, and 336, unless otherwise noted.

**Subpart J—Equipment Authorization Procedures**

22. Delayed indefinitely, amend § 2.1091 by revising paragraphs (a) and (c)(3) to read as follows:

**§ 2.1091 Radiofrequency radiation exposure evaluation: mobile devices.**

(a) Requirements of this section are a consequence of Commission responsibilities under the Telecommunications Act of 1996. *See* subpart I of part 1 of this chapter, in particular § 1.1307(b).

* * * * *

(c) * * *

(3) Unless otherwise specified in this chapter, any other single mobile or multiple mobile and portable RF source(s) associated with a device is exempt from routine environmental evaluation for RF exposure prior to equipment authorization or use, except as specified in § 1.1307(c) of this chapter.

* * * * *

23. Delayed indefinitely, amend § 2.1093 by revising paragraphs (a) and (c)(3) to read as follows:

**§ 2.1093 Radiofrequency radiation exposure evaluation: portable devices.**

(a) Requirements of this section are a consequence of Commission responsibilities under the Telecommunications Act of 1996. *See* subpart I of part 1 of this chapter, in particular § 1.1307(b) of this chapter.

* * * * *

(c) * * *

(3) Unless otherwise specified in this chapter, any other single mobile or multiple mobile and portable RF source(s) associated with a device is exempt from routine environmental evaluation for RF exposure prior to equipment authorization or use, except as specified in § 1.1307(c) of this chapter.

* * * * *

**PART 5—EXPERIMENTAL RADIO SERVICE**

24. The authority citation for part 5 is revised to read as follows:

**Authority:** 47 U.S.C. 154, 301, 302a, 303, 307, 332, 336.

**Subpart B—Applications and Licenses**

25. Delayed indefinitely, amend § 5.63 by revising paragraph (a) to read as follows:

**§ 5.63 Supplemental statements required.**

* * * * *

(a) If installation and/or operation of the equipment requires preparation of an Environmental Assessment under § 1.1307(b) of this chapter, an Environmental Assessment as defined in § 1.1307 of this chapter must be submitted with the application.

* * * * *

**PART 17—CONSTRUCTION, MARKING, AND LIGHTING OF ANTENNA STRUCTURERS**

26. The authority citation for part 17 continues to read as follows:

**Authority:** 47 U.S.C. 154, 301, 303, and 309.

**Subpart A—General Information**

27. Delayed indefinitely, revise and republish § 17.4 to read as follows:

**§ 17.4 Antenna structure registration.**

(a) The owner of any proposed or existing antenna structure that requires notice of proposed construction to the Federal Aviation Administration (FAA) due to physical obstruction must register the structure with the Commission (*see* § 17.7 for FAA notification requirements). This includes those structures used as part of stations licensed by the Commission for the transmission of radio energy, or to be used as part of a cable television head end system. If a Federal Government antenna structure is to be used by a Commission licensee, the structure must be registered with the Commission. If the FAA exempts an antenna structure from notification, it is exempt from the requirement that it register with the Commission (*see* § 17.7(e) for exemptions to FAA notification requirements).

(1) For a proposed antenna structure or alteration of an existing antenna structure, the owner must register the structure prior to construction or alteration.

(2) For a structure that did not originally fall under the definition of "antenna structure," the owner must register the structure prior to hosting a Commission licensee.

(b) Except as provided in paragraph (e) of this section, each owner of an antenna structure described in paragraph (a) of this section must electronically file FCC Form 854 with the Commission. Additionally, each owner of a proposed structure referred to in paragraph (a) of this section must submit a valid FAA determination of "no hazard." In order to be considered valid by the Commission, the FAA determination of "no hazard" must not have expired prior to the date on which FCC Form 854 is received by the Commission. The height of the structure will be the highest point of the structure including any obstruction lighting or lightning arrester. If an antenna structure is not required to be registered under paragraph (a) of this section and it is voluntarily registered with the Commission after October 24, 2014, the registrant must note on FCC Form 854 that the registration is voluntary. Voluntarily registered antenna structures are not subject to the lighting and marking requirements contained in this part and do not require a determination of "no hazard" from the FAA for processing in the ASR system.

(c) Each prospective applicant must complete the environmental notification process described in this paragraph except as specified in paragraph (l) of this section.

(1) *Exceptions from the environmental notification process.* Completion of the environmental notification process is not required when FCC Form 854 is submitted solely for the following purposes:

(i) For notification only, such as to report a change in ownership or contact information, or the dismantlement of an antenna structure;

(ii) For a reduction in height of an antenna structure or an increase in height that does not constitute a substantial increase in size as defined in paragraph I(E)(1) through (3) of appendix B to part 1 of this chapter, provided that there is no construction or excavation more than 30 feet beyond the existing antenna structure property;

(iii) Any lighting change or modification that does not involve the addition of steady red lights;

(iv) For replacement of an existing antenna structure at the same geographic location that does not require an Environmental Assessment (EA) under §§ 1.1306(b) and 1.1307(b) through (d) of this chapter, provided the new structure will not involve red steady-burning lighting, there will be no substantial increase in size as defined in paragraph I(E)(1) through (3) of appendix B to part 1 of this chapter, and there will be no construction or excavation more than 30 feet beyond the existing antenna structure property;

(v) For any other change that does not alter the physical structure, lighting, or geographic location of an existing structure;

(vi) For construction, modification, or replacement of an antenna structure for which a Federal agency other than the Commission has been designated as the lead agency and for which environmental review has concluded; or

(vii) For the construction or deployment of an antenna structure that will:

(A) Be in place for no more than 60 days;

(B) Requires notice of construction to the FAA;

(C) Does not require marking or lighting under FAA regulations;

(D) Will be less than 200 feet in height above ground level; and

(E) Will either involve no excavation or involve excavation only where the depth of previous disturbance exceeds the proposed construction depth (excluding footings and other anchoring mechanisms) by at least two feet. An applicant that relies on this exception must wait 30 days after removal of the antenna structure before relying on this exception to deploy another antenna structure covering substantially the same service area.

(2) *Commencement of the environmental notification process.* The prospective applicant shall commence the environmental notification process by filing information about the proposed antenna structure with the Commission. This information shall include, at a minimum, all of the information required on FCC Form 854 regarding ownership and contact information, geographic location, and height, as well as the type of structure and anticipated lighting. Prospective applicants who have determined that the proposed antenna structure is categorically excluded from further environmental processing under § 1.1306 of this chapter shall be required to certify that none of the Commission's list of extraordinary circumstances in § 1.1306(b) of this chapter are present. The Wireless Telecommunications Bureau may utilize a partially completed FCC Form 854 to collect this information.

(3) *National notice.* The Commission shall post notification of the proposed construction on its Web site. This posting shall include the information contained in the initial filing with the Commission or a link to such information. The posting shall remain on the Commission's Web site for a period of 30 days.

(4) *Requests for environmental processing.* Any request filed by an interested person pursuant to § 1.1307(c) of this chapter must be received by the Commission no later than 30 days after the proposed antenna structure goes on notice pursuant to paragraph (c)(3) of this section. The Wireless Telecommunications Bureau shall establish by public notice the process for filing requests for environmental processing and responsive pleadings consistent with the following provisions:

(i) *Service and pleading cycle.* The interested person or entity shall serve a copy of its request on the prospective ASR applicant pursuant to § 1.47 of this chapter. Oppositions may be filed no later than 10 days after the time for filing requests has expired. Replies to oppositions may be filed no later than five days after the time for filing oppositions has expired. Oppositions shall be served upon the requester, and replies shall be served upon the prospective applicant.

(ii) *Content.* An environmental request that does not meet the requirements of § 1.1307(c) of this chapter may be dismissed. The request must be submitted as a written petition filed electronically, setting forth in detail the reasons supporting requester's contentions. If the filer is unable to submit electronically, or if filing electronically would be unreasonably burdensome, the request may be submitted by mail, with a request for waiver under § 1.1304 of this chapter.

(5) *Amendments.* The prospective applicant must file an amendment to report any substantial change in the information provided to the Commission. An amendment will not require further notice if the only reported change is a reduction in the height of the proposed new or modified antenna structure; if no addition of red steady-burning lighting is proposed; or if the amendment reports only administrative changes that are not subject to the requirements specified in this paragraph. All other changes to the physical structure or geographic location data for and the addition of red steady-burning lighting to proposed registered antenna structure require additional notice and a new period for filing requests pursuant to paragraphs (c)(3) and (c)(4) of this section.

(6) *Environmental Assessments.* If an EA is required under §§ 1.1306 or 1.1307 of this chapter, the antenna structure registration applicant shall attach the EA to its environmental submission, regardless of any requirement that the EA also be attached to an associated service-specific license or construction permit application. The contents of an EA are described in § 1.1307 of this chapter. The EA may be provided either with the initial environmental submission or as an amendment. If the EA is submitted as an amendment, the Commission shall post notification on its Web site for an additional 20 days and consider additional requests pursuant to paragraph (c)(4) of this section within 20 days after a completed EA is submitted.

(7) *Disposition.* The processing Bureau shall resolve all environmental issues, in accordance with the environmental regulations in §§ 1.1301 through 1.1313 of this chapter, before the tower owner, or the first tenant licensee acting on behalf of the owner, may complete the antenna structure registration application. Requests for environmental review submitted under paragraph (c)(4) of this section shall be resolved within 90 days of the end of the pleading cycle set forth in paragraph (c)(4)(i) of this section, not including the time between a request from staff to the applicant for additional information is made and the applicant's provision of the requested information to staff. In a case where no EA is submitted, the Bureau shall notify the applicant whether an EA is required under § 1.1307(c) of this chapter. In a case where an EA is submitted, the Bureau shall either grant a Finding of No Significant Impact (FONSI) or notify the applicant that further environmental processing is required pursuant to § 1.1307 of this chapter. Upon filing the completed antenna structure registration application, the applicant shall certify that the construction will not have a

significant environmental impact, unless an Environmental Impact Statement is prepared pursuant to § 1.1312 of this chapter.

(d) In accordance with § 1.1306(g) of this chapter and excepting applications for antenna structures that are not required to be registered under paragraph (a) of this section, all prospective applicants are required to support their initial determinations that a proposed new antenna structure or modification of an existing antenna structure is categorically excluded from further environmental processing under § 1.1306 of this chapter by indicating whether any extraordinary circumstances listed in § 1.1306(b) of this chapter are present.

(e) If the owner of the antenna structure cannot file FCC Form 854 because it is subject to a denial of Federal benefits under the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 862, the first tenant licensee authorized to locate on the structure (excluding tenants that no longer occupy the structure) must register the structure electronically using FCC Form 854, and provide a copy of the Antenna Structure Registration (FCC Form 854R) to the owner. The owner remains responsible for providing to all tenant licensees and permittees notification that the structure has been registered, consistent with paragraph (f) of this section, and for posting the registration number as required by paragraph (g) of this section.

(f) The Commission shall issue to the registrant FCC Form 854R, Antenna Structure Registration, which assigns a unique Antenna Structure Registration Number. The antenna structure owner shall immediately provide to all tenant licensees and permittees notification that the structure has been registered, along with either a copy of Form 854R or the Antenna Structure Registration Number and a link to the FCC antenna structure website: https://wireless.fcc.gov/antenna/. This notification must be done electronically.

(g) Except as described in paragraph (h) of this section, the Antenna Structure Registration Number must be displayed so that it is conspicuously visible and legible from the publicly accessible area nearest the base of the antenna structure along the publicly accessible roadway or path. Where an antenna structure is surrounded by a perimeter fence, or where the point of access includes an access gate, the Antenna Structure Registration Number should be posted on the perimeter fence or access gate. Where multiple antenna structures having separate Antenna Structure Registration Numbers are located within a single fenced area, the Antenna Structure Registration Numbers must be posted both on the perimeter fence or access gate and near the base of each antenna structure. If the base of the antenna structure has more than one point of access, the Antenna Structure Registration Number must be posted so that it is visible at the publicly accessible area nearest each such point of access. Materials used to display the Antenna Structure Registration Number must be weather-resistant and of sufficient size to be easily seen where posted.

(h) The owner is not required to post the Antenna Structure Registration Number in cases where a federal, state, or local government entity provides written notice to the owner that such a posting would detract from the appearance of a historic landmark. In this case, the owner must make the Antenna Structure Registration Number available to representatives of the Commission, the FAA, and the general public upon reasonable demand.

(i) Absent Commission specification, the painting and lighting specifications recommended by the FAA are mandatory (*see* § 17.23). However, the Commission may specify painting and/or lighting requirements for each antenna structure registration in addition to or different from those specified by the FAA.

(j) Any change or correction in the overall height of one foot or greater or coordinates of one second or greater in longitude or latitude of a registered antenna structure requires prior approval from the FAA and modification of the existing registration with the Commission.

(k) Any change in the marking and lighting that varies from the specifications described on any antenna structure registration requires prior approval from the FAA and the Commission.

(l) The owner of any proposed or existing antenna structure that does not require notice of proposed construction to the FAA due to physical obstruction may register the structure with the Commission on a voluntary basis. Voluntary registrations shall not be subject to the requirements of paragraphs (b), (c), (g), (i) of this section, § 17.6, and Subparts B and C of this part. Modifications of voluntarily registered antenna structures shall not require prior approval (*see* paragraphs (i), (j), and (k) of this section) unless those modifications result in the requirement of antenna structure registration; however, antenna structure owners shall ensure at all times that information in ASR, including structure height and lighting, is current and accurate.

28. Delayed indefinitely, amend § 17.6 by revising the last sentence of paragraph (c) to read as follows:

**§ 17.6 Responsibility for painting and lighting compliance.**

* * * * *

(c) * * * The owner remains responsible for providing to all tenant licensees and permittees notification that the structure has been registered, consistent with § 17.4(g), and for posting the registration number as required by § 17.4(h).

**PART 22—PUBLIC MOBILE SERVICES**

29. The authority citation for part 22 continues to read as follows:

**Authority:** 47 U.S.C. 154, 222, 303, 309, and 332.

**Subpart B—Licensing Requirements and Procedures**

30. Delayed indefinitely, amend § 22.143 by revising paragraph (d)(5) to read as follows:

**§ 22.143 Construction prior to grant of application.**

* * * * *

(d) * * *

(5) The applicant has indicated in the application that the proposed facility would not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter; and

* * * * *

31. Delayed indefinitely, amend § 22.165 by revising paragraph (c) to read as follows:

**§ 22.165 Additional transmitters for existing systems.**

* * * * *

(c) ***Environmental.*** The additional transmitters must not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter.

* * * * *

**Subpart E—Paging and Radiotelephone Service**

32. Delayed indefinitely, amend § 22.503 by revising paragraph (g)(1) to read as follows:

**§ 22.503 Paging geographic area authorizations.**

* * * * *

(g) * * *

(1) FCC grant of an application authorizing the construction of the facility requires preparation of an Environmental Assessment under § 1.1307(b) of this chapter. *See* § 1.923(e) of this chapter.

* * * * *

**PART 27—MISCELLANEOUS WIRELESS COMMUNICATIONS SERVICES**

33. The authority citation for part 27 continues to read as follows:

**Authority:** 47 U.S.C. 154, 301, 302a, 303, 307, 309, 332, 336, 337, 1403, 1404, 1451 and 1452, unless otherwise noted.

**Subpart B—Applications and licenses**

34. Delayed indefinitely, amend § 27.11 by revising paragraph (a) to read as follows:

**§ 27.11 Initial authorization.**

(a) An applicant must file a single application for an initial authorization for all markets won and frequency blocks desired. Initial authorizations shall be granted in accordance with § 27.5. Applications for individual sites are not required and will not be accepted, except where required for Environmental Assessments, in accordance with § 1.1307(b) of this chapter.

* * * * *

**Subpart I—1.4 GHZ Band**

35. Delayed indefinitely, amend § 27.803 by revising paragraph (b)(1) to read as follows:

**§ 27.803 Coordination requirements.**

* * * * *

(b) * * *

(1) That requires submission of an Environmental Assessment under § 1.1307(b) of this chapter;

* * * * *

**Subpart J—1670–1675 MHz Band**

36. Delayed indefinitely, amend § 27.903 by revising paragraph (b)(1) to read as follows:

**§ 27.903 Coordination requirements.**

* * * * *

(b) * * *

(1) That requires submission of an Environmental Assessment under § 1.1307(b) of this chapter;

* * * * *

**Subpart M—Broadband Radio Service and Educational Broadband Service**

37. Delayed indefinitely, amend § 27.1208 by revising paragraph (a)(2) to read as follows:

**§ 27.1208 Geographic area licensing.**

(a) * * *

(2) Submission of an Environmental Assessment is required under § 1.1307(b) of this chapter; and

* * * * *

**PART 30—UPPER MICROWARE FLEXIBLE USE SERVICE**

38. The authority citation for part 30 continues to read as follows:

**Authority:** 47 U.S.C. 151, 152, 153, 154, 301, 303, 304, 307, 309, 310, 316, 332, 1302, unless otherwise noted.

**Subpart B—Applications and Licenses**

39. Delayed indefinitely, amend § 30.101 to read as follows:

**§ 30.101 Initial authorizations.**

Except with respect to in the 37–37.6 GHz band, an applicant must file a single application for an initial authorization for all markets won and frequency blocks desired. Initial authorizations shall be granted in accordance with § 30.4 of this chapter. Applications for individual sites are not required and will not be accepted, except where required for Environmental Assessments, in accordance with § 1.1307(b) of this chapter.

**PART 63—EXTENSION OF LINES, NEW LINES, AND DISCONTINUANCE, REDUCTION, OUTAGE AND IMPAIRMENT OF SERVICE BY COMMON CARRIERS; AND GRANTS OF RECOGNIZED PRIVATE OPERATING AGENCY STATUS**

40. The authority citation for part 63 continues to read as follows:

**Authority:** 47 U.S.C. 151, 154(i), 154(j), 160, 201–205, 214, 218, 403, 571, unless otherwise noted.

41. Delayed indefinitely, amend § 63.01 by revising paragraph (b) to read as follows:

**§ 63.01 Authority for all domestic common carriers.**

* * * * *

(b) Domestic common carriers subject to this section shall not engage in any line construction that requires environmental review under § 1.1302 of this chapter and that may have a significant effect on the environment as defined in § 1.1306 of this chapter without prior compliance with the Commission's environmental rules.

42. Delayed indefinitely, amend § 63.18 by revising paragraph (g) to read as follows:

**§ 63.18 Contents of applications for international common carriers.**

* * * * *

(g) Where the applicant is seeking facilities-based authority under paragraph (e)(3) of this section that requires environmental review under § 1.1302 of this chapter, a statement whether an authorization of the facilities is categorically excluded as defined by § 1.1306 of this chapter. If answered affirmatively, an Environmental Assessment as described in § 1.1307 of this chapter need not be filed with the application.

* * * * *

**PART 73—RADIO BROADCAST STATIONS**

43. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

**Subpart C—Digital Audio Broadcasting**

44. Delayed indefinitely, amend § 73.406 by revising paragraph (b)(4) to read as follows:

**§ 73.406 Notification.**

* * * * *

(b) * * *

(4) A certification that the operation will not cause human exposure to levels of radio frequency radiation in excess of the limits specified in § 1.1310 of this chapter and therefore excluded from environmental processing pursuant to § 1.1307(b) of this chapter. Any station that cannot certify compliance must submit an Environmental Assessment (EA) pursuant to § 1.1307 of this chapter and may not commence IBOC operation until such EA is ruled upon by the Commission.

* * * * *

**Subpart H—Rules Applicable to All Broadcast Stations**

45. Delayed indefinitely, amend § 73.1010 by revising paragraph (a)(6) to read as follows:

**§ 73.1010 Cross reference to rules in other parts.**

* * * * *

(a) * * *

(6) Subpart I, "Procedures Implementing the National Environmental Policy Act of 1969" (*see* § 1.1301 *et seq.* of this chapter).

* * * * *

**PART 74—EXPERIMENTAL RADIO, AUXILIARY, SPECIAL BROADCAST AND OTHER PROGRAM DISTRIBUTIONAL SERVICES**

46. The authority citation for part 74 continues to read as follows:

**Authority:** 47 U.S.C. 154, 302a, 303, 307, 309, 310, 325, 336, and 554.

**Subpart—General; Rules Applicable to All Services in Part 74**

47. Delayed indefinitely, amend § 74.5 by revising paragraph (a)(7) to read as follows:

**§ 74.5 Cross reference to rules in other parts.**

* * * * *

(a) * * *

(7) Subpart I, "Procedures Implementing the National Environmental Policy Act of 1969" (*see* § 1.1301 *et seq.* of this chapter).

* * * * *

48. Delayed indefinitely, amend § 74.25 by revising paragraph (a)(4) to read as follows:

**§ 74.25 Temporary conditional operating authority.**

* * * * *

(a) * * *

(4) The applicant has determined that the facility(ies) does not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter.

* * * * *

**PART 78—CABLE TELEVISION RELAY SERVICE**

49. The authority citation for part 78 continues to read as follows:

**Authority:** 47 U.S.C. 152, 153, 154, 301, 303, 307, 308, 309.

**Subpart B—Applications and Licenses**

50. Delayed indefinitely, amend § 78.15 by revising paragraph (c) to read as follows:

**§ 78.15 Contents of applications.**

* * * * *

(c) CARS applicants must follow the procedures prescribed in § 1.1307(b) of this chapter regarding the filing of Environmental Assessments.

**Subpart D—Technical Regulations**

51. Delayed indefinitely, amend § 78.109 by revising paragraph (b)(9) to read as follows:

**§ 78.109 Major and minor modifications to stations.**

* * * * *

(b) * * *

(9) Any modification or amendment requiring an Environmental Assessment (as governed by § 1.1301 *et seq.* of this chapter);

* * * * *

**PART 80—STATIONS IN THE MARITIME SERVICES**

52. The authority citation for part 80 continues to read as follows:

**Authority:** 47 U.S.C. 151–155, 301–609, 3 U.S.T. 3450, 3 U.S.T. 4726, 12 U.S.T. 2377

**Subpart H—Frequencies**

53. Delayed indefinitely, amend § 80.371 by revising paragraph (c)(4)(iv) to read as follows:

**§ 80.371 Public correspondence frequencies.**

* * * * *

(c) * * *

(4) * * *

(iv) The transmitters must not require preparation of an Environment Assessment under § 1.1307(b) of this chapter.

* * * * *

**PART 90—PRIVATE LAND MOBILE RADIO SERVICES**

54. The authority citation for part 90 continues to read as follows:

**Authority:** 47 U.S.C. 154(i), 161, 303(g), 303(r), 332(c)(7), 1401–1473.

**Subpart G—Applications and Authorizations**

55. Delayed indefinitely, amend § 90.129 by revising paragraph (g) to read as follows:

**§ 90.129 Supplemental information to be routinely submitted with applications.**

* * * * *

(g) The Environmental Assessment required by § 1.1307 of this chapter, if applicable. If an application filed under this part proposes the use of one or more new or existing antenna structures that require registration under part 17 of this chapter, any required Environmental Assessment should be submitted pursuant to the process set forth in § 17.4(c) of this chapter rather than with the application filed under this part.

* * * * *

56. Delayed indefinitely, amend § 90.159 by revising paragraph (b)(4) to read as follows:

**§ 90.159 Temporary and conditional permits.**

* * * * *

(b) * * *

(4) The applicant has determined that the proposed facility does not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter.

* * * * *

57. Delayed indefinitely, amend § 90.169 by revising paragraph (d)(5) to read as follows:

**§ 90.169 Construction prior to grant of application.**

* * * * *

(d) * * *

(5) The applicant has indicated in the application that the proposed facility does not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter; and,

* * * * *

**Subpart S—Regulations Governing the Licensing and Use of Frequencies in the 806–824, 851–869, 896–901, and 935–940 MHz Bands**

58. Delayed indefinitely, amend § 90.655 to read as follows:

**§ 90.655 Special licensing requirements for Specialized Mobile Radio systems.**

End users of conventional or trunked Specialized Mobile Radio systems that have control stations that require FAA clearance, as specified in §§ 17.7 through 17.17 of this chapter, or that require preparation of an Environmental Assessment under § 1.1307(b) of this chapter, or that are located in a "quiet zone," as defined by § 1.924 of this chapter must be individually licensed for such control stations prior to construction or operation. All other end users' operations will be within the scope of the base station licensee. All end users, however, continue to be responsible to comply with 47 CFR part 90 and other federal laws.

59. Delayed indefinitely, amend § 90.683 by revising paragraph (a)(6) to read as follows:

**§ 90.683 EA-based SMR system operations.**

(a) * * *

(6) Any additional transmitters placed in operation must comply with § 1.1307(b) of this chapter.

* * * * *

**Subpart T—Regulations Governing Licensing and Use of Frequencies in the 220–222 MHz Band**

60. Delayed indefinitely, amend § 90.733 by revising paragraph (i)(3) to read as follows:

**§ 90.733 Permissible operations.**

* * * * *

(i) * * *

(3) Comply with the provisions of § 1.1307(b) of this chapter.

**Subpart Y—Regulations Governing Licensing and Use of Frequencies in the 4940–4990 MHz Band**

61. Delayed indefinitely, amend § 90.1207 by revising paragraph (b)(1)(ii) to read as follows:

**§ 90.1207 Licensing.**

* * * * *

(b) * * *

(1) * * *

(ii) Submission of an Environmental Assessment is required under § 1.1307(b) of this chapter; or

* * * * *

**PART 97—AMATEUR RADIO SERVICE**

62. The authority citation for part 97 continues to read as follows:

**Authority:** 47 U.S.C. 151–155, 301–609, unless otherwise noted.

**Subpart A—General Provisions**

63. Delayed indefinitely, amend § 97.13 by revising paragraph (a) to read as follows:

**§ 97.13 Restrictions on station location.**

(a) An amateur station must comply with §§ 1.1307(b) and 1.90002 of this chapter.

* * * * *

**PART 100 – SPACE AND EARTH STATION SERVICES**

64. The authority citation for part 100 continues to read as follows:

**Authority:** 47 U.S.C. 154, 301, 302, 303, 307, 309, 310, 319, 332, 605, and 721, unless otherwise noted.

**Subpart C – Operational and Frequency Specific Requirements**

65. Delayed indefinitely, amend § 100.282 by revising paragraph (a)(1) to read as follows:

**§100.282 MSS and ATC requirements.**

(a) * * *

(1) *No construction permit required.* Construction permits are not required for Ancillary Terrestrial Component (ATC) stations. A party with licenses issued under this part for launch and operation of 1.5/1.6 GHz or 1.6/2.4 GHz Mobile-Satellite Service space stations and operation of associated ATC facilities may commence construction of ATC base stations at its own risk after commencing physical construction of the space stations, subject to the requirements of § 1.1307(b) of this chapter and part 17 of this chapter.

* * * * *

**PART 101—FIXED MICROWAVE SERVICES**

66. The authority citation for part 101 continues to read as follows:

**Authority:** 47 U.S.C. 154, 303.

**Subpart B—Applications and Licenses**

67. Delayed indefinitely, amend § 101.31 by revising paragraph (b)(1)(iv) to read as follows:

**§ 101.31 Temporary and conditional authorizations.**

* * * * *

(b) * * *

(1) * * *

(iv) The applicant has determined that the facility(ies) does not require preparation of an Environmental Assessment under § 1.1307(b) of this chapter;

* * * * *

**Subpart L—Local Multipoint Distribution Service**

68. Delayed indefinitely, amend § 101.1009 by revising paragraph (a)(1)(ii) to read as follows:

**§ 101.1009 System operations.**

(a) * * *

(1) * * *

(ii) Submission of an Environmental Assessment is required under § 1.1307(b) of this chapter.

* * * * *

**Subpart O—Multiple Address Systems**

69. Delayed indefinitely, amend § 101.1329 by revising paragraph (a) to read as follows:

**§ 101.1329 EA Station license, location, modifications.**

* * * * *

(a) Requires the submission of an Environmental Assessment under § 1.1307(b) of this chapter;

* * * * *

**Subpart Q—Service and Technical Rules for the 70/80/90 GHz Bands**

70. Delayed indefinitely, amend § 101.1523 by revising paragraph (c)(1) to read as follows:

**§ 101.1523 Sharing and coordination among non-government licensees and between non-government and government services.**

* * * * *

(c) * * *

(1) Facilities requiring the submission of an Environmental Assessment under § 1.1307(b) of this chapter;

* * * * *

# APPENDIX B

## Final Regulatory Flexibility Analysis

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) incorporated an Initial Regulatory Flexibility Analysis (IRFA) in the *Modernizing the Commission's National Environmental Policy Act Rules Notice of Proposed Rulemaking* released in August 2025 (*NEPA NPRM*).[2] The Commission sought written public comment on the proposals in the *NEPA NPRM*, including comment on the IRFA. The comments received are discussed below. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA, and it (or summaries thereof) will be published in the Federal Register.[3]

### A. Need for, and Objectives of, the Proposed Rules

2. In the *Report and Order (Order)*, the Commission updates its environmental rules to align them with the requirements of the amended NEPA statute and with guidance from the White House and the Supreme Court. The NEPA regulatory regime has long been one of the biggest obstacles to new infrastructure builds. In 2023, Congress recognized the need for reform and amended the NEPA statute to eliminate unnecessary reviews and accelerate others.[4] At the beginning of his term in 2025, President Trump took action and directed federal agencies to streamline their procedures for environmental review.[5] The Supreme Court also addressed NEPA last year, providing guidance on the statute's requirements.[6]

3. In the *Order*, the Commission takes action to streamline its environmental review in order to promote efficiency and encourage deployment of infrastructure that results in more competition and technological innovation. The *Order* adopts the statutory definition of Major Federal Action (MFA), as provided in the amended NEPA, and its exclusions, and clarifies how the definition of MFA will apply in the context of the Commission's rules. Then, the *Order* adopts reforms to streamline other aspects of the Commission's NEPA rules, including: revising the FCC's rules describing its categorical exclusion (CE) and extraordinary circumstances; decoupling the Commission's NEPA rules from its NHPA rules; modifying the environmental notification and public participation processes for ASR applications; adopting procedures for the Commission, in conjunction with the other federal agency or agencies involved in a particular action subject to NEPA, to designate a lead federal agency or joint lead agencies; removing and replacing the federal agency exception; removing references to rescinded NEPA regulations; and correcting cross-references to other NEPA regulations. The *Order* also adopts amendments to modernize its rules regarding environmental assessments (EAs) and environmental impact statements (EISs) and codifies procedures addressing NEPA review during emergency situations. By taking these actions, the *Order* helps expedite and simplify the Commission's environmental review processes and clears the way for more and faster infrastructure builds across the country.

---

[1] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[2] *Modernizing the Commission's National Environmental Policy Act Rules; CTIA Petition for Rulemaking on the Commission's National Environmental Policy Act Rules*, WT Docket No. 25-217, Notice of Proposed Rulemaking, 40 FCC Rcd 6377(2025) (*NEPA NPRM*).

[3] 5 U.S.C. § 604.

[4] *See* 42 U.S.C. § 4321 *et seq*.; Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023).

[5] *Unleashing American Energy*, Exec. Order No. 14154, 90 Fed. Reg. 8353, 8355 (Jan. 29, 2025) (E.O. 14154). We also note that, on April 15, 2025, President Trump issued a Presidential Memorandum entitled "Updating Permitting Technology for the 21st Century", which directs agencies to "properly leverage technology to effectively and efficiently evaluate environmental permits." *Updating Permitting Technology for the 21st Century*, Presidential Memorandum (Apr. 15, 2025).

[6] *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S.168 (2025).

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

4. Comments regarding the impact of the rule on small entities were submitted by several parties. We summarize these comments here and analyze the impact of the Commission's adopted rules in section E, *infra*.

5. The Communications Infrastructure Contractors Association (NATE) urges the Commission to redefine MFA, expand categorical exclusions, establish firm timelines for review, allow programmatic review and batch processing, and increase inter-agency staffing and coordination.[7] It asserts that these changes would impact small businesses by "reduc[ing] compliance costs, compress[ing] timelines, and bring[ing] certainty to project planning—while preserving environmental stewardship . . . ."[8] The Nebraska State Historic Preservation Office comments that National Historic Preservation Act (NHPA) compliance "continues to be required for categories of Commission actions regardless of the MFA definition" and that the NHPA definition of undertaking should be followed.[9] Power & Communication Contractors Association (PCCA), an association whose members consist of a number of small businesses, urges adherence to the Fiscal Responsibility Act of 2023's (FRA's) statutory deadlines and page limits for environmental reviews, as well as the clarifications on the scope of NEPA review provided by the Supreme Court's decision in *Seven County Infrastructure Coalition v. Eagle County, Colorado*,[10] and advocates for agencies focusing on assessing only the reasonable foreseeable environmental effects of proposed actions as defined by the RFA to prevent unnecessary litigation and delays.[11]

### C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

6. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA,[12] the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and provide a detailed statement of any change made to the proposed rules as a result of those comments.[13] The Chief Counsel filed comments regarding the proposed rules in this proceeding, which we summarize and respond to below.

7. In its comments, the SBA expresses feedback it received during a roundtable with small entity stakeholders on concerns with the proposals in the *NEPA NPRM*, which consisted of ensuring coordination among federal agencies, enforcing reasonable and firm review timelines, narrowing the definition of MFA, and establishing additional categorical exclusions.[14] First, SBA recommends that the FCC be the lead agency on communications infrastructure projects involving multiple federal agencies, and that the FCC ensure that its NEPA regulations are as consistent as possible with those of other agencies.[15] The SBA next recommends the FCC should adopt NEPA procedures that align closer to the goals of the FRA, specifically by not adding additional regulatory requirements or by implementing requirements in a manner that will increase the time necessary to complete an EA or EIS.[16] SBA

[7] NATE Comments at 3–7.

[8] NATE Comments at 6.

[9] Nebraska State Historic Preservation Office Comments at 3.

[10] *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S.C. 168 § (2025).

[11] PCCA Comments at 4.

[12] Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010).

[13] 5 U.S.C. § 604(a)(3).

[14] SBA Comments at 3.

[15] SBA Comments at 4.

[16] SBA Comments at 5.

identified small business stakeholders' support for the adoption of the definition of MFA proposed in the *NEPA NPRM*, and recommends that the FCC should only require NEPA review for projects where the FCC has a substantial part in the construction process.[17] Finally, SBA raises several additional categorical exclusions requested by small entity stakeholders, consisting of small cell sites, tower collocations, and fiber installations in an existing right of way that has previously undergone a NEPA review.[18]

8. As discussed below, the Commission takes several actions consistent with SBA recommendations.

### D. Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

9. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the adopted rules.[19] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[20] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[21] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[22] The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.[23]

10. Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions.[24] In general, a small business is an independent business having fewer than 500 employees.[25] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses.[26] Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and are not dominant in their field.[27] While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500

[17] SBA Comments at 5.

[18] SBA Comments at 6–7.

[19] 5 U.S.C. § 604.

[20] *Id*. § 601(6).

[21] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[22] 15 U.S.C. § 632.

[23] 13 CFR § 121.903.

[24] 5 U.S.C. § 601(3)–(6).

[25] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business* (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

[26] *Id*.

[27] 5 U.S.C. § 601(4).

employees.[28] Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[29] Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[30]

11. The rules adopted in the *Order* will apply to small entities the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS)[31] codes and corresponding SBA size standard.[32] Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the adopted rules will impact a substantial number of small entities. Where available, we also provide additional information regarding the number of potentially affected entities in the identified industries below.

**Table 1. 2022 U.S. Census Bureau Data by NAICS Code**

| **Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable)** | **NAICS Code** | **SBA Size Standard** | **Total Firms[33]** | **Total Small Firms[34]** | **% Small Firms** |
|---|---|---|---|---|---|
| Wireless Telecommunications Carriers (except Satellite)[35] | 517112 | 1,500 employees | 1,184 | 1,081 | 91.30% |
| Satellite Telecommunications | 517410 | $44 million | 332 | 195 | 58.73% |
| All Other Telecommunications | 517810 | $40 million | 1,673 | 1,007 | 60.19% |

[28] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

[29] 5 U.S.C. § 601(5).

[30] *See* U.S. Census Bureau, 2022 Census of Governments –Organization, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, tables 1–11.

[31] The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. *See* www.census.gov/NAICS for further details regarding the NAICS codes identified in this chart.

[32] The size standards in this chart are set forth in 13 CFR 121.201, by six-digit NAICS code.

[33] *U.S. Census Bureau*, "*Selected Sectors: Employment Size of Firms for the U.S.: 2022*." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEEMPFIRM, 2025, "*Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2022*." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVFIRM, 2025.

[34] *Id.*

[35] Affected Entities in this industry include Broadband Personal Communications Service, Broadband Radio Service and Educational Broadband Service, Fixed Microwave Services, Location and Monitoring Service (LMS), Multichannel Video Distribution and Data Service (MVDDS), Multiple Address Systems, Personal Radio Services, Private Land Mobile Radio - 900 MHz Band, Public Safety Radio Licensees.

**Table 2. Telecommunications Service Provider Data**

| **2024 Universal Service Monitoring Report Telecommunications Service Provider Data** [36] **(Data as of December 2023)** | **SBA Size Standard (1500 Employees)** | | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Wireless Telecommunications Carriers (except Satellite)[37] | 585 | 498 | 85.13 |

### E. Description of Economic Impact and Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

12. The RFA directs agencies to describe the economic impact of adopted rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.[38]

13. The rule changes the Commission adopts in the *Order* will help provide certainty for all applicants, including small entities. These changes are expected to reduce the number of applications that require NEPA review and streamline the environmental review process, prioritizing efficiency and certainty and expediting the process for all applicants seeking environmental approval of pending construction projects. While these types of changes will reduce economic impact and regulatory burden for all applicants, small entity applicants, who typically lack both the financial and staffing resources of their larger counterparts, will particularly benefit from the rule changes in the *Order*. The Commission expects that the reporting, recordkeeping, and other requirements associated with these revised rules will be the same for small and other entities.

14. First, the *Order* codifies the statutory definition of MFA as provided in the amended NEPA, and its exclusions; and clarifies how the definition of MFA will apply in the context of the Commission's rules, including several determinations as to whether certain specific deployments qualify as MFAs. The codified definition and its applicability to Commission rules are expected to reduce economic burden to small entities and other applicants alike by clarifying when certain deployments will require an environmental review, thereby eliminating costs associated with entities having to make such determinations themselves.

15. The *Order* also adopts other changes to the Commission's environmental review procedures that will reduce economic burdens on small and other entities. These include substantive revisions to the Commission's CE and extraordinary circumstances rules; the environmental notification and public participation processes for ASR applications under part 17; the procedures for determining lead and cooperating agencies for the NEPA review process and the federal agency exception; as well as the revision and elimination of vague, ambiguous, or nonfunctional terms and language. The Commission finds the adopted amendments to the NEPA review process further harmonize the

[36] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2024), https://docs.fcc.gov/public/attachments/DOC-408848A1.pdf.

[37] Affected Entities in this industry include all reporting wireless carriers and service providers.

[38] 5 U.S.C. § 604(a)(5).

Commission's NEPA regulations with the revised NEPA statute, and will reduce the economic impact and regulatory burden on all applicants by making the process clearer and simpler. In addition, the *Order* decouples the NEPA and NHPA rules to distinguish their separate requirements and to reduce confusion. Although this change separates the two reviews, it is anticipated that this will still result in a net reduction in costs for applicants. Even when NEPA and NHPA review were combined, NHPA review included its own timelines and review standards negotiated under the NPAs.[39] Though applicants will still need to conduct section 106 NHPA review for federal undertakings, they will not need to incur the costs of NEPA review if the undertaking is not also an MFA. These changes apply to large and small businesses, and the cost savings are expected to be significant.

16. Further, the *Order* harmonizes the Commission's regulations pertaining to environmental assessments (EA) and environmental impact statements (EIS) with the requirements of the amended NEPA statute, effectively reducing delay and confusion for all applicants. These modifications include, among others, imposing page limits of EAs and EISs, making clarifications on the public notice comment requirements for both EAs and EISs, and codifying time limits for Commission review of EAs and completion of the EA and EIS processes. These changes will ensure timely NEPA review of Commission MFAs and reduce costs associated with uncertainty and construction delays, allowing applicants to anticipate the extent of NEPA review and better prepare for expected expenses.

17. Finally, the *Order* codifies emergency procedures informed by CEQ guidelines that will provide clarity on what entities may expect for environmental reviews of deployments during emergency circumstances. The emergency procedures include a shortened EA approach for qualifying actions. The Commission anticipates that these procedures will reduce the economic burden on all applicants and allow them to make necessary deployments in a timely fashion.

18. As the changes made in this *Order* do not modify the classes of entities that will be required to comply with the NEPA rules, the Commission expects the same classes of entities will be subject to these requirements as before and will require the same professional skills to complete NEPA's reporting or recordkeeping requirements.

### F. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

19. The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[40]

20. As discussed above, the *Order* provides a clearer definition of what constitutes an MFA by codifying the statutory definition of MFA and its exclusions, as well as clarifying how the adopted definition will be applied to particular categories of actions. The adopted changes will help minimize economic impacts on small entities by clarifying when NEPA review will be triggered, thereby reducing the potential for confusion. The adoption of the definition and exclusions, as well as its application to the Commission's rules, are supported by several commenters, including SBA, NATE, and other parties who represent the interests of small entities.[41]

[39] Nationwide Programmatic Agreement for the Collocation of Wireless Antennas, 47 CFR pt. 1, app. B (Collocation NPA); Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process, 47 CFR pt. 1, app. C (Wireless NPA) (collectively, NPAs).

[40] 5 U.S.C. § 604(a)(6).

[41] *See e.g.*, NATE Comments at 3–7, SBA Comments at 5–7.

21. In addition, the *Order*'s numerous streamlining revisions to the NEPA review process aim to relieve significant economic burdens on small entities by providing clear and predictable rules for compliance, thereby ensuring NEPA serves as a tool for informed decision-making, rather than as a barrier to investment, innovation, and connectivity. These include revisions to the CE and extraordinary circumstances rules, decoupling NEPA and NHPA, revisions to the environmental notification and public participation processes for ASR applications, adopting procedures for determining lead and cooperating agencies and replacing the federal agency exception, as well as removing references to rescinded CEQ regulations. The Commission considered comments provided by a wide range of commenters in evaluating what revisions to make to its environmental rules.

22. As explained in the O*rder*, the Commission elects to maintain its broad categorical CE, because it is cost-efficient and sufficient to meet the Commission's obligations under NEPA, and is generally supported by commenters. In reaching its conclusions in the *Order*, the Commission considered a broad range of alternative proposed revisions to its CE rules, including whether to adopt a set of individualized CEs, whether to modify its rules to allow for adopting another agency's CE, whether to revise the existing list of extraordinary circumstances, and whether to retain the catchall provisions for extraordinary circumstances. For example, several commenters including NATE and SBA suggested expanding CEs for particular individualized actions, such as collocations and small cell deployments.[42] In the *Order*, the Commission elects to maintain its broad CE because of its recognized clarity and efficiency, and because of a lack of support for finding that individualized CEs were superior. In the *Order*, the Commission also considers removing the provision found in section 1.1307(c) that allows members of the public to raise NEPA complaints against Commission MFAs, as suggested by WIA,[43] but declines to do so, noting that it would remove the public's ability to identify potential significant environmental effects not identified by applicants or enumerated in the rules. The Commission also considers but declines to implement PEER's suggestion that 1.1307(c) and 1.1307(d) not be deleted but instead be converted to an extraordinary circumstance.[44]

23. The Commission received comments expressing concerns that streamlining NEPA review may weaken NHPA review.[45] In addition, one commenter opposed decoupling NEPA and NHPA review.[46] The *Order* finds, however, that these concerns are based on an assumption that the proposal to decouple NEPA from NHPA would weaken NHPA review. In the *Order,* the Commission explains that decoupling NHPA from NEPA does not alter the Commission's section 106 obligations or reduce the rigor of our historic preservation review.

24. The modernizing updates to the requirements for EAs and EISs will reduce economic burdens on small entities by setting clear deadlines and timelines for the environmental review process, and by reducing unnecessary delay. Though the adopted page limits, time limits, and other changes were generally supported by commenters – including PCCA, NATE, and SBA – the Commission received and considered other alternatives. For example, Dynamic Environmental expressed concern with adopting timelines for EA review, arguing that the timelines were unnecessary and could require the Commission to ensure sufficient resources existed to meet them, and would grant applicants a right to seek judicial review if the proscribed timeframes were not met.[47] The Commission finds, however, that a majority of

[42] *See, e.g.*, NATE Comments at 3–7; SBA Comments at 5–7.

[43] WIA Comments at 9.

[44] PEER Comments at 14, 17–18.

[45] Standing Rock Sioux Tribe Comments at 7–8; Flandreau Santee Sioux Tribe Comments at 4–5; Choctaw Nation Comments on the CTIA Petition, RM-12003 at 1, Yuhaaviatam of San Manuel Nation Comments on the CTIA Petition, RM-12003 at 1, Mandan, Hidatsa and Arikara Nation Comments on the CTIA Petition, RM-12003 at 1.

[46] The Organized Village of Kasaan Comments at 2 (Village of Kasaan).

[47] Dynamic Environmental Comments at 23–24.

EAs are processed within sixty (60) days and does not anticipate that meeting the codified timelines would significantly tax Commission resources. The delineated timelines will impact the economic burden on applicants—including small entities—by creating consistency and efficiency that applicants may expect when preparing for the review process.

25. The Commission considered other comments responding to proposed changes to the Commission's environmental rules pertaining to EA and EIS requirements. For example, CTIA argued that the Commission should amend section 1.1308 of its rules to clarify that a reasonableness standard applies throughout the environmental review process and that the Commission need only consider a "reasonable range of alternatives [ ] that are technically and economically feasible, and meet the purpose and need of the proposal."[48] The Commission declined to adopt that suggested change, however, as nothing in section 1.1308 is inconsistent with the application of a reasonableness standard as described in the NEPA statute.

26. Finally, the *Order* codifies emergency procedures to address NEPA review of projects requiring urgent and immediate action during emergency circumstances, providing clarity to small entities on what may be expected for an environmental impact review during such circumstances. Codifying these procedures will reduce confusion and expense for small businesses during a period when expedited action is needed. In reaching its conclusion, the Commission considered alternatives such as adopting a new CE or a new exclusion to the definition of MFA for emergency situations. However, the codified emergency procedures better serve the purpose of the NEPA statute and requirements, are more consistent with recommendations and guidance from CEQ, and do not significantly increase economic burdens on small entities.

### G. Report to Congress

27. The Commission will send a copy of the *Order*, including this Final Regulatory Flexibility Analysis, in a report to Congress pursuant to the Congressional Review Act.[49] In addition, the Commission will send a copy of the *Order*, including this Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the SBA and will publish a copy of the *Order*, and this Final Regulatory Flexibility Analysis (or summaries thereof) in the Federal Register.[50]

---

[48] CTIA Petition, RM-12003 at 24–25 citing to 42 U.S.C. § 4332(2)(C)(i)–(ii) (internal quotation marks omitted); *see also* CTIA Comments at 25–26 and fn. 122.

[49] 5 U.S.C. § 801(a)(1)(A).

[50] *Id.* § 604(b).

## APPENDIX C

## Initial Regulatory Flexibility Analysis

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Federal Communications Commission (Commission) has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the policies and rules proposed in the *Further Notice of Proposed Rulemaking* (*Further Notice*) assessing the possible significant economic impact on a substantial number of small entities. The Commission requests written public comments on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments specified on the first page of the *Further Notice*. The Commission will send a copy of the *Further Notice*, including this IRFA, to the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy.[2] In addition, the *Further Notice* and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A. Need for, and Objectives of, the Proposed Rules

#### 1. Definition of Undertaking under the National Historic Preservation Act

2. In the *Further Notice*, the Commission seeks comment on its approach to implementing section 106 of the National Historic Preservation Act (NHPA), including section 106 efficiencies.[4] Specifically, the Commission seeks to refresh the record on the meaning of "undertaking" and the Commission's approach to implementing section 106 of the NHPA. Additionally, and in light of the Commission's findings related to the licensing of spectrum, the Commission seeks comment on whether activities that are part of the deployment and operation of communications infrastructure are within the scope of "undertaking." The Commission also seeks comment on actions and practices that the Commission could adopt to provide more efficiencies in the section 106 process and add greater predictability for all stakeholders.

3. The NHPA requires federal agencies to take into account the effect of an "undertaking on any historic property" and the Advisory Council on Historic Preservation's[5] rules afford each individual federal agency the responsibility to "determine whether [a] proposed Federal act to be taken by it is an undertaking."[6] The Commission licenses the use of spectrum and not facilities. Because of this, the Commission seeks comment on whether the construction of communications facilities connected with the issuance of a Commission license for the use of spectrum should be regarded as an "undertaking," where the Commission does not issue a "permit, license or approval" for deployment of the facilities themselves, but rather for the use of spectrum. The Commission seeks comment on the impact of its determination that spectrum licenses and facilities deployment in connection with spectrum licenses are not subject to NEPA review and its related rescission of section 1.1312 of the rules on whether spectrum licensing is an undertaking under the NHPA.[7] The Commission also seeks comment on whether its actions merit

[1] 5 U.S.C. § 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[2] *Id*. § 603(a).

[3] *Id*.

[4] 54 U.S.C. § 300101*et seq*. Note that in 2014, the NHPA statute was relocated from Title16 in the U.S. Code.

[5] The Advisory Council was established by the NHPA as an independent agency of the federal government. *See* 54 U.S.C. § 304101.

[6] 36 CFR § 800.3(a) (citing 36 CFR § 800.16(y)).

[7] *See* Transcript, FCC's Virtual Tribal Consultation on Modernizing the Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 10, 18 (Dec. 11, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/10226086707465 (noting that the Yavapai Prescott Indian Tribe and the Susanville Indian Rancheria asks if wireless facility deployments are not subject to NEPA review will such deployments be subject to NHPA review); Transcript, FCC's Virtual Tribal Consultation on Modernizing the

(continued….)

reconsideration of the determination that Commission spectrum licensing activities are subject to NHPA review.

4. The Commission seeks comment on whether there are efficiencies to be gained through modifications to the Commission's NHPA procedures. Specifically, the Commission seeks comment on whether it should permit batching of section 106 submissions in order to reduce repetitive submissions and paperwork. The Commission seeks comment on possible approaches to bringing non-compliant towers into compliance with section 106 in order to increase the inventory of structures available for communications facility deployment through collocation, rather than the typically more onerous process of erecting new tower structures. The Commission seeks comment on any trends that have developed in the indication of Geographic Areas of Interest and what practices might assist in addressing an increased designation of Geographic Areas of Interest. In terms of emergency and disaster situations, the Commission seeks comment on whether additional efficiencies are needed in responding to damage infrastructure due to weather-related incidents to more quickly restore communications for citizens in impacted areas. The Commission seeks comment on Tribal consultations timelines and what specific modifications are needed to resolve any timeliness issues without compromising the integrity of the consultation process. Finally, the Commission seeks comment on procedures for applicants to notify Tribal Nations and NHOs (Tribal Nations/NHOs) of proposed tower builds and collocations, and reciprocally, for Tribal Nations/NHOs to respond by indicating whether such proposals may affect historic properties to which they attach religious and/or cultural significance.

#### 2. Definition of "Agency Action" under the Endangered Species Act

5. In the *Further Notice*, the Commission also seeks comment on whether the construction of communications facilities connected with the issuance of a Commission license for the use of spectrum is an "agency action" under the Endangered Species Act (ESA) where the Commission does not grant a license or permit for deployment of the facilities themselves, but rather for the use of spectrum. Under the ESA, an agency action "means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air."[8]

### B. Legal Basis

6. The proposed action is authorized pursuant to sections 1, 2, 4(i)–(j), 201, 214, 301, 302a, 303, 307, 309, 319, and 332 of the Communications Act of 1934, as amended 47 U.S.C. §§ 151, 152, 154(i)–(j), 201, 214, 301, 302a, 303, 307, 309, 319, and 332, section 704(b) of the Telecommunications Act of 1996, Pub. L. No. 104-104, section 102 of the National Environmental Policy Act of 1969, as amended, 42 U.S.C. § 4332, section 106 of the National Historic Preservation Act of 1966, as amended, 54 U.S.C. § 306108, and the Endangered Species Act of 1973, as amended, 16 U.S.C. § 1536.

### C. Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

7. The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[9] The RFA generally

(Continued from previous page)
Commission's NEPA Rules, Prepared by the Office of Native Affairs and Policy, FCC at 9–10 (Jan. 14, 2025), available at https://www.fcc.gov/ecfs/search/search-filings/filing/103041866728827 (noting that the Tlingit & Haida Tribes and the Flandreau Santee Sioux Tribe of South Dakota believe that even if a project is no longer subject to NEPA review it must remain subject to section 106 review).

[8] 50 CFR. § 404.02 Definitions.

[9] 5 U.S.C. § 603(b)(3).

defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[10] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[11] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[12] The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.[13]

8. Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions.[14] In general, a small business is an independent business having fewer than 500 employees.[15] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses.[16] Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and not dominant their field.[17] While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500 employees.[18] Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[19] Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[20]

9. The rules proposed in the *Further Notice* will apply to small entities in the industries identified in the chart below by their six-digit Nortsh American Industry Classification System (NAICS)[21]

---

[10] *Id.* § 601(6).

[11] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[12] 15 U.S.C. § 632.

[13] 13 CFR 121.903.

[14] 5 U.S.C. § 601(3)–(6).

[15] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business* (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

[16] *Id.*

[17] 5 U.S.C. § 601(4).

[18] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

[19] 5 U.S.C. § 601(5).

[20] *See* U.S. Census Bureau, 2022 Census of Governments – Organization, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, tables 1–11.

[21] The North American Industry Classification System (NAICS) is the standard used by federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. *See* www.census.gov/NAICS for further details regarding the NAICS codes identified in this chart.

codes and corresponding SBA size standard.[22] Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the proposed rules will impact a substantial number of small entities. Where available, we also provide additional information regarding the number of potentially affected entities in the industries identified below.

**Table 1. 2022 U.S. Census Bureau Data by NAICS Code**

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms[23] | Total Small Firms[24] | % Small Firms |
|---|---|---|---|---|---|
| Wireless Telecommunications Carriers (except Satellite)[25] | 517112 | 1,500 employees | 1,184 | 1,081 | 91.30% |
| Satellite Telecommunications | 517410 | $44 million | 332 | 195 | 58.73% |
| All Other Telecommunications | 517810 | $40 million | 1,673 | 1,007 | 60.19% |

**Table 2. Telecommunications Service Provider Data**

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data [26] (Data as of December 2023) | SBA Size Standard (1500 Employees) | | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Wireless Telecommunications Carriers (except Satellite)[27] | 585 | 498 | 85.13 |

[22] The size standards in this chart are set forth in 13 CFR 121.201, by six digit North American Industrial Classification System (NAICS) code.

[23] *U.S. Census Bureau*, "*Selected Sectors: Employment Size of Firms for the U.S.: 2022*." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEEMPFIRM, 2025, "*Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2022*." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVFIRM, 2025.

[24] *Id.*

[25] Affected Entities in this industry include Broadband Personal Communications Service, Broadband Radio Service and Educational Broadband Service, Fixed Microwave Services, Location and Monitoring Service (LMS), Multichannel Video Distribution and Data Service (MVDDS), Multiple Address Systems, Personal Radio Services, Private Land Mobile Radio - 900 MHz Band, Public Safety Radio Licensees.

[26] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2024), https://docs.fcc.gov/public/attachments/DOC-408848A1.pdf.

[27] Affected Entities in this industry include all reporting wireless carriers and service providers.

### D. Description of Economic Impact and Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

10. The RFA directs agencies to describe the economic impact of proposed rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.[28]

11. The *Further Notice* seeks comment on potential rule changes that may affect reporting, recordkeeping and other compliance requirements. Specifically, the *Further Notice* seeks comment on the following: (1) the identification of "undertaking" in the context of the deployment of communications facilities; (2) the batching process for submitting multiple proposed applications for section 106 review; (3) bringing into section 106 compliance existing towers that are non-compliant; (4) trends that have developed in the indication of Geographic Areas of Interest; (5) streamlining the re-establishment of communications infrastructure capacity after damage from natural disasters and other emergencies; and (6) modification of procedures for applicants to notify Tribal Nations of proposed tower builds and collocations, and reciprocally, for Tribal Nations to respond by indicating whether such proposal may affect historic properties to which they attach religious and/or cultural significance. The *Further Notice* also seeks comment on whether the construction of communications facilities connected with the issuance of a Commission license for the use of spectrum is an "agency action" under the ESA where the Commission does not grant a license or permit for deployment of the facilities themselves, but rather for the use of spectrum.

12. We anticipate that if the record supports a more accurate and precise identification of the "undertaking" under the NHPA for aspects of communications facilities deployment, this will not increase the burden on small entities engaged in the section 106 process and that the expenditure of time and resources on the section 106 process will be reduced for small entities. Batching is a streamlined process whereby section 106 analysis associated with proposed communications infrastructure deployments may be submitted to State Historic Preservation Officers (SHPOs) and through the Tower Construction Notification System (TCNS) in batches instead of individually. The *Further Notice* seeks comment on whether SHPOs and Tribal Historic Preservation Officers (THPOs) should batch submissions and under what circumstances. Presently, batching is only in use for the deployment of communications facilities associated with the building out the Positive Train Control (PTC) railroad safety system through the PTC Program Comment.[29] If batching is expanded to additional deployment situations, this may require modifications to reporting or other compliance requirements for small entities and/or jurisdictions to enable such submissions. We anticipate that batching rather than individual submissions will add no additional burden to small entities and may reduce the cost and delay associated with the deployment of wireless infrastructure. We also anticipate that if the record supports a more accurate and precise identification of "agency actions" under the ESA for aspects of communications facilities deployment, this will not increase the burden on small entities engaged in complying with the ESA and that the expenditure of time and resources in complying with the ESA will be reduced for small entities.

13. Additionally, the *Further Notice* seeks comment on whether and through what procedures the Commission should act to bring into section 106 compliance existing towers that are now non-complaint. We anticipate that if the record supports adoption of a process that can facilitate section 106

[28] 5 U.S.C. § 603(b)(4).

[29] *See Wireless Telecommunications Bureau Announces Adoption of Program Comment to Govern Review of Positive Train Control Wayside Facilities*, WT Docket No. 13-240, Public Notice, 29 FCC Rcd 5340 (WTB 2014) (announcing "Program Comment to Tailor the Federal Communications Commission's Section 106 Review for Undertaking Involving the Construction of Positive Train Control Wayside Poles and infrastructure") (PTC Program Comment).

compliance that this will reduce the burden on small entities by diminishing expenses and delays associated with the deployment of wireless infrastructure because the number of opportunities to collocate will increase for small entities. This change will allow small entities to have more opportunities to avail themselves of the multiple section 106 exclusion scenarios permitted by the Collocation NPA.

14. We also seek comment on trends in the identification of Geographic Areas of Interest by Tribal Nations and NHOs. These are areas within which Tribal Nations or NHOs have identified historic properties with religious and cultural significance to them.[30] We seek comment both on whether the record includes data indicating a significant expansion of the geographic area being selected, and, if so, on methods that might assist with processing the enlarged geographic scope. If such methods are meritorious, we anticipate that the time and resource burden expended on the section 106 process would be reduced for small entities.

15. We also seek comment on whether the repair or replacement of a damaged tower structure that results in a communication capacity emergency should be able to proceed without section 106 review in circumstances in which section 106 review had been completed for the structure at that site prior to it being damaged. We anticipate that if the record supports adoption of this approach, this will reduce the burden on small entities of re-establishing communications capacity in emergency situations. We also seek comment regarding whether Tribal Nation requests for Government-to-Government consultation concerning the proposed deployment of communications infrastructure have a material effect on the timing of these deployments, and, if so, what modifications could be adopted to ameliorate timing delays without compromising the integrity of these consultations. We anticipate that if the record supports both a determination that these consultations generally have a material impact on the timing of facilities deployment, and the adoption of adjustments that can shorten the timetable while preserving the integrity of the consultation process, that small entities will benefit in terms of saved time and resources expended to accomplish facilities deployments.

16. Finally, the *Further Notice* seeks comment on more definite timelines for section 106 review. The Commission current rules provide procedures for applicants to notify Tribal Nations and NHOs (Tribal Nations/NHOs) of proposed tower builds and collocations, and reciprocally, for Tribal Nations/NHOs to respond by indicating whether such proposals may affect historic properties to which they attach religious and/or cultural significance. Changes to these rules should benefit small entities by making for a more standardized and efficient process and implementation of these changes should save small entities resources. Such modifications should resolve timeliness issues without compromising the integrity of the consultation process.

17. At this time, the Commission cannot quantify the potential cost savings of any rules changes discussed in the *Further Notice*, should they be adopted. We do not believe that small entities would need to hire professionals in order for them to comply with the proposed rules. As part of our invitation for comment by interested parties, however, we request that any small entities participating in the comment process discuss any benefits or drawbacks associated with the proposed approaches, provide information on their current costs of compliance with the Commission's existing rules, as well as provide data and information on any differential impacts faced by small entities. We expect the information we receive in comments to help the Commission identify and evaluate relevant matters for small entities, including compliance costs, and identify other burdens that may result from the matters raised in the *Further Notice*.

[30] *See, e.g.*, Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process, 47 CFR pt. 1, app. C (Wireless NPA) at Section IV: Participation of Indian Tribes and Native Hawaiian Organizations in Undertakings Off Tribal Lands.

### E. Discussion of Significant Alternatives Considered That Minimize the Significant Economic Impact on Small Entities

18. The RFA directs agencies to provide a description of any significant alternatives to the proposed rules that would accomplish the stated objectives of applicable statutes, and minimize any significant economic impact on small entities.[31] The discussion is required to include alternatives such as: "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rules for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities.[32]

19. In developing its proposals in the *Further Notice* for minimizing significant economic impact on small entities, the Commission considered significant alternatives. The Commission will continue to consider a number of approaches to refining its section 106 processing rules, including by seeking comment on whether to expand the batching approach to section 106 submissions. The Commission will also consider the record in refining its compliance with the ESA. Part of the determination process will include consideration of savings in time and financial resources for small entities.

20. In addition, the *Further Notice* invites comment from small entities on alternative approaches in which the Commission could refine its historic preservation section 106 processing rules and its compliance with ESA in ways that will reduce economic impact and regulatory burdens on project sponsors. The Commission then will decide what actions it should take based on the subsequently developed record. Part of the decisional process will include evaluating the impact of these decisions on small entities and what alternatives we might adopt to lessen significant economic impacts and regulatory burdens on small entities. The Commission will consider alternative proposals and approaches from commenters that would minimize the economic impact on small entities. The Commission's evaluation of the comments filed in this proceeding will shape the final conclusions it reaches, the final alternatives it considers, and the actions it ultimately takes to minimize any significant economic impact that may occur on small entities from the final rules.

### F. Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules

21. None.

---

[31] *Id.* § 603(c).

[32] *Id.* § 603(c)(1)–(4).

## APPENDIX D

## List of Commenters

**Initial Commenters**:

Advisory Council on Historic Preservation (ACHP)
Alliance to Reduce Light Pollution
American Astronomical Society (AAS)
American Bird Conservancy and Maryland Ornithological Society (ABC & MOS)
American Cultural Resources Association (ACRA)
Arizona State Historic Preservation Officer (AZ SHPO)
Ashley Stava et al.
Attorneys General of New York, California, Washington, Massachusetts, Arizona, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, Oregon, Rhode Island, Vermont, and District of Columbia; and the Harris County, Texas Attorney) (States Attorneys General et al.)
Breeanna Charolla
California State Historic Preservation Officer Julianne Polanco (CA SHPO)
Commercial Space Federation (CSF)
Competitive Carriers Association (CCA)
Connecticut State Historic Preservation Office (CT SHPO)
Conservative Political Action Committee Foundation Center for Regulatory Freedom (CPAC CRF)
CTIA
DarkSky International (DarkSky)
David Ackerman
Delaware State Historic Preservation Office (DE SHPO)
Dinah Bear
Dynamic Environmental Associates, Inc. (Dynamic Environmental)
The Electric Utilities Coalition
Elk Valley Rancheria, California
Elizabeth Schumacher-Berger
Environmental Health Sciences September 16, 2025 (EHS)
Environmental Health Sciences September 18, 2025 (EHS)
Flandreau Santee Sioux Tribe
Frederick P Sinclair Jr.
Georgia State Historic Preservation Office (GA HPD)
Idaho State Historic Preservation Office (ID SHPO)
Iowa State Historic Preservation Office (IA SHPO)
Jodie Nettelhorst
Karen G Elliot
Knik Tribe
Kuiper Systems LLC
Maryland Historical Trust – Maryland State Historic Preservation Office (MHT)
Matt Marcus
Miami Tribe of Oklahoma
Michigan State Historic Preservation Office (MI SHPO)
NATE: The Communications Infrastructure Contractors Association, Todd Schlekeway (NATE)
National Association of Tribal Historic Preservation Officers (NATHPO)
National Conference of State Historic Preservation Officers (NCSHPO)
National Congress of American Indians (NCAI)
National Trust for Historic Preservation
Navajo Nation Telecommunications Regulatory Commission (NNTRC)
Nebraska State Historic Preservation Office (NE SHPO)
New Jersey Historic Preservation Office (NJ HPO)

New York State Historic Preservation Office (NY SHPO)
North American Submarine Cable Association (NASCA)
Organized Village of Kassan (OVK)
Paul D'Ari
Pit River Tribe
Power & Communication Contractors Association (PCCA)
Public Employees for Environmental Responsibility (PEER)
Regulatory and Technology Committee of the Energy Telecommunications and Electrical Association (ENTELEC)
Rhode Island Historical Preservation and Heritage Commission - Rhode Island State Historic Preservation Office (RIHPHC)
Royal Astronomical Society (RAS)
AST & Science, LLC et al. (Satellite Operators)
Theodora Scarato September 8, 2025
Theodora Scarato September 16, 2025
Saskia C Vaughan DDS MAGD
Secure World Foundation (SWF)
Sisseton Wahpeton Oyate Tribal Historic Preservation Officer Diane Desrosiers (Sisseton Wahpeton Oyate)
Space Exploration Holdings, LLC (SpaceX)
Standing Rock Sioux Tribe
T-Mobile USA, Inc. (T-Mobile)
TechFreedom
TZ Sawyer Technical Consultants (TZSTC)
U.S. Chamber of Commerce Coalition
U.S. Small Business Administration Office of Advocacy
Utilities Technology Council (UTC)
Virginia Department of Historic Resources (VA DHR)
Viasat, Inc.
Wired Broadband, Inc., et al. (Wired Broadband)
Wireless Infrastructure Association (WIA)
Wisconsin State Historic Preservation Office (WI SHPO)
WISPA—The Association for Broadband Without Boundaries (WISPA)

**Reply Commenters:**

AT&T Services, Inc. (AT&T)
Catherine Kleiber, Dan Kleiber, Gilbert Kleiber, Ezra Kleiber
Central Council of the Tlingit & Haida Indian Tribes of Alaska (Tlingit & Haida Tribes)
Chickasaw Nation
CTIA
Environmental Health Sciences (EHS)
International Astronomical Union (IAU)
National Association of Tribal Historic Preservation Officers and National Congress of American Indians (NATHPO & NCAI)
National Trust for Historic Preservation
Oglala Sioux Tribe
AST & Science, LLC et al. (Satellite Operators)
Society for American Archaeology and Society for Historical Archaeology (SAA & SHA)
Space Exploration Holdings, LLC (SpaceX)
United South and Eastern Tribes Sovereignty Protection Fund (USET SPF)
Verizon
Crown Castle Fiber LLC (Crown Castle)

Washington Department of Archaeology and Historic Preservation—Washington State Historic Preservation Office (WA SHPO)
Wired Broadband, Inc. et al.
Wireless Infrastructure Association (WIA)
WISPA—The Association for Broadband Without Boundaries (WISPA)

***Ex Parte* Commenters:**

Mille Lacs Band of Ojibwe (11/21/2025)
Environmental Health Trust (12/2/2025)
Organized Village of Kasaan (1/12/2026)
Susan Foster Rocky Mountains for Safe Technology (1/20/2026)
CTIA (7/30/2025, 1/22/2026, 9/21/2026 & 9/23/2026)
Wireless Infrastructure Association (WIA) (1/23/2026 & 9/23/2026)
International Commission on the Biological Effects of Electromagnetic Fields, Elizabeth Kelley (5/14/2026)
Children's Health Defense (5/28/2026)
Ohio Broadband & Technology Association (9/23/2026)

## APPENDIX E

## Regulatory Impact Analysis

### Modernizing the Commission's National Environmental Policy Act Rules
### Report and Order

### A. Need for Regulatory Action

1. This Report and Order, if adopted, would implement revisions to the National Environmental Policy Act (NEPA) enacted in the Fiscal Responsibility Act of 2023 and take additional steps to streamline the Commission's NEPA procedures. The Order would find that spectrum authorizations issued by the Commission do not constitute Major Federal Actions (MFAs) or give rise to MFAs subject to environmental review requirements under NEPA. In particular, the Order would find that deployments of facilities in connection with geographic area spectrum licenses, site-based spectrum licenses, unlicensed or licensed-by-rule wireless services, and satellite earth stations do not qualify as MFAs to the extent the deployments do not require antenna structure registration. The Order would also find that Commission licensed space-based operations and activities are not MFAs. The Order would further find that the Commission's Antenna Structure Registration (ASR) process, which applies to towers over 200 feet tall or infrastructure that may otherwise interfere with the flight path of a nearby airport or helipad and which prescribes specific lighting and marking requirements for those towers, continues to be subject to NEPA.

2. This regulatory impact analysis is submitted to the Office of Information and Regulatory Affairs (OIRA) for interagency review. Consistent with Executive Order 12866, this analysis presents an assessment of the costs and benefits, including regulatory compliance costs, associated with the proposals in this notice. We conclude that the rules being proposed will result in significant benefits and cost savings without substantial harms or costs. We also tentatively conclude that the actions being proposed are deregulatory under Executive Order 14192.

### B. Benefits

3. We find that the rules being adopted will increase economic welfare by reducing costs for wireless licensees related to the updating of the Commission's NEPA procedures. We measure the welfare gain each year between 2026 and 2030 by estimating the reduction in costs related to: 1) licensees no longer needing to conduct NEPA assessments in the review process for infrastructure construction; 2) licensees no longer needing to conduct environmental assessments (EAs) in the review process for infrastructure construction; and 3) the streamlining of applications for infrastructure requiring ASR.

4. To estimate the cost savings from eliminating NEPA assessments for infrastructure construction not subject to ASR, we begin by estimating the percentage of antenna structures subject to ASR. The Commission does not maintain a database of all cell towers constructed in the United States, and the industry does not appear to keep a count of all towers either. However, the Wireless Infrastructure Association (WIA) tracks information on both macrocell sites and small cell sites. According to WIA, macrocell sites house multiple antennas and radios, can be mounted on rooftops or masts but the majority are mounted on towers, and "are designed to provide coverage over large geographic areas, often spanning many miles."[1] We find macrocell sites to be the closest analog to antenna structures for purposes of this analysis and we, therefore, rely on reporting by WIA to estimate the number of macrocell sites constructed between 2023 and 2025 to estimate cost savings resulting from changes to the NEPA process whenever we lack data to count towers specifically.[2] WIA's annual Infrastructure By the

[1] WIA, *Wireless Infrastructure by the Numbers: 2024 Key Industry Statistics* at 7 (May 7, 2025), available at https://wia.org/wireless-infrastructure-by-the-numbers-2024/

[2] *See* WIA, *Wireless Infrastructure by the Numbers: 2022 Key Industry Statistics*, available at https://8967849.fs1.hubspotusercontent-

(continued….)

Numbers surveys indicate that from 2023 to 2025, a total of 45,350 new macrocell sites were constructed, for an average rate of 15,117 new sites per year.[3] The Commission's ASR database reflects that in 2023, 2024, and 2025, 1,660, 1,898, and 2,006 new ASR registered projects were constructed, respectively, for an average of 1,885 new ASR registered projects per year. Using these averages, we calculate that approximately 12.27% of new macrocell sites will be subject to ASR registration and 87.73% of new macrocell sites will not be subject to ASR registration. Therefore, we estimate that, under the rules adopted in this *Order*, roughly 13,262 macrocell sites per year will no longer be subject to NEPA.

5. We next consider the number of small cell deployments not subject to ASR.[4] Based on industry reports, small cell deployments remained relatively flat from 2023 to 2025 but are "expected to increase in the coming years as the industry moves to densify networks."[5] According to WIA, this is "due to the pandemic and shifting mobile data demands."[6] Between 2023 and 2025, the total number of small cell sites increased by 4,852, for an average annual gain of 1,617 small cell sites or 3,784 small cell nodes.[7]

6. We next use survey data of "major CTIA member mobile wireless providers" to obtain estimated costs for NEPA assessments in 2025.[8] The survey responses reveal that NEPA assessment costs generally range from $100 to $5,500, with an industry reported average cost of $2,374 per installation.[9] We choose to use the $2,374 estimate for our estimate of macrocell site NEPA assessment costs because it is based on the most recently published data available. Because macrocell site construction involves more

(Continued from previous page)
na1.net/hubfs/8967849/WIA/Whitepapers%20+%20Reports/Wireless%20Infrastructure%20By%20The%20Numbers%202022/WIA_WP_MobileConnectivity23.pdf; WIA, *Wireless Infrastructure by the Numbers: 2023 Key Industry Statistics*, available at https://8967849.fs1.hubspotusercontent-na1.net/hubfs/8967849/WIA/Whitepapers%2C%20Reports%2C%20Briefs/Wireless%20Infrastructure%20By%20The%20Numbers%202023/WIA_WP_MobileConnectivity24.pdf; WIA, *Wireless Infrastructure by the Numbers: 2024 Key Industry Statistics* (May 7, 2025); WIA, *Wireless Infrastructure by the Numbers: 2025 Key Industry Statistics* (Mar. 18, 2026), available at https://wia.org/wireless-infrastructure-by-the-numbers-2025-key-statistics/.

[3] WIA reflects 35,300 new macrocell sites in 2023, 3,250 in 2024, and 6,800 in 2025. *See* WIA, *Wireless Infrastructure by the Numbers: 2023* to WIA, *Wireless Infrastructure by the Numbers: 2025*. Although the 2023 number reflects a statistical outlier compared to 2024 and 2025, it is in line with changes in the total number of cell sites in operation from 2020 to 2025 as reported by both WIA and CTIA as well as changes in total macrocell sites as reported by WIA 2023–2025. Therefore, we assume the number is accurate.

[4] *Id.*

[5] 2025 WIA report at 8. For example, WIA reports that in 2025 there were 198,100 outdoor small cell sites, and 462,750 small cell nodes. *See id.* at 2, 8. The NERA Study (survey data collected by "major member mobile wireless providers") estimates that by 2030 there will be 417,721 outdoor small cell sites, which would equate to 977,467 small cell nodes if we apply WIA's assumption of 2.34 nodes per site. *See* Quantifying the Opportunity of Reforming the Federal Communications Commission's National Environmental Policy Act and National Historical Preservation Act Rules, WT Docket No. 25-217, 3, fn. 4, and at 9 (filed Jan. 22, 2026), https://www.fcc.gov/ecfs/document/10122774520255/1 (NERA Study).

[6] WIA, *Wireless Infrastructure by the Numbers: 2025 Key Industry Statistics* at 8.

[7] *See* WIA, *Wireless Infrastructure by the Numbers: 2022 Key Industry Statistics* at 2; WIA, *Wireless Infrastructure by the Numbers: 2023 Key Industry Statistics* at 2, 8; WIA, *Wireless Infrastructure by the Numbers: 2024 Key Industry Statistics* at 2, 8; WIA, *Wireless Infrastructure by the Numbers: 2025 Key Industry Statistics* at 2, 8. Note that in its 2022 report, WIA reports small cell nodes in its top line numbers, and from 2023 through 2025 it reports small cell sites in its top line numbers, although it provides the number of small cell nodes within the body text.

[8] Quantifying the Opportunity of Reforming the Federal Communications Commission's National Environmental Policy Act and National Historical Preservation Act Rules, WT Docket No. 25-217, at 8 & 10 (filed Jan. 22, 2026), https://www.fcc.gov/ecfs/document/10122774520255/1 (NERA Study).

[9] NERA Study at 10.

environmental considerations than small cell site construction and environmental reviews for small cells are often more streamlined and can be categorically excluded in many cases, we choose $500 as our estimate of small cell site NEPA assessment costs. We calculate that approximately 13,262 macrocell sites per year would no longer be subject to NEPA, saving $31.5 million per year when applying 2025 NEPA assessment costs. We calculate that approximately 1,617 small cell sites per year would no longer be subject to NEPA, saving $808,500 per year. This would reflect a total savings for both macrocell sites and small cells sites of $32.2 million annually.

7. To estimate future cost savings, we assume the average number of wireless deployments constructed and the number subject to ASR remain the same, then adjust the NEPA assessment cost estimates for inflation, using projections from the Federal Reserve, assuming a 3.6% increase in 2026, a 2.3% increase in 2027, and 2.0% increase for 2028, 2029, and 2030.[10] We treat the present value of the savings associated with avoided NEPA assessments as a public benefit. We estimate the present value of the avoided NEPA assessments is approximately $163.9 million at a 3% discount rate or $152.2 million at a 7% discount rate.[11] These numbers reflect a conservative estimate, as evidence from WIA, NERA, and the Commission's ASR database suggest the rate of macrocell site construction is accelerating, as well as industry projections that small cell deployments will accelerate in the future as the industry pursues greater 5G densification.[12]

8. To estimate the cost savings related to eliminating EAs for facilities constructed pursuant to spectrum licenses and not subject to ASR,[13] we determine the percentage of wireless deployments requiring an EA that are not otherwise subject to ASR registration. Our records indicate that in the years 2023, 2024, and 2025, 116 towers triggered the need to produce an EA, which averages to 38.67 towers per year. Out of the 116 towers that triggered a need for an EA between 2023 and 2025, 21 towers, or 7 towers per year, did not meet the criteria for mandatory ASR registration (because they were either less than 200 feet in height or did not require notice to the FAA due to physical obstruction). Therefore, we assume that 18% of EAs are for towers that do not require ASR registration. Next, we obtain estimates for EA costs from NERA's survey of CTIA member mobile wireless providers, which shows a wide range of EA costs from $5,000 to $50,000, with an average cost of $15,500 per installation.[14] For our calculations we use the average of $15,500 as our estimate for tower EA costs. We then adjust the EA costs for inflation using projections from the Federal Reserve.[15] Assuming 7 towers per year no longer need to produce an EA, that reflects an annual savings of $108,500. Projecting the cost savings forward for 2026–2030, we estimate the present value of the avoided EAs is approximately $552,513 at a 3% discount rate or $513,007 at a 7% discount rate.

9. We next estimate the cost savings from streamlining NEPA review through changes such as adopting page and time limits for EAs and EISs, codifying time limits for staff review of EAs, imposing page limits on third party complaints and timelines for staff reviews of complaints, and allowing

---

[10] We note that our NEPA assessment cost estimates are drawn from 2025 data, thus we apply 2026 inflation rate when calculating 2026 cost savings. Federal Reserve, *June 17, 2026: FOMC Projections materials, accessible version* (June 17, 2026), https://www.federalreserve.gov/monetarypolicy/fomcprojtabl20260617.htm.

[11] Given a discount rate and year value $V_i$, we calculate a producer surplus present value of five years as $\sum_{i=2026}^{2030} \frac{V_i}{(1+r)^{i-2025}}$. As the equation suggests, we use 2026 as our base year for our present value calculations.

[12] *See, e.g.*, NERA Study at 9 and the WIA, *Wireless Infrastructure by the Numbers* studies 2023–2025.

[13] An EA is a document that provides evidence for determining whether the project has a significant impact on the environment.

[14] NERA Study at 10.

[15] Federal Reserve, *June 17, 2026: FOMC Projections materials, accessible version* (June 17, 2026), https://www.federalreserve.gov/monetarypolicy/fomcprojtabl20260617.htm.

shortened environmental review documents in emergencies.[16] These changes will reduce costs in two ways: applicants' costs will be reduced for infrastructure that is required to go through the Commission's ASR process, additionally costs associated with Commission staff review time will be reduced. We estimate these reductions will equate to a roughly a 20% reduction in NEPA and EA review costs due to streamlining the NEPA review process for infrastructure requiring ASR as required by this *Order*. We estimate the annual savings created by streamlining the review process for infrastructure requiring ASR registration to be $978,863.[17] Adjusted for inflation for the period 2026 to 2030, the present value of the savings is approximately $5.0 million at a 3% discount rate or $4.6 million at a 7% discount rate.

10. In total, we estimate the present value of the total cost savings from eliminating environmental review for infrastructure construction not subject to ASR and streamlining the NEPA review process for infrastructure subject to ASR registration is $169.5 million at a 3% discount rate or $157.4 million at a 7% discount rate. We note that our estimates of welfare gains are likely conservative because we lack information to estimate gains for consumers and producers related to the elimination of delays in deploying new cell sites. They are also conservative because they assume a flat rate of new infrastructure builds when the evidence suggests the rate of infrastructure builds is increasing. Consumers would experience gains due to network quality increases arriving more quickly and we would expect that licensees would not have to rely on less economically efficient network solutions in the short run.

### C. Costs

11. We do not anticipate any substantial harms or costs will be created by the changes in the Commission's NEPA procedures.

### D. Alternative Policies

12. Alternatively, the Commission could choose to retain the current NEPA review process. This would result in no benefits or costs, with no net effect.

### E. Justification Determination

13. Given that the estimated present value of the increased economic welfare created by the Commission's streamlining of the NEPA review procedures for 2026–2030 is $169.5 million at a 3% discount rate or $157.4 million at a 7% discount rate, and that we do not anticipate any significant costs or harms, we find the Report and Order to have substantial net positive benefits relative to the status quo.

---

[16] NEPA Report and Order at 61–71, paras. 155–181.

[17] We reach this number by first taking the sum of the number of towers subject to ASR registration multiplied by the average NEPA review cost and the number of ASR towers requiring an EA multiplied by the average EA cost to calculate the total NEPA and EA assessment costs for towers subject to ASR registration (approximately $4.9 million). We then multiply this total by 20% to find our estimated cost savings of $978,863 per year.

**STATEMENT OF**
**CHAIRMAN BRENDAN CARR**

Re: *Modernizing the Commission's National Environmental Policy Act Rules*, WT Docket No. 25-217, Report and Order and Further Notice of Proposed Rulemaking (September 30, 2026).

Unleashing infrastructure builds through permitting reform is a central pillar of the FCC's Build America agenda. After all, cutting through red tape means faster builds, more choice for consumers, and greater competition in communities across the country.

We know that this playbook works. During President Trump's first term, the FCC's infrastructure reforms paved the way for America's leadership in 5G. But in the years that followed, FCC infrastructure reforms stalled out. And Americans paid the price through slower deployments and more expensive service. Just look at the FCC's NEPA environmental review process.

Consider one recent case in Arizona. A crew had to wait more than four years for NEPA clearance to build a 100-foot structure—not in any sort of sensitive area but on top of previously disturbed dirt near a gas station and public storage facility. In another case involving a monopole in North Carolina, NEPA was weaponized as part of a family feud. The whole saga ended up consuming nearly half a decade and burned through thousands of pages of pleadings, the submission of an environmental assessment along with multiple amendments, and even a consultation with the Fish & Wildlife Service. After it was all said and done, the FCC found that the tower would have no significant impact. No legitimate environmental interests were served in these cases. It was all just needless cost and needless delay in service of environmental larping.

Faced with these types of abuses, all three branches of the federal government have acted to rein in these wayward applications of NEPA. Specifically, Congress amended NEPA in 2023 to make it clear that the law's environmental procedures apply to major federal actions only. The legislation also codified something that was true from the start: NEPA was never intended to regulate private decisions made by private parties. The Supreme Court and President Trump followed suit by confirming that NEPA is a procedural law of limited application.

With today's action, we finish the job here at the FCC. We confirm that the FCC's NEPA regulations do not apply to private wireless infrastructure decisions made by private companies.

This one reform will make a big difference. Today's vote and related reforms are expected to save over $2 billion in compliance costs while zeroing out over $7 billion in economic harm over the next ten years. This means that our decision will likely eliminate evaluations for more than 14,800 wireless deployments—and this will translate into millions of dollars in savings each year from forgone environmental assessments and other paperwork requirements. Those savings will mean faster builds, too.

This decision is also a big deal for America's leadership in space. We make clear today that the FCC will not extend backwards-looking NEPA regulation to next-gen satellite constellations—whether orbital datacenters or D2D systems. This clarification means that our nation's innovators can continue to build without the unpredictable specter of activist lawsuits or last-minute surprises. In the end, by eliminating uncertainty and delays, providers can accelerate the deployment of network solutions, allowing consumers to enjoy improved service quality sooner.

For their great work on this Build America win, I want to extend my thanks to Jeff Bartlett, Deborah Broderson, Jennifer Flynn, Garnet Hanly, Thomas Hastings, Kari Hicks, Allison Jones, Karl Kensinger, Robert Krinsky, John Lockwood, Jennifer Salhus, and Anjali Singh.

**STATEMENT OF**
**COMMISSIONER ANNA GOMEZ**

Re: *Modernizing the Commission's National Environmental Policy Act Rules,* WT Docket No. 25-217, Report and Order and Further Notice of Proposed Rulemaking (September 30, 2026).

In updating the National Environmental Policy Act of 1969 (NEPA), Congress reaffirmed the statute's purpose of promoting efforts which will prevent or eliminate damage to the environment and stimulate health and welfare.[718] NEPA exists in part to ensure that while we continue to build wireless infrastructure that provides boundless opportunities for the future, we also leave our ecosystems and natural resources intact for the next generation. In this new age of rapid advancement and continuous deployment of new technologies, these protections remain as important as ever.

I strongly support efforts to streamline environmental review requirements to ensure that infrastructure deployment can occur in a timely manner. At the same time, we must honor the purpose of the statute that Congress has tasked us with implementing.

In this item, the Commission establishes new standards for what constitutes a "Major Federal Action" (MFA) at the FCC. In doing so, it carves out many of the projects the Commission authorizes by virtue of spectrum licensing. While the need for streamlining review processes is clear, we cannot abdicate our responsibility with regard to our licensees. Because I believe our proposed NEPA rules allow our interpretation of MFAs to swallow the rule, I dissent with regard to the Report and Order.

I look forward to seeing how the record develops in our historic preservation Further Notice of Proposed Rulemaking (FNPRM). In passing the National Historic Preservation Act, Congress made clear that it was "necessary and appropriate for the Federal Government to accelerate its historic preservation programs and activities."[719] Decades later, this goal is no less important. As we examine potential changes to our rules, we must continue to be cognizant of our trust responsibility to Tribal Nations and to maintain our relationship with them. I encourage parties to comment on how the Commission's rules can be improved to streamline deployment while preserving our shared history. For this reason, I approve with regard to the FNPRM.

Thank you to the Wireless Telecommunications Bureau for your work on this item.

[718] 42 U.S.C. § 4321.

[719] 54 U.S.C. § 300101.

**STATEMENT OF**
**COMMISSIONER OLIVIA TRUSTY**

Re: *Modernizing the Commission's National Environmental Policy Act Rules,* Report and Order and Further Notice of Proposed Rulemaking, WT Docket No. 25-217 (September 30, 2026).

For too long, the Commission's approach to its implementation of the National Environmental Policy Act has not kept pace with the communications technologies and infrastructure Americans rely upon every day. Although well-intentioned, existing environmental rules are onerous and outdated. NEPA compliance ultimately translates into higher broadband deployment costs, more expensive broadband services for consumers, and more unconnected Americans across the country.

The data speaks for itself. In some cases, environmental reviews have added as much as five years to the completion timeline for a broadband build.[720] And over the next decade, environmental reviews are projected to contribute to $2.2 billion in additional deployment costs for wireless providers.[721]

These excessive costs and delays affect real people. In Mississippi, it means that patients cannot readily connect with their doctor for a telehealth appointment. In Kansas, it means that a mother cannot start a business from home while caring for her children. And in New Mexico, it means that a student cannot easily access distance learning tools throughout the school year.

We also know that the impact of these rules extends beyond the connectivity needs of local towns and communities. As President Trump recognized in one of his first executive orders of his second term, NEPA rules have a direct tie to the nation's broader economic, technology leadership, and national security goals.

And so, I welcome today's Report and Order to streamline and update the Commission's approach to NEPA implementation. Through several reforms, we are removing a significant regulatory barrier to infrastructure investment that will help connect more Americans, promote the deployment of 5G services, and lay the groundwork for U.S. leadership in 6G. Today's action will also help to increase broadband affordability, and ensure that broadband providers can strengthen the communications capabilities of first responders and nearby military installations without having to navigate unnecessary red tape.

Importantly, this item also takes the step of clarifying that extraterrestrial space operations are not subject to NEPA. In taking this approach, we avoid constraining American innovation, commerce, and U.S. leadership in space by applying NEPA's terrestrial regulatory regime to this orbital domain. To be clear, this clarification does not create a regulatory vacuum for space operations or diminish U.S. treaty obligations. Indeed, U.S.-licensed operators remain subject to requirements addressing orbital debris and space safety where, among other things, collision mitigation and congestion issues can be addressed.

Fundamentally, the practical result of today's action is more time and resources for building and improving networks. Providers can put money otherwise spent on compliance toward faster upgrades and denser coverage, improving service for consumers.

And finally, through the Further Notice, we will examine our framework for implementing the National Historic Preservation Act as part of our continuing work to make infrastructure deployment more efficient.

I thank the Wireless Bureau for its hard work on this important item.

---

[720] NERA, Quantifying the Opportunity of Reforming the Federal Communications Commission's National Environmental Policy Act and National Historical Preservation Act Rules at 12 (2026), https://api.ctia.org/wp-content/uploads/2026/01/Dippon_NEPA_NHPA_Reform_Final.pdf.

[721] *Id.* at 11.